## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| DEKA INVESTMENT GMBH and CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>SANTANDER CONSUMER USA HOLDINGS INC., THOMAS G. DUNDON, JASON KULAS, JUAN CARLOS ALVAREZ, ROMAN BLANCO, GONZALO DE LAS HERAS, STEPHEN A. FERRISS, MATTHEW KABAKER, TAGAR OLSON, ALBERTO SANCHEZ, JAVIER SAN FELIX, JUAN ANDRES YANES, DANIEL ZILBERMAN, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK SECURITIES INC., SANTANDER INVESTMENT SECURITIES INC., BARCLAYS CAPITAL INC., GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. LLC, RBC CAPITAL MARKETS, LLC, BMO CAPITAL MARKETS CORP., CREDIT SUISSE SECURITIES (USA) LLC, UBS SECURITIES LLC, WELLS FARGO SECURITIES, LLC, KKR CAPITAL MARKETS LLC, SANDLER O'NEILL & PARTNERS, L.P., STEPHENS INC., AND LOYAL3 SECURITIES, INC.,<br><br>*Defendants*. | Case No.: 3:15-CV-2129-K<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>Hon. Ed Kinkeade |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION.................................................................................................. 3

II.   NATURE OF THE ACTION................................................................................ 10

III.  JURISDICTION AND VENUE........................................................................... 11

IV.   PARTIES.............................................................................................................. 12

      A. Lead Plaintiffs ............................................................................................. 12

      B. The Corporate Defendant ............................................................................ 13

      C. The Individual Defendants ........................................................................... 15

      D. The Underwriter Defendants ........................................................................ 21

            V.   BACKGROUND FACTS RELATING TO THE DIVIDEND AND
      COMPLIANCE MISSTATEMENTS ................................................................... 24

      A. The Federal Reserve Adopts And Implements "Capital Plan"
         Requirements............................................................................................... 24

      B. SCUSA's Board Enterprise Risk Committee Is Established Prior
         To The IPO And Has Responsibilities Related To The CCAR
         Process And SHUSA's Stress Testing .................................................... 26

      C. Prior To SCUSA's IPO, Numerous Bank Holding Companies,
         Including The Parent Companies Of Certain Underwriter
         Defendants, Made Disclosures About Dividend Restrictions
         Attributable To The CCAR Process In Their Publicly-Available
         SEC Filings................................................................................................. 28

      D. Regulation S-K, Item 201(c) Affirmatively Required Disclosure
         Of The Dividend Restrictions...................................................................... 31

      E. Regulation S-K, Item 503(c) Affirmatively Required Disclosure
         Of The Dividend Restrictions Because It Was One Of The Most
         Significant Factors That Made The IPO Risky ........................................... 31

      F. Summary Of The Facts Defendants Knew Or Should Have
         Known Prior To The IPO And IPO Roadshows ......................................... 32

      G. SCUSA Touts Dividends And Its Supposedly Extensive
         Compliance And Risk Management During Its Roadshow
         Presentations Prior To The IPO................................................................... 33

      H. The Offering Documents Tout Dividends And SCUSA's
         Supposedly Extensive Compliance And Risk Management,
         But There Is No Disclosure About The Dividend Restrictions
         Or Compliance Issues.................................................................................. 35

      I. After The IPO, SCUSA's Form 10-K Repeats The Intention To Pay
         Dividends Without Disclosing Dividend Restrictions Attributable
         To The CCAR Process ................................................................................ 38

      J. The Federal Reserve Objects To SHUSA's Capital Plan........................... 40

K. Despite The Failed Stress Test By SHUSA, SCUSA Announces Payment Of A Dividend During An Earnings Conference Call ............................ 41

L. A Risk Factor About The Federal Reserve's Power To Restrict Dividends Is Belatedly Added To SCUSA's Form 10-Q ...................................... 43

M. SCUSA Files A Form 8-K Attaching An Investor Presentation That Emphasizes SCUSA's Supposedly Established Compliance Program And Says Nothing About Compliance Issues .......................................... 45

N. SCUSA's Shares Drop More Than 4% After SCUSA Announces That It Will No Longer Pay Dividends And Expects Higher Compliance Costs ........................................................................................... 46

O. SCUSA's Shares Drop More Than 8% After SCUSA Reveals Its Compliance Processes Were Never "Best In Class" And That SCUSA Had Been Unaware Of Regulatory Expectations Associated With The CCAR Process ...................................................... 48

P. SCUSA's Shares Drop Another 1.35% After SCUSA Reveals That It Must Hire 100 More Compliance Professionals Given SHUSA's Stress Test Failure ........................................................................ 50

Q. SCUSA Belatedly Adds The Dividend Restrictions As A Risk Factor To A Subsequent SCUSA IPO ................................................................. 52

R. SHUSA Settles The Federal Reserve's Enforcement Action Regarding The SCUSA Dividend .......................................................... 54

S. SHUSA Failed Its Second Stress Test .................................................. 55

VI. BACKGROUND FACTS RELATING TO OTHER IMPROPER PRACTICES ............................................................................................. 55

A. SCUSA's Violations Of California Repossession Laws ....................................... 58

B. SCUSA's Violations Of The TCPA And Analogous State Consumer Protection Laws ................................................................... 62

C. SCUSA's Violations Of The FDCPA And Corresponding State Laws ......................................................................................... 64

D. SCUSA's Violations Of The TILA And Corresponding State Laws ......................................................................................... 66

E. SCUSA's Violations Of The FCRA And Analogous State Laws ......................................................................................... 67

F. SCUSA's Violations Of The SCRA ..................................................... 70

G. SCUSA Discloses The Necessity For Increased Compliance ................................ 73

VII. THE SECURITIES ACT CLAIMS ............................................................ 74

A. Class Action Allegations Related To The Securities Act Claim ............................ 74

B. The Inapplicability Of The Statutory Safe Harbor And Bespeaks Caution Doctrine As To The Securities Act Claims .............................. 76

C. False Or Misleading Statements Related To The Securities Act Claims ...................................................................................... 77

D. The Securities Act Defendants' Strict Liability Or Negligence ........................... 81

    1.   The Individual Defendants' Negligence ......................................... 82

    2.   The Underwriter Defendants' Negligence .................................... 86

VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ....................................... 89

    FIRST CLAIM UNDER THE SECURITIES ACT
Violation Of Section 11 Of The Securities Act
(Against SCUSA, The Individual Defendants
And The Underwriter Defendants) ......................................................................... 89

    SECOND CLAIM UNDER THE SECURITIES ACT
Violation Of Section 12(a)(2) Of The Securities Act
(Against SCUSA, The Individual Defendants And The
Underwriter Defendants) ....................................................................................... 91

    THIRD CLAIM UNDER THE SECURITIES ACT
Violation Of Section 15 Of The Securities Act
(Against the Individual Defendants) ...................................................................... 95

IX. THE EXCHANGE ACT CLAIMS ................................................................................ 97

    A. Class Action Allegations Related To The Exchange Act Claims ......................... 97

    B. The Section 10(b) Defendants' Fraudulent Scheme .............................................. 99

    C. Pre-Class Period False Or Misleading Statements .............................................. 110

    D. Class Period False Or Misleading Statements ..................................................... 112

    E. Additional Allegations Of Scienter ..................................................................... 117

        1.   The Section 10(b) Defendants Admitted They Were
Subject To Federal Reserve Oversight ........................................ 117

        2.   The Board Enterprise Risk Committee ......................................... 117

        3.   Motive And Opportunity ............................................................... 118

    F. Loss Causation ..................................................................................................... 121

    G. Inapplicability Of The Statutory Safe Harbor Relating To The
Exchange Act Claims ........................................................................................... 123

    H. Presumption Of Reliance ...................................................................................... 124

X.  CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ........................................... 126

    FIRST CLAIM UNDER THE EXCHANGE ACT
Violation Of Section 10(b) Of The Exchange Act
(Against Defendants SCUSA, Dundon And Kulas) ............................................. 126

    SECOND CLAIM UNDER THE EXCHANGE ACT
Violation Of Section 20(a) Of The Exchange Act
(Against Defendants Dundon And Kulas) ............................................................ 127

XI.  PRAYER FOR RELIEF ................................................................................................ 129

XII. JURY TRIAL DEMANDED ........................................................................................ 130

1.     Court-appointed Lead Plaintiffs Deka Investment GmbH ("Deka") and City of Dearborn Heights Act 345 Police & Fire Retirement System ("Dearborn Police & Fire" and collectively with Deka, "Lead Plaintiffs") bring this action individually and on behalf of all persons and entities similarly situated pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1, *et seq.*, and 15 U.S.C. §78u-4, *et seq.*, for violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") against Santander Consumer USA Holdings Inc. ("SCUSA" or the "Company"), certain of its officers and directors, and the underwriters of SCUSA's Initial Public Offering ("IPO"), as well as for violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) promulgated thereunder against SCUSA and certain SCUSA officers, and for violations of Section 20(a) of the Exchange Act against certain controlling officers of SCUSA.

2.     Lead Plaintiffs allege the following based on personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on, *inter alia*, the independent investigation of Court-appointed Co-Lead Counsel, Grant & Eisenhofer P.A. and Robbins Geller Rudman & Dowd LLP, and Local Counsel, Kendall Law Group LLP, and/or third parties they have retained to assist in their investigation.  This investigation included, but was not limited to: (a) review and analysis of (i) public filings with the U.S. Securities and Exchange Commission ("SEC") by defendant SCUSA, (ii) research reports by securities and financial analysts, (iii) transcripts of investor conference calls, (iv) publicly available presentations by SCUSA, (v) press releases and media reports, (vi) economic analyses of securities movement and pricing data, (vii) publicly available filings by regulators, (viii) the initial class action complaint in this action filed, prior to transfer of this action to this Court, in the United States District Court for the Southern District of

New York on August 26, 2014 styled *Richard Steck v. Santander Consumer USA Holdings, Inc., et al.*, No. 14-cv-6942, alleging, *inter alia*, violations of Sections 11 and 15 of the Securities Act, and (ix) other publicly available material and data identified herein; and (b) consultation with relevant experts.

3.       Co-Lead Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only to the Defendants named herein, or are exclusively within their custody or control.   Co-Lead Counsel believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       INTRODUCTION

4.       This case is about fundamental expectations every investor in a public company has – dividend payments and compliance.  The expectations regarding dividends are so important to the integrity of the securities markets that SEC regulations affirmatively require companies to disclose current restrictions on their ability to pay dividends and restrictions that they reasonably believe are likely to limit future dividends.  SCUSA — the corporate issuer Defendant in this case — repeatedly flouted that requirement and in so doing violated the federal securities laws. SCUSA also repeatedly claimed that it had the systems in place to effectively monitor and ensure compliance with regulations and laws governing its lending business when those systems were, in fact, materially deficient, and affirmatively stated it was in compliance with such laws when, in reality, SCUSA was not.

5.       SCUSA is a multi-billion company engaged in subprime auto lending to consumers.  Its stock currently trades on the New York Stock Exchange ("NYSE").  In January 2014, SCUSA was preparing for a multi-billion dollar IPO of its common stock, which was completed on January 23, 2014.  During the IPO roadshows, SCUSA enticed investors with

promises of a payout of 30% of its annual earnings in the form of dividends, and in the IPO Offering Documents (as defined below) stated that it intends to pay dividends on a quarterly basis at an initial amount of $0.15 per share.  But investors were misled.

6.     SCUSA failed to disclose that there were already existing, and likely additional future, restrictions on its ability to pay dividends.  These restrictions made the promise of a 30% dividend payout virtually impossible to achieve.  The restrictions were attributable to SCUSA's relationship with Santander Holdings USA, Inc. ("SHUSA"), a large bank holding company with more than $50 billion in assets that is subject to oversight by the Federal Reserve.  During the relevant time.  SHUSA: (a) owned more than 60% of SCUSA's shares; (b) consolidated SCUSA's financial results with SHUSA's results; (c) controlled SCUSA by virtue of its majority ownership as well as a shareholders' agreement with other large SCUSA shareholders; (d) placed eight directors and/or officers of SHUSA or SHUSA's parent company on SCUSA's eleven-person board of directors; and (e) controlled SCUSA's ability to declare and pay dividends.  As a result of this relationship with SHUSA, SCUSA was a controlled subsidiary of SHUSA for bank regulatory purposes and was itself subject to regulatory oversight by the Federal Reserve.

7.     Federal regulations promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act required that SHUSA, as a $50 billion bank holding company, submit a capital plan to the Federal Reserve detailing, among other things, intended capital distributions, including payment of dividends, compliance and risk management procedures and SHUSA's financial reactions to various "stress test" scenarios (*e.g.*, hypothetical downturns in economic conditions).  A main purpose of the regulatory scheme was to establish prior notice and approval requirements for capital distributions, such as dividends, by bank holding companies to help restore financial health and safety to the country's banking system.

8.      Since SCUSA was a consolidated and controlled subsidiary of SHUSA, SCUSA's inclusion in SHUSA's stress tests and capital plans was required.  The capital plan and stress test were required to be, and were, filed with the Federal Reserve on January 6, 2014, prior to SCUSA's January 23, 2014 IPO.  The regulations provided that the Federal Reserve would examine the capital plan and report whether SHUSA passed the "stress test" no later than March 31, 2014.  Until that time, no unauthorized capital distributions, including dividends, were to be paid.  These regulations and the Federal Reserve's associated review process were known as the annual Comprehensive Capital Analysis and Review ("CCAR").

9.      Despite the CCAR regulatory scheme, SCUSA's IPO Offering Documents and "roadshow" presentations made no disclosure about the Federal Reserve's ability to restrict the payment of dividends, which, in and of itself, violated the federal securities laws because such restrictions were required to be affirmatively disclosed by SEC regulations.

10.     In addition to the failure to disclose the dividend restrictions, however, SCUSA misrepresented the strength of its compliance and risk management framework and the compliance and risk management framework it shared with SHUSA.  More specifically, SCUSA represented in roadshows prior to the IPO, in the IPO Offering Documents and in SEC filings thereafter that SCUSA's compliance and risk management framework were "extensive" and "comprehensive" and the result of "shared best practices in compliance and risk management" with SHUSA and its parent company — the giant Spanish banking conglomerate, Banco Santander S.A. ("Santander").  As SCUSA later was forced to admit, however, not only were SCUSA's compliance and risk management frameworks not "extensive" or "comprehensive" or the product of "shared best practices" with SHUSA and Santander prior to the IPO and thereafter, SCUSA was *not even aware* of the Federal Reserve's expectations for compliance

with the CCAR regulations that were applicable to companies that were—as SCUSA was—subject to Federal Reserve oversight.

11.     SCUSA's failure to make these required disclosures about the dividend restrictions and CCAR compliance inadequacies was particularly egregious since many other companies subject to the CCAR regulations (including the parent companies of numerous underwriters in SCUSA's IPO) had already been disclosing dividend restrictions applicable to CCAR in SEC filings that were publicly-available for more than a year prior to the IPO.  In addition, prior to the IPO, SCUSA had a committee of its board of directors that was supposedly dedicated to addressing SCUSA's compliance with the CCAR capital plan/"stress test" processes, but that committee either failed miserably in discharging its obligations or never undertook any meaningful actions at all.

12.     Defendants' disclosure violations got progressively worse after the IPO.  In its first-ever annual report as a public company, filed with the SEC in March 2014, SCUSA again failed to disclose the CCAR dividend restrictions, just as it had in the IPO.  Then, five days before the March 31, 2014 deadline by which the Federal Reserve was required to state whether SHUSA passed or failed its stress test, circumstances changed dramatically.

13.     On March 26, 2014, the Federal Reserve found that SHUSA failed its stress test and that compliance and risk management within the bank holding company framework was severely lacking.  According to the Federal Reserve's March 26, 2014 CCAR objection letter, it found "widespread and significant deficiencies across SHUSA's capital planning processes," including governance, risk management, management information systems and assumptions and analysis in SHUSA's capital planning processes.  It also specifically told SHUSA that it was not permitted to implement its plan for capital distributions, and was required to resubmit its capital

plan to correct the deficiencies.  At that point, it became crystal clear that SCUSA could not pay dividends without violating federal regulations.  Nevertheless, while SHUSA issued a press release on March 26, 2014 to its shareholders announcing the failed stress test, SCUSA remained silent.  It specifically refrained from informing SCUSA shareholders of the existence of the failed stress test, the consequences on SCUSA's ability to pay dividends, the drastic inadequacies in SCUSA's and SHUSA's "shared" compliance and risk management framework or the materially higher compliance costs that were necessary to bring SCUSA into compliance with, among other things, applicable CCAR regulations.  Instead of making these disclosures, on May 1, 2014, SCUSA repeated its statements about the Company's supposedly extensive and comprehensive compliance framework and supposedly shared best practices in compliance and risk management with SHUSA and Santander that it had falsely made in the IPO.  The Company also repeated its intention to pay a current quarterly dividend in May 2014 and, further, its intention to pay additional quarterly dividends such that SCUSA would pay dividends in the amount of 30% of its annual earnings.  SCUSA's dividend declaration was directly contrary to the Federal Reserve's earlier finding that SHUSA failed its stress test and express instruction that capital distributions were not permitted until SHUSA resubmitted its capital plan and passed the stress test.

14.     Eventually, in May and June 2014, SCUSA was forced to admit that it could not lawfully pay dividends and that the compliance and risk management framework it shared with SHUSA/Santander was severely inadequate.  As the truth was gradually revealed, SCUSA's stock price dropped substantially, on enormous volumes on the NYSE, from the $24 IPO price to as low as $18.99 during the relevant time period.  For example, on May 29, 2014, SCUSA announced that it would no longer be able to pay dividends and that it expected to incur higher

costs than originally anticipated in connection with CCAR and other compliance requirements. On this news, SCUSA's shares dropped 4.63% to $19.76 from the prior day's close of $20.72 on extremely high volume of more than 10 million shares traded.

15.     Then, ultimately, on June 11, 2014, SCUSA incredulously claimed that it had never even been aware of the expectations of the Federal Reserve with respect to SCUSA's involvement in the CCAR "stress test" process.  The words of its then-Chief Executive Officer ("CEO"), defendant Thomas Dundon, at a June 11, 2014 investor conference speak volumes about SCUSA's severely reckless, or intentional, disregard of the CCAR requirements. In response to analysts' probing questions, Dundon told investors that "*we were not aware of the expectations*" of the Federal Reserve respecting the CCAR process.  This level of, at a minimum, severe recklessness is even more distressing given that, since 2011, Dundon had been (like seven of his fellow SCUSA directors) a member of the board of directors of SHUSA, which was *directly* subject to Federal Reserve oversight.  On June 12, 2014, SCUSA further admitted that its compliance framework was so severely flawed (or non-existent) that SCUSA would have to hire 100 additional compliance professionals at $125,000 each for an annual cost of at least $12.5 million.  This additional compliance expense represented an increase between 5% and 8% of the salary and benefit expenses *for all employees in the entire Company*, not just compliance employees, over each of the previous three years.

16.     In another telling admission, SCUSA now recognizes its obligation to disclose the Federal Reserve's ability to prohibit or restrict dividend payments by SCUSA in prospectuses for stock offerings that have taken place since the January 23, 2014 IPO, and in its recently-filed financial statements.  In addition, in September, 2014, SHUSA entered into an agreement to settle an enforcement action by the Federal Reserve in which it admitted that the dividend

payments by SCUSA violated applicable regulations, and expressly agreed that SCUSA would not pay any dividends until SHUSA resubmitted its capital plan and passed the "stress test." SHUSA's and SCUSA's shared compliance and risk management framework was so inexorably flawed that SHUSA failed another stress test in early 2015, after resubmission of SHUSA's capital plan. Thus, SCUSA has not lawfully paid common stock dividends ever since the January 23, 2014 IPO.[1]

17.     The IPO Offering Documents also contained false or misleading statements about SCUSA's controls, processes and procedures related to other aspects of SCUSA's consumer finance business, and its compliance with laws and regulations. The Offering Documents acknowledged that SCUSA was required to comply with numerous federal consumer protection laws, including the Telephone Consumer Protection Act ("TCPA"), the Fair Debt Collection Practices Act ("FDCPA"), the Truth in Lending Act ("TILA"), the Fair Credit Reporting Act ("FCRA") and the Servicemembers Civil Relief Act ("SCRA"), and, acknowledged that SCUSA must comply with consumer protection laws in many states and local jurisdictions, including state laws analogous to the TCPA, FDCPA, FCRA and TILA.

18.     The Offering Documents then stated (emphasis added): (a) "We [i.e., SCUSA] *are in compliance* with state laws and regulations applicable to our lending operations in each state"; (b) "We [i.e., SCUSA] have made significant technology investments in our servicing systems *to ensure* that our servicing activities are in compliance with federal and local consumer lending rules in all 50 states;" (c) "Most of our servicing processes and quality-control measures also serve a dual purpose in that they both *ensure compliance with the appropriate regulatory*

---

[1] SCUSA paid the unauthorized May, 2014 dividend it had declared in violation of CCAR regulations, but, as explained further below, that was only because the Federal Reserve required Santander to infuse capital into SHUSA.

*laws* and ensure that we deliver the best possible customer service"; (d) SCUSA's "complaint tracking processes *ensure customer complaints are addressed appropriately* and that the customers receive status updates"; and (e) to manage its legal and compliance risk, SCUSA "maintain[ed] an *extensive* compliance, internal control and monitoring framework, which include[d]…ongoing compliance with all applicable regulations…."

19.     As explained in detail below, contrary to its representations:   (a) SCUSA repeatedly violated California and Massachusetts repossession laws; (b) SCUSA repeatedly violated the TCPA, FDCPA, TILA, FCRA and/or analogous state consumer protection laws; (c) SCUSA repeatedly violated the SCRA by illegally repossessing the cars of active duty U.S. military personnel; (d) SCUSA's complaint tracking processes did not ensure that customer complaints were addressed appropriately; (e) SCUSA's servicing systems, servicing processes and quality-control measures did not ensure compliance with applicable law; and (f) SCUSA's compliance framework with respect to not only CCAR (as discussed above), but also state and federal consumer protection laws, was severely inadequate.

## II.   NATURE OF THE ACTION

20.     The claims asserted herein are based on the foregoing facts, among others set forth below, and arise under the Securities Act and the Exchange Act.

21.     The Securities Act claims are brought by Lead Plaintiffs individually and, with certain narrow exceptions identified below, on behalf of all persons and entities who purchased or otherwise acquired the common stock of defendant SCUSA in or traceable to SCUSA's January 23, 2014 IPO, and were damaged thereby (collectively, the "Securities Act Class").

22.     The Securities Act claims are based solely on strict liability and negligence, and are not based on any reckless or intentionally fraudulent conduct by or on behalf of the Defendants (i.e., these claims do not allege, arise from, or sound in, fraud).  Lead Plaintiffs

specifically disclaim any allegation of fraud, scienter or recklessness in the non-fraud Securities Act claims.

23.     The Exchange Act claims are brought by Lead Plaintiffs individually and, with certain narrow exceptions identified below, on behalf of all persons and entities who, between January 23, 2014 (the date of the filing of SCUSA's final Form S-1/A for the IPO) and June 12, 2014 (the date of the last corrective disclosure) (inclusive the "Exchange Act Class Period"), purchased or otherwise acquired the securities of SCUSA, and were damaged thereby (collectively, the "Exchange Act Class").

## III.   JURISDICTION AND VENUE

24.     The Securities Act claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o.

25.     The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

27.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22(a) of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Defendant SCUSA maintains an office in this District.  Many of the acts and transactions that constitute violations of law complained of herein took place in this District.  Additionally, Defendants consented to litigation of this matter in this District by filing a motion to transfer venue to this District.

11

28.     In connection with the acts, transactions and conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications and the facilities of a national securities exchange.

## IV.   PARTIES

### A.     LEAD PLAINTIFFS

29.     Lead Plaintiff Deka is organized as a Kapitalverwaltungsgesellschaft ("KVG") under the laws of Germany.  Under the German investment law, a KVG makes investments in its own name for a third party – here, the investment funds managed by Deka for the benefit of others – and a KVG's investment power and legal ownership of the funds carries with it the right to bring legal claims, in its own name, to recover losses incurred by the funds for which the KVG makes investments.  Deka purchased 393,113 shares of SCUSA stock in or traceable to the IPO (from the date of the IPO on January 23, 2014 through August 26, 2014, the filing date of the initial complaint in this action), as set forth in the certification already on file with the Court and attached hereto as Exhibit A.  Deka also purchased shares of SCUSA stock at artificially inflated prices as set forth in Exhibit A during the Exchange Act Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.  On September 3, 2015, this Court appointed Deka as a Co-Lead Plaintiff for this litigation.

30.     Lead Plaintiff Dearborn Police & Fire is a pension fund that manages investments for the benefit of policemen and policewomen and firefighters in the City of Dearborn, Michigan.  Dearborn Police & Fire purchased 8,235 shares of SCUSA stock in or traceable to the IPO, as set forth in the certification already on file with the Court and attached hereto as Exhibit A, and suffered damages as a result of the violations of the federal securities laws alleged herein.  Dearborn Police & Fire also purchased shares of SCUSA stock during the Exchange Act Class

Period at artificially inflated prices as set forth in Exhibit A, and suffered damages as a result of violations of the federal securities laws alleged herein.   On September 3, 2015, this Court appointed Dearborn Police & Fire as a Co-Lead Plaintiff for this litigation.

### B. THE CORPORATE DEFENDANT

31.     Defendant SCUSA is a Delaware corporation with its principal executive offices located at 1601 Elm Street, Suite 800, Dallas, Texas 75201.  SCUSA is the holding company for SCUSA Illinois, and subsidiaries, a specialized consumer finance company focused on vehicle finance and unsecured consumer lending products.  The Company's primary business is the indirect origination of retail installment contracts principally through manufacturer-franchised dealers in connection with their sale of new and used vehicles to retail consumers.

32.     On or about January 23, 2014, SCUSA conducted its IPO, in which it issued 85,242,042 shares of common stock at a price of $24.00, for a total offering amount exceeding $2 billion.  The IPO was conducted pursuant to several documents that were filed with the SEC and disseminated to the investing public, including:  (a) the Form S-1 registration statement that SCUSA filed with the SEC on July 3, 2013 and repeatedly amended, until on or about January 22, 2014, when the Company filed with the SEC the final Form S-1/A (collectively, the "Registration Statement") for the IPO; and (b) the final prospectus dated January 22, 2014, which was filed with the SEC on or about January 24, 2014 on Form 424(b)(4) (the "Prospectus").  (The Registration Statement and Prospectus, together with all documents that were incorporated therein by reference, are sometimes referred to herein collectively as the "Offering Documents.")

33.     SCUSA's common stock actively trades on the NYSE under the ticker symbol "SC" and, according to the Company's Form 10-K filed with the SEC on March 6, 2014, as of February 28, 2014, there were 348,710,767 shares of common stock outstanding.

34.    Both prior to and after the IPO, the Company was owned more than 60% by SHUSA, a subsidiary of Santander.  SHUSA is a bank holding company, with $77 billion in total assets as of September 30, 2013, that was during all relevant times subject to oversight by the Federal Reserve Bank.   Santander is a foreign corporation operating in the banking and consumer finance industries and, as of September 30, 2013, the largest bank in the Eurozone by market capitalization.  SHUSA is, and was at all relevant times, both prior to and after the IPO, a controlling person of SCUSA and, in addition to many other incidences of the power to control SCUSA, SHUSA had the power to control whether SCUSA paid dividends to its shareholders. As stated in SCUSA's Form 10-K for the fiscal year ended December 31, 2013, filed with the SEC on March 6, 2014, as the owner of more than 60% of SCUSA's common stock, SHUSA:

> has significant influence over [SCUSA], including and pursuant to the terms of [a] Shareholders Agreement. Pursuant to the Shareholders Agreement, SHUSA has the right to nominate a majority of [SCUSA's] directors, provided certain minimum share ownership thresholds are maintained. Through [SCUSA's] board of directors, SHUSA controls [SCUSA's] policies and operations, including, among other things, the appointment of management, future issuances of [SCUSA] common stock or other securities, ***the payment of dividends***, if any, on [SCUSA] common stock, the incurrence of debt by [SCUSA], and the entering into of extraordinary transactions.   In addition, the Shareholders Agreement provides the directors nominated by SHUSA with approval rights over certain specific material actions taken by SCUSA, provided certain minimum share ownership thresholds are maintained. These material actions include changes in material accounting policies, changes in material tax policies or positions and changes in [SCUSA's] principal line of business.

SCUSA 2013 Form 10-K at 35 (emphasis added).

35.    Prior to the IPO, SHUSA owned 224,890,292 shares of SCUSA common stock, which represented ownership of 64.85% of the outstanding shares.  Via the underwriting process, SHUSA sold approximately 13,895,243 shares of SCUSA common stock in the IPO at $24 per share for proceeds of approximately $333.5 million.  After the IPO, SHUSA continued to own

approximately 210,995,049 shares of SCUSA common stock, which represented ownership of 60.74% of the outstanding shares.

36.     As a result of the IPO, SHUSA consolidated the financial results of SCUSA in SHUSA's financial statements.  SHUSA's Form 10-K for the year ended December 31, 2013, filed with the SEC on March 14, 2014 ("2013 SHUSA Form 10-K"), stated that the "consolidation of SCUSA's financial results with [SHUSA's] will result in a material increase in [SHUSA's] total assets.  Higher capital requirements resulting from an increase in [SHUSA's] assets could lead to a material decline in [SHUSA's] capital ratios.  If we cease to be 'well-capitalized,' it could result in increasing oversight and regulation or restrict [SHUSA's] ability to make capital distributions or sell or purchase assets." 2013 SHUSA Form 10-K at 30.  The 2013 SHUSA Form 10-K further stated that "SCUSA is also subject to regulatory oversight because the Federal Reserve considers SCUSA to be a controlled subsidiary of SHUSA for bank regulatory purposes."  *Id.* at 4 SHUSA also acknowledged in SEC filings that "[a]s a consolidated subsidiary of SHUSA, SCUSA is included in [SHUSA's] stress tests and capital plans."  SHUSA Form 10-Q for the quarter ended March 31, 2014, filed with the SEC on May 15, 2014, at 90.

37.     SCUSA is a defendant with respect to both the Securities Act claims and the Exchange Act claims.

### C.     THE INDIVIDUAL DEFENDANTS

38.     Defendant Thomas G. Dundon ("Dundon") was, at all relevant times, CEO and a director of SCUSA, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Dundon was also a management presenter and made statements concerning SCUSA's business in SCUSA's roadshow meetings with investors, through which the Company marketed its IPO to investors.  According to the Registration Statement, Dundon

had "approximately 20 year of experience in the consumer finance industry" and was fully committed to "the implementation of best practices in risk management, corporate governance, regulatory compliance, financial accountability and effective system control."   Because of his senior position within and control of the Company, Dundon possessed the power and authority to control the contents of the Registration Statement and Prospectus, SCUSA's press releases, investor and media presentations, and other SEC filings.   Dundon was also a director of SHUSA since December 2011.   According to the Prospectus, as a member of SCUSA's board of directors, Dundon received annual regulatory and compliance training. Prospectus at 77.   On July 2, 2015, SCUSA announced Dundon would be replaced immediately as Chairman and CEO of SCUSA but would continue to serve as a director and adviser.

39.   Prior to the IPO, Dundon was the beneficial owner of approximately 12.4% of SCUSA's shares. *Id.* at 133-34.

40.   Defendant Jason Kulas ("Kulas") was, at all relevant times, Chief Financial Officer ("CFO") of SCUSA, and signed or authorized the signing of the Company's Registration Statement filed with the SEC. Kulas was also a management presenter and made statements concerning SCUSA's business in SCUSA's roadshow meetings with investors, through which the Company marketed its IPO to investors.   According to the Registration Statement, Kulas "ha[d] approximately 18 years of experience in the financial services industry" and was fully committed to "the implementation of best practices in risk management, corporate governance, regulatory compliance, financial accountability and effective system control."   Because of his senior position within and control of the Company, Kulas possessed the power and authority to control the contents of the Registration Statement and Prospectus, SCUSA's press releases, investor and media presentations, and other SEC filings.   Prior to joining SCUSA, Kulas was an

investment banker at JP Morgan.  As SCUSA's CFO, Kulas oversaw SCUSA's capital markets and corporate strategy divisions, among others.  According to SCUSA's July 2, 2015 press release, since SCUSA's IPO, Kulas had overseen "various regulatory functions including the Comprehensive Capital Analysis and Review."

41.    Prior to the IPO, Kulas was the beneficial owner of 677,596 SCUSA shares. Prospectus at 133-34.

42.    Defendants Dundon and Kulas are defendants with respect to both the Securities Act claims and the Exchange Act claims.

43.    Defendant Juan Carlos Alvarez ("Alvarez")  was, at all relevant times, a director of SCUSA until April 29, 2014 when he resigned, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Alvarez was also, at all relevant times, CFO of SHUSA, a director of SHUSA, a member of SHUSA's Executive Management Committee and a director of SHUSA's wholly-owned banking subsidiary, Santander Bank, N.A. ("SBNA").  Alvarez was also, at all relevant times, Senior Executive Vice President of SBNA. *See id*. at 101-03.  According to the Prospectus, as a member of SCUSA's board of directors, Alvarez received annual regulatory and compliance training.  *Id.* at 77.

44.    Defendant Roman Blanco ("Blanco") was, at all relevant times, a director of SCUSA and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Blanco was also, at all relevant times, the Santander US Country Head, President and CFO of SHUSA, and a member of the SHUSA Executive Management Committee.  *See id.* at 101-03.  According to the Prospectus, as a member of SCUSA's board of directors, Blanco received annual regulatory and compliance training.  *Id.* at 77.

45.     Defendant Gonzalo de Las Heras ("de Las Heras") was, at all relevant times, a director and Honorary Chairman of SCUSA and a member of the Audit Committee, which had responsibility for, among other things, monitoring and assessing SCUSA's compliance with legal and regulatory requirements, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  de Las Heras was also, at all relevant times, a director of SHUSA and a director of SBNA.  According to the Prospectus, as a member of SCUSA's board of directors, de Las Heras received annual regulatory and compliance training. *Id.*

46.     Defendant Stephen A. Ferriss ("Ferriss") was, at all relevant times, a director of SCUSA, and Chairman of the Audit Committee, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Ferris was also, at all relevant times, a director of SHUSA and a director of SBNA and Chairman of the SHUSA and SBNA Audit Committees. *Id.* at 101-03.  According to the Prospectus, as a member of SCUSA's board of directors, Ferriss received annual regulatory and compliance training.  *Id.* at 77.

47.     Defendant Matthew Kabaker ("Kabaker") was, at all relevant times, a director of SCUSA and member of the Board Enterprise Risk Committee, which had oversight responsibilities with respect to, among other things, SCUSA's legal, regulatory and compliance risk, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  According to the Prospectus, as a member of SCUSA's board of directors, Kabaker received annual regulatory and compliance training. *Id.*

48.     Defendant Tagar Olson ("Olson") was, at all relevant times, a director of SCUSA and a member of the Audit Committee and signed or authorized the signing of the Company's

Registration Statement filed with the SEC.   According to the Prospectus, as a member of SCUSA's board of directors, Olson received annual regulatory and compliance training.  *Id.*

49.   Defendant Alberto Sanchez ("Sanchez") was, at all relevant times, a director and Vice Chairman of SCUSA, a member of the Audit Committee and a member of the Board Enterprise Risk Committee and signed or authorized the signing of the Company's Registration Statement filed with the SEC.   Sanchez was also, at all relevant times, a director of SHUSA, a director of SBNA and Head of Strategy and Specialty Finance of the U.S. for Santander.  *Id.* at 101-03.   Sanchez was also a management presenter and made statements concerning SCUSA's business in SCUSA's roadshow meetings with investors, through which the Company marketed its IPO to investors.   According to the Prospectus, as a member of SCUSA's board of directors, Sanchez received annual regulatory and compliance training. *Id.* at 77.

50.   Defendant Javier San Felix ("San Felix") was, at all relevant times, a director of SCUSA and signed or authorized the signing of the Company's Registration Statement filed with the SEC.   According to the Prospectus, as a member of SCUSA's board of directors, San Felix received annual regulatory and compliance training.  *Id.*

51.   Defendant Juan Andres Yanes ("Yanes") was, at all relevant times, a director of SCUSA and a member of the Board Enterprise Risk Committee until June 24, 2014, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.   Yanes was also, at all relevant times, a director of SHUSA and a director of SBNA and a member of SHUSA's Executive Management Committee.  *Id.* at 101-03.   According to the Prospectus, as a member of SCUSA's board of directors, Yanes received annual regulatory and compliance training.  *Id.* at 77.

52.     Defendant Daniel Zilberman ("Zilberman") was, at all relevant times, a director of SCUSA and signed or authorized the signing of the Company's Registration Statement filed with the SEC.   According to the Prospectus, as a member of SCUSA's board of directors, Zilbermann received annual regulatory and compliance training.  *Id.*

53.     Defendants Dundon, Kulas, Alvarez, Blanco, de Las Heras, Ferriss, Kabaker, Olson, Sanchez, San Felix, Yanes and Zilberman are collectively referred to as the "Individual Defendants."

54.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Offering Documents.   In addition, Defendants Dundon and Kulas, because of their positions with the Company, possessed the power and authority to control the contents of SCUSA's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.   Defendants Dundon and Kulas were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, Defendants Dundon and Kulas knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.   Defendants Dundon and Kulas are liable for the false or misleading statements pleaded herein, as those statements were each "group-published" information, the result of their collective actions.

55.     With the exception of Dundon and Kulas, who are Defendants with respect to both the Securities Act claims and the Exchange Act claims, the Individual Defendants are Defendants only with respect to the Securities Act claims.

### D.     THE UNDERWRITER DEFENDANTS

56.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter, global coordinator and joint book-running manager of the Company's IPO.   In the Offering, Citigroup agreed to purchase 14,998,294 shares of SCUSA, exclusive of the over-allotment option.  Because Santander Investment Securities Inc. and KKR Capital Markets LLC—underwriters for the IPO identified more fully below—are under common control with SCUSA and certain of the selling stockholders in the IPO and because affiliates of each of these underwriters were to receive at least 5% of the proceeds of the IPO, a conflict of interest existed under Financial Industry Regulatory Authority ("FINRA") Rule 5121. As a result, Citigroup agreed to act as a qualified independent underwriter for the IPO, and participated in due diligence and the preparation of the Prospectus and the Registration Statement.

57.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter, global coordinator and joint book-running manager of the Company's IPO. In the Offering, J.P. Morgan agreed to purchase 14,998,294 shares of SCUSA, exclusive of the over-allotment option.

58.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter and joint book-running manager of the Company's IPO. In the Offering, Merrill Lynch agreed to purchase 6,131,803 shares of SCUSA, exclusive of the over-allotment option.

21

59.     Defendant Deutsche Bank Securities Inc. ("Deutsche") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Deutsche agreed to purchase 6,131,803 shares of SCUSA, exclusive of the over-allotment option.

60.     Defendant Santander Investment Securities Inc. ("Santander Investment") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Santander Investment agreed to purchase 6,131,803 shares of SCUSA, exclusive of the over-allotment option.  Because Santander Investment is under common control with SCUSA and because affiliates of Santander Investment were to receive at least 5% of the proceeds of the IPO, Santander Investment had a conflict of interest in the IPO under FINRA Rule 5121.

61.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Barclays agreed to purchase 3,532,098 shares of SCUSA, exclusive of the over-allotment option.

62.     Defendant Goldman, Sachs & Co. ("Goldman") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Goldman agreed to purchase 3,532,098 shares of SCUSA, exclusive of the over-allotment option.

63.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Morgan Stanley agreed to purchase 3,532,098 shares of SCUSA, exclusive of the over-allotment option.

64.     Defendant RBC Capital Markets, LLC ("RBC") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, RBC agreed to purchase 3,532,098 shares of SCUSA, exclusive of the over-allotment option.

65.      Defendant BMO Capital Markets Corp. ("BMO") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, BMO agreed to purchase 2,624,701 shares of SCUSA, exclusive of the over-allotment option.

66.      Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Credit Suisse agreed to purchase 2,624,701 shares of SCUSA, exclusive of the over-allotment option.

67.      Defendant UBS Securities LLC ("UBS") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, UBS agreed to purchase 2,624,701 shares of SCUSA, exclusive of the over-allotment option.

68.      Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Wells Fargo agreed to purchase 2,624,701 shares of SCUSA, exclusive of the over-allotment option.

69.      Defendant KKR Capital Markets LLC ("KKR") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, KKR agreed to purchase 1,124,872 shares of SCUSA, exclusive of the over-allotment option.  Because KKR is under common control with certain of the selling stockholders in the IPO and because affiliates of KKR were to receive at least 5% of the proceeds of the IPO, KKR had a conflict of interest in the IPO under FINRA Rule 5121.

70.      Defendant Sandler O'Neill & Partners, L.P. ("Sandler") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Sandler agreed to purchase 397,455 shares of SCUSA, exclusive of the over-allotment option.

71.     Defendant Stephens Inc. ("Stephens") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, Stephens agreed to purchase 397,455 shares of SCUSA, exclusive of the over-allotment option.

72.     Defendant LOYAL3 Securities, Inc. ("LOYAL3") served as an underwriter to SCUSA in connection with the Offering.  In the Offering, LOYAL3 agreed to purchase 52,495 shares of SCUSA, exclusive of the over-allotment option.

73.     Defendants Citigroup, J.P. Morgan, Merrill Lynch, Deutsche, Santander Investment, Barclays, Goldman, Morgan Stanley, RBC, BMO, Credit Suisse, UBS, Wells Fargo, KKR, Sandler, Stephens and LOYAL3  are collectively referred to hereinafter as the "Underwriter Defendants."

74.     The Underwriter Defendants are defendants only with respect to the Securities Act claims.

## V.     BACKGROUND FACTS RELATING TO THE DIVIDEND AND COMPLIANCE MISSTATEMENTS

### A.     THE FEDERAL RESERVE ADOPTS AND IMPLEMENTS "CAPITAL PLAN" REQUIREMENTS

75.     In November 2011, the Federal Reserve adopted the so-called "capital plan rule," which required bank holding companies with $50 billion or more of consolidated assets to submit capital plans to the Federal Reserve for review on annual basis.  *See* 12 C.F.R. § 225.8; "Comprehensive Capital Analysis and Review 2014:  Summary Instructions and Guidance," Board of Governors of the Federal Reserve System (dated Nov. 1, 2013) (hereafter "CCAR Instructions") at 1.  The capital plan is required to include detailed descriptions of, among other things, all planned capital actions (including payment of dividends) over a nine-quarter planning horizon.  CCAR Instructions at 2.  The capital plan is also required to include results of stress tests conducted by the bank holding company and a discussion of compliance and risk

management processes.  *See id.* at 2-3.  A main purpose of the CCAR was to establish "prior notice and approval requirements for capital distributions" (such as dividends) by bank holding companies.  *See* 12 C.F.R. § 225.8(a).

76.     As alleged earlier herein, SHUSA is a bank holding company subject to the CCAR process.  SHUSA consolidated the financial results of SCUSA in SHUSA's financial statements.  In turn, SCUSA was subject to regulatory oversight because the Federal Reserve considers SCUSA to be a controlled subsidiary of SHUSA for bank regulatory purposes, and as a consolidated subsidiary of SHUSA, SCUSA was included in SHUSA's stress tests and capital plans.  SHUSA was not required to submit a capital plan for years 2011-2013, but was required to submit a capital plan for the year 2014 CCAR.

77.     The Federal Reserve issued instructions and guidance on November 1, 2013 notifying affected bank holding companies that the first capital planning horizon would commence at the beginning of the fourth quarter of 2013 (October 1, 2013) and conclude at the fourth quarter of 2015 (December 31, 2015).  *See* CCAR Instructions at 6.  Thus, capital plans for the year 2014 CCAR were required to be submitted by January 6, 2014.  The CCAR Instructions expressly stated that the bank holding companies required to participate in the year 2014 CCAR were, among others:  Bank of America Corp., BMO Financial Corp., Citigroup, Inc., The Goldman Sachs Group, Inc., JPMorgan Chase & Co., Morgan Stanley, Wells Fargo & Co. and SHUSA.[2]  Under the heading "Common Dividend Payouts," the CCAR Instructions state:  "The Federal Reserve expects that capital plans will reflect conservative common dividend payout ratios.  In particular, requests that imply common dividend payout ratios above

---

[2] Deutsche Bank Trust Corporation was also subject to the year 2014 CCAR, although it received an extension from compliance with the capital plan rule until June 30, 2014.

30 percent of projected after-tax net income available to common shareholders in either the BHC [i.e., bank holding company] baseline or supervisory baseline will receive particularly close scrutiny." CCAR Instructions at 23. The CCAR Instructions also expressly stated that "[a]fter performing appropriate analysis, the Federal Reserve will, by March 31, either object or provide a notice of non-objection to the submitted capital plan…." *Id.* at 27.

78.     The CCAR regulations themselves, which are cited in the CCAR Instructions, state that the "Board … will object, in whole or in part, to the capital plan or provide the bank holding company with a notice of non-objection to the capital plan …. " 12 C.F.R. § 225.8(f)(2)(i), and further state:

> If the Board … objects to a capital plan and until such time as the Board … issues a non-objection to the bank holding company's capital plan, the bank holding company may not make any capital distribution,[3] other than … capital distributions with respect to which the Board or the appropriate Reserve Bank has indicated in writing its non-objection.

12 C.F.R. § 225.8(f)(2)(iv).

79.     SHUSA submitted its capital plan to the Federal Reserve on January 6, 2014 (about three weeks prior to SCUSA's IPO). The capital plan is not publicly available.

**B.     SCUSA'S BOARD ENTERPRISE RISK COMMITTEE IS ESTABLISHED PRIOR TO THE IPO AND HAS RESPONSIBILITIES RELATED TO THE CCAR PROCESS AND SHUSA'S STRESS TESTING**

80.     The Board Enterprise Risk Committee was established by SCUSA's board of directors prior to the IPO and, according to the Prospectus, was "charged with the responsibility for establishing the governance over the risk management process …." Prospectus at 73. According to the Prospectus, the Board Enterprise Risk Committee met quarterly and was "chartered to assist the Board in promoting the best interests of the Company by overseeing

---

[3] "Capital distribution" is defined to include dividends. *See* 12 C.F.R. § 225.8(d)(3) and (4).

policies, procedures and risk practices relating to enterprise-wide risk and compliance with regulatory guidance." *Id.* at 74.

81.     A document entitled "Santander Consumer USA Holdings Inc. Board Enterprise Risk Committee Charter" (the "Charter") on the Company's website unequivocally states that the responsibilities of the Board Enterprise Risk Committee included consideration of the CCAR "stress test" processes and related compliance issues.  The Charter, which according to SCUSA's website has an effective date of July 2015,[4] states:

> (a) Review on an ongoing basis, and recommend to the Board for approval, the liquidity risk management strategies and policies developed by senior management of the Company, including considering the adverse scenarios utilized in stress testing exercises;
>
> (b) Review all risk and risk management components of the Company's capital management policies on an annual basis, including considering the adverse scenarios utilized in stress testing exercises;
>
> (c) Review and contribute to the key risk assumptions and risk parameters relating to the Capital Plan/Comprehensive Capital Analysis Review (CCAR) developed by the Capital Committee of the Board of Directors of Santander Holdings USA, Inc., an affiliate of the Company ("SHUSA"); assess risks and risk parameters with reference to stress testing loss estimates under severely stressed scenarios; and
>
> (d) Discuss periodic reports on regulatory and compliance issues, the status of those issues, and trends.

82.     The members of the Board Enterprise Risk Committee included defendants Kabaker, Sanchez and Yanes.  According to the Prospectus, these Defendants were selected because their "experiences and qualifications can lead to broad and informed views on risk matters facing [the Company] and the financial services industry, including, but not limited to,

---

[4] Lead Plaintiffs note that it is unclear what, if any, differences there were in the Charter that was in effect at the time of the IPO, as the Charter that was effective at the time of the IPO is unavailable on SCUSA's website and Lead Plaintiffs are otherwise unable to obtain it without discovery.

risk matters that address, credit, market, liquidity, operational, compliance, legal and other general business conditions."

### C. PRIOR TO SCUSA'S IPO, NUMEROUS BANK HOLDING COMPANIES, INCLUDING THE PARENT COMPANIES OF CERTAIN UNDERWRITER DEFENDANTS, MADE DISCLOSURES ABOUT DIVIDEND RESTRICTIONS ATTRIBUTABLE TO THE CCAR PROCESS IN THEIR PUBLICLY-AVAILABLE SEC FILINGS

83.     Prior to SCUSA's IPO in January 2014, at least six other bank holding companies that were, like SHUSA, subject to the CCAR process, made disclosures about the dividend restrictions imposed by the CCAR regulations and process.

84.     In fact, the parent or affiliated companies of many of the Underwriter Defendants were, at all relevant times, bank holding companies with $50 billion or more of consolidated assets required to submit capital plans for review by the Federal Reserve on an annual basis, and they were among the bank holding companies that made disclosures about CCAR dividend restrictions prior to SCUSA's IPO.  The chart below specifies the Underwriter Defendants with parent companies subject to the Federal Reserve's "stress test" procedures prior to the IPO and the parent companies' recognition — in SEC filings that were publicly-available at the time of SCUSA's IPO — of the dividend restrictions imposed by the CCAR regulations and process.

| Underwriter Defendant | Parent Company Subject To CCAR | Acknowledgment of CCAR Dividend Restriction in SEC Filings Prior to SCUSA's IPO |
|---|---|---|
| Citigroup Global Markets Inc. | Citigroup Inc. | 2012 FORM 10-K AT 67 (EMPHASIS ADDED) – "CITI'S ABILITY TO RETURN CAPITAL TO SHAREHOLDERS IS DEPENDENT IN PART ON THE CCAR PROCESS AND THE RESULTS OF REQUIRED REGULATORY STRESS TESTS AND OTHER GOVERNMENTAL APPROVALS.  In addition to Board of Directors' approval, *any decision by Citi to return capital to shareholders, whether through an increase in its common stock dividend or by initiating a share repurchase program, is dependent* |

| | | |
|---|---|---|
| | | *in part on regulatory approval, including annual regulatory review of the results of the Comprehensive Capital Analysis and Review (CCAR) process required by the Federal Reserve Board* and the supervisory stress tests required under the Dodd-Frank Act. Restrictions on Citi's ability to increase its common stock dividend or engage in share repurchase programs as a result of these processes has, and could in the future, negatively impact market perceptions of Citi." |
| J.P. Morgan Securities LLC | JPMorgan Chase & Co. | 2012 Form 10-K at 2 (emphasis added) – "In December 2011, the Federal Reserve issued final rules regarding the submission of capital plans by bank holding companies with total assets of $50 billion or more. Pursuant to these rules, the Federal Reserve requires the Firm to submit a capital plan on an annual basis. In October 2012, the Federal Reserve and OCC issued rules requiring the Firm and certain of its bank subsidiaries to perform stress tests under one stress scenario created by the Firm as well as three scenarios (baseline, adverse and severely adverse) mandated by the Federal Reserve. *If the Federal Reserve objects to the Firm's capital plan, the Firm will be unable to make any capital distributions unless approved by the Federal Reserve*." |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | Bank of America Corporation | 2012 Form 10-K at 3 (emphasis added) – "We are subject to various regulatory policies and requirements relating to the payment of dividends, including requirements to maintain capital above regulatory minimums. The appropriate federal regulatory authority is authorized to determine, under certain circumstances relating to the financial condition of a bank or bank holding company, that *the payment of dividends would be an unsafe or unsound practice and to prohibit payment thereof*. For instance, under proposed rules, we are required to submit to the Federal Reserve a capital plan as part of an annual Comprehensive Capital Analysis and Review (CCAR). Supervisory review of the CCAR has a stated purpose of assessing the capital planning process of major U.S. bank holding companies, *including any planned capital actions such as the payment of dividends on common stock*." |
| Goldman, Sachs & Co. | The Goldman Sachs Group, Inc. | 2012 Form 10-K at 76 (emphasis added) – "As part of the Federal Reserve Board's annual CCAR, U.S. bank holding companies with total consolidated assets of $50 billion or greater are required to submit annual capital plans for review by the Federal Reserve Board. The purpose of the Federal Reserve Board's review is to ensure that these institutions have robust, forward looking capital planning processes that account for their unique risks and that permit continued |

| | | operations during times of economic and financial stress. The Federal Reserve Board will evaluate a bank holding company based on whether it has the capital necessary to continue operating under the baseline and stressed scenarios provided by the Federal Reserve. *As part of the capital plan review, the Federal Reserve Board evaluates an institution's plan to make capital distributions, such as increasing dividend payments* or repurchasing or redeeming stock, across a range of macro-economic and firm-specific assumptions. In addition, the rules adopted by the Federal Reserve Board under the Dodd-Frank Act, require us to conduct stress tests on a semi-annual basis ….. " |
|---|---|---|
| Morgan Stanley & Co. LLC | Morgan Stanley | 2012 Form 10-K at 10 (emphasis added) – "Pursuant to the Dodd-Frank Act, the Federal Reserve has adopted new capital planning and stress test requirements for large bank holding companies, including the Company. Under the Federal Reserve's capital plan final rule, bank holding companies with $50 billion or more of consolidated assets, such as the Company, must submit an annual capital plan to the Federal Reserve, taking into account the results of separate stress tests designed by the bank holding company and the Federal Reserve. The capital plan must include a description of all planned capital actions over a nine-quarter planning horizon, including any issuance of a debt or equity capital instrument, any capital distribution (i.e., payments of dividends or stock repurchases), and any similar action that the Federal Reserve determines could impact the bank holding company's consolidated capital…In addition, even with an approved capital plan, *the bank holding company must seek the approval of the Federal Reserve before making a capital distribution* if, among other reasons, the bank holding company would not meet its regulatory capital requirements after making the proposed capital distribution." |
| Wells Fargo Securities, LLC | Wells Fargo & Company | 2012 Form 10-K at 6 (emphasis added) – "In late 2011, the FRB finalized rules to require large BHCs to submit capital plans annually for review to determine if the FRB had any *objections before making any capital distributions*. The rule requires updates to capital plans in the event of material changes in a BHC's risk profile, including as a result of any significant acquisitions." |

85.    All of these SEC filings were publicly-available for inspection by Defendants prior to SCUSA's IPO.

**D.      REGULATION S-K, ITEM 201(C) AFFIRMATIVELY REQUIRED DISCLOSURE OF THE DIVIDEND RESTRICTIONS**

86.      Prior to the IPO, SEC regulations promulgated under the Securities Act affirmatively required issuers, like SCUSA, to disclose in a registration statement restrictions on the issuer's ability to pay dividends.

87.      More specifically, Regulation S-K, Item 201(c), provides, in part, as follows:

(c) Dividends.

(1) State the frequency and amount of any cash dividends declared on each class of its common equity by the registrant for the two most recent fiscal years and any subsequent interim period for which financial statements are required to be presented by § 210.3 of Regulation S–X. *Where there are restrictions* (including, where appropriate, restrictions on the ability of registrant's subsidiaries to transfer funds to the registrant in the form of cash dividends, loans or advances) *that currently materially limit the registrant's ability to pay such dividends or that the registrant reasonably believes are likely to limit materially the future payment of dividends on the common equity so state and either (i) describe briefly (where appropriate quantify) such restrictions*, or (ii) cross reference to the specific discussion of such restrictions in the Management's Discussion and Analysis of financial condition and operating results prescribed by Item 303 of Regulation S–K (§229.303) and the description of such restrictions required by Regulation S–X in the registrant's financial statements.[5]

17 C.F.R. § 229.201(c) (emphasis added)

**E.      REGULATION S-K, ITEM 503(C) AFFIRMATIVELY REQUIRED DISCLOSURE OF THE DIVIDEND RESTRICTIONS BECAUSE IT WAS ONE OF THE MOST SIGNIFICANT FACTORS THAT MADE THE IPO RISKY**

88.      Prior to the IPO, under Item 503(c) of Regulation S-K, an issuer was required to, among other things, provide a "discussion of the most significant factors that make the offering risky or speculative."

---

[5] Rule 4-08(e) of Regulation S-X requires that a registrant's financial statements "[d]escribe the most significant restrictions…on the payment of dividends by the registrant, including their sources [and] their pertinent provisions…."  17 C.F.R. § 210.4-08(e).  As discussed further below, no such description was contained in SCUSA's first-filed financial statement (its Form 10-K filed in March 2014).

89.     The material facts concerning the restriction on SCUSA's ability to pay dividends and/or SCUSA's woefully inadequate compliance framework was one of the most significant factors that made the SCUSA IPO risky or speculative.

90.     The Offering Documents failed to include any discussion regarding the dividend restriction or the drastic compliance inadequacies.

**F.      SUMMARY OF THE FACTS DEFENDANTS KNEW OR SHOULD HAVE KNOWN PRIOR TO THE IPO AND IPO ROADSHOWS**

91.     Given the foregoing, prior to the January 24, 2014 IPO, SCUSA, the Individual Defendants and the Underwriter Defendants were aware or should have been aware that:  (a) SCUSA was a controlled subsidiary of SHUSA for bank regulatory purposes; (b) post-IPO, SHUSA consolidated SCUSA's financial results with SHUSA's financial results; (c) as a consolidated subsidiary of SHUSA, SCUSA was included in SHUSA's stress tests and capital plans in the CCAR process; (d) proposed dividend payouts in the 30% range would receive close scrutiny by the Federal Reserve; (e) SHUSA, by virtue of its ownership of approximately 61% of SCUSA's shares post-IPO, had the ability to control whether SCUSA paid dividends; (f) public shareholders who purchased shares in the IPO would receive approximately 21% of any dividend payments made by SCUSA;[6] (g) other companies that were—as SCUSA was—effected by the CCAR process were making disclosures concerning dividend restrictions imposed by the CCAR process; (h) it would not be known whether the Federal Reserve objected to SHUSA's capital plan until March 2014; (i) SHUSA and therefore its controlled subsidiary, SCUSA, could not pay any dividends unless and until the Federal Reserve issued a statement of non-objection to SHUSA's capital plan; (j) Item 201(c) required disclosure of dividend restrictions imposed by

---

[6] The remaining approximately 18% of dividend payments would be received by the other selling stockholders in the IPO, who, along with SHUSA, still owned a substantial amount of SCUSA's shares post-IPO.

the CCAR regulations and the Federal Reserve's "stress test" procedures; and (k) Item 503(c)

required that the Offering Documents include a "discussion of the most significant factors that

ma[d]e the offering risky or speculative," the dividend restrictions imposed by the CCAR

process was one of the most significant factors that made the IPO risky, especially since, as

explained below, SCUSA was stating that it was going to pay shareholders 30% of its annual

earnings in the form of dividends.

### G.   SCUSA TOUTS DIVIDENDS AND ITS SUPPOSEDLY EXTENSIVE COMPLIANCE AND RISK MANAGEMENT DURING ITS ROADSHOW PRESENTATIONS PRIOR TO THE IPO

92.     Knowing about or negligently overlooking abundant evidence of the dividend

restrictions imposed by the CCAR regulations and process, during SCUSA's roadshow

presentations to investors in January 2014, SCUSA touted its prior dividend payout history to

entice investors to purchase SCUSA common stock in the IPO and represented that it could

achieve a whopping 30% dividend payout ratio for 2014, and, at the same time, also trumpeted

its supposedly extensive risk management and reporting procedures and compliance strength.

93.     An undated SCUSA "Initial Public Offering Road Show Presentation" was used

by SCUSA to solicit investors.  It states that Defendants Dundon, Kulas and Sanchez, among

others, were "Management Presenters" for SCUSA.  The presentation emphasizes that from 2008

to 2013, prior to the IPO, SCUSA had a stellar dividend payout history:  "Dividend payout:

30%+."  The Initial Public Offering Road Show Presentation also states that SCUSA has

"Dedicated Sponsorship from Santander," which is "through SHUSA, a 100% bank holding

company owned by Banco Santander S.A.," and that SCUSA and SHUSA/Banco Santander S.A.

had "Extensive risk management and reporting procedures" and "Compliance (AML [i.e., anti-

money laundering], fair lending, etc.)."  There is nothing in the written presentation indicating

that there was any restriction on the payment of dividends by SCUSA or that SCUSA's risk

management and compliance procedures respecting, among other things, the CCAR process were woefully inadequate, if not non-existent, as was ultimately revealed in a June 11, 2014 SCUSA conference call with analysts (discussed further below) and a June 12, 2014 SCUSA press release (discussed further below) almost six months after the IPO.

94.     A January 22, 2014 article on the investor website seekingalpha.com explained how, during the roadshow, SCUSA touted its dividend payout history and stated that SCUSA anticipated a 30% dividend payout ratio and had (supposedly) extensive risk management and compliance expertise, emphasizing that these were reasons investors should purchase SCUSA common stock in the IPO.   The article, entitled "Santander Consumer USA A Hit With Institutions With Sharply Rising Dividends Likely," stated (emphasis added):

> One oddity of the [SCUSA] deal is the full one hour roadshow presentation which is amazingly long.  The CEO Tom Dundon is engaging but spends a long time talking about each slide and telling the story.  Seems like nobody could persuade him to keep it short.
>
> *     *     *
>
> Structurally the sponsorship from Santander (which will own 61% post-IPO) provides substance, stability, funding and 'opportunistic liquidity' measured in billions of dollars.  ***Santander also helped bring global risk management compliance and oversight into the business mix***.
>
> *     *     *
>
> So the big question is where will this stock price and trade post deal.  The original offering range was $22 to $24 with proposed annual dividends of $0.60/share for a mid-point yield of 2.6%.
>
> ***Management is stating that they will 'pay out 30+% of their net income in the form of dividends.'***  Given that figure has been running at around $700M it suggests that the dividend is join [sic] to go up a material amount over time.  For example for the year 2012 the company paid out $491M in dividends which is $1.40/share for a yield of 6%.
>
> If investors do the math and believe in company execution that level of dividend pay-out would push the share price to $30+ and position it for 10-15% growth from there based on business results.

**H.    THE OFFERING DOCUMENTS TOUT DIVIDENDS AND SCUSA'S SUPPOSEDLY EXTENSIVE COMPLIANCE AND RISK MANAGEMENT, BUT THERE IS NO DISCLOSURE ABOUT THE DIVIDEND RESTRICTIONS OR COMPLIANCE ISSUES**

95.    Subsequent to the roadshows, the Prospectus, which was dated January 22, 2014, also emphasized the attractiveness of SCUSA's dividend payout history and declared that SCUSA intended to pay quarterly dividends going forward after the IPO.  In a section of the Prospectus entitled "Dividend Policy," SCUSA disclosed that in the brief period of time from December 2010 to April 2013, SCUSA had declared and paid nine separate dividends totaling more than $1.9 billion in cash dividends to common stockholders.  Prospectus at 35.  These prior dividends ranged from 17 cents per share to as much as $1.63 per share (adjusted for certain reorganizations).  *Id.*  SCUSA also stated:

> It has been our policy in recent years to pay a dividend to all common stockholders.  Following the completion of this offering, **we currently intend** to pay dividends on a quarterly basis at an initial amount of approximately $0.15 per share.  Our board of directors may also change or eliminate the payment of future dividends at its discretion, without prior notice to our stockholders, and our dividend policy and practice may change at any time and from time to time in the future.  Any future determination to pay dividends to our stockholders will be dependent upon our financial condition, results of operation, capital needs, government regulations, and any other factors that our board of directors may deem relevant at such time and from time to time.

*Id.*

96.    There was no disclosure in this section of the Prospectus or anywhere else in the Offering Documents that SCUSA was prohibited from paying any dividends unless and until the Federal Reserve found that SHUSA passed its "stress test," which, shortly after the IPO, it did not, or that SCUSA's ability to pay dividends may otherwise be affected by the CCAR process and the Federal Reserve's ability to restrict dividend payments.

97.    The Prospectus also contained a "Risk Factor" acknowledging that SCUSA was subject to oversight by the Federal Reserve:

> We may be subject to certain banking regulations that may limit our business activities.
>
> Because our largest shareholder is a bank holding company and because we provide third-party services to banks, we are subject to certain banking regulations, including oversight by the Federal Reserve, the Office of the Comptroller of the Currency, and the Bank of Spain. Such banking regulations could limit the activities and the types of businesses that we may conduct. The Federal Reserve has broad enforcement authority over bank holding companies and their subsidiaries. The Federal Reserve could exercise its power to restrict SHUSA from having a non-bank subsidiary that is engaged in any activity that, in the Federal Reserve's opinion, is unauthorized or constitutes an unsafe or unsound business practice, and could exercise its power to restrict us from engaging in any such activity. The Federal Reserve may also impose substantial fines and other penalties for violations that we may commit. Additionally, the Federal Reserve has the authority to approve or disallow acquisitions we may contemplate, which may limit our future growth plans. To the extent that we are subject to banking regulation, we could be at a competitive disadvantage because some of our competitors are not subject to these limitations.

*Id.* at 26-27.

98.     Again, however, there was no disclosure, as was affirmatively required pursuant to Regulation S-K, Item 201(c), that SCUSA was under a then-current restriction on paying dividends because SHUSA had not passed the "stress test." Phrased differently, nowhere did the Prospectus state that SCUSA was prohibited from paying dividends unless and until the Federal Reserve issued a non-objection letter to SHUSA's capital plan. In addition, there was no disclosure that SCUSA's ability to pay dividends may otherwise be affected by the CCAR process.

99.     While the Offering Documents failed to explain the restriction on SCUSA's payment of dividends resulting from its relationship with Santander, they did generally state that SCUSA has a strong relationship with Santander and that this relationship led (supposedly) to SCUSA's development of extensive risk management processes to deal with oversight by the Federal Reserve that came along with the Santander relationship. The Prospectus states:

> ***Strong Relationship with Santander.*** Santander…has provided us with significant funding support, both through existing committed liquidity and opportunistic extensions of credit. Because of our relationship with Santander, we are subject to the regulatory oversight of the Federal Reserve System…. This oversight has led us to develop and maintain ***extensive risk management and reporting procedures and has helped us to continually adapt to the evolving regulatory requirements for consumer finance in the United States***.

*Id.* at 4 (emphasis added); *see also id.* at 88.   In fact, the Offering Documents emphasized that SCUSA (supposedly) "derive[d] significant benefits from [its] relationship with Santander, including … ***shared*** ***best practices in compliance and risk management***." *Id.* at 82 (emphasis added).

100.   The Offering Documents also had several more statements about the (supposed) quality of SCUSA's compliance program.  For example, in a section entitled "Regulatory Risks," the Prospectus states:

> Due to the highly regulated nature of the consumer finance industry, we are required to comply with a wide array of federal, state, and local laws and regulations that regulate, among other things, the manner in which we conduct our origination and servicing operations.  These regulations directly impact our business and require constant compliance, monitoring, and internal and external audits.  Although ***we have an extensive enterprise-wide compliance framework*** structured to continuously monitor our activities, compliance with applicable law is costly, and may create operational restraints.

*Id.* at 25 (emphasis added).

101.   And, in a later section entitled "Market Risk," the Prospectus states:

> In response to the evolving regulatory requirements for consumer finance, in 2012, we established the position of Chief Compliance Officer, later expanded to Chief Compliance and Risk Officer, to place emphasis on SCUSA's commitment to manage regulatory in a ***comprehensive compliance management program*** and overall risk in an enterprise risk program.

*Id.* at 74 (emphasis added).

102.   And in a later section entitled "Legal and Compliance Risk," the Prospectus states:

We must comply with the significant number of laws and regulations governing the consumer finance industry and, specifically, consumer protection. Compliance with applicable law is costly and can affect operating results. Compliance also requires a robust framework of governance and controls, which may create operational constraints. To manage our legal and compliance risk, *we maintain an extensive compliance, internal control, and monitoring framework*, which includes the gathering of corporate control performance threshold indicators, Sarbanes-Oxley testing, monthly quality control tests, ongoing compliance monitoring with all applicable regulations, internal control documentation and review of processes, and internal audits.

*Id.* at 77 (emphasis added).

103.    These statements were also false or misleading because, as would later be revealed, SCUSA's compliance and risk management framework and controls were anything but "extensive," "comprehensive" or the product of "shared best practices" – they were woefully inadequate, if not non-existent.

I.    **AFTER THE IPO, SCUSA'S FORM 10-K REPEATS THE INTENTION TO PAY DIVIDENDS WITHOUT DISCLOSING DIVIDEND RESTRICTIONS ATTRIBUTABLE TO THE CCAR PROCESS**

104.    On March 6, 2014, SCUSA filed its Form 10-K for the year ended 2013 and repeated its intention to pay dividends that it had touted in roadshow presentations and in the Offering Documents.  The Form 10-K stated:

We currently intend to pay dividends on a quarterly basis at an initial amount of approximately $0.15 per share. Our board of directors may also change or eliminate the payment of future dividends at its discretion, without prior notice to our stockholders, and our dividend policy and practice may change at any time and from time to time in the future. Any future determination to pay dividends to our stockholders will be dependent upon our financial condition, results of operation, capital needs, government regulations, and any other factors that our board of directors may deem relevant at such time and from time to time.

2013 Form 10-K at 41.  SCUSA repeated this intention despite knowing, or negligently or recklessly overlooking, that SHUSA's capital plan was under review by the Federal Reserve and that SHUSA had not yet received a non-objection from the Federal Reserve and, therefore, was

not permitted to pay dividends.  In addition, there was no disclosure that SCUSA's ability to pay dividends may otherwise be affected by the CCAR process.

105.    In addition, the Form 10-K emphasized SCUSA's supposedly extensive compliance and risk management framework.  The Form 10-K stated under the heading "Regulatory Risks":  "Although we have an extensive enterprise-wide compliance framework structured to continuously monitor our activities, compliance with applicable law is costly, and may create operational constraints."  The Form 10-K further stated under the heading "Legal and Compliance Risks":  "To manage our legal and compliance risk, we maintain an extensive compliance, internal control, and monitoring framework, which includes the gathering of corporate control performance threshold indicators, Sarbanes-Oxley testing, monthly quality control tests, ongoing compliance monitoring with all applicable regulations, internal control documentation and review of processes, and internal audits."  *Id.* at 32, 74.

106.    The 2013 Form 10-K further stated that:  "We rely on our relationship with Santander, through SHUSA, for several competitive advantages including relationships with OEMs [i.e., Original Equipment Manufacturers] and ***regulatory best practices***."  Id. at 24 (emphasis added).

107.    In a certification attached as an exhibit to the 2013 Form 10-K and signed by Defendant Dundon on March 5, 2014, Dundon certified that he reviewed the Form 10-K and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."  *Id.*, Ex. 31.1.  In a certification attached as an exhibit to the 2013 Form 10-K and signed by Defendant Kulas on March 5, 2014, Defendant Kulas certified that he reviewed the 2013 Form 10-K and

that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." *Id.*, Ex. 31.2.

108.    These statements were also false or misleading because, as would be later revealed, SCUSA's compliance and risk management framework and controls were anything but "extensive" or shared "best practices" – they were woefully inadequate, if not non-existent.

109.    Moreover, under Rule 4-08(e) of Regulation S-X, the Form 10-K (like the IPO Offering Documents) was required, but failed to, disclose the dividend restrictions and/or that SCUSA's ability to pay dividends may otherwise be affected by the CCAR process.

### J.    THE FEDERAL RESERVE OBJECTS TO SHUSA'S CAPITAL PLAN

110.    On March 26, 2014 (five days prior to the March 31 deadline stated in the CCAR Instructions), the Federal Reserve found that SHUSA failed its stress test and issued its objection to the capital plan submitted by SHUSA.  *See* "Comprehensive Capital Analysis and Review 2014:  Assessment Framework and Results," Board of Governors of the Federal Reserve System (dated March 2014) (hereafter "2014 CCAR Results") at 7.

111.    The 2014 CCAR Results reiterated what the CCAR regulations provide—that no dividends were to be paid out unless and until the Federal Reserve issues a prior non-objection to the bank holding company's capital plan.  The 2014 CCAR Results state:

> For CCAR 2014, the nine-quarter planning horizon covered in the capital plans begins with the fourth quarter of 2013 and ends with the close of the fourth quarter of 2015.  ***If the Federal Reserve does not object to a BHC's capital plan***, the BHC may make its planned capital distributions for the four-quarter period beginning with the second quarter of 2014 and running through the end of the first quarter of 2015.

2014 CCAR results at 6 n. 8 (emphasis added).

112.    Contrary to, among other things, the representation in the IPO Offering Documents that SCUSA had "shared best practices in compliance and risk management" with Santander, the 2014 CCAR results also expressly stated that:

> The Federal Reserve objected to the capital plan from [SHUSA] due to widespread and significant deficiencies across [SHUSA's] capital planning processes.  Specific deficiencies were identified in several areas, including governance, internal controls, risk-identification and risk management, management information systems (MIS), and assumptions and analysis that support [SHUSA's] capital planning processes.

Id. at 7.  The 2014 CCAR results further stated that given the Federal Reserve's objection to a capital plan, the bank holding company may not make any capital distribution unless the Federal Reserve indicates in writing that it does not object to the distribution.  More specifically, the 2014 CCAR Results stated that:

> These BHCs [i.e., bank holding companies that failed their stress tests, including SHUSA] are not permitted to implement their requested plans for increased capital distributions, and are required to resubmit their capital plans to the Federal Reserve following substantial remediation of the issues that led to the objections, consistent with the requirements in the Federal Reserve's capital plan rule.

113.    SCUSA said nothing to its shareholders about the failed stress test, the Federal Reserve's finding of "widespread and significant deficiencies" in compliance and risk management (among other areas), or the consequences of the failed stress test for SCUSA and its shareholders or its ability to pay dividends to shareholders.

### K.    DESPITE THE FAILED STRESS TEST BY SHUSA, SCUSA ANNOUNCES PAYMENT OF A DIVIDEND DURING AN EARNINGS CONFERENCE CALL

114.    On May 1, 2014, SCUSA held its first-ever earnings conference call as a public company with analysts.  During the call, Chairman and CEO Dundon echoed SCUSA's intention, as disclosed in the Offering Documents, to pay a dividend and stated:  "[O]ur Board of Directors had declared a quarterly cash dividend of $0.15 per share payable on May 30, 2014 to shareholders of record at the close of business on May 12, 2014…[W]e expect this dividend to

be about $52.3 million. The dividend is consistent with our belief that SCUSA can produce both earnings growth and a strong total shareholder return." Thomson Reuters Transcript of SCUSA May 1, 2014 Q1 Earnings Conference Call ("Reuter's Tr."), at 4. A written "1Q14 Investor Presentation" used during the conference call, which was subsequently filed with the SEC along with the Company's May 1, 2014 press release (discussed below), also stated that the board had declared a cash dividend of $0.15 per share that totaled approximately $52.3 million.[7] In addition, during the conference call, CFO Kulas stated: "[W]e continue to anticipate *a dividend payout ratio of 30%* of annual earnings…." *See* Reuters Tr. at 5 (emphasis added).

115. Also, on May 1, 2014, the Company issued a press release entitled, "Santander Consumer USA Holdings Inc. reports first quarter 2014 net income of $81.5 million, or $0.23 per share, and declares cash dividend of $0.15 per share." Therein, the Company, in relevant part, stated (bolded emphasis added; italicized emphasis in original):

> *"SCUSA is pleased to report strong results for our first quarter as a public company as core net income grew 38 percent quarter-over-quarter. We continued to demonstrate strong liquidity and capital markets access, issuing more retail auto loan asset-backed securities year-to-date than any other issuer in the market. Our asset origination performance in the first quarter positions us for continued growth and profitability in the coming quarters. **We are confident in the financial objectives discussed prior to our IPO with regard to dividend payments of 30 percent**, a return on equity of 20-25 percent, and EPS growth of approximately 10 percent. In addition, we've just completed a successful first year for Chrysler Capital, a key growth driver for the company,"* said Tom Dundon, Chairman and Chief Executive Officer.

> *"In an environment of increased competition, we are continuing to enhance shareholder value by leveraging our efficient structure and relationships, including Chrysler, to produce profitable asset growth. **A further testament to our shareholder commitment is our Board of Directors' decision to declare a dividend on our earnings from our first quarter as a public company**. Our balance sheet strength and robust profitability affords us the opportunity to continue to drive total shareholder return,"* said Jason Kulas, President and Chief Financial Officer.

---

[7] This dividend payout amounted to more than 64% of SCUSA's first quarter earnings of $81.5 million.

116.    Neither the May 1 press release, investor presentation or conference call disclosed anything about the dividend restrictions imposed by the CCAR process, the Federal Reserve's objection to SHUSA's capital plan based on the SHUSA's failed stress test, which had occurred more than a month earlier, or about SCUSA's woefully inadequate, if not non-existent, compliance framework respecting the CCAR process or otherwise.

### L.    A RISK FACTOR ABOUT THE FEDERAL RESERVE'S POWER TO RESTRICT DIVIDENDS IS BELATEDLY ADDED TO SCUSA'S FORM 10-Q

117.    About four months after the January 2014 IPO and about two months after the failed stress test, on May 15, 2014, SCUSA filed with the SEC its Form 10-Q for the period ending March 31, 2014 ("May 15, 2014 10-Q").  This 10-Q reiterated what had been disclosed in the May 1 press release — that "[o]n May 1, 2014, SCUSA's Board of Directors declared a cash dividend of $0.15 per share to be paid on May 30, 2014 to shareholders of record as of the close of business on May 12, 2014."  May 15, 2014 10-Q at 29.

118.    In contrast to the IPO Prospectus, however, the May 15, 2014 10-Q stated as follows under the heading "Regulatory Risks":

> *We may be subject to certain banking regulations that may limit our business activities.*
>
> Because our largest shareholder, SHUSA, is a bank holding company and because we provide third-party services to banks, we are subject to certain banking regulations, including oversight by the Federal Reserve, the Office of the Comptroller of the Currency, and the Bank of Spain. Such banking regulations could limit the activities and the types of businesses that we may conduct. The Federal Reserve has broad enforcement authority over bank holding companies and their subsidiaries. The Federal Reserve could exercise its power to restrict SHUSA from having a non-bank subsidiary that is engaged in any activity that, in the Federal Reserve's opinion, is unauthorized or constitutes an unsafe or unsound business practice, and could exercise its power to restrict us from engaging in any such activity. ***This power includes the authority to prohibit or limit the payment of dividends if, in the Federal Reserve's opinion, such payment would constitute an unsafe or unsound practice. Moreover, certain banks and bank holding companies, including SHUSA, are required to perform a stress test and submit a capital plan to the Federal Reserve on an annual basis, and to receive a notice***

43

> *__of non-objection to the plan from the Federal Reserve before taking capital__*
> *__actions, such as paying dividends,__* implementing common equity repurchase
> programs, or redeeming or repurchasing capital instruments. *__This requirement__*
> *__could have a negative impact on SCUSA__*. The Federal Reserve may also impose
> substantial fines and other penalties for violations that we may commit, and has
> the authority to approve or disallow acquisitions we may contemplate, which may
> limit our future growth plans. To the extent that we are subject to banking
> regulation, we could be at a competitive disadvantage because some of our
> competitors are not subject to these limitations.

Id. at 70 (emphasis added).

119.    By contrast, the Offering Documents for the IPO contained no such disclosure about stress tests, the Federal Reserve's power to prohibit or limit dividend payments or the need to receive a notice of non-objection to the capital plan before paying dividends, even though those requirements existed at the time of the IPO.

120.    The May 15, 2014 10-Q added the foregoing disclosure, and in a separate section also stated that:

> Certain banks and bank holding companies, including SHUSA, are required to
> perform a stress test and submit a capital plan to the Federal Reserve on an annual
> basis, and to receive a notice of non-objection to the plan from the Federal
> Reserve before taking capital actions, such as paying dividends, implementing
> common equity repurchase programs, or redeeming or repurchasing capital
> instruments.  As a consolidated subsidiary of SHUSA, SCUSA is included in
> SHUSA's stress tests and capital plans.  On March 26, 2014, the Federal Reserve
> announced that, based on qualitative concerns, it objected to, and is requiring
> resubmission of, SHUSA's capital plan.  This action could have a negative impact
> on SCUSA.

*Id.* at 31.

121.    Nothing was said, however, regarding the need to hire any additional compliance professionals, let alone that the Company's compliance was so woefully inadequate that at least 100 additional compliance professionals at an expense of $12.5 million annually would be necessary, as SCUSA later admitted in a June 12, 2014 press release (discussed below).  To the contrary, the May 15, 2014 10-Q affirmatively reassured investors that SCUSA's compliance

was not merely adequate, but extensive. The May 15, 2014 10-Q stated (emphasis added): "To manage our legal and compliance risk, *we maintain an extensive compliance, internal control, and monitoring framework*, which includes the gathering of corporate control performance threshold indicators, Sarbanes-Oxley testing, monthly quality control tests, ongoing compliance monitoring with all applicable regulations, internal control documentation and review of processes, and internal audits," and "Although *we have an extensive enterprise-wide compliance framework* structured to continuously monitor our activities, compliance with applicable law is costly, and may create operational constraints." Id. at 56 (emphasis added).

M.  **SCUSA FILES A FORM 8-K ATTACHING AN INVESTOR PRESENTATION THAT EMPHASIZES SCUSA'S SUPPOSEDLY ESTABLISHED COMPLIANCE PROGRAM AND SAYS NOTHING ABOUT COMPLIANCE ISSUES**

122.  On May 21, 2014, SCUSA filed a Form 8-K with the SEC stating it is "furnishing copies of slides, which will be used in connection with presentations on one or more occasions." May 21, 2014 Form 8-K, Item 7.01. The Form 8-K attached a series of slides entitled: "Santander Consumer USA Holdings Inc. Investor Presentation." *Id.*, Ex. 99.1. The slide presentation included a section on "Compliance."

123.  A slide headed "Compliance Program" stated (emphasis added): "Stemming from big bank ownership since 2000, SCUSA's *established compliance program* plays a pivotal role in daily operations" and "Responsibility of *assuring day to day compliance with applicable laws* and regulations rests with SCUSA's individual business units, their officers, and employees." *Id.*, Ex. 99.1 at 49. The slide further stated that "SCUSA's Compliance Management Program consists of," among other things, "Risk Assessments," "Board and Management Oversight," "Regulatory Monitoring" and "Change Management." *Id.*

124.  Upon information and belief, the slide presentation was used by SCUSA in connection with presentations on one or more occasions, and none of the slides in the

presentation disclosed any existing compliance issues related to CCAR compliance, or otherwise.

**N.    SCUSA'S SHARES DROP MORE THAN 4% AFTER SCUSA ANNOUNCES THAT IT WILL NO LONGER PAY DIVIDENDS AND EXPECTS HIGHER COMPLIANCE COSTS**

125.    On May 29, 2014, SCUSA issued a Form 8-K announcing that, as was previously reported in the May 15, 2014 10-Q, the Federal Reserve informed SHUSA on March 26, 2014 that SHUSA failed its stress test and therefore the Federal Reserve objected to SHUSA's capital plan.  May 29, 2014 Form 8-K at 2.  The Form 8-K explains that the Federal Reserve had informed SHUSA on May 22, 2014 that it did not object to SCUSA's payment of the May dividend *but only if* Santander contributes at least $20.9 million in capital to SHUSA prior to payment of the dividend.[8]  The Form 8-K further explains that the Federal Reserve also informed SHUSA that until the Federal Reserve issues a non-objection letter to SHUSA's capital plan, future dividend payments by SCUSA will require prior receipt of a written non-objection letter from the Federal Reserve.  The May 29, 2014 Form 8-K then stated:

> SHUSA has informed SCUSA that SHUSA does not currently expect to submit a revised capital plan to the Federal Reserve until January 2015, subject to the Federal Reserve's approval.  Accordingly, ***other than the May Dividend, SCUSA does not expect to pay dividends during the remainder of 2014***.  SCUSA currently intends to resume paying quarterly dividends in accordance with SCUSA's previously disclosed dividend policy at such time as it is permitted to do so by the Federal Reserve.

*Id.* (emphasis added).  This May 29, 2014 Form 8-K went on to state that:

> In addition, ***SCUSA expects to incur higher costs than originally anticipated in connection with compliance*** with, and assisting SHUSA in, the CCAR process.  The suspension of SCUSA's ability to pay dividends or other limitations placed on SCUSA by the Federal Reserve or any other regulator and additional costs associated with regulatory compliance could have a material adverse effect on SCUSA and the trading price of its common stock.

---

[8] Santander contributed $21 million in capital to SHUSA on May 28, 2014.

*Id.* (emphasis added).

126.    On this news, SCUSA's shares dropped 4.63% to $19.76 from the prior day's close of $20.72 on extremely high volume of more than 10 million shares traded.   Analysts specifically attributed the drop to the announcement about the dividend and the announcement of sharply higher compliance costs.   A J.P. Morgan analyst report dated May 30, 2014 states:

> Yesterday, …. [SCUSA] filed an 8-K revising its dividend outlook….Based on the Fed's update, [SCUSA] will suspend its dividend following the $0.15/share 2Q14 dividend declared May 1st.   Per the Fed's requirements, [SCUSA] will suspend the dividend until SHUSA, which owns 60% of [SCUSA], receives Federal Reserve approval of its capital plan.   SHUSA has informed [SCUSA] that it does not intend to submit a revised capital plan until January 2015.   Accordingly, [SCUSA]'s dividend is suspended for the remainder of 2014. Shares dropped 4.6% on the news Thursday.

J.P. Morgan Research Report dated May 30, 2014 at 1.   The report further states:   "Santander has agreed to provide the capital to account for the May dividend, but we do not anticipate such capital support will be provided by Santander going forward." *Id.* at 2.   With respect to SCUSA's statement that it expects to incur higher compliance costs, the analyst report stated:   "We have increased our expense assumptions based on the higher regulatory costs.   We have modeled an additional $30M in 2014 and an additional $20M in 2015 and 2016 to account for the increased costs.   The net effect is full year earnings of $2.07 and $2.28 per share for 2014 and 2015, respectively.   This compares to our previous estimates of $2.09 and $2.30 for 2014 and 2015, respectively." *Id.*

127.    Similarly, an RBC Capital Markets analyst report dated May 30, 2014 explained that SCUSA's inability to pay dividends due to SHUSA failing the stress test was a surprise to investors and contrary to expectations.   The report states:

Key points:

Nobody Expects the Fed Inquisition: [SCUSA] disclosed yesterday that the Federal Reserve informed SHUSA that while it does not object to [SCUSA's] previously announced $0.15 p/s dividend, the company must contribute at least $20.9 million of capital to SHUSA prior to payment.   SHUSA did not successfully pass the Fed's 2014 Comprehensive Capital Analysis and Review (CCAR) test on qualitative factors, limiting the company's ability to return capital to shareholders.  ***Capital return approval constraint <u>is a surprise</u>*** for [SCUSA], given the company is not directly subject to the CCAR/CapPR process.

Dividends on Hold for the Rest of 2014:  The Federal Reserve restricted future dividends without prior receipt of written non-objection letter from the Federal Reserve.  The company does not expect to be permitted to pay dividends until SHUSA has submitted a capital plan to the Federal Reserve which is not expected until January 2015 – a decision largely outside of SC's control, and is ***clearly disappointing for investors that <u>expected</u> a roughly 30% dividend payout ratio/roughly 4% dividend yield for 2014***.

May 30, 2014 RBC Capital Markets Report at 1 (emphasis added).

O.     **SCUSA'S SHARES DROP MORE THAN 8% AFTER SCUSA REVEALS ITS COMPLIANCE PROCESSES WERE NEVER "BEST IN CLASS" AND THAT SCUSA HAD BEEN UNAWARE OF REGULATORY EXPECTATIONS ASSOCIATED WITH THE CCAR PROCESS**

128.    On June 11, 2014, SCUSA made a presentation at a conference during which CEO, Dundon: (a) disclosed that (i) SCUSA's compliance and risk management was not "extensive" or "comprehensive" or the result of "shared best practices" as had been represented in the IPO, and (ii) compliance and risk management expenses were going to rise extensively and, as a result, SCUSA would not be able to grow assets as much as previously forecasted; and (b) admitted that the Company had not been aware of regulatory expectations to the CCAR process.  A transcript of the conference states as follows:

Morgan Stanley Representative: One of the other things we spent some time to talk about during the IPO process was sort of the view for selling for prime originations, and in the first quarter I think it was a little bit less in terms of sales than what we maybe expected. Can you talk about the dynamics of how you think about the economics of selling versus taking it off balance sheet?

Tom Dundon: We've had some changes because of the regulatory environment in our philosophy and think, going forward, most of the loans that we can originate above 640 we will flow off and keep the servicing strip. I use 640 FICO as a

general guideline, and then below that we think the economic trade to sell the residual of a near-prime or subprime loan starts to give up too much, *so as we deal with the changing regulatory environment, we think we have to put a lot of focus on compliance and risk management and the CCAR process so we are not going to grow the assets that are on our balance sheet as much* and that means we will sell a few more of the prime and mid-prime than maybe we would have thought we were going to.

Morgan Stanley Representative: That's a good segue into capital and the CCAR process that obviously some changes into how you think about the dividend going forward given Santander Holdings, and the fact that you're consolidated up into that, how do you think about the current level of ownership of Santander and the ability to independently sort of set capital policy, how has that changed over this process?

Tom Dundon: Well I think what we have learned in the CCAR process is as a subsidiary we are going to be treated like a bank and *we are trying to work closely with the regulators to build out our enterprise risk processes, CCAR process, compliance processes, our key now is to be best in class and act just like a bank* even though we don't have deposits, and I'm not sure we were aware of that fact but we are aware, that's a big focus for us is we want to be best in class now that we are understanding what the expectations are, *we were not aware of the expectations*, and we are 100% aware of those expectations and we have a pretty big commitment to do it very well, from the CCAR process all the way through risk management, and part of that is shifting some of the mix from net interest margin to fee income, limiting the size of the balance sheet in exchange for more fee income and less risk on the balance sheet and letting the company focus more on building out this enterprise risk framework and process to support CCAR within Santander.

*See* Conference Transcript, attached as Ex. 99.1 to Form 8-K filed on June 12, 2014 (emphasis added).  Dundon's admission that the Company had not been aware of regulators' expectations respecting the CCAR process and that the Company *needed to become* "best-in-class" in its compliance capabilities was directly contrary to the representation in the IPO Offering Documents that SCUSA *already had* "shared best practices in compliance and risk management" with Santander.

129.    SCUSA's shares dropped 8.55% (on enormous volume exceeding 10.5 million shares) from a close of $21.05 on June 10, 2014 to $19.25 on June 11, 2014.

**P.    SCUSA'S SHARES DROP ANOTHER 1.35% AFTER SCUSA REVEALS THAT IT MUST HIRE 100 MORE COMPLIANCE PROFESSIONALS GIVEN SHUSA'S STRESS TEST FAILURE**

130.    In a Form 8-K, which was filed with the SEC on June 12, 2014, SCUSA stated:

As a result [of the failed stress test] and as the Company also previously disclosed, the Company expects to incur additional compliance costs. ***The Company's incremental costs related to regulatory compliance, including CCAR, are currently expected to include an incremental staffing requirement of approximately 100 full time employees at approximately $125,000 average annual cost per person***. The Company expects that these incremental employees will represent one component of costs the Company will incur ***in developing a best-in-class compliance capability***. Other costs of the process will include, but may not be limited to, IT systems, consultants and advisors, and legal costs. The Company is in the process of evaluating and estimating the overall impact of these costs on its expected results.

June 12, 2014 Form 8-K at 2 (Emphasis added).  The Form 8-K also stated that "if the current regulatory circumstances in the [U.S.], and in particular, of Grupo Santander in the United States, and current competitive environment persist, our earnings growth beginning in 2015 could be reduced to approximately 2-3% as the Company lowers the growth of owned assets and shifts the mix toward more capital efficient higher ROE servicing income." *Id.*

131.    The (at least) $12.5 million annual compliance salary costs (i.e., $125,000 x 100 full time employees) represented more than (i) a 5.7% increase over SCUSA's $217,172,000 salary and benefits expense for the nine months ended September 30, 2013 for not just compliance personnel, but personnel in the entire Company, (ii) a 5.5% increase over SCUSA's $225,159,000 salary and benefits expense for the year ended December 31, 2012 for not just compliance personnel, but personnel in the entire Company, (iii) a 5.8% increase over SCUSA's $213,688,000 salary and benefits expense for the year ended December 31, 2011 for not just compliance personnel, but personnel in the entire Company, and (iv) a 8.2% increase over SCUSA's $151,528,000 salary and benefits expense for the year ended December 31, 2010 for

not just compliance personnel, but personnel in the entire Company, as reported in the Prospectus at pages 56, 58, and F-3, respectively.

132.    In addition, SCUSA's admission that the Company needed to "*develop*" a "best-in-class" compliance capability was directly contrary to the representation in the IPO Offering Documents that SCUSA *already had* "shared best practices in compliance and risk management" with Santander.

133.    SCUSA's stock dropped another 1.33% on June 12, 2014 to close at $18.99 on extremely high volume of more than 7.8 million shares traded on the NYSE.

134.    A Wells Fargo report dated June 13, 2014 stated that "the drivers of the sell off" of SCUSA's stock included "Higher expenses resulting from CCAR compliance costs."   *See* June 13, 2013 Wells Fargo Report at 1.

135.    Since the IPO, SCUSA's stock significantly underperformed stocks in the S&P Financials Sector Index, as reflected in the following chart:

[INTENTIONALLY LEFT BLANK]



**Q.    SCUSA BELATEDLY ADDS THE DIVIDEND RESTRICTIONS AS A RISK FACTOR TO A SUBSEQUENT SCUSA IPO**

136.    SCUSA completed a follow on offering of its common stock pursuant to a prospectus dated August 22, 2014.  Unlike the Prospectus for the initial IPO discussed above, the August 2014 prospectus contained several, specific disclosures about the Federal Reserve's ability to restrict dividend payments.  Under a section entitled "Risks Associated with Our Business Strategy," the August 2014 prospectus states:

> Investing in our common stock involves substantial risk….   Some of the more significant challenges and risks included the following:
>
> **We are subject to certain banking regulations that limit our business activities, including our ability to pay dividends and enter into certain business transactions without the approval of the Federal Reserve**.  We are subject to certain banking regulations, including oversight by the Federal Reserve, which has the power to impose substantial fines and other penalties for violations

52

that we may commit, and <u>has the authority to approve or disallow</u> acquisitions, <u>the payment of dividends</u> or other activities <u>that we may contemplate</u>.  To the extent that we are subject to banking regulations, we could be at a competitive disadvantage because some of our competitors are not subject to these limitations.

August 22, 2014 Prospectus at 5 (bolded emphasis in original, underlined emphasis added).  As stated above, no such disclosure was made in the Offering Documents for the January 2014 IPO, although one was affirmatively required under Regulation S-K, Item 201(c), as SCUSA's addition of this statement in the August 2014 prospectus tacitly recognizes.

137.    Under "Dividend Policy," the August 22, 2014 prospectus went on to state:

It has been our policy in recent years to pay a dividend to all common stockholders. Following the IPO, it was our stated policy to pay dividends on a quarterly basis at an initial amount of $0.15 per share.

We operate in a highly regulated industry and are subject to various U.S. federal and state laws and regulatory authorities. Because SHUSA is our largest and controlling shareholder and a bank holding company, we are subject to certain bank regulations, including oversight by the Office of the Comptroller of the Currency, the Bank of Spain, the CFPB and the Federal Reserve. These regulators **have the ability to limit** certain of our activities, including **the timing and amount of dividends** and other limitations on our growth.

On May 1, 2014, our board of directors declared a dividend of $0.15 per share of our common stock.  The Federal Reserve informed SHUSA on May 22, 2014 that it did not object to our payment of the May dividend, provided that Santander contribute at least $20.9 million of capital to SHUSA prior to such payment, so that SHUSA's consolidated capital position would be unaffected by the payment of the May dividend. The Federal Reserve also informed SHUSA that until the Federal Reserve issues a non-objection to SHUSA's capital plan, any future dividend by us will require prior receipt of a written non-objection from the Federal Reserve. On May 28, 2014, Santander provided $21.0 million of additional capital to SHUSA. On May 30, 2014, we paid the dividend that our board had declared on May 1, 2014. There can be no assurance when SHUSA will submit a revised capital plan, or whether or when the Federal Reserve will accept SHUSA's capital plan.  Therefore, **we will not be permitted to pay any further dividends until such time as SHUSA has submitted to the Federal Reserve a capital plan and either the Federal Reserve issues a non-objection to such plan or the Federal Reserve otherwise issues its written non-objection to the payment of a dividend by us**.

Id. at 33 (emphasis added); *see also id.* at 8 (another similar description of the dividend policy). A prospectus Supplement dated September 2, 2014 relating to this offering contains similar disclosures. *See* September 2, 2014 Prospectus Supplement at S-6, S-9, S-11.

> **R.    SHUSA SETTLES THE FEDERAL RESERVE'S ENFORCEMENT ACTION REGARDING THE SCUSA DIVIDEND**

138.   On September 15, 2014, SHUSA and the Federal Reserve entered into an agreement to settle the Federal Reserve's enforcement action over the payment of the May 2014 dividend by SCUSA. *See In re Santander Holdings USA, Inc.*, No. 14-028-WA/RB-HC, Board of Governors of the Federal Reserve System, Washington, D.C. (Sept. 15, 2014).

139.   In the settlement agreement, SHUSA admitted that at the time of the IPO, SCUSA was not permitted to declare or pay dividends was a "violation" of CCAR regulations. The settlement agreement states in relevant part:  (a) "WHEREAS, the Reserve Bank authorized Santander Holdings to make quarterly payments on certain preferred stock instruments in the [March 26, 2014] Objection Letter but did not authorize any other capital distributions by [SHUSA];" (b) "WHEREAS, despite the [March 26, 2014] Objection Letter, [SCUSA] declared a cash dividend on its common stock payable in the second quarter of 2014, which was not specifically authorized in advance by the Federal Reserve at the time of, or after, the issuance of the Objection Letter;" (c) "WHEREAS, [the Federal Reserve] advised [SHUSA] that the declaration of cash dividends having an impact on [SHUSA's] consolidated capital constituted an unauthorized capital distribution under 12 CFR 225.8(c)(2);" and (d) "WHEREAS, in order to mitigate this violation," on May 28, 2014, [Santander], [SHUSA's parent company], contributed $21 million to [SHUSA]." *Id.* at 2.

140.   The settlement agreement stated that SCUSA "shall not declare or pay any dividends" without the prior approval of the Federal Reserve and that SHUSA agreed that it

would "take all actions necessary" to ensure that SCUSA does not declare or pay any dividends without the prior written approval of the Federal Reserve. *Id.* at 4.

### S.   SHUSA FAILED ITS SECOND STRESS TEST

141.   As of the filing date of this amended complaint, SCUSA has not paid any common stock dividends since the May 2014 dividend that was unauthorized by the Federal Reserve. In fact, SHUSA failed another stress test in March 2015. *See* "Santander fails second round of stress test," Bostonglobe.com (March 11, 2015). As a result, SHUSA entered into a second settlement agreement with the Federal Reserve in which SHUSA agreed, among other things, that it would submit a written plan acceptable to the Federal Reserve to strengthen board oversight of the management of the consolidated organization, including SCUSA's operations and activities. *See In re Santander Holdings USA, Inc.*, No. 15-018-WA/RB-HC, Board of Governors of the Federal Reserve System, Washington, D.C. (July 2, 2015).

## VI.   BACKGROUND FACTS RELATING TO OTHER IMPROPER PRACTICES

142.   In addition to misrepresentations relating to dividends and CCAR compliance, the Offering Documents misrepresented that SCUSA had the systems, processes, controls and procedures in place to ensure compliance with federal and state consumer protection laws. The Offering Documents acknowledged that SCUSA had to comply with the FDCPA, FCRA, SCRA, TCPA and TILA, as well as analogous state and local laws. In relevant part, the Offering Documents stated:

> Due to the highly regulated nature of the consumer finance industry, we are required to comply with a wide array of federal, state, and local laws and regulations that regulate, among other things, the manner in which we conduct our origination and servicing operations. These regulations directly impact our business and require constant compliance, monitoring, and internal and external audits. Although we have an extensive enterprise-wide compliance framework structured to continuously monitor our activities, compliance with applicable law is costly, and may create operational constraints.

55

These laws and their implementing regulations include, among others, usury laws, Anti-Money Laundering requirements (Bank Secrecy Act and USA PATRIOT Act), Equal Credit Opportunity Act ("ECOA"), Fair Debt Collection Practices Act, Fair Credit Reporting Act, Privacy Regulations (Gramm-Leach Bliley Act and Right to Financial Privacy Act), Electronic Funds Transfer Act, Servicemembers' Civil Relief Act, Telephone Consumer Protection Act, Truth in Lending Act, and requirements related to unfair, deceptive, or abusive acts or practices.

Many states and local jurisdictions have consumer protection laws analogous to, or in addition to, those listed above. These federal, state, and local laws regulate the manner in which financial institutions deal with customers when making loans or conducting other types of financial transactions.

Prospectus at 25.

143.    The Offering Documents then stated (emphasis added):

**State Lending Regulations**

In general, state statutes establish maximum loan amounts, interest rates, fees and maximum amounts allowed to be charged for such fees, insurance premiums, and fees that may be charged for both direct and indirect lending. Specific allowable charges vary by state and type of license. Statutes in Texas, for example, allow for indexing the maximum small loan amounts to the Consumer Price Index and setting maximum rates for automobile purchase loans based on the age of the vehicle. In addition, state laws regulate the keeping of books and records and other aspects of the operation of consumer finance companies. State and federal laws regulate account collection practices.

We are separately licensed under the laws of each state in which we operate. Licenses granted by the regulatory agencies in these states are subject to renewal every year and may be revoked for failure to comply with applicable state and federal laws and regulations. ***We are in compliance with state laws and regulations*** applicable to our lending operations in each state.

*Id.* at 97.

144.    The Offering Documents further stated (emphasis added):

We have built our servicing approach based on years of experience as a nonprime lender. Our servicing activities consist largely of processing customer payments, responding to customer inquiries (such as requests for payoff quotes), processing customer requests for account revisions (such as payment deferrals), maintaining a perfected security interest in the financed vehicle, monitoring vehicle insurance coverage, pursuing collection of delinquent accounts, and remarketing repossessed or off-lease vehicles. We have made significant technology investments in our servicing systems ***to ___ensure___ that our servicing***

***activities are in compliance with federal and local consumer lending rules in all 50 states***.

*Id.* at 92.

145.   The Offering Documents further stated:

Most of our servicing processes and quality-control measures also serve a dual purpose in that they both ***ensure compliance with the appropriate regulatory laws*** and ensure that we deliver the best possible customer service. Additionally, our servicing platform and all of the features we offer to our customers are scalable and can be tailored through statistical modeling and automation.

*Id.* at 93.

146.   The Offering Documents further stated (emphasis added):

An example of another system control to mitigate compliance risk is that our customer dialing system has been programmed based on regulatory requirements to not permit dialing a customer phone number outside of permissible time periods or that already has been called the maximum number of times that day.

\*   \*   \*

In order to provide the best possible customer service, we provide multiple convenience options to our customers and have implemented many strategies to monitor and improve the customer experience. In addition to live agent assistance, our customers are offered a wide range of self-service options via our interactive voice response system and through our customer website. Self-service options include demographic management (such as updating a customer's address, phone number, and other identifying information), payment and payoff capability, payment history reporting, as well as online chat and communication requests. Quality assurance teams perform account reviews and are responsible for grading our phone calls to ensure adherence to our policies and procedures as well as compliance with regulatory rules. Our analytics software converts speech from every call into text so that each of our conversations with a customer can be analyzed and subsequently data-mined. This is used to identify harmful words or phrases in realtime for potential intervention from a manager, and to search for the omission of words or phrases that are required for specific conversations. A quality control team provides an independent, objective assessment of the servicing department's internal control systems and underlying business processes. This helps us identify organizational improvements while protecting our franchise reputation and brand. Lastly, ***complaint tracking processes ensure customer complaints are addressed appropriately*** and that the customers receive status updates. These systems assign the account to a specialized team (Office of

the President) until the complaint is deemed to be closed. This team tracks and resolves customer complaints and is subject to a robust quality assurance program.

*Id.* at 78, 92.

147.    The Offering Documents further stated (emphasis added):

We must comply with the significant number of laws and regulations governing the consumer finance industry and, specifically, consumer protection. Compliance with applicable law is costly and can affect operating results. Compliance also requires a robust framework of governance and controls, which may create operational constraints.

To manage our legal and compliance risk, *we maintain an extensive compliance, internal control, and monitoring framework, which includes* the gathering of corporate control performance threshold indicators, Sarbanes-Oxley testing, monthly quality control tests, *ongoing compliance monitoring with all applicable regulations*, internal control documentation and review of processes, and internal audits.

*Id.* at 77.

148.    Contrary to the representations in the Offering Documents: (a) SCUSA repeatedly violated California repossession laws; (b) SCUSA repeatedly violated the TCPA, FDCPA, TILA, FCRA and analogous state consumer protection laws; (c) SCUSA repeatedly violated the SCRA by illegally repossessing the cars of active duty U.S. military personnel; (d) SCUSA's complaint tracking processes did not ensure that customer complaints were addressed appropriately; (e) SCUSA's servicing systems, servicing processes and quality-control measures did not ensure compliance with applicable law; and (f) SCUSA's compliance framework with respect to not only CCAR (as discussed above), but also state and federal consumer protection laws, was severely inadequate.

A.    SCUSA'S VIOLATIONS OF CALIFORNIA REPOSSESSION LAWS

149.    SCUSA's violations of state consumer protection laws and lack of appropriate servicing systems and quality-control measures to ensure compliance with such laws are

supported by class action complaints filed against SCUSA by Thomas and Belinda Vitrano on February 25, 2013 and by Cara Powers ("Powers") on October 17, 2012.

150.    The Vitranos brought a complaint on behalf of all consumers who purchased a motor vehicle primarily for personal use or family purposes and, as part of that transaction:  (i) entered into an agreement subject to California's Rees-Levering Automobile Sales Finance Act, California Civil Code § 2981, *et seq.*; (ii) whose motor vehicle was repossessed or voluntarily surrendered; (iii) who were issued a Notice of Intention ("NOI") to Dispose of Vehicle by SCUSA dated from July 1, 2011 through July 31, 2014, or to whom SCUSA failed to provide an NOI within 60 days of repossession; and (iv) against whose account a deficiency balance was assessed.  *Vitrano, et al. v. Santander Consumer USA Inc.*, No. 2:13-cv-02492-AB-MRW (C.D. Cal. Apr. 8, 2013).  The complaint further alleged that SCUSA, *inter alia*, violated California Civil Code § 2983.2 and the California Unfair Competition Law, Business and Professions Code § 17200 by failing to include statutorily required information in its post-repossession NOI.  The case was removed to federal court by SCUSA on April 8, 2013.

151.    In October 2012, SCUSA repossessed the Vitranos' 2006 Ford Expedition. SCUSA's NOI did not contain several of the disclosures mandated by Civil Code § 2983.2(a)(1)-(a)(9).    The Vitranos were unable to recover the Expedition, and alleged that SCUSA subsequently assessed a deficiency balance against the Vitranos, falsely informing them that they owed the balance of the deficiency when they, in fact, did not owe on the balance due to SCUSA's non-compliance with the Rees-Levering Act.   In addition, in violation of the law, SCUSA repossessed a second car of the Vitranos – a 2008 Ford Focus in October 2012.   The Vitranos allege they never received an NOI from SCUSA.  The Vitranos were unable to recover the Ford Focus, and alleged that SCUSA subsequently assessed a deficiency balance against

them, again falsely informing them that they owed a deficiency balance when they did not owe any amounts due to SCUSA's non-compliance with the Rees-Levering Act.

152.    Subsequently, a class action settlement was reached and final approval granted on February 18, 2015 by the U.S. District Court for the Central District of California.  Per the terms of the settlement, SCUSA was ordered to provide relief to the 38,698 class members as follows: (i) repurchase class members' deficiency accounts from third party creditors; (ii) cease from collection activity with regard to any of the class members' deficiency accounts and be enjoined from any further collection attempts; (iii) change the class members' deficiency accounts to reflect a zero balance; (iv) refund 60% of the collected $712,778 deficiency balances to the class members; (v) instruct several credit reporting agencies to delete class members' trade lines; and (vi) pay a service award of $2,500 to each class representative.  Because the relief included reducing the deficiency balance for all class members, SCUSA was forced to forgo nearly $200 million in collectible debt.  Further, it had to refund over $427,000 to class members who partially paid deficiency balances and put in place corporate governance to prevent similar violations.  Subsequent to entry of the final approval order, the U.S. District Court for the Central District of California held a hearing on SCUSA's non-compliance with the settlement agreement.

153.    This expansive and costly settlement for failure to comply with California state laws governing repossession contradicts SCUSA's statements in the Offering Documents that it was in compliance with state laws and had the systems, processes and/or quality control measures to "ensure compliance with the appropriate regulatory laws."

154.   In Massachusetts, consumer Powers asserted class actions claims against SCUSA,[9] alleging SCUSA wrongfully charged consumers' credit and/or debit cards monthly late fees when they were not late on car loan payments and that SCUSA engaged in unlawful repossession practices.  *Powers v. Santander Consumer USA, Inc.*, No. 4:12-cv-11932-TSH (D. Mass. Oct. 17, 2012).   Powers accused SCUSA of violating various Massachusetts laws including the Motor Vehicle Retail Installment Sales Act (Mass Gen. Laws Ch. 255B, §§ 11, 14, 20A, 20B) and the Consumer Credit Cost Disclosure Act (Mass. Gen. Laws Ch. 140D, § 28A(2), and the Uniform Commercial Code.

155.   Powers purchased a used Lexus from a Quincy, Massachusetts car dealership in 2007, for which she agreed to pay $279 monthly payments over 48 months.  During those four years, SCUSA, which acquired her loan from United Auto Credit Corporation in 2009, charged her late fees at least four times when her loan payments were not late.

156.   Powers alleges that SCUSA sent her a notice of default in August 2011, asserting that she owed $530.53, for which Powers made a partial payment.  Nevertheless, in November 2011, SCUSA repossessed her car while she was away from home, claiming she owed over $800 on her loan.  Powers alleges SCUSA provided her with an NOI which stated she could get her vehicle back if she repaid $1,420.82 plus $25 per day in storage fees.  Powers was able to get her vehicle back, but SCUSA never gave her the title to the car.

157.   SCUSA ultimately settled the case in August 2014, agreeing to waive $23 million in deficiency balances and provide $750,000 in cash relief to eligible class members, as well as

---

[9] Powers asserted class action claims on behalf of all individuals who held a retail sales installment contract held by SCUSA, who had their vehicle repossessed by SCUSA between September 2008 and October 2012, who received an NOI or other statutory notice regarding repossession, whose account balance at the time of repossession was less than $2,000, against whom SCUSA had not obtained a deficiency judgment as of May 2014 and who had not obtained a bankruptcy discharge.

delete negative credit reporting for these individuals.  The court entered final judgment in the case in December 2014.  This costly settlement for failure to comply with Massachusetts laws governing fees and repossession contradicts SCUSA's statements in the Offering Documents that it was in compliance with state laws and had the systems, processes and quality control measures to "ensure compliance with the appropriate regulatory laws."

### B.   SCUSA'S VIOLATIONS OF THE TCPA AND ANALOGOUS STATE CONSUMER PROTECTION LAWS

158.    The TCPA provides statutory damages for unlawful calls made to consumers in violation of the TCPA, and treble damages for each willful or knowing violation.  Violations of the TCPA occur when a person makes a telephone call using any automatic telephone dialing system or an artificial or prerecorded voice to any emergency telephone line, to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home or similar establishment, or to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service or other radio common carrier service, or any service for which the called party is charged for the call.  47 U.S.C. § 227(b)(1)(A)(i)-(iii).  It is also unlawful for any person to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes.  47 U.S.C. § 227(b)(1)(B). Corresponding state laws include Ariz. Rev. Stat. Ann. § 13-291, Ariz. Rev. Stat. Ann. § 1271, *et seq.*, O.C.G.A. § 46-5-27, Minn. Stat. § 325E.27, 61 R.I. Gen. Laws §5-61-1, *et seq.*, and Utah Code Ann. § 1325a101, *et seq.*

159.    At least 23 complaints were filed against SCUSA preceding the IPO, alleging violations of the TCPA and corresponding state laws (where applicable).  *See* Exhibit B § I.

After the IPO was completed, at least an additional six complaints detailing SCUSA's violations of the TCPA were filed. *Id.*

160.    Examples of SCUSA's blatant violations of the TCPA and/or analogous state laws include the following complaints:

- *Albee v. Santander Consumer USA, Inc.*, No. 3:13-cv-01158-TJC-JRK (M.D. Fla. Sept. 23, 2013) – Stephen F. Albee ("Albee") did not have a business relationship with SCUSA and owed no debt relating to the purchase of a vehicle, yet Albee received at least 50 calls from SCUSA in an attempt to collect a debt.  Albee informed SCUSA that they had the wrong number, but SCUSA continued to call using an automated dialing system.  Each unlawful call to Albee is $500 in statutory damages under the TCPA, and each willful unlawful call amounts to $1,500 in statutory damages.  Further, under the Florida Consumer Credit Collection Practices Act § 559.55, *et seq.* ("FCCPA"),  Albee is entitled to statutory damages and injunctive relief.

- *Gunn v. Santander Consumer USA Inc.*, No. 8:13-cv-02071-MSS-TBM (M.D. Fla. Aug. 12, 2013) – Patrick Gunn ("Gunn") alleged that SCUSA began calling Gunn and Gunn's mother, co-signor of the auto loan, to collect on an alleged debt.  Gunn asserted that SCUSA called him and his mother three to four times a day, every day of the week.  Gunn informed SCUSA that he could not pay the alleged debt and instructed SCUSA to stop calling.  He also asked SCUSA to stop calling his mother, who was suffering from cancer at the time.  Despite these requests, SCUSA continued to call Gunn and his mother.  Gunn alleged that SCUSA made more than 70 collection calls and violated the TCPA and the FCCPA.

- *Spann v. Santander Consumer USA, Inc.*, No. 5:13-cv-00223-MTT (M.D. Ga. June 21, 2013) – Veronica E. Spann ("Spann") alleged that starting in January 2011 through her filing of the complaint on June 21, 2013, a period spanning approximately two years and six months, SCUSA made multiple daily collection calls to Spann and her extended family using an automatic telephone dialing system.  Spann alleged that SCUSA continued to call even after she told SCUSA to stop.

- *Hibler v. Santander Consumer USA, Inc*, No. 5:13-cv-01354-JGB-OP (C.D. Cal. Aug. 2, 2013) – Jeff Hibler ("Hibler") alleged that he did not owe money to SCUSA, was never a customer of SCUSA and was not the individual SCUSA sought to collect a debt from.  The correct individual was "Christopher Barton."  Nevertheless, in spring of 2013, SCUSA began to call him daily on his cellular phone in an effort to collect a debt he did not owe, placing multiple calls per day from an automatic telephone dialing system.  Due to Hibler's cell phone service, he incurred a charge

for all of SCUSA's incoming calls.   Hibler also alleged violations of California's Rosenthal Fair Debt Collection Act, Cal. Civ. Code § 1788, *et seq.*

- *Rich v. Santander Consumer USA Inc.*, No. 1:14-cv-07322 (N.D. Ill. Sept. 19, 2014) – David Rich ("Rich") alleged that he was not one of SCUSA's customers, that he never provided his cell phone number to SCUSA and that he did not have any business relationship with SCUSA.  Rich never consented to having SCUSA call his cell phone; however, between May 29, 2014 and August 12, 2014, SCUSA used an automated dialer to call Rich's cell phone 118 times.  SCUSA continued to call despite the fact that Rich informed SCUSA that it had the wrong telephone number.

161.   The nature and sheer volume of these TCPA suits and corresponding state law actions directly contradicts SCUSA's statements in the Offering Documents that SCUSA was "in compliance with state laws and regulations" and that its servicing systems ensured its "servicing activities are in compliance with federal and local consumer lending rules in all 50 states."

### C.   SCUSA's Violations of the FDCPA and Corresponding State Laws

162.   At least 39 complaints were filed against SCUSA prior to the IPO alleging violations of the FDCPA, 15 U.S.C. § 1692, *et seq.*, and corresponding state consumer protection laws (where applicable).  *See* Exhibit B § II.   Following the IPO, at least seven cases were filed in 2014 alleging similar violations.   *Id.*   These suits further reflect that SCUSA was not in compliance with state law and did not have adequate systems in place to ensure compliance with state and federal regulations, as represented in the Offering Documents.

163.   The FDCPA, enacted in 1978, prohibits false, deceptive, misleading, harassing, abusive and offensive conduct during the collection of consumer debts.   Among many other things, a debt collector cannot make any false, deceptive or misleading statements, cannot threaten suit, garnishment or seizure of property without legal ability to do the same, and cannot report or threaten to report false credit information.   15 U.S.C. §§ 1692e(5), (8), (10).   State law analogs of the FDCPA contain similar prohibitions.   *See, e.g.*, Cal. Civ. Code § 1788, *et seq.*; Fla

Stat. Ann. § 559.55, *et seq.*; Ga. Code Ann. § 7-3-25; NY. Gen. Bus. Law § 600, *et seq.*;  Texas

Fin. Code Ann. § 392.001, *et seq.*

164.    Examples of SCUSA's violations of the FDCPA and/or related state laws include:

- *Cruz v. Santander Consumer USA, Inc.*, No. 3:13-cv-00474-JBA (D. Conn. Apr. 8, 2013) – Shiela J. Cruz ("Cruz") alleged that she obtained an auto loan financed by SCUSA in 2006.  Cruz diligently made payments on the loan and was never late or delinquent.  In May 2012, SCUSA began calling and writing Cruz, stating that she had failed to make a payment in May 2012.  SCUSA made the same accusation in July 2012, when Cruz had in fact made the payment.  Cruz informed SCUSA that she had made the May and July 2012 payments, that she was not late for either and that the checks had cleared as shown by copies of the cleared checks from her bank.  After enduring nine months of harassment from SCUSA via phone calls and mail, in March 2013, SCUSA sent Cruz an acknowledgment that the July 2013 payment had cleared, but never acknowledged the May 2012 payment.  Despite the fact that Cruz repeatedly informed SCUSA that these payments were timely made, providing SCUSA with evidence of payment, SCUSA continued to attempt to collect these debts in violation of the FDCPA and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.*

- *Oliphant, et al. v. Citifinancial Auto Ltd., et al.*, No. 6:13-cv-00031-SEH (D. Mont. May 13, 2013) – The Oliphants alleged that when SCUSA took action to repossess the Oliphants' vehicle, the notice provided by SCUSA failed to meet the requirements of the FDCPA as follows: (i) it failed to inform them of the amount of the debt; (ii) it failed to include a statement providing that if the Oliphants disputed the debt in writing within a 30 day period, SCUSA would have to obtain verification of the debt; (iii) it failed to notify the Oliphants that a verification of the debt would be mailed to them; and (iv) it failed to advise that upon the Oliphants' written request within a 30 day period, SCUSA was obligated to provide them with the name and the address of the original creditor.  Moreover, the first notice the Oliphants received of SCUSA's intent to collect on the debt owed was dated September 4, 2012, after their vehicle had already been repossessed.  Further, that SCUSA violated the Montana Consumer Protection Act. Mont. Code Ann. § 30-14-101, *et seq.* for, among other things, engaging in unfair and deceptive debt collection practices.

- *Paluck, et al. v. Santander Consumer USA, Inc., et al.*, No. 1:13-cv-00812-MHS (N.D. Ga. Mar. 14, 2013)-The Palucks alleged that in 2006, they purchased a 2003 Honda Odyssey, which was financed through Citi.  In November 2012, they began receiving numerous harassing calls from SCUSA and SCUSA's agents, attempting to collect an alleged outstanding balance on the vehicle note.  The consumers alleged that SCUSA had

repeatedly misled and deceived them as to the balance owed on the note, and that SCUSA had attempted to coerce and embarrass these consumers into making additional payments through its repeated phone calls. Further, SCUSA's conduct violated § 1692(d) of the FDCPA because SCUSA used harassment and/or abusive means in attempting to collect upon the alleged debt. They likewise alleged that SCUSA violated § 1692(e) of the FDCPA by using false representations and/or deceptive means in attempting to collect upon the alleged debt, and further violated § 1692(f) of the FDCPA by using unfair and/or unconscionable means in attempting to collect upon the alleged debt.

165.    The nature and number of these FDCPA cases filed against SCUSA coupled with SCUSA's other violations of consumer protection laws reflect SCUSA's systematic non-compliance with consumer protection laws and the failure of SCUSA's servicing systems and quality-control measures to ensure such compliance, in contrast to SCUSA's claims to the contrary in the Offering Documents.

### D.    SCUSA'S VIOLATIONS OF THE TILA AND CORRESPONDING STATE LAWS

166.    SCUSA's violations of TILA and corresponding state laws further rendered the representations in the Offering Documents misleading.  At least eight complaints were filed against SCUSA prior to and following the IPO alleging violations of TILA, 15 U.S.C. § 1601, *et seq*., and corresponding state consumer protection laws (where applicable), for failure to provide adequate disclosures and documentation relating to SCUSA's retail installment contracts, which provides for statutory damages.  *See* Exhibit B §III.

167.    In *Lunn v. Steve Rayman Chevrolet, LLC, et al*., No. 1:12-cv-04411-ODE (N.D. Ga. Dec. 21, 2012), for example, Loretha Lunn ("Lunn") alleged, *inter alia*, TILA violations, asserting that on July 26, 2012, a dealership sold her a vehicle and prepared an installment sales contract.  According to Lunn, the dealership advised her that Ally Bank would be the lienholder; however, the loan documents listed Fifth Third Bank.  Lunn further alleged that subsequently, SCUSA contacted her and advised that it was the lienholder, and that the dealership had listed

her income as $3,707 per month and had noted she had worked for her employer for over two years.  When Lunn provided corrected information, i.e., that her bi-weekly income was $1,207 and that she had worked for less than a year with her current employer, SCUSA told her to "go along with it" as there would be no problems if she remained current with her payments. Afterwards, Lunn returned the vehicle to the dealership in order to rescind the contract and revoke her acceptance of the vehicle due to the misrepresentations.

168.    Additional cases were filed following the IPO which further evidence SCUSA's violations of TILA as well as other laws.  This includes a class action complaint filed on August 31, 2015, against SCUSA for violations of TILA and the Illinois Motor Vehicle Retail Installment Sales Act, 815 Ill. Comp. Stat. Ann. § 375/1, *et seq.*, for failure to inform consumers that they were making an additional purchase when they signed the Guaranteed Asset Protection ("GAP") contract, or that their signatures represented an additional "non-required" purchase. *Pettye v. Santander Consumer USA, Inc.*, No. 1:15-cv-07669 (N.D. Ill. Aug. 31, 2015).  The allegations date back to August 31, 2010, years before the IPO.

169.    These additional cases citing SCUSA's violations of the TILA and corresponding state laws further evidence the false or misleading nature SCUSA's statements in the Offering Documents that it was in compliance with state laws and had the systems, processes or quality control measures to "ensure compliance with the appropriate regulatory laws."

E.    SCUSA'S VIOLATIONS OF THE FCRA AND ANALOGOUS STATE LAWS

170.    Prior to or shortly after the IPO, at least 20 cases were filed evidencing SCUSA's repeated violations of the FCRA, which was passed to protect consumers from the willful and/or negligent inclusion of inaccurate information in their credit reports.  15 U.S.C. § 1681.  These 20 cases for violations of the FCRA and corresponding state laws (where applicable) are provided in Exhibit B § IV, attached hereto.  Examples of SCUSA's violations of the FCRA include:

- *Schrophsire v. Santander Consumer, USA, Inc.*, No. 2:12-cv-15114 (E.D. Mich. Nov. 19, 2012) − ("Schrophsire") alleged willful violations of the FCRA.  In June 2011, Schrophsire discovered that SCUSA had furnished inaccurate information about his vehicle loan to TransUnion and Equifax.   These credit reporting agencies had both reflected a trade line related to the loan as "charged off."   Neither trade line was accurate, as Schrophsire had paid SCUSA and was current on his monthly payments.  Schrophsire contacted both credit agencies to dispute the reporting, and sent a payment history from SCUSA's website which illustrated he was current.   Both credit agencies contacted SCUSA to notify it of the dispute.   After being informed by the credit agencies of Schrophsire's dispute of the trade lines, SCUSA failed to conduct a proper reinvestigation of the dispute as required under 15 U.S.C. § 1681s-2(b) of the FCRA.  SCUSA failed to review all relevant information provided to it by each credit reporting agency in conducting its reinvestigation, including a failure to direct all of the credit reporting agencies to remove the trade lines, under 15 U.S.C. § 1681s-2(b) of the FCRA.

- *Christmas v. Santander Consumer USA, Inc.*, No. 4:13-cv-03389-RBH (D.S.C. Dec. 4, 2013) – Linda Christmas ("Christmas") alleged SCUSA violated the TCPA, FDCPA, FCRA, and the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq*.  The original contract for Christmas' 2005 Chrysler Sebring specified payments for $330 per month for 72 months.   After the contract was sold to SCUSA, Christmas continued to make payments to SCUSA, and made her final payment in September 2013.  SCUSA subsequently informed her that she still owed over $6,000, in violation of the terms of the original loan.  Earlier that year, Christmas had tried to refinance her home but her application was denied because of her credit.  In October 2013, Christmas sent SCUSA a certified letter disputing the amount owed, enclosing a copy of her original contract and her payment history.   Since SCUSA reported the amount owed to the credit reporting agencies, Christmas also had to dispute the trade line with them.  SCUSA threatened to repossess Christmas' vehicle if she did not pay the erroneous amount and further refused to provide her with the title to the vehicle.   They also continued to report the negative event to the credit reporting agencies.  SCUSA made multiple automated calls in an effort to collect the erroneous amount.

- *Crawford v. Santander Consumer USA, Inc., et al.*, No. 2:13-cv-00111-JCM-NJK (D. Nev. Jan. 22, 2013) – Colleen Crawford ("Crawford") filed a complaint against SCUSA for violations of the FCRA.   In 2006, Crawford purchased a 2006 Nissan Frontier pickup.  Under the terms of the financing agreement, Crawford was to make 72 payments of $440.  In June 2010, SCUSA sent Crawford a written solicitation, stating that as a reward for her excellent payment history, she could defer June's payment until the end of the term agreement.  Crawford accepted the offer.  In July 2010, SCUSA charged Crawford a late fee and continued to charge this

late fee month after month.  SCUSA also began making an average of five collection calls per day through 2012.  Crawford made all 72 payments to SCUSA but despite the terms of the agreement, SCUSA claimed $900.00 was due at the end of the term.  SCUSA also reported this negative event to the credit bureaus and then refused to remove it despite Crawford's requests.

171.    These complaints evidence that the Offering Documents' assertion that SCUSA's servicing systems, processes and quality control measures ensured compliance with, among other things, the FCRA, were materially misleading.

172.    In addition to the above, in *Hillis v. Trans Union, LLC, et al.*, No. 2:13-cv-02203-LDD (E.D. Pa. Apr. 24, 2013), Gary Hillis ("Hillis") disputed a negative credit event reported by SCUSA.  The dispute arose from an automobile loan that Hillis and his ex-wife entered into during their marriage.  In 2007, Hillis' marriage ended in divorce, and the Texas court's divorce decree awarded the underlying vehicle to his ex-wife.  The decree also required Hillis' ex-wife to make all remaining payments on the car loan and, in the event she failed to do so, indemnify Hillis for any resulting liability.  Hillis alleged that SCUSA violated the FCRA.  According to Hillis, SCUSA inaccurately reported the car loan to consumer reporting agencies as the responsibility of Hillis to pay, neglected to conduct a proper investigation into the matter and failed to mark the loan as "disputed," despite knowledge of Hillis' efforts to dispute it.  SCUSA moved to dismiss Hillis' complaint, and the court denied the motion, noting that once SCUSA learned of the divorce decree, it could have reported Hillis' account as "disputed," or marked it in some other way that would cause a future creditor to inquire further and more completely understand his situation.  The court also denied SCUSA's motion for summary judgment, noting that SCUSA had no policy in place regarding consumers who have rights of indemnification relating to debts on their credit reports.

173.    The court's Order denying summary judgment referenced the deposition testimony from SCUSA's designated corporate representative Wayne Nightengale ("Nightengale") taken on January 24, 2014.  Nightengale was a Senior Vice President at SCUSA since 2010.  Prior to that time he held other positions at SCUSA.  As Senior Vice President, he was responsible for all aspects of servicing, including customer service, early-stage and late-stage collections. Nightengale testified on behalf of SCUSA that it had *no policy in place* regarding indemnification relating to debts on its credit reports even upon receipt of a divorce decree so stating.

174.    The case filed by Hillis and SCUSA's own testimony admitting  its lack of policies further evidence that the Offering Documents' assertion that SCUSA's servicing systems, processes and quality control measures ensured compliance with, among other things, the FCRA, were materially misleading.

### F.      SCUSA's VIOLATIONS OF THE SCRA

175.    The Offering Documents acknowledge SCUSA's obligation to comply with the SCRA, which includes a requirement to obtain a court order prior to repossessing a U.S. servicemember's car when that member paid a deposit on the vehicle or installment on the loan while not in military service.   50 App. U.S.C.  §  532.   The purpose of SCRA is to provide protections to servicemembers while they are in military service.  According to the complaint filed by the U.S. Attorney General, *United States v. Santander Consumer, USA Inc.*, No. 3:15-cv-633 (N.D. Tex. Feb. 25, 2015), however, SCUSA had engaged in a pattern and practice involving the repossession of more than 1,100 of military servicemembers' cars and/or seeking to collect fees from military servicemembers for unauthorized repossessions.

176.    Prior to the time of the IPO, Defendants were on notice that violations of the SCRA had been alleged and/or occurred but did not disclose these violations to investors.  For

example, the U.S. Army's Legal Assistance Program sent SCUSA a complaint letter after, in violation of SCRA, SCUSA repossessed the car of U.S. Army Specialist Joshua Davis in the middle of the night while he was at basic training. The Legal Assistance Program referred the matter to the U.S. Department of Justice ("DOJ"), after SCUSA failed to respond. This is inconsistent with Defendants' representations, among other things, that SCUSA's tracking process ensures "customer complaints are addressed appropriately."

177.    SCUSA was also served with a complaint filed in 2011, *Beard v. Santander Consumer, USA, Inc.*, No. 1:11-CV-01815-LJO-BAM (E.D. Cal. Oct. 31, 2011), in which plaintiff Charles Beard, a member of the United States Army National Guard, alleged his car had been repossessed while he was on active duty in violation of the SCRA. The parties were subsequently ordered to arbitration and an award was issued on April 26, 2013, prior to SCUSA's IPO.

178.    Another complaint for violations of the SCRA was filed on June 3, 2013, *Platte v. Santander Consumer USA Inc.*, No. 3:13-cv-02070-M (N.D. Tex.). Petty Officer Michael Platte alleged that his vehicle was repossessed while he was in boot camp. The parties were ordered to arbitration on August 7, 2013.

179.    The DOJ also notified SCUSA on January 31, 2013 that it was opening an investigation into SCUSA's motor vehicle loan servicing policies, practices and procedures. The investigation included reviewing data on SCUSA's motor vehicle repossessions between January 1, 2008 and February 28, 2013.

180.    This is the type of data that the Offering Documents claimed SCUSA's servicing systems would have captured to ensure that the Company's activities were in compliance with federal lending rules. The repossessions, according to the DOJ's complaint following review of

this data, occurred even though there was evidence in SCUSA's own records that borrowers were SCRA protected servicemembers.  As a result of SCUSA's illegal practices, on February 26, 2015, the Honorable Judge Jane J. Boyle of the United States District Court for the Northern District of Texas entered a Consent Order (as amended on March 27, 2015) which contained the following findings:

> [T]he United States has determined that Defendant [SCUSA] conducted 785 motor vehicle repossessions between January 1, 2008 and February 28, 2013 that were not in compliance with SCRA.

> [SCUSA] sought to collect repossession-related fees assessed as part of an additional 327 motion vehicle repossessions that occurred between January 1, 2008 and February 28, 2013 was not in compliance with the SCRA.

*United States v. Santander Consumer USA Inc.*, No. 3:15-cv-633, (Dkt. No. 1) Addendum to Consent Order at 2 (N.D. Tex. March 27, 2015), ECF No. 8-1.

181.    Not only did SCUSA have to pay more than $9.4 million as part of the Consent Order for its wide-spread violations of SCRA, the largest settlement for illegal automobile repossessions ever obtained by the United States under the SCRA, it incurred additional expenditures as a result of its unlawful practices, including: (i) providing SCRA compliance training to employees who have the ability to reduce interest rates for servicemembers, who are involved in repossessions or whom provide customer service to servicemembers; and (ii) developing SCRA Policies and Procedures for Processing SCRA Relief Requests.

182.    The Consent Order, which was signed by SCUSA representatives, further provides that SCUSA "is implementing a system to determine and verify whether any borrowers are servicemembers by electronically comparing borrowers named on each motor vehicle loan against the Department of Defense Manpower Data Center [] database and against its own records of military service information received from borrowers."  *United States v. Santander*

*Consumer USA Inc.*, No. 3:15-cv-633 Consent Order at 3-4 (Dkt. No. 6) (N.D. Tex. Feb. 26, 2015).

183.    Given the foregoing admission in the Consent Order, such a system was not in place at the time the Offering Documents were filed with the SEC.  As such, the statements in the Offering Documents that SCUSA's servicing processes and quality-control measures "ensure compliance with the appropriate regulatory laws" were materially misleading.

### G.    SCUSA DISCLOSES THE NECESSITY FOR INCREASED COMPLIANCE

184.    Following the IPO, on May 29, 2014, SCUSA disclosed, *inter alia*, that "SCUSA expects to incur higher costs than originally anticipated in connection with compliance, and assisting SHUSA in, the CCAR process.  The suspension of SCUSA's ability to pay dividends or other limitations placed on SCUSA by the Federal Reserve or any other regulator and additional costs associated with regulatory compliance could have a material aderse effect on SCUSA and the trading price of its common stock."  On this news, SCUSA's shares dropped 4.63% to $19.76 from a close of $20.72 the prior day.  Later, during a July 31, 2014 conference call SCUSA explained that "consistent with the 8-K we filed in June, we estimate the need to add approximately 100 full-time employees related directly and indirectly to regulatory compliance, including CCAR.  Thus far, 20 positions have been identified as specific to CCAR . . . ."

185.    On June 11, 2014, SCUSA gave an investor presentation (discussed above) in which Defendant Dundon was asked about sales for prime originations being less in the first quarter than the analyst expected and what the dynamics were in terms of the economics of selling versus taking it off balance sheet.  Dundon responded, in pertinent part:

> We've had some changes because of the regulatory environment in our philosophy and think, going forward, most of the loans that we can originate above 640 we will flow off and keep the servicing strip. . . .  [A]s we deal with the changing regulatory environment, we think we have to put a lot of focus on compliance and risk management and the CCAR process so we are not going to

grow the assets that are on our balance sheet as much and that means we will sell a few more of the prime and mid-prime than maybe we have thought we were going to.

186.    Following the investor presentation, SCUSA's stock price dropped from a close

of $21.05 on June 10, 2014 to a close of $19.25 on June 11, 2014, a 8.55% drop in a single day.

187.    Subsequently, on June 12, 2014, SCUSA issued a Form 8-K disclosing (as

discussed above) that:

> [As] previously disclosed, the Company expects to incur additional compliance costs.   The Company's incremental costs related to regulatory compliance, including CCAR, are currently expected to include an incremental staffing requirement of approximately 100 full time employees at approximately $125,000 average annual cost per person.   The Company expects that these incremental employees will represent one component of costs that Company will incur in developing a best-in-class compliance capability.   Other costs of the process will include, but may not be limited to, IT systems, consultants and advisors, and legal costs.   The Company is in the process of evaluating and estimating the overall impact of these costs on its expected results.

188.    On this news, the Company's stock dropped another 1.33% on June 12, 2014 to

close at $18.99 per share.   Morgan Stanley analysts wrote on June 15, 2014, that "we look for the

expense ratio to increase from higher legal and compliance costs."   Credit Suisse analysts noted

on June 16, 2014 that "SCUSA will have to add about $12.5 million of personnel costs and other

costs related to compliance and the CCAR process.   We have added $30 million of annual

expenses to our forecast, which represents about $0.08 per share and about 60 bps of ROE.

These amounts could be higher over time."

## VII.   THE SECURITIES ACT CLAIMS

### A.    CLASS ACTION ALLEGATIONS RELATED TO THE SECURITIES ACT CLAIM

189.    Lead Plaintiffs bring the Securities Act claims on behalf of themselves and as a

class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf

of the Securities Act Class, which, as alleged above, consists of all those who purchased or

otherwise acquired the common stock of SCUSA in or traceable to the Company's IPO, and were damaged thereby.  Excluded from the Securities Act Class are Defendants (as set forth above), present or former executive officers of the corporate defendant and their immediate family members (as defined in 17 C.F.R. § 229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)), SHUSA and the other selling stockholders identified in the Offering Documents and present or former executive officers of SHUSA and the other selling stockholders identified in the Offering Documents and their immediate family members (as defined in 17 C.F.R. § 229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)).

190.    The members of the Securities Act Class are so numerous that joinder of all members is impracticable.  For example, SCUSA issued at least 74,991,470 shares of common stock in the IPO, with an underwriter option to issue an additional 11,248,720 shares.  After the IPO, SCUSA's stock traded actively on the NYSE.  While the exact number of the Securities Act Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the Securities Act Class members number in the thousands.

191.    Lead Plaintiffs' claims are typical of the claims of the members of the Securities Act Class.  Lead Plaintiffs and the other members of the Securities Act Class purchased or otherwise acquired SCUSA common stock in the IPO and sustained damages as a result of Defendants' conduct complained of herein.

192.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests that are adverse or antagonistic to the Securities Act Class.

193.    Common questions of law and fact exist as to all members of the Securities Act Class, and predominate over any questions solely affecting individual members of the Securities Act Class.  Among the questions of law and fact common to the Securities Act Class are:

(a)  whether the Securities Act was violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public in connection with the Company's IPO omitted and/or misrepresented material facts about the business, operation, and prospects of SCUSA; and

(c)  the extent of damages sustained by the Securities Act Class, and the proper measure of damages.

194.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Securities Act Class may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Securities Act Class to individually redress the wrongs done to them as alleged herein.  There will be no difficulty in the management of this action as a class action.

195.    The names and addresses of those persons and entities that purchased or otherwise acquired SCUSA's common stock in or traceable to the IPO are available from the Company's transfer agent(s) or other sources.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

**B.  THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE AS TO THE SECURITIES ACT CLAIMS**

196.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false or misleading

statements or material omissions pleaded with respect to the Securities Act claims.

197.    First, Section 27(A) of the Securities Act provides that the statutory safe harbor "shall not apply to a forward-looking statement that is made in connection with an initial public offering." 15 U.S.C. § 77z-2(b)(2)(D).

198.    Second, none of the misstatements complained of herein were forward-looking statements. Rather, they were misstatements concerning current facts and conditions existing at the time the statements were made.

199.    Third, to the extent that any statements may be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth in detail above, the then existing facts contradicted Defendants' statements. Given the then-existing facts contradicting Defendants' statements, the generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements and material omissions.

###    C.    FALSE OR MISLEADING STATEMENTS RELATED TO THE SECURITIES ACT CLAIMS

200.    The IPO Offering Documents were materially false or misleading because Item 201(c) affirmatively required disclosure of the dividend restrictions imposed by the CCAR process, but there was no such disclosure in the Offering Documents. Therefore, Defendants violated Sections 11 and 12(a)(2) of the Securities Act.

201.    The IPO Offering Documents were also materially false or misleading because: (a) Item 503(c) of Regulation S-K affirmatively required a "discussion of the most significant factors that make the offering risky or speculative;" (b) the restriction on SCUSA's ability to pay dividends stemming from the CCAR process and/or the compliance inadequacies alleged herein

was one of the most significant factors that made the SCUSA IPO risky or speculative; and (c) the Offering Documents failed to include any discussion regarding the dividend restriction or the compliance inadequacies.   Therefore, Defendants violated Sections 11 and 12(a)(2) of the Securities Act.

202.   The Offering Documents (emphasis added) stated that:   "Following the completion of this offering, *we currently intend* to pay dividends on a quarterly basis at an initial amount of approximately $0.15 per share."

203.   This statement was false or misleading because Defendants knew or should have known SCUSA was unable to pay dividends unless and until the Federal Reserve found that SCUSA did not object to SHUSA's capital plan and because Defendants failed to disclose the dividend restrictions imposed by the CCAR process and the effect those restrictions had and were going to, or were likely to, have on SCUSA's ability to pay dividends to shareholders.

204.   The Offering Documents contained several false or misleading statements regarding SCUSA's compliance framework.   Specifically, the Offering Documents stated:

> *Strong Relationship with Santander.*   Santander has provided us with significant funding support, both through existing committed liquidity and opportunistic extensions of credit. Because of our relationship with Santander, we are subject to the regulatory oversight of the Federal Reserve System….   This oversight has led us to develop and maintain *extensive risk management and reporting procedures and has helped us to continually adapt to the evolving regulatory requirements for consumer finance in the United States*.

Prospectus at 4 (emphasis added); *see also id*. at 88.   The Offering Documents further stated that SCUSA "derived significant benefits from [its] relationship with Santander, including…*shared best practices in compliance and risk management*."   *Id.* at 82 (emphasis added).   The Offering Documents further stated:

> Due to the highly regulated nature of the consumer finance industry, we are required to comply with a wide array of federal, state, and local laws and

78

regulations that regulate, among other things, the manner in which we conduct our origination and servicing operations. These regulations directly impact our business and require constant compliance, monitoring, and internal and external audits. Although *we have an extensive enterprise-wide compliance framework* structured to continuously monitor our activities, compliance with applicable law is costly, and may create operational restraints.

*Id* at 25 (emphasis added).  The Offering Documents further stated:

In response to the evolving regulatory requirements for consumer finance, in 2012, we established the position of Chief Compliance Officer, later expanded to Chief Compliance and Risk Officer, to place emphasis on SCUSA's commitment to manage regulatory in a *comprehensive compliance management program* and overall risk in an enterprise risk program.

*Id.* at 74 (emphasis added).  The Offering Documents further stated:

We must comply with the significant number of laws and regulations governing the consumer finance industry and, specifically, consumer protection. Compliance with applicable law is costly and can affect operating results. Compliance also requires a robust framework of governance and controls, which may create operational constraints. To manage our legal and compliance risk, *we maintain an extensive compliance, internal control, and monitoring framework*, which includes the gathering of corporate control performance threshold indicators, Sarbanes-Oxley testing, monthly quality control tests, ongoing compliance monitoring with all applicable regulations, internal control documentation and review of processes, and internal audits.

*Id.* at 77 (emphasis added).

205.   These statements were false or misleading because SCUSA's compliance and risk management framework and controls were anything but "extensive," "comprehensive" or "shared best practices" – they were woefully inadequate, as was later revealed when SCUSA announced additional expenses, including being required to hire 100 additional compliance professionals at a cost of $12.5 million annually and admitted that it was unaware of regulatory expectations related to the CCAR process.

206.   The January 2014 "Initial Public Offering Road Show Presentation" by SCUSA stated that from 2008 to 2013, prior to the IPO, SCUSA had a "Dividend payout:  30%+" and that SCUSA had "Extensive risk management and reporting procedures" and "Compliance

(AML [i.e., anti-money laundering], fair lending, etc.)," and SCUSA stated that it "will 'pay out 30+% of their net income in the form of dividends.'"

207.    These statements were false or misleading because SCUSA knew or should have known it was unable to pay dividends unless and until the Federal Reserve found that it did not object to SHUSA's capital plan and because SCUSA knew or should have known its compliance and risk management procedures were far from extensive as they related to the CCAR process.[10]

208.    The Offering Documents further stated (emphasis added): "*We are in compliance with state laws and regulations applicable to our lending operations in each state*."  Prospectus at 97.

209.    This statement was false or misleading because, as stated in detail above, at the time of the IPO, SCUSA was not in compliance with applicable state law and regulations applicable to its lending operations.

210.    The Offering Documents further stated (emphasis added):

> We have built our servicing approach based on years of experience as a nonprime lender.  Our servicing activities consist largely of processing customer payments, responding to customer inquiries (such as requests for payoff quotes), processing customer requests for account revisions (such as payment deferrals), maintaining a perfected security interest in the financed vehicle, monitoring vehicle insurance coverage, pursuing collection of delinquent accounts, and remarketing repossessed or off-lease vehicles.   We have made significant technology investments in our servicing systems *to ensure that our servicing activities are in compliance with federal and local consumer lending rules in all 50 states*.

*Id.* at 92.

211.    This statement was materially false or misleading because, as alleged in detail above, SCUSA's servicing systems were inadequate and did not ensure compliance with applicable federal and state regulatory laws.

---

[10] For the avoidance of doubt, Lead Plaintiffs are not alleging that the portion of these statements about SCUSA's *prior* dividend payments are false or misleading.

212.    The Offering Documents further stated (emphasis added):  "***Most of our servicing processes and quality-control measures also serve a dual purpose in that they both ensure compliance with the appropriate regulatory laws*** and ensure that we deliver the best possible customer service. Additionally, our servicing platform and all of the features we offer to our customers are scalable and can be tailored through statistical modeling and automation." *Id.* at 93.

213.    This statement was false or misleading because, as alleged in detail above, SCUSA's servicing processes and quality-control measures did not ensure compliance with appropriate federal or state regulatory laws.

214.    The Offering Documents further stated (emphasis added):  SCUSA's "complaint tracking processes ***ensure customer complaints are addressed appropriately*** and that the customers receive status updates." *Id.* at 92.

215.    This statement was false or misleading because, as alleged in detail above, SCUSA's complaint tracking process did not ensure that customer complaints were addressed appropriately.

### D.    THE SECURITIES ACT DEFENDANTS' STRICT LIABILITY OR NEGLIGENCE

216.    SCUSA, as the issuer, is strictly liable under Section 11 for the false or misleading statements and material omissions in the Offering Documents identified elsewhere herein.  With respect to the Section 12(a)(2) claim, SCUSA (through the action of its agents – the Individual Defendants – described herein) acted negligently in failing to ascertain that the Offering Documents contained false or misleading statements and/or omissions of material fact.

217.    The Individual Defendants and Underwriter Defendants are liable for the false or misleading statements and material omissions in the Offering Documents, identified elsewhere herein, because they acted negligently in failing to ascertain that the Offering Documents

81

contained false or misleading statements and/or omissions of material fact, did not conduct a reasonable investigation of the statements contained in the Offering Documents and/or did not possess reasonable grounds for believing that the statements in the Offering Documents were true and not misleading.

### 1.      The Individual Defendants' Negligence

218.      The Individual Defendants did not conduct a reasonable investigation into the accuracy of the disclosures in the Offering Documents because they negligently failed to ascertain that:  (a) SCUSA was a controlled subsidiary of SHUSA for bank regulatory purposes and as a consolidated subsidiary of SHUSA, SCUSA was included in SHUSA's stress tests and capital plans in the CCAR process; (b) it would not be known whether the Federal Reserve objected to SHUSA's capital plan until March 2014; (c) SHUSA and therefore its controlled subsidiary, SCUSA, could not pay any dividends unless and until the Federal Reserve issued a statement of non-objection to SHUSA's capital plan; (d) SCUSA's ability to pay future dividends, particularly sufficient dividends to achieve a 30% payout ratio, was likely to be affected by the CCAR process; (e) Item 201(c) required that the Offering Documents disclose dividend restrictions; and (f) these restrictions on dividend payments and/or the compliance inadequacies alleged elsewhere herein were one of the "most significant factors that ma[d]e the offering risky or speculative," and therefore Item 503(c) of Regulation S-K affirmatively required a discussion of the dividend restrictions and the compliance inadequacies in the Offering Documents, but the Offering Documents failed to include any discussion regarding the dividend restrictions or the compliance inadequacies.

219.      In addition, the Individual Defendants' investigation was not reasonable because: (a) the restrictions on payment of dividends by a bank holding company was plainly stated in the CCAR Instructions, a document that the Individuals Defendants were or should have been

familiar with prior to the IPO; (b) other bank holding companies, including the parent companies of certain of the Underwriter Defendants, had disclosed the restriction on the ability of the respective bank holding companies and/or their subsidiaries to make capital distributions (including dividends) in numerous publicly available SEC filings that were easily obtainable by the Individual Defendants prior to the IPO and that were reviewed or should have been reviewed by the Individual Defendants prior to the IPO; (c) eight of SCUSA's 11 board members were officers and/or directors of SHUSA and/or Santander and therefore either knew of the CCAR restrictions on payment of dividends directly or should have known about such restrictions given their senior positions with SHUSA and/or Santander;[11] (d) all of the Individual Defendants (with the exception of Kulas), as members of SCUSA's board of directors, received annual regulatory and compliance training that included or should have included discussion of the CCAR process and, therefore, were aware or should have been aware of the dividend restrictions; and (e) Individual Defendants Kabaker, Sanchez and Yanes were members of the Board Enterprise Risk Committee, which, upon information and belief, had responsibility, prior to the IPO, for assessing the effect of the CCAR process and SHUSA's stress test on SCUSA and, therefore, were aware of or should have been aware of the dividend restrictions.

220.    In addition, the Individual Defendants' investigation into the statements in the Offering Documents that the Company had an "extensive risk management and reporting

---

[11] These directors are:  (1) SCUSA's CEO Dundon, who was a director of SHUSA at the time of SCUSA's IPO; (2) de Las Heras, who at the time of the SCUSA IPO had been a director of SHUSA since October 2006; (3) Sanchez, who at the time of the SCUSA IPO had been a director of SHUSA since January 2009; (4) Alvarez, who at the time of the SCUSA IPO was CEO of SHUSA; (5) Blanco, who at the time of the SCUSA IPO was CHO of SHUSA; (6) Ferriss, who at the time of the SCUSA IPO was a director of SHUSA since 2012; (7) San Felix, who at the time of the SCUSA IPO had been a Senior Vice President of Santander since May 2013; and (8) Yanes, who at the time of the SCUSA IPO had been a director of SHUSA since September 2009, and SHUSA's Chief Risk Officer and a member of its Executive Management Committee.  *See* Prospectus at 101-03.

procedures," "shared best practices in compliance and risk management," an "extensive enterprise-wide compliance framework" , a "comprehensive compliance management program" and "extensive compliance, internal control, and monitoring framework" were not reasonable. Rather the Company's compliance framework was woefully inadequate at the time of the IPO, as evidenced by the following:  (a) SCUSA's need to hire an additional 100 full-time compliance employees at an annual cost of $12.5 million annually less than six months after the IPO, which, as alleged interalia, elsewhere herein, represented between a 5.5% increase and an 8.2% increase over SCUSA's salary and benefits expense for (not just compliance personnel, but) *all the employees in the entire Company* since 2011; and (b) CEO Dundon's admission at the June 11, 2014 investor presentation (discussed more fully elsewhere herein) that "we were not aware of the expectations" of regulators relating to CCAR compliance and enterprise risk processes.

221.    In addition, Defendants SCUSA, Dundon and Kulas did not conduct a reasonable investigation into the accuracy of the disclosures during the roadshow presentations — that SCUSA "will 'pay out 30+% of their net income in the form of dividends'" and that SCUSA and SHUSA/Santander had "Extensive risk management and reporting procedures" and "Compliance" — for the same reasons discussed above.

222.    The Individual Defendants also did not conduct a reasonable investigation into the accuracy of the statements in the Offering Documents regarding SCUSA's systems, processes, procedures and controls to effectively monitor risk and ensure compliance with laws and regulations because, interalia, the following would have informed the Individual Defendants that the  statements in the Offering Documents were materially inaccurate: (a) multiple complaints filed against SCUSA for violations of the SCRA and a complaint letter sent to SCUSA by the U.S. Army's Legal Assistance Program regarding the same; (b) multiple consumer complaints

alleging violations of the TCPA, FDCPA, FCRA and TILA, and corresponding state consumer protection laws; and (c) two class actions filed in California and Massachusetts for SCUSA's failure to comply with state laws governing the post-repossession notice to consumers.  Further, the Company admitted on June 12, 2014 that SCUSA would increase costs associated with compliance, including adding approximately 100 full-time employees related to regulatory compliance (with at least 20 of those positions being specific to CCAR as set forth in SCUSA's 2Q14 Investor Presentation) and thus acknowledged that fundamental deficiencies in the company's systems and processes existed at the time of the IPO.  Further, CEO Dundon also admitted during a November 4, 2014 conference call that the Company was "focused on enhancing processes related to risk management, governance, and internal control," which acknowledges that the Company's risk management policies and procedures, internal governance and internal control processes, including those related to regulatory compliance, were insufficient at the time of the IPO.  He further admitted during a February 3, 2015 conference call that while the Company's regulatory expectations had not changed, their "understanding [of them] changed," and that the Company was trying to "incorporate those expectations into [their] risk management and governance processes and that's clearly a transition that costs [SCUSA] time and money."  Further, the Offering Documents themselves claimed, for example, that SCUSA had the systems, processes and procedures in place which "enable[d] us to effectively monitor, price and manage risk on a real-time basis and at a highly granular level;" that "we have an extensive enterprise wide compliance framework structured to continuously monitor our activities;" and that SCUSA's "quality-control measures" ensure "compliance with [the] appropriate regulatory laws."  If such systems, processes, procedures and controls had existed,

the Individual Defendants would have been informed that such statements were inaccurate as they would have reflected the systemic compliance and legal violations alleged herein.

### 2.     The Underwriter Defendants' Negligence

223.    The Underwriter Defendants did not conduct a reasonable investigation into the accuracy of the disclosures in the Offering Documents because they negligently failed to ascertain that:  (a) SCUSA was a controlled subsidiary of SHUSA for bank regulatory purposes and as a consolidated subsidiary of SHUSA, SCUSA was included in SHUSA's stress tests and capital plans in the CCAR process; (b) it would not be known whether the Federal Reserve objected to SHUSA's capital plan until March 2014; (c) SHUSA and therefore its controlled subsidiary, SCUSA, could not pay any dividends unless and until the Federal Reserve issued a statement of non-objection to SHUSA's capital plan; (d) SCUSA's ability to pay future dividends, particularly sufficient dividends to achieve a 30% payout ratio, was likely to be affected by the CCAR process; (e) Item 201(c) required that the Offering Documents disclose dividend restrictions; and (f) these restrictions on dividend payments and/or the compliance inadequacies alleged elsewhere herein were one of the "most significant factors that ma[d]e the offering risky or speculative," and therefore Item 503(c) of Regulation S-K affirmatively required a discussion of the dividend restrictions and the compliance inadequacies in the Offering Documents, but the Offering Documents failed to include any discussion regarding the dividend restrictions or the compliance inadequacies.

224.    In addition, the Underwriter Defendants' investigation was not reasonable because:  (a) the restriction on payment of dividends by a bank holding company was plainly stated in the CCAR Instructions, a document that was reviewed by or should have been reviewed by the Underwriter Defendants prior to the IPO; and (b) other bank holding companies, including the parent companies of certain of the Underwriter Defendants, had disclosed the restriction on

the respective bank holding companies' ability to make capital distributions (including dividends) in numerous publicly available SEC filings that were easily obtainable by the Underwriter Defendants prior to the IPO and that were reviewed by, or should have been reviewed by, the Underwriter Defendants prior to the IPO.

225.    In addition, the Underwriter Defendants' investigation into the statements in the Offering Documents that the Company had an "extensive risk management and reporting procedures," "shared best practices in compliance and risk management," an "extensive enterprise-wide compliance framework"; a "comprehensive compliance management program" and "extensive compliance, internal control, and monitoring framework" was not reasonable because the Underwriter Defendants were negligent in failing to ascertain that the Company's compliance framework was woefully inadequate at the time of the IPO, as evidenced by:  (a) SCUSA's need to hire an additional 100 full-time compliance employees at an annual cost of $12.5 million annually less than six months after the IPO, which, as alleged elsewhere herein, represented between a 5.5% increase and an 8.2% increase over SCUSA's salary and benefits expense for (not just compliance personnel, but) *all the employees in the entire Company* since 2011; and (b) CEO Dundon's admission at the June 11, 2014 investor presentation (discussed more fully elsewhere herein) that "we were not aware of the expectations" of regulators relating to CCAR compliance and enterprise risk processes.  In addition, the Underwriter Defendants, some or all of whom were, upon information and belief, present at roadshow presentations for the IPO, did not conduct a reasonable investigation into the accuracy of the disclosures during the roadshow presentations — that SCUSA "will 'pay out 30+% of their net income in the form of dividends'" that SCUSA and SHUSA/Santander had "Extensive risk management and reporting procedures" and "Compliance" — for the same reasons discussed above.

226.    The Underwriter Defendants also did not conduct a reasonable investigation into the accuracy of the disclosures in the Offering Documents regarding SCUSA's systems, processes, procedures and controls to effectively monitor risk and ensure compliance with laws and regulations because, *interalia,* the following would have informed the Underwriter Defendants that the statements in the Offering Documents were materially inaccurate: (a) multiple complaints filed against SCUSA for violations of the SCRA and a complaint letter sent to SCUSA by the U.S. Army's Legal Assistance Program regarding the same; (b) multiple consumer complaints alleging violations of the TCPA, FDCPA, FCRA and TILA, and corresponding state consumer protection laws; and (c) two class actions filed in California and Massachusetts for SCUSA's failure to comply with state laws governing the post-repossession notice to consumers.  Further, the company admitted on June 12, 2014 that SCUSA would increase costs associated with compliance, including adding approximately 100 full-time employees related to regulatory compliance (with 20 of those positions being specific to CCAR as set forth in SCUSA's 2Q14 Investor Presentation) and thus acknowledged that fundamental deficiencies in the Company's systems and processes exited at the time of the IPO.  CEO Dundon during a November 4, 2014 conference call that the Company was "focused on enhancing processes related to risk management, governance, and internal control," which acknowledges that the Company's risk management policies and procedures, internal governance and internal control processes, including those related to regulatory compliance, were insufficient at the time of the IPO.  He further admitted during a February 3, 2015 conference call wherein he stated that while the Company's regulatory expectations had not changed, their "understanding [of them] changed," and that the Company was trying to "incorporate those expectations into [their] risk management and governance processes and that's clearly a

transition that costs [SCUSA] time and money."  Further, the Offering Documents themselves claimed, for example, that SCUSA had the systems, processes and procedures in place which "enable[d] us to effectively monitor, price and manage risk on a real-time basis and at a highly granular level;" that "we have an extensive enterprise wide compliance framework structured to continuously monitor our activities;" and that SCUSA's "quality-control measures" ensure "compliance with [the] appropriate regulatory laws."  If such systems, processes, procedures and controls had existed, the Underwriter Defendants would have been informed that such statements were inaccurate as they would have reflected the systemic compliance and legal violations alleged herein.

## VIII.   CLAIMS FOR RELIEF UNDER THE SECURITIES ACT

### FIRST CLAIM UNDER THE SECURITIES ACT
### Violation of Section 11 of The Securities Act
### (Against SCUSA, The Individual Defendants And The Underwriter Defendants)

227.   This claim is brought against SCUSA, the Individual Defendants and the Underwriter Defendants.

228.   This claim does not sound in fraud.  For the purposes of this Section 11 claim, Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act.  This claim is based solely on strict liability as to SCUSA, and negligence as to the remaining Defendants.  Lead Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this Section 11 claim.

229.   Except as stated in the prior paragraph, Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

230.   This claim is brought against all Defendants pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all proposed Securities Act Class members who

purchased or otherwise acquired SCUSA's common stock in or traceable to the IPO, and were damaged thereby.

231.    At the time of the IPO, the Registration Statement, including the Prospectus, contained untrue statements of material fact, omitted to state facts necessary to make the statements therein not misleading and/or failed to disclose required material information as alleged above.

232.    SCUSA is the registrant for the IPO and issuer of the common stock sold pursuant to the Registration Statement.  As issuer of the shares, SCUSA is strictly liable to Lead Plaintiffs and to the members of the class who purchased common stock in or traceable to the IPO for the materially false or misleading statements in or materials omissions from the Registration Statement.

233.    The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.  The Individual Defendants were signatories of the false or misleading Registration Statement.  The Underwriter Defendants were underwriters of the IPO.

234.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

235.    Lead Plaintiffs and the other members of the Securities Act Class acquired SCUSA shares pursuant and/or traceable to the Registration Statement for the IPO.

236.    Lead Plaintiffs and the other members of the Securities Act Class who purchased SCUSA stock pursuant or traceable to the Registration Statement suffered substantial damages as a result of the false or misleading statements and omissions of material facts in the Registration Statement, as they either sold these shares at prices below the IPO price of $24 per share or still

held shares as of the date of the initial complaint containing claims under the Securities Act — August 26, 2014 — when the closing price of the common stock was $18.81 per share, which was below the $24 IPO price.

237.    This claim is brought within the applicable statute of limitations because the initial complaint in this action was filed less than one year between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based and the time the claim was first filed, and less than three years have elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time this action was commenced.

238.    By reason of the conduct herein alleged, the Defendants named in this Count have violated Section 11 of the Securities Act.

**SECOND CLAIM UNDER THE SECURITIES ACT**
**Violation of Section 12(a)(2) of The Securities Act**
**(Against SCUSA, the Individual Defendants and the Underwriter Defendants)**

239.    This claim is asserted against Defendants SCUSA, the Individual Defendants and the Underwriter Defendants.

240.    This claim does not sound in fraud.  For the purposes of this Section 12(a)(2) claim, Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 12(a)(2) of the Securities Act.  This claim is based solely on negligence.  Lead Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this Section 12(a)(2) claim.

241.    Except as stated in the prior paragraph, Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

242.    This claim is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Securities Act Class who purchased SCUSA's

common stock in the IPO, against SCUSA, the Individual Defendants and the Underwriter Defendants.

243.    Each Defendant named in this claim for relief was a seller, offeror and/or solicitor of sales of the common stock offered pursuant to the Registration Statement and Prospectus.

244.    SCUSA was the issuer of shares in the IPO.  SCUSA solicited the purchase of shares by virtue of issuing the Registration Statement, Prospectus and making roadshow presentations and distributing roadshow materials, and was motivated at least in part to serve its own financial interests.

245.    Defendant Dundon sold, or had interests in entities that sold, 3,420,499 shares in the IPO for proceeds of approximately $82,091,976.  Dundon also solicited the purchase of shares by virtue of signing the Registration Statement containing the Prospectus, participating in roadshow presentations, acting as a "Management Presenter" at roadshow presentations and answering investor questions at SCUSA's roadshow meetings.  In making these solicitations, Dundon was motivated in part to serve SCUSA's interests and his own.  In addition to Dundon, and/or companies in which he has an interest, receiving $82,091,976 in proceeds from the IPO, the value of Dundon's retained shares was approximately $1,157,167,512 based on the IPO price.

246.    Defendant Kulas sold, or had interests in entities that sold, 217,323 shares in the IPO for proceeds of approximately $5,215,752.  Kulas also solicited the purchase of shares by virtue of signing the Registration Statement containing the Prospectus, participating in roadshow presentations, acting as a "Management Presenter" at roadshow presentations and answering investor questions at SCUSA's roadshow meetings.  In making these solicitations, Kulas was motivated in part to serve SCUSA's interests and his own.  In addition to Kulas or companies in

which he has an interest receiving $5,215,752 in proceeds from the IPO, the value of Kulas'
retained shares was approximately $20,938,872 based on the IPO price.

247.    The other Individual Defendants solicited the purchase of shares by virtue of
signing the Registration Statement containing the Prospectus and/or participating in roadshow
presentations, acting as a "Management Presenter" at roadshow presentations and/or answering
investor questions at SCUSA's roadshow meetings.  In making these solicitations, the Individual
Defendants were motivated in part to serve SCUSA's interests and their own.

248.    The Underwriter Defendants transferred title to SCUSA stock to Lead Plaintiffs
and other members of the Securities Act Class who purchased shares in the IPO, and transferred
title of SCUSA stock to other underwriters and/or broker-dealers that sold those securities as
agents for the Underwriter Defendants.  The Underwriter Defendants also solicited the purchase
of SCUSA stock in the IPO by the Lead Plaintiffs and other members of the Securities Act Class
who purchased in the IPO by means of the Registration Statement and Prospectus, motivated at
least in part by the desire to serve the Underwriter Defendants' own financial interests and the
interests of SCUSA including but not limited to, earning commissions (and/or their affiliates
earning commissions) on the sale of SCUSA stock in the IPO.  Upon information and belief,
some or all of the Underwriter Defendants participated in the IPO roadshow presentations by
SCUSA.

249.    At the time of the IPO, the Registration Statement and Prospectus contained
untrue statements of material fact, omitted to state facts necessary to make the statements therein
not misleading and/or failed to disclose required material information as alleged above.

250.    Lead Plaintiffs and other members of the Securities Act Class who purchased
SCUSA common stock in the IPO made such purchases pursuant to the materially untrue and

misleading offering documents, and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained therein.

251.    Lead Plaintiffs and the other members of the Securities Act Class who purchased the common stock pursuant to the offering documents suffered substantial damages as a result of the false and misleading statements and/or omissions of material facts in the offering documents, as they either sold these shares at prices below the IPO price of $24 per share or still held shares as of the date of the initial complaint containing claims under the Securities Act — August 26, 2014 — when the closing price of the common stock was $18.81 per share, which was below the $24 per share IPO price.

252.    Members of the Securities Act Class who purchased the common stock pursuant to the offering documents and still hold that stock have sustained substantial damages as a result of the untrue statements of material facts and omissions contained therein, for which they hereby elect to rescind and tender their common stock to the Defendants sued in this claim for relief in return for the consideration paid with interest.  Those members of the Securities Act Class who have already sold their stock acquired in the IPO pursuant to the materially untrue and misleading offering documents are entitled to damages from the Securities Act Defendants.

253.    This claim is brought within the applicable statute of limitations because the initial complaint in this action was filed less than one year between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based and the time this action was first filed, and less than three years have elapsed between the time that the securities upon which this claim is brought were bona fide offered to the public and the time this action was commenced.

254.    By reason of the conduct herein alleged, the Defendants named in this claim for relief have violated Section 12(a)(2) of the Securities Act.

### THIRD CLAIM UNDER THE SECURITIES ACT
#### Violation of Section 15 of The Securities Act
#### (Against the Individual Defendants)

255.    This claim is asserted against the Individual Defendants.

256.    This claim does not sound in fraud.  For the purposes of this Section 15 claim, Lead Plaintiffs do not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 15 of the Securities Act.  This claim is based solely on negligence.  Lead Plaintiffs specifically disclaim any allegation of fraud, scienter or recklessness in this Section 15 claim.

257.    Except as stated in the prior paragraph, Lead Plaintiffs repeat and reallege each and every allegation contained above.

258.    This claim is asserted against the Individual Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Securities Act Class who purchased or otherwise acquired SCUSA common stock issued pursuant or traceable to the Registration Statement.

259.    At all relevant times, these Defendants were controlling persons of the Company within the meaning of Section 15 of the Securities Act.  Defendant Dundon, at the time of the filing of the Registration Statement and the IPO, served as Chairman of the Board of Directors and CEO.  Defendant Kulas was CFO at the time of the filing of the Registration Statement and the IPO.  The other Individual Defendants were directors at the time of the filing of the Registration Statement and the IPO.  Defendants Alvarez, Blanco, Heras, Ferriss, Sanchez and Yanez all also served as either executives and/or directors of SHUSA.  SHUSA controlled SCUSA's policies and operations.   Defendants Dundon, Kulas and the other Individual

Defendants approved the IPO and reviewed and approved the Registration Statement and Prospectus.

260.    Defendants Dundon, Kulas and the other Individual Defendants, prior to and at the time of the IPO, participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of SCUSA's business affairs, including the IPO.

261.    As officers and/or directors of a company engaging in an IPO, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to SCUSA's business. These Defendants participated in the preparation and dissemination of the offering documents, and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority as senior officers and/or directors of SCUSA, these Defendants were able to, and did, control the contents of the offering documents, which contained materially untrue information and failed to disclose material facts.

262.    By reason of the aforementioned conduct, the Individual Defendants are liable under Section 15 of the Securities Act jointly and severally with and to the same extent as SCUSA is liable under Sections 11 and 12(a)(2) of the Securities Act, to Lead Plaintiffs and members of the Securities Act Class who purchased or otherwise acquired common stock issued pursuant to the Registration Statement and Prospectus.

263.    This claim is brought within the applicable statute of limitations because the initial complaint in this action was filed less than one year between the time Plaintiffs discovered or reasonably could have discovered the facts upon which this claim is based and the time the claim was first filed, and less than three years have elapsed between the time that the securities

upon which this claim is brought were bona fide offered to the public and the time this action was commenced.

## IX.   THE EXCHANGE ACT CLAIMS

### A.   CLASS ACTION ALLEGATIONS RELATED TO THE EXCHANGE ACT CLAIMS

264.   Lead Plaintiffs bring the Exchange Act claims on behalf of themselves and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Exchange Act Class, which, as alleged previously, consists of all persons or entities who purchased or otherwise acquired the securities of SCUSA during the Exchange Act Class Period (between January 23, 2014 and June 12, 2014, inclusive, as alleged previously herein), and were damaged thereby.   Excluded from the Exchange Act Class are Defendants (as set forth above), present or former executive officers of the corporate defendant and their immediate family members (as defined in 17 C.F.R. § 229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)), SHUSA and the other selling stockholders identified in the Offering Documents and present or former executive officers of SHUSA and the other selling stockholders identified in the Offering Documents and their immediate family members (as defined in 17 C.F.R. § 229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)).

265.   The members of the Exchange Act Class are so numerous that joinder of all members is impracticable.   For example, SCUSA issued at least 74,991,470 shares of common stock in the IPO, with an underwriter option to issue an additional 11,248,720 shares.   After the IPO, SCUSA's stock traded actively on the NYSE.   While the exact number of the Exchange Act Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that the Exchange Act Class members number in the thousands.

266.  Lead Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class.  Lead Plaintiffs and the other members of the Exchange Act Class purchased or otherwise acquired SCUSA common stock during the Exchange Act Class Period and sustained damages as a result of the Exchange Act Defendants' conduct complained of herein.

267.  Lead Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests that are adverse or antagonistic to the Exchange Act Class.

268.  Common questions of law and fact exist as to all members of the Exchange Act Class, and predominate over any questions solely affecting individual members of the Exchange Act Class.  Among the questions of law and fact common to the Exchange Act Class are:

(a)  whether the Exchange Act was violated by the Exchange Act Defendants' acts as alleged herein;

(b)  whether statements made by the Exchange Act Defendants to the investing public during the Exchange Act Class Period omitted and/or misrepresented material facts about the business, operations and prospects of SCUSA; and

(c)  the extent of damages sustained by the Exchange Act Class, and the proper measure of damages.

269.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Exchange Act Class may be relatively small, the expense and burden of individual litigation makes it impracticable for members of the Exchange Act Class to individually redress the

wrongs done to them as alleged herein.  There will be no difficulty in the management of this action as a class action.

270.    The names and addresses of those persons and entities that purchased or otherwise acquired and/or sold SCUSA's common stock during the Exchange Act Class Period are available from the Company's transfer agent(s) or other sources.  Notice may be provided to such class members via first-class mail using techniques and a form of notice similar to those customarily used in securities class actions.

### B.    THE SECTION 10(b) DEFENDANTS' FRAUDULENT SCHEME

271.    The allegations that follow describe the acts, practices and a course of conduct engaged in by certain Defendants that operated as a fraud on the investing public.  As described in more detail below, Defendants Dundon, Kulas and SCUSA (the "Section 10(b) Defendants") devised and participated in a fraudulent scheme pursuant to which they concealed: (a) the risks that SCUSA faced from the CCAR process; (b) the effect of the Federal Reserve's March 26, 2014 finding that SHUSA had failed its stress test; and (c) SCUSA's woefully inadequate compliance framework, would have on SCUSA's ability to pay dividends.

272.    During the roadshow presentations prior to SCUSA's January 23, 2014 IPO, the Section 10(b) Defendants touted SCUSA's past dividend payout history, and the prospect that it would continue in the future, as a key selling point for the IPO.  Defendants Dundon and Kulas, among others, were management presenters during roadshow presentations to investors in January 2014.  They used a written "Initial Public Offering Road Show Presentation" to solicit investors.  The presentation emphasizes that from 2008 to 2013, prior to the IPO, SCUSA had a stellar dividend payout history: "Dividend payout: 30%+."  During the presentation, according to a January 22, 2014 article on the investor website seekingalpha.com, SCUSA's management

presenters stated that SCUSA will pay out at least 30% of their net income in the form of dividends.  That representation was a key selling point for the IPO, and the Section 10(b) Defendants made it to create an expectation among investors that SCUSA's dividend payout going forward would be consistent with its prior dividend track record.  This representation was so important that the Section 10(b) Defendants approved of statements in the IPO Offering Documents touting SCUSA's payment of more than $1.9 billion in cash dividends to common stockholders from December 2010 to April 2013 and stating SCUSA's intention to pay quarterly cash dividends at an initial amount of $0.15 per share.

273.    The Initial Public Offering Road Show Presentation also stated that SCUSA had "Dedicated Sponsorship from Santander," which is "through SHUSA, a 100% bank holding company owned by Banco Santander S.A.," and that SCUSA and SHUSA/Banco Santander S.A. had "Extensive risk management and reporting procedures" and "Compliance (AML [i.e., anti-money laundering], fair lending, etc.)."  That representation was also important for the IPO because the Section 10(b) Defendants knew, or were severely reckless in disregarding, that compliance and/or risk management problems at SCUSA (and/or SHUSA) could lead or contribute to SHUSA failing its stress test in the CCAR process and to long-term restrictions on SHUSA (and therefore on SCUSA) to make capital distributions (including dividends) to shareholders.  This representation was so important that the Section 10(b) Defendants approved statements in the Offering Documents touting SCUSA's supposedly "extensive risk management and reporting procedures," "shared best practices in compliance and risk management," "extensive enterprise-wide compliance framework," "comprehensive compliance management program," and "extensive compliance, internal control, and monitoring framework."

274.     Prior to the IPO roadshows and the IPO, however, the Section 10(b) Defendants knew or were severely reckless in not knowing that there were restrictions on the payment of dividends by SCUSA.  As described more fully above, the Section 10(b) Defendants knew (or easily could have ascertained since documents reflecting the following information were publicly available on the Federal Reserve's website) that:  (a) SHUSA was a bank holding company subject to the CCAR process; (b) SHUSA was required to submit (and by early 2014 had submitted) a capital plan to the Federal Reserve and did so no later than January 6, 2014; (c) CCAR regulations required that the capital plan include detailed descriptions of, among other things, all planned capital actions (including payment of dividends) over a nine-quarter planning horizon, and results of stress tests conducted by SHUSA; (d) the CCAR regulations state that the entire purpose of the CCAR process was to establish prior notice and approval requirements for capital distributions, such as dividends, by bank holding companies; (e) the CCAR Instructions expressly stated that "[a]fter performing appropriate analysis, the Federal Reserve will, by March 31, either object or provide a notice of non-objection to the submitted capital plan…." and, thus, it would not be known whether the Federal Reserve objected to SHUSA's capital plan until March 2014; (f) CCAR regulations stated that no capital distributions could be made unless and until the Federal Reserve issued a notice of non-objection to the bank holding company's capital plan; and (g) the Federal Reserve stated in the December 2013 CCAR Instructions that it expects that dividend payout ratios would be conservative and payout ratios above 30% would receive particularly close scrutiny.  In addition, the Section 10(b) Defendants also knew that:  (a) SCUSA was a controlled subsidiary of SHUSA for bank regulatory purposes; (b) post-IPO, SHUSA consolidated SCUSA's financial results with SHUSA's financial results; (c) as a consolidated subsidiary of SHUSA, SCUSA was included in SHUSA's stress tests and capital

plans in the CCAR process; (d) SHUSA, by virtue of its ownership of approximately 61% of SCUSA's shares post-IPO, had the ability to control whether SCUSA paid dividends; (e) public shareholders who purchased shares in the IPO would receive approximately 21% of any dividend payments made by SCUSA; and (f) Rule 4-08(e) of Regulation S-X required that the Company's financial statements disclose dividend restrictions.

275.   Defendant Dundon was in a particularly good position to have had this knowledge because he was not only Chairman and CEO of SCUSA, but also a director of SHUSA who had access to SHUSA's books and records.  Seven other directors of Defendant SCUSA were also in particularly good positions to have had this knowledge since they were officers and/or directors of SHUSA and/or Santander and had similar access to SHUSA's books and records.

276.   Although the Section 10(b) Defendants knew or were severely reckless in not knowing the foregoing restrictions on dividends imposed by the CCAR process, there was nothing in the written Initial Public Offering Road Show Presentation or the Offering Documents indicating that there were any restrictions associated with the CCAR process on the payment of dividends by SCUSA.

277.   The Section 10(b) Defendants also knew or were severely reckless in not knowing that, as described earlier herein, six of the other bank holding companies that were subject to the same stress testing procedures in the CCAR process (which had been identified along with SHUSA in the 2014 CCAR) had been warning their shareholders — in their publicly available SEC filings issued at least a year prior to SCUSA's IPO — that capital distributions by companies subject to the CCAR process required prior approval of the Federal Reserve.  Despite the fact that others were warning their shareholders about these restrictions on dividends and other capital distributions, the Section 10(b) Defendants made no disclosures about the risks to

SCUSA with respect to the CCAR process or the restrictions on dividend payments by SCUSA stemming from the CCAR process in either the written Initial Public Offering Road Show Presentation or the Offering Documents.

278.     In addition to knowing or being severely reckless in not knowing about the risks related to the CCAR process, including the restrictions on SCUSA's payment of dividends, the Section 10(b) Defendants knew or were severely reckless in not knowing that SCUSA's compliance framework was woefully inadequate to comply with the CCAR regulatory process requirements expected of a multi-billion dollar controlled subsidiary of a bank holding company that was included in SHUSA's stress tests and capital plan.

279.     On March 6, 2014, the Section 10(b) Defendants knew or were severely reckless in not knowing that the Federal Reserve was in the process of reviewing SHUSA's capital plan, was scheduled to make its finding on SHUSA's stress test no later than March 31, 2014 and still had not found that SHUSA passed its stress test.  Since Dundon was a member of SHUSA's board of directors, it is near impossible that he could have been unaware that SHUSA's capital plan was under review by the Federal Reserve and had not been approved, and the same is true of the seven other SCUSA directors who were also directors and/or officers of SHUSA and/or Santander.  In addition, since Kulas had, from the time of the IPO (as stated in the Company's July 2, 2015 press release), overseen various regulatory functions including CCAR, it is near impossible that he could have been unaware that SHUSA's capital plan was under review by the Federal Reserve and had not been approved.

280.     Nevertheless, on March 6, 2014, the Section 10(b) Defendants approved statements in the Company's Form 10-K for the year ended 2013 that repeated the intention to pay a quarterly cash dividend of $0.15 per share and repeated that the Company supposedly had

"an extensive enterprise-wide compliance framework" an "extensive compliance, internal control, and monitoring framework, which includes … ongoing compliance monitoring with all applicable regulations" and relied on its "relationship with Santander, through SHUSA, for several competitive advantages including … regulatory best practices." March 6, 2014 Form 10-K at 24, 32, 74. The Form 10-K also failed, in violation of applicable regulations, to disclose the dividend restrictions. Nevertheless, Defendants Dundon and Kulas signed certifications on the same date falsely attesting that there were no materially false or misleading statements, or material omissions, in the Form 10-K.

281.   On March 26, 2014, regardless of the Section 10(b) Defendants' then-existing state of actual knowledge regarding the CCAR dividend restrictions and/or CCAR regulations and/or the Federal Reserve's CCAR stress-testing procedures, the world changed dramatically. On that date, upon information and belief, the Section 10(b) Defendants learned that the Federal Reserve found that SHUSA had failed its stress test and that the Federal Reserve issued its objection to the capital plan submitted by SHUSA. The 2014 CCAR Results expressly state that:

> The Federal Reserve objected to the capital plan from [SHUSA] due to widespread and significant deficiencies across [SHUSA's] capital planning processes. Specific deficiencies were identified in several areas, including governance, internal controls, risk-identification and risk management, management information system (MIS), and assumptions and analysis that support [SHUSA's] capital planning processes.

2014 CCAR Results at 7.

282.   The 2014 CCAR Results further stated that given the Federal Reserve's objection to a capital plan, the bank holding company may not make any capital distribution unless the Federal Reserve indicates in writing that it does not object to the distribution, and specifically that:

These BHCs [i.e., bank holding companies that failed their stress tests, including SHUSA] are not permitted to implement their requested plans for increased capital distributions, and are required to resubmit their capital plans to the Federal Reserve following substantial remediation of the issues that led to the objections, consistent with the requirements in the Federal Reserve's capital plan rule.

*Id.*

283.    The consequence of the Federal Reserve's finding that SHUSA failed its stress test was that the Section 10(b) Defendants knew beyond doubt, or were severely reckless in not knowing, that SCUSA's pre- and post-IPO representations that it anticipated making dividend payments of 30% of annual earnings was no longer possible, if it ever was.  By the express terms of the 2014 CCAR Results, SHUSA (and thus its controlled subsidiary SCUSA) could not make any capital distributions, including payment of dividends, until, at the earliest:  (a) SHUSA resubmitted its capital plan to the Federal Reserve; (b) SHUSA remediated the  "widespread and significant deficiencies across [SHUSA's] capital planning processes," including compliance failures; (c) the Federal Reserve had the opportunity to reexamine the resubmitted capital plan and time to reach conclusions with respect thereto; and (d) the Federal Reserve withdrew its objections to the "widespread and significant deficiencies."  Thus, the Section 10(b) Defendants knew or were severely reckless in not knowing that given the Federal Reserve's expansive objection to SHUSA's capital plan, including the identification of compliance failures, there was no realistic way that SCUSA could achieve the 30% dividend payout ratio it had predicted for investors in the IPO.  Since Dundon was a member of SHUSA's board of directors, it is near impossible that he could have been unaware that SCUSA could not realistically achieve the 30% dividend payout ratio it had predicted for investors in the IPO, and the same is true of the seven other SCUSA directors who were also directors and/or officers of SHUSA and/or Santander, and Kulas, who oversaw various regulatory functions including CCAR from the time of the IPO.  But

the Section 10(b) Defendants made the affirmative decision that they would say nothing to SCUSA's shareholders about the consequences of the failed stress test for SCUSA's shareholders.

284.  At about the time the Federal Reserve found SHUSA failed its stress test, SCUSA's first ever earnings conference call as a public company was fast-approaching.  The last thing the Company wanted to have to do on this historic call was to have to tell analysts and investors that the 30% dividend payout investors they were expecting based on the Company's predictions was not going to happen and, worse yet, that the Company's compliance framework that had been touted as "comprehensive," "extensive" and the product of "shared best practices" with Santander and SHUSA prior to and at the time of the IPO suffered from widespread and significant deficiencies relating to, among other things, the CCAR process.  Indeed, as CEO Dundon would later admit (in the June 11, 2014 investor conference call), even though he and seven of his fellow SCUSA board members were also directors and/or officers of SHUSA and/or Santander and Kulas oversaw various regulatory functions including CCAR from the time of the IPO, the Company had not even been aware of regulators' expectations in the CCAR process. Given that lack of awareness, at a minimum, the Section 10(b) Defendants were severely reckless in not knowing that the Company's prior representations about having comprehensive and extensive compliance frameworks and sharing best practices as to compliance with SHUSA and Santander were untrue.  So, on March 26, 2014, the Section 10(b) Defendants' scheme to defraud persisted when they said nothing to SCUSA's shareholder about the failed stress test and its consequences for SCUSA and, instead, simply repeated their prior statements about the

Company's intention to pay dividends and (supposedly) extensive compliance framework as though the stress test failure had no consequences for SCUSA.[12]

285.    With the scheme in place, on May 1, 2014, SCUSA held its first-ever earnings conference call as a public company using a written presentation, which was contemporaneously filed with the SEC on May 1, 2014 in a Form 8-K. Nothing was said about the failed stress test, compliance deficiencies or the consequences the failed stress test would have on dividend payments by SCUSA in either the written presentation or during the conference call, despite Defendant Dundon's statement that SCUSA's board had declared the previously announced 15 cent per share dividend, and Defendant Kulas' statement that "we continue to anticipate a dividend payout ratio of 30% of annual earnings."

286.    In a press release issued by the Company on the same day, Defendant Dundon repeated the substance of the misleading statement Defendant Kulas had made on the conference call, again without any mention of the failed stress test or compliance issues or the consequences for SCUSA and its shareholders. The press release stated: "'We are confident in the financial objectives discussed prior to our IPO with regard to dividend payments of 30 percent….,' said Tom Dundon, Chairman and Chief Executive Officer."

287.    With the Company's first-ever earnings conference call out of the way, the Company's quarterly report was due two weeks later. Pressure was mounting to disclose to SCUSA's shareholders the truth about the failed stress test for SCUSA's shareholders and it consequences as it was inevitable that the relevant truth about the consequences of the failed stress test eventually would leak into the market. Thus, the Section 10(b) Defendants' scheme

---

[12] SHUSA (not SCUSA) disclosed the Federal Reserve's objection to SHUSA's capital plan to its shareholders in a Form 8-K filed with the SEC by SHUSA on March 26, 2014. There was no disclosure in this Form 8-K about the consequences of the objection on dividend payments to SCUSA.

began to unravel and/or their severely reckless behavior began to come to light.  On May 15, 2014, the Company filed its Form 10-Q with the SEC for the quarter ending March 31, 2014, in which it finally disclosed what the Section 10(b) Defendants had known for almost two months—that the Federal Reserve found that SHUSA failed its stress test.  Even this disclosure was materially incomplete, however.  The Form 10-Q stated that the failed stress test was based on unspecified "qualitative concerns" of the Federal Reserve.  May 15, 2014 Form 10-Q at 31.  There was no statement in the Form 10-Q that the Federal Reserve had objected to the capital plan due to "widespread and significant deficiencies," including deficiencies in governance, internal controls, and risk-identification and risk management and analysis that support capital planning processes.  And the Section 10(b) Defendants said nothing in the Form 10-Q about SCUSA's woefully inadequate compliance framework.  To the contrary, in a continuation of the scheme, or their severely reckless actions, the Section 10(b) Defendants decided to falsely reiterate in the 10-Q their prior representations that the Company maintains "an extensive compliance, internal control, and monitoring framework, which includes… ongoing compliance with all applicable regulations," has "an extensive enterprise-wide compliance framework" and relies on its "relationship with Santander, through SHUSA, for several competitive advantages including … regulatory best practices."  *Id.* at 56.  But the Section 10(b) Defendants knew, or were severely reckless in not knowing, that these statements were untrue.

288.    On May 21, 2014, the Section 10(b) Defendants again misrepresented the Company's compliance framework in connection with presentations to investors.  A slide presentation used in these presentations touted the Company's (supposedly) "established" compliance program which satisfied the Company's "[r]esponsibility of assuring day to day compliance with applicable laws and regulations."   None of the slides in the presentation

addressed or disclosed any existing compliance issues related to CCAR compliance or otherwise, let alone disclose the truth that: (a) SCUSA's compliance framework was so "under-established" that day-to-day compliance with CCAR regulations was far from "assured" – it was near impossible; or (b) SCUSA did not even know what regulators overseeing the CCAR process expected of it.

289.    The fraud further unraveled when on May 29, 2014, SCUSA announced that due to the failed stress test it would no longer pay dividends for the remainder of fiscal year 2014 (with the exception of the May 15, 2014 dividend).[13]   The May 29 announcement also obliquely stated that SCUSA expected to incur higher compliance costs in connection with assisting SHUSA in the CCAR process.  SCUSA's share price skidded 4.63% on the news that – contrary to what had been represented to SCUSA shareholders by the Section 10(b) Defendants prior to the IPO and during the Class Period – the Company would not achieve a 30% dividend payout ratio and the supposedly "extensive" compliance framework was not extensive or the product of shared "best practices" and would ultimately be far more costly.

290.    In a further continuation of the fraud, however, even the May 29 announcement was materially incomplete.  The Section 10(b) Defendants had not revealed the full extent of the compliance deficiencies.  It was not until June 12, 2014, when the Company announced that it would need to hire 100 full-time compliance professionals at an annual cost of $12.5 million that

---

[13] The only reason the Federal Reserve allowed payment of the May 2014 dividend was because Santander – the parent company of SHUSA – was required to make a capital infusion into SHUSA in the amount of the May 15 dividend (approximately $21 million).

SCUSA shareholders appreciated how truly inadequate the Company's supposedly "extensive" and "comprehensive" compliance framework really was.[14]

291.    Ultimately, in a June 11, 2014 conference call with analysts, Defendant Dundon was forced to admit that SCUSA never even knew what was expected of it in the CCAR process and further admit that the Company was now going to have to incur substantial additional costs to begin the process of "***developing a best-in-class compliance capability***" related to the CCAR process (June 12, 2014 Form 8-K (attaching June 11, 2014 conference call transcript) at 2 (emphasis added), when ever since the IPO the Company had been telling investors it already had "shared best practices in compliance and risk management" with SHUSA/Santander and SCUSA had an extensive compliance framework.

### C.    PRE-CLASS PERIOD FALSE OR MISLEADING STATEMENTS

292.    Prior to the commencement of the class period or Exchange Act class period on January 23, 2014, the Section 10(b) Defendants made several false or misleading statements.

293.    First, the January 2014 "Initial Public Offering Road Show Presentation" by SCUSA emphasized that from 2008 to 2013, prior to the IPO, SCUSA had a stellar dividend payout history:  "Dividend payout:  30%+" and that SCUSA had "Extensive risk management and reporting procedures" and "Compliance (AML [i.e., anti-money laundering], fair lending, etc.)" and SCUSA stated that it "will 'pay out 30+% of their net income in the form of dividends.'"

294.    These statements were materially false and misleading because the Section 10(b) Defendants knew, or were severely reckless in not knowing, that:  (a) SCUSA was unable to pay

---

[14] SCUSA later disclosed that during a July 31, 2014 earnings call that "[t]hus far, 20 positions [had] been identified as being specific to CCAR…."  The other 80 positions apparently related to general compliance failures with respect to SCUSA's compliance with federal and state consumer protection laws.

dividends unless and until the Federal Reserve found that it did not object to SHUSA's capital plan; and (b) SCUSA's compliance and risk management procedures were far from extensive as they related to, among other things, the CCAR process.[15]

295.    On January 22, 2014 SCUSA stated in the Offering Documents for the IPO, which were signed by the Section 10(b) Defendants, that:  (a) "we currently intend to pay dividends on a quarterly basis at an initial amount of approximately $0.15 per share;" (b) "This oversight [i.e., regulatory oversight of the Federal Reserve resulting from SCUSA's relationship with SHUSA and Santander] has led us to develop and maintain extensive risk management and reporting procedures….;" (c) SCUSA "derived significant benefits from [its] relationship with Santander, including…shared best practices in compliance and risk management;" (d) "we have an extensive enterprise-wide compliance framework….;" (e) it has "a comprehensive compliance management program;" and (f) "To manage our legal and compliance risk, we maintain an extensive compliance, internal control, and monitoring framework…."  Prospectus at 4, 8, 25, 77.

296.    These statements were materially false and/or misleading because the Section 10(b) Defendants knew, or were severely reckless in not knowing, that:  (a) the risks, including the restrictions on dividends and additional costs associated with the CCAR process; (b) SCUSA was unable to pay dividends unless and until the Federal Reserve found that it did not object to SHUSA's capital plan; and (c) SCUSA's compliance and risk management procedures were far from extensive as they related to, among other things, the CCAR process.  The IPO Offering Documents were also materially false or misleading because Item 201(c) affirmatively required disclosure of the dividend restrictions in the CCAR process but there was no such disclosure in

---

[15] For the avoidance of doubt, Lead Plaintiffs are not alleging that the portion of these statements about SCUSA's *prior* dividend payments are false or misleading.

the Offering Documents.  The IPO Offering Documents were also materially false or misleading because:  (a)  Item 503(c) of Regulation S-K affirmatively required a "discussion of the most significant factors that make the offering risky or speculative;" (b) the restrictions on SCUSA's ability to pay dividends stemming from the CCAR process and/or the compliance inadequacies was one of the most significant factors that made the SCUSA IPO risky or speculative; and (c) the Offering Documents failed to include any discussion regarding the dividend restrictions, the risks associated with the CCAR process on said dividends or the compliance inadequacies.

### D.   CLASS PERIOD FALSE OR MISLEADING STATEMENTS

297.    In its Form 10-K for the year ended 2013, which was signed by the Section 10(b) Defendants on March 5, 2014 and filed with the SEC on March 6, 2014, SCUSA stated that:  (a) "we currently intend to pay dividends on a quarterly basis at an initial amount of approximately $0.15 per share;" (b) "we have an extensive enterprise-wide compliance framework….;" (c) "To manage our legal and compliance risk, we maintain an extensive compliance, internal control, and monitoring framework….;" and (d) SCUSA relies on its "relationship with Santander, through SHUSA, for several competitive advantages including…regulatory best practices." March 6, 2014 Form 10-K at 32, 41, 74.  In a certification attached as an exhibit to the 2013 Form 10-K and signed by Dundon on March 5, 2014, Defendant Dundon certified that he reviewed the 2013 Form 10-K and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." *Id.*, Ex. 31.1.  In a certification attached as an exhibit to the 2013 Form 10-K and signed by Defendant Kulas on March 5, 2014, Kulas certified that he reviewed the 2013 Form 10-K and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report." *Id.* Ex. 31.2.

298.    These statements were materially false and/or misleading because the Section 10(b) Defendants knew, or were severely reckless in not knowing, that:  (a) SCUSA was unable to pay dividends unless and until the Federal Reserve found that it did not object to SHUSA's capital plan; and (b) SCUSA's compliance and risk management procedures were far from extensive as they related to, among other things, the CCAR process.  These statements were also materially false and/or misleading because, as would be later revealed, SCUSA's compliance and risk management framework and controls were anything but "extensive" – they were woefully inadequate.  Moreover, the Form 10-K was materially false or misleading because under Rule 4-08(e) of Regulation S-X, the Form 10-K (like the IPO Offering Documents) was required, but failed to, disclose the dividend restrictions.

299.    On March 26, 2014, SCUSA, SHUSA and, upon information and belief, the Section 10(b) Defendants learned that the Federal Reserve had found that SHUSA failed its stress test and objected to the capital plan submitted by SHUSA.  SHUSA issued a March 26, 2014 press release announcing the failed stress test.  SCUSA, however, remained silent and did not inform its investors of:  (a) the existence of the failed stress test by SHUSA; (b) the consequences of the failed stress test on SCUSA's ability to pay dividends; and (c) the drastic inadequacies in SCUSA's compliance framework.

300.    Then, on May 1, 2014, (a) SCUSA put out a press release (i) stating SCUSA's board "had declared a quarterly cash dividend of $0.15 per share payable on May 30, 2014 to shareholders of record at the close of business on May 12, 2014," (ii) quoting CEO Dundon as follows, "We are confident in the financial objectives discussed prior to our IPO with regard to

dividend payments of 30 percent...," and (iii) quoting CFO Kulas as follows:  "A further testament to our shareholder commitment is our Board of Directors' decision to declare a dividend on earnings from our first quarter as a public company;" and (b) in SCUSA's first ever earnings conference call as a public company, CFO Kulas stated "we continue to anticipate a dividend payout ratio of 30% of annual earnings."

301.    These statements were materially false and/or misleading because the Section 10(b) Defendants knew, or were severely reckless in not knowing, that:  (a) SCUSA was unable to pay dividends unless and until the Federal Reserve found that it did not object to SHUSA's capital plan; (b) the Federal Reserve had already found that SHUSA failed its stress test; and (c) SCUSA's compliance and risk management procedures were far from extensive as they related to, among other things, the CCAR process and, therefore, it was a virtual certainty that the Federal Reserve would not allow SCUSA to pay dividends going forward.  Consequently, the Section 10(b) Defendants could not have held, and did not hold, the honest belief that the Company could achieve a dividend payout ratio of 30% of annual earnings at the time the foregoing statements were made.

302.    On May 15, 2014, SCUSA's Form 10-Q for the period ending March 31, 2014, which was signed by the Section 10(b) Defendants:  (a) reiterated that "On May 1, 2014, SCUSA's Board of Directors declared a cash dividend of $0.15 per share to be paid on May 30, 2014 to shareholders of record as of the close of business on May 12, 2014;" (b) stated that the Federal Reserve's objection to SHUSA's capital plan was based on unspecified "qualitative concerns" and "could have a negative impact on SCUSA;" (c) stated that "To manage our legal and compliance risk, we maintain an extensive compliance, internal control, and monitoring framework;" (d) "we have an extensive enterprise-wide compliance framework structured to

continuously monitor our activities;" and (e) stated that SCUSA relies on its "relationship with Santander, through SHUSA, for several competitive advantages including … regulatory best practices." May 15, 2014 Form 10-Q at 29, 31, 56, 63, 69. In a certification attached as an exhibit to this Form 10-Q and signed by Defendant Dundon on May 15, 2014, Dundon certified that he reviewed the Form 10-Q and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." *Id.* Ex. 31.1. In a certification attached as an exhibit to this Form 10-Q and signed by Defendant Kulas on May 15, 2014, Kulas certified that he reviewed the Form 10-Q and that the report "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report." *Id.* Ex. 31.2.

303. These statements were materially false and/or misleading because the Section 10(b) Defendants knew, or were severely reckless in not knowing, that: (a) SCUSA was unable to pay dividends unless and until the Federal Reserve found that it did not object to SHUSA's capital plan; and (b) SCUSA's compliance and risk management procedures were far from extensive as they related to, among other things, the CCAR process or the product of shared best practices and, therefore, it was a virtual certainty that the Federal Reserve would not allow SCUSA to pay dividends going forward. Consequently, the Federal Reserve's objection to SHUSA's capital plan not only "could have" a negative impact on SCUSA, it was a virtual certainty as the Federal Reserve would not allow SCUSA to continue to pay out dividends while such a woefully inadequate compliance framework persisted at SCUSA (and/or SHUSA). In

addition, the statement that the failed stress test was based on unspecified "qualitative concerns" of the Federal Reserve was itself materially misleading because that statement omitted that the Federal Reserve had objected to the capital plan due to "widespread and significant deficiencies," including deficiencies in governance, internal controls and risk-identification and risk management and analysis that support capital planning processes.

304.   Upon information and belief, SCUSA used a slide presentation entitled "Santander Consumer USA Holdings Inc. Investor Presentation," that SCUSA filed with the SEC in a Form 8-K filed May 21, 2014, in connection with investor presentations on one or more occasions on or shortly after May 21, 2014.   One of the slides headed "Compliance Program" stated (emphasis added):   "Stemming from big bank ownership since 2000, SCUSA's **established compliance program** plays a pivotal role in daily operations" and "Responsibility of **assuring day to day compliance with applicable laws** and regulations rests with SCUSA's individual business units, their officers, and employees."

305.   These statements were false or misleading because the Section 10(b) Defendants knew, or were severely reckless in not knowing, that:   (a) SCUSA's compliance and risk management procedures were far from "established" as they related to, among other things, the CCAR process — they were woefully inadequate or non-existent; and (b) "compliance" with applicable law and regulations imposed by the CCAR process and by state and federal consumer protection laws, was not "assured" — in fact, quite the opposite, *non*-compliance with the CCAR process and regulations was already known to the Section 10(b) Defendants, as well as non-compliance with state and federal consumer protections laws.

### E.     ADDITIONAL ALLEGATIONS OF SCIENTER

#### 1.     The Section 10(b) Defendants Admitted They Were Subject to Federal Reserve Oversight

306.    SCUSA's Offering Documents, signed by Defendants Dundon and Kulas, acknowledge "we are subject to the regulatory oversight of the Federal Reserve System."  Further, the Offering Documents tout this oversight as a strength: "This oversight has led us to develop and maintain extensive risk management and reporting procedures and has helped us to continually adapt to the evolving regulatory requirements for consumer finance in the United States."   Capital plans for the year 2014 CCAR were required to be submitted  by January 6, 2014 (three weeks prior to the IPO), including a capital plan by SHUSA.  As a consolidated subsidiary of SHUSA, SCUSA was included in SHUSA's stress tests and capital plans in the CCAR process.   SCUSA, its CEO Dundon and its CFO Kulas, were thus well aware or severely reckless in not knowing that SCUSA was part of the capital plan and well aware of the inherent risks of non-approval of the plan to investors in the IPO, including the restrictions on dividends and increased compliance costs.

#### 2.     The Board Enterprise Risk Committee

307.    The Offering Documents state that the Board Enterprise Risk Committee, which was established prior to the IPO, met quarterly.   According to the Board Enterprise Risk Committee charter, the Committee's responsibility included "considering the adverse scenarios utilized in stress testing exercises," "Review[ing] and contribut[ing] to the key risk assumptions and risk parameters relating to the [CCAR] developed by the Capital Committee of the Board of Directors of [SHUSA]," "assess[ing] risks and risk parameters with reference to stress testing loss estimates under severely stressed scenarios" and "Discuss[ing] periodic reports on regulatory and compliance issues, the status of those issues, and trends."

308.    Upon information and belief, the Board Enterprise Risk Committee met at least once from January 6, 2014, when SHUSA's capital plan was submitted to the Federal Reserve, and June 12, 2014, the end of the Exchange Act Class Period or class period, and discussed the CCAR process and SHUSA's capital plan.   While Lead Plaintiffs and the Exchange Act Class, without discovery, have no way of knowing what was learned by the members of the Board Enterprise Risk Committee in those discussions and what, if anything, was communicated to the Section 10(b) Defendants regarding those discussions, at a minimum, the Board Enterprise Risk Committee likely reviewed the CCAR process documents described herein and thus likely would have been aware, as is plainly communicated in those documents, that dividend payments were not permitted unless and until the Federal Reserve issued a non-objection to SHUSA's capital plan.   The Section 10(b) Defendants were not only, at a minimum, severely reckless in not ascertaining this information from the CCAR process documents themselves, but also were severely reckless in not ascertaining this information from the Board Enterprise Risk Committee.

309.    Alternatively, if the Board Enterprise Risk Committee did not meet shortly prior to or during the Exchange Act Class Period to discuss the CCAR process and/or SHUSA's capital plan submission — as the Committee's Charter required, the failure to meet in and of itself amounts to severe recklessness on the part of SCUSA and contributes to a strong inference of scienter.   And the other Section 10(b) Defendants (Dundon and Kulas) similarly acted in a severely reckless fashion in not insisting that the Board Enterprise Risk Committee meet to discharge its responsibilities as stated in the Charter.

### 3.    Motive and Opportunity

310.    Defendants were motivated to conceal the risks that SCUSA faced with respect to the CCAR process, the deficiencies in SCUSA's compliance framework and the dividend restrictions imposed by the CCAR process as a result of the Company's Executive Incentive

Program ("EIP"), SCUSA's Senior Executive Annual Bonus Plan ("SEABP") and SCUSA's Omnibus Incentive Plan ("OIP").

311.    As discussed in the Offering Documents (Prospectus at 108), SCUSA's board approved target annual bonus levels under the EIP for fiscal year 2014 equal to 100% of annual base salary for Defendants Dundon and Kulas, among other SCUSA officers.   Bonuses are awarded by, among other things, referencing the Company's overall performance goals from year to year and assessing the individual performance of each individual eligible for EIP bonuses, including the individual's performance in the execution of the Company's goals and objectives.  Dundon's base salary for fiscal year 2014 was $2,625,000 and Kulas' base salary for fiscal year 2014 was $890,000; thus, Dundon stood to receive an additional $2,625,000 and Kulas stood to receive an additional $890,000 if the goals of the Company were achieved.

312.    Dundon and Kulas were also eligible to receive additional unspecified bonuses pursuant to the SEABP, the receipt of which was also based on the achievement of performance goals (*See Id* at. 121113).

313.    Defendants Dundon and Kulas were also eligible to receive SCUSA stock, restricted stock and/or stock options under the OIP, the award and receipt of which was also dependent upon achievement of performance goals, including, among other things, total stockholder return (measured in terms of stock price appreciation and/or dividend growth).  *See Id* at. 121.

314.    One of the Company's main goals, as Defendants Dundon and Kulas emphasized during the IPO roadshows and otherwise in statements during the class period, was a dividend payout ratio of 30%.  Whether that dividend payout goal was met was one of the criteria by which their performance for purposes of awarding bonuses under the EIP, SEABP and OIP

would be met.  Dundon's and Kulas' desire to receive bonuses under the EIP, SEABP and OIP contributes to a strong inference of scienter.

315.   Defendants Dundon and Kulas were also motivated to conceal the risks that SCUSA faced with respect to the CCAR process, the deficiencies in SCUSA's compliance framework and the dividend restrictions imposed by the CCAR process to keep the value of SCUSA's shares artificially inflated.  After the IPO, Defendant Dundon personally owned approximately 48,215,313 shares of SCUSA stock and a company that was 100% owned by Dundon also owned approximately 34,598,506 shares of SCUSA stock.  Combined, these more than 82,813,819 shares were worth nearly $2 billion when valued at the $24 per share IPO price. After the IPO, Defendant Kulas owned approximately 872,453 shares of SCUSA stock.  These shares were worth nearly $21 million when valued at the $24 per share IPO price — a price that investors did not know could be impacted by the risks that SCUSA faced with respect to the CCAR process.  By March 26, 2014, however, SCUSA's shares began to dip below the $24 per share IPO price and closed at $23.14 resulting in millions of dollars of paper losses for Dundon and Kulas.  Dundon and Kulas knew that disclosure of the truth about the failed stress test, the drastic compliance inadequacies and the consequences on SCUSA's ability to pay dividends would sink SCUSA's share price even further, as ultimately occurred when the fraud unraveled. Thus, the substantial SCUSA stock ownership by Defendants Dundon and Kulas and their desire to maintain such stock ownership at artificially inflated levels also contributes to a strong inference of scienter.

316.   The Section 10(b) Defendants had the opportunity to commit fraud because each of them prepared, reviewed and/or approved the SEC filings, press releases, investor presentations, conference call statements and other documents containing the false or misleading

statements and omissions as alleged herein, and thus had the ability to influence and control the content of those statements.

### F.   LOSS CAUSATION

317.   The Section 10(b) Defendants' pre-class period materially false and misleading statements and material omissions respecting SCUSA's intention to achieve a dividend payout ratio of at least 30% of annual earnings and their statements about the Company's supposedly extensive compliance framework and shared best practices in compliance with Santander and SHUSA, caused artificial inflation of SCUSA's stock price that existed at the beginning of the Class Period.

318.   Throughout the Exchange Act Class Period, the price of SCUSA's stock remained artificially inflated as a direct result of the Section 10(b) Defendants' materially false statements and omissions about the risks that SCUSA faced as part of the CCAR process, the Company's intention to achieve a dividend payout ratio of at least 30% of annual earnings and their statements about the Company's supposedly extensive compliance framework and shared best practices in compliance with Santander and SHUSA.   The ability of the Company, as a subsidiary of a large bank holding company, to pay dividends and the adequacy of the Company's compliance framework and shared compliance framework with Santander and SHUSA was material information to the Exchange Act Class.   Had the truth been disclosed to the market prior to and/or during the Exchange Act Class Period, the members of the Exchange Act Class would not have purchased SCUSA common stock or would not have purchased SCUSA common stock at the artificially inflated prices they paid.

319.   When the truth about the Company was leaked into the market, the artificial inflation that had been caused by the Section 10(b) Defendants' pre-class period misrepresentations and omissions, and the artificial inflation that continued to persist during the

class period or Exchange Act Class Period as the result of the Section 10(b) Defendants' continuing class period misrepresentations and omissions, or Exchange Act Class Period was gradually eliminated from the price of the Company's securities, causing significant losses to members of the Exchange Act Class.

320.    SCUSA's May 15, 2014 disclosure to SCUSA's shareholders that the Federal Reserve had objected to and was requiring resubmission of SHUSA's capital plan due to unspecified "qualitative concerns" and that such action "could have a negative impact on SCUSA" partially revealed the truth, causing SCUSA's stock price to decline from a close of $21.55 on May 14, 2015 to $21.23 on May 15, 2014, a decline of 1.48%.

321.    SCUSA's May 29, 2014 disclosure that as a result of the Federal Reserve's March 26, 2014 objection to SHUSA's capital plan, SCUSA does not expect to pay dividends during the remainder of 2014 (other than the May 2014 dividend), and that SCUSA expects to incur higher compliance costs related to, among other things, the CCAR process, partially revealed the truth, causing SCUSA's stock price to decline from a close of $20.72 on May 28, 2014 to $19.76 on May 29, 2014, a decline of 4.63% on enormously heavy volume of 10,241,049 shares traded on the NYSE.

322.    SCUSA's June 11, 2014 conference with investors at which investors learned that:  (a) SCUSA's compliance and risk management was not "extensive" or "comprehensive" or the result of "shared best practices" as had been represented in the IPO; (b) compliance and risk management expenses were going to rise extensively and, as a result, SCUSA would not be able to grow assets as much as previously forecasted; and (c) the Company had not been aware of regulatory expectations attendant to the CCAR process, partially revealed the truth, causing

SCUSA's shares to drop 8.55% (on enormous volume exceeding 10.5 million shares) from a close of $21.05 on June 10, 2014 to $19.25 on June 11, 2014.

323.    SCUSA's June 12, 2014 disclosure that the Company's incremental costs related to regulatory compliance, including CCAR, would include a requirement that at least 100 additional, full-time compliance employees would need to be hired at approximately $125,000 average annual cost per person ($12.5 million annually), partially revealed the truth, causing SCUSA's stock to drop another 1.33% on June 12, 2014 to close at $18.99 on extremely high volume of more than 7.8 million shares traded on the NYSE.

324.    The declines in SCUSA's stock following the revelations of May 15, 2014 to June 12, 2014 and the resulting losses suffered by members of the Exchange Act Class are directly attributable to the market's reaction to the disclosure of information that had previously been misrepresented and/or concealed by the Section 10(b) Defendants, and to the market's adjustment of the Company's stock price to reflect the newly-emerging truth about the Company's inability to pay dividends and woefully inadequate compliance framework.

325.    The Exchange Act Defendants' conduct, as alleged herein, proximately caused foreseeable losses to members of the Exchange Act Class.

**G.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR RELATING TO THE EXCHANGE ACT CLAIMS**

326.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in the Exchange Act section of this complaint.  First, the statutory safe harbor does not apply to false or misleading statements that are made in connection with an initial public offering (such as the statements in the Offering Documents).

327.     Second, the statements complained of were not forward-looking statements nor were they identified as forward-looking statements when made.  Rather, the false or misleading statements complained of in the Exchange Act section of this complaint concerned historical and/or current facts and conditions existing at the time the statements were made.

328.     To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking statements, they were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, the Exchange Act Defendants are liable for those false or misleading forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, or the statement was authorized and/or approved by an executive officer of SCUSA who knew that the statement was materially false or misleading when made.

### H.     PRESUMPTION OF RELIANCE

329.     Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

    (a)  the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the class period or Exchange Act Class Period;

    (b)  the omissions and misrepresentations were material;

    (c)  the securities of SCUSA traded in an efficient market; and

    (d)  the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the securities of SCUSA; and Lead Plaintiff Deka and other members of the Exchange Act Class purchased the securities of SCUSA between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

330.    At all relevant times, the markets for the securities of SCUSA were efficient for the following reasons, among others:

(a)  as a regulated issuer, SCUSA filed periodic public reports with the SEC;

(b)  SCUSA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)  SCUSA was followed by numerous securities analysts employed by major brokerage firm(s), including BMO Capital Markets, Credit Suisse, Deutsche Bank Securities Inc., J.P. Morgan Securities LLC, RBC Capital Markets, LLC, Stephens, Inc., and Wells Fargo Securities, LLC, who wrote reports that were distributed to the sales force(s) and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)  the securities of SCUSA were actively traded in efficient markets, including the NYSE, where the Company's common stock trades under the ticker symbol "SC."

331.    As a result of the foregoing, the markets for the securities of SCUSA promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities of SCUSA.  Under these circumstances, all purchasers of the securities of SCUSA during the Exchange Act Class Period suffered similar injury through their purchase of the securities at artificially inflated prices and the presumption of reliance applies.

332.    Further, to the extent that the Section 10(b) Defendants concealed or improperly failed to disclose material facts with regard to the Company, the Exchange Act Class is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153 (1972).

## X.     CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### FIRST CLAIM UNDER THE EXCHANGE ACT
### Violation of Section 10(b) of The Exchange Act
### (Against Defendants SCUSA, Dundon and Kulas)

333.     Lead Plaintiffs and the Exchange Act Class repeat and reallege each of the allegations set forth above as if fully set forth herein.

334.     This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Lead Plaintiffs and the Exchange Act Class, against Defendants SCUSA, Dundon and Kulas (previously defined as the "Section 10(b) Defendants").

335.     As alleged herein, throughout the class period or Exchange Act Class Period, the Section 10(b) Defendants, individually and in concert, directly and indirectly, by use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange, made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  The Section 10(b) Defendants' false and/or misleading statements and omissions were intended to and did, as alleged herein:  (a) deceive the investing public and Lead Plaintiffs and other members of the Exchange Act Class; (b) artificially create, inflate and/or maintain the market for and market price of the Company's securities; and (c) cause Lead Plaintiffs and other members of the Exchange Act Class to purchase the Company's securities at inflated prices.

336.     The Section 10(b) Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents which contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

337. As described above, the Section 10(b) Defendants made the false or misleading statements and/or omissions knowingly and intentionally, or with such severe recklessness as to constitute willful deceit and fraud upon Lead Plaintiffs and the other Exchange Act Class members who purchased SCUSA stock during the Class Period.

338. The Section 10(b) Defendants' false and/or misleading statements and/or omissions were made in connection with the purchase or sale of the Company's securities.

339. In ignorance of the false or misleading nature of the Section 10(b) Defendants' statements and/or omissions, and relying directly or indirectly on those statements and/or upon the integrity of the market price for SCUSA securities, Lead Plaintiffs and members of the Exchange Act Class purchased SCUSA stock at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the stock at artificially inflated prices.

340. The market price of SCUSA stock declined materially upon the public disclosure of the facts that had been previously misrepresented or omitted by the Section 10(b) Defendants, as described above.

341. Lead Plaintiffs and members of the Exchange Act Class were substantially damaged as a direct and proximate result of their purchases of SCUSA stock at artificially inflated prices and the subsequent decline in the price of SCUSA stock when the truth was disclosed.

## SECOND CLAIM UNDER THE EXCHANGE ACT
### Violation of Section 20(a) of The Exchange Act
### (Against Defendants Dundon and Kulas)

342. Lead Plaintiffs and the Exchange Act Class repeat and reallege each of the allegations set forth above as if fully set forth herein.

343.    This claim is brought pursuant to Section 20(a) of the Exchange Act against Defendants Dundon and Kulas (collectively, the "Section 20(a) Defendants") on behalf of Lead Plaintiffs and the Exchange Act Class.

344.    As alleged herein, the Section 10(b) Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making false or misleading statements and/or omissions in connection with the purchase or sale of securities and by participating in a fraudulent scheme and course of business or conduct.  This fraudulent conduct was undertaken with scienter because SCUSA is charged with the knowledge and scienter of Defendants' Dundon and/or Kulas and others who knew of or engaged in severe recklessness in disregarding the falsity or misleading nature of the Company's statements and of the fraudulent nature of the scheme.

345.    Lead Plaintiffs and other members of the Exchange Act Class who purchased SCUSA stock suffered damages in connection with their purchases of those securities, as a direct and proximate result of the violations of Section 10(b) and Rule 10b-5(b) by the Section 10(b) Defendants.

346.    Defendants Dundon and Kulas were controlling persons of SCUSA because of their senior executive positions with SCUSA, their direct involvement in the day-to-day business and operations of SCUSA, including participation in drafting and signing and approving SCUSA's SEC filings, participation in and speaking roles at investor and earnings conference calls and/or presentations.

347.    By virtue of the foregoing, the Section 20(a) Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making

of SCUSA, including the content and dissemination of the Offering Documents, press releases and other materials alleged to be false or misleading herein.

348.    The Section 20(a) Defendants are culpable for participation in the matters alleged herein because they did not act in good faith in connection with the conduct at issue, acted with knowledge that SCUSA's public statements were materially false or misleading, or omitted material information, and/or or they acted with severely reckless disregard for the truth.

349.    By virtue of their positions as controlling persons of SCUSA, and their culpable participation in the Section 10(b) Defendants' violation of Section 10(b) and Rule 10b-5(b) as alleged herein, the Section 20(a) Defendants are each jointly and severally liable for those violations pursuant to Section 20(a) of the Exchange Act, with and to the same extent as the Section 10(b) Defendants.

## XI.    PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Securities Act Class and Exchange Act Class as defined herein;

(b)    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiffs and other members of the Securities Act Class and/or Exchange Act Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Securities Act Class and/or Exchange Act Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XII.   JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  October 30, 2015                              Respectfully submitted,

**KENDALL LAW GROUP LLP**
/s/ Joe Kendall
Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jamie J. McKey
Texas Bar No. 24045262
jmckey@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Tel.: (214) 744-3000
Fax: (214) 744-3015

*Local Counsel for the Class*

**GRANT & EISENHOFER P.A.**
/s/ James J. Sabella
James J. Sabella (*pro hac vice*)
Charles T. Caliendo (*pro hac vice*)
Robert D. Gerson (*pro hac vice*)
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel.:  (646) 722-8500

**ROBBINS GELLER RUDMAN & DOWD LLP**
/s/ Willow E. Radcliffe
Willow E. Radcliffe (*pro hac vice*)
Sunny Sarkis (*pro hac vice*)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel.:  (415) 288 4545

*Co-Lead Counsel for the Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of this document was forwarded to counsel of record through the Court's ECF system on October 30, 2015.

By:  /s/ Joe Kendall
JOE KENDALL