# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | |
|---|---|
| DEKA INVESTMENT GMBH and CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case No.:  3:15-CV-2129-K |
| *Plaintiffs*, | Hon. Ed Kinkeade |
| v. | **ORAL ARGUMENT REQUESTED** |
| SANTANDER CONSUMER USA HOLDINGS INC., THOMAS G. DUNDON, JASON KULAS, JUAN CARLOS ALVAREZ, ROMAN BLANCO, GONZALO DE LAS HERAS, STEPHEN A. FERRISS, MATTHEW KABAKER, TAGAR OLSON, ALBERTO SANCHEZ, JAVIER SAN FELIX, JUAN ANDRES YANES, DANIEL ZILBERMAN, CITIGROUP GLOBAL MARKETS INC., J.P. MORGAN SECURITIES LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, DEUTSCHE BANK SECURITIES INC., SANTANDER INVESTMENT SECURITIES INC., BARCLAYS CAPITAL INC., GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. LLC, RBC CAPITAL MARKETS, LLC, BMO CAPITAL MARKETS CORP., CREDIT SUISSE SECURITIES (USA) LLC, UBS SECURITIES LLC, WELLS FARGO SECURITIES, LLC, KKR CAPITAL MARKETS LLC, SANDLER O'NEILL & PARTNERS, L.P., STEPHENS INC., AND LOYAL3 SECURITIES, INC., | |
| *Defendants*. | |

# LEAD PLAINTIFFS' OMNIBUS BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND FACTS ........................................................................................... 6

    A. SCUSA Is Controlled By SHUSA ................................................................. 6

    B. The CCAR Restrictions On Capital Distributions ........................................ 6

    C. SCUSA Touts Dividends, Compliance And Risk Management
       During Its Roadshow And In The IPO Offering Documents ......................... 8

    D. In Its First Form 10-K Following The IPO, SCUSA Repeats
       The Intention To Pay Dividends Without Disclosing The Restrictions ......... 9

    E. The Fed Objects To SHUSA's Capital Plan But SCUSA Says
       Nothing To Investors ...................................................................................... 9

    F. SCUSA Makes Its First Mention Of SHUSA's Failed Stress Test
       But Continues To Make Misleading Statements .......................................... 10

    G. SCUSA's Shares Drop Substantially As The Truth Is Revealed ................. 11

    H. SHUSA Settles An Enforcement Action With The Fed ............................... 12

    I. Other Compliance And Risk Management Failures ...................................... 13

ARGUMENT ......................................................................................................... 14

I.    THE SECURITIES ACT CLAIMS ARE ACTIONABLE ............................... 14

    A. The Elements Of The Securities Act Claims ............................................... 15

    B. Defendants' Failure To Disclose The Restrictions On Dividends
       Was Materially Misleading .......................................................................... 16

       1. Defendants Violated Their Affirmative Duty to Disclose the
          Restrictions on SCUSA's Payment of Dividends .................................. 17

       2. The PSLRA Safe Harbor And Bespeaks Caution Doctrine
          Are Inapplicable To The Securities Law Claims ................................... 24

    C. Defendants Made Actionable Misstatements During The Roadshow
       And In The Offering Documents Regarding CCAR Compliance ................ 26

    D. The Offering Documents Contain Actionable Misstatements
       About Compliance Pertinent To SCUSA's Lending Operations ................. 30

    E. Defendants Are Statutory Sellers Under § 12(a)(2) ..................................... 34

    F. § 15 Control Person Liability Is Adequately Pled ....................................... 35

II.    THE EXCHANGE ACT CLAIMS ARE ACTIONABLE ................................. 36

    A. The Requirements For Pleading Fraud Under § 10(b) ................................. 36

    B. Material Misstatements And Omissions Are Adequately Pled .................... 37

i

C. The AC Pleads A Strong Inference Of Scienter ........................................................ 40

   1. The Scienter Allegations Are Cogent And Compelling ......................................... 40

   2. The Motive And Opportunity Allegations Strengthen Scienter ........................... 42

   3. Defendants' Opposing Inferences Are Meritless ................................................... 44

D. The PSLRA Safe Harbor And The Bespeaks Caution Doctrine
Do Not Apply To The Exchange Act Claims ............................................................. 46

III.    THE SECURITIES ACT CLAIMS ARE NOT TIME BARRED ................................... 47

A. The Statute Of Limitations Argument Is Premature .................................................. 47

B. The AC Relates Back To The IC ............................................................................... 48

C. Equitable Estoppel Applies To The Securities Act Claims ........................................ 53

CONCLUSION ................................................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alcatel Sec. Litig.*,
  382 F. Supp. 2d 513 (S.D.N.Y. 2005)...................................................................51

*Alpern v. UtiliCorp United Inc.*,
  84 F.3d 1525 (8th Cir. 1996) .....................................................................50, 52

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...................................................................................14

*Auer v. Robbins*,
  519 U.S. 452 (1997)...................................................................................19

*Bachow v. Swank Energy Income Advisers, L.P.*,
  2010 WL 70520 (N.D. Tex. Jan. 6, 2010) ..................................................... *passim*

*Barthel v. Stamm*,
  145 F.2d 487 (5th Cir. 1944) .......................................................................50

*Belodoff v. Netlist, Inc.*,
  2009 U.S. Dist. LEXIS 39903 (C.D. Cal. Apr. 17, 2009) ......................................50

*Bisso v. Rambusch*,
  1977 WL 1017 (S.D.N.Y. May 12, 1977) .........................................................16

*Bond Opportunity Fund II, LLC v. Heffernan*,
  340 F. Supp. 2d 146 (D.R.I. 2004)...................................................................52

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
  2012 WL 1080366 (S.D.N.Y. Mar. 30, 2012) ....................................................32

*Broad v. Rockwell Int'l Corp.*,
  642 F.2d 929 (5th Cir. 1981) .......................................................................37

*Burges v. Bancorpsouth, Inc.*,
  2015 WL 4198795 (M.D. Tenn. July 10, 2015) ..................................................28

*Caldwell v. Berlind*,
  543 F. App'x 37 (2d Cir. 2013) .....................................................................51

*Chauvin v. Nat'l Gypsum Servs.*,
  2014 U.S. Dist. LEXIS 98627 (E.D. La. July 21, 2014)....................................49, 50

*Chevron U.S.A. Inc. v. NRDC,*
    467 U.S. 837 (1984).............................................................................................35

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.,*
    2013 WL 1100819 (W.D. La. Mar. 15, 2013) ......................................................29

*In re Cobalt Int'l Energy, Inc. Sec. Litig.,*
    2016 U.S. Dist. LEXIS 5702 (S.D. Tex. Jan. 19, 2016) ..................................47, 48

*In re Commonwealth Oil Tesoro Petroleum Grp. Sec. Litig.,*
    467 F. Supp. 227 (W.D. Tex. 1979)......................................................................51

*Dennis v. Gen. Imaging, Inc.,*
    918 F.2d 496 (5th Cir. 1990) ...............................................................................47

*Duncan v. Walker,*
    533 U.S. 167 (2001).............................................................................................23

*In re Elec. Data Sys. Corp. "ERISA" Litig.,*
    305 F. Supp. 2d 658 (E.D. Tex. 2004) ..................................................................34

*In re Enron Corp. Sec.,*
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ..................................................................16

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.,*
    310 F. Supp. 2d 819 (S.D. Tex. 2004) ..................................................................54

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000).............................................................................................22

*Fed. Deposit Ins. Corp. v. Conner,*
    20 F.3d 1376 (5th Cir. 1994) ..........................................................................50, 52

*Fitzpatrick v. Uni-Pixel, Inc.,*
    35 F. Supp. 3d 813  (S.D. Tex. 2014) ...................................................................44

*Freudenberg v. E*Trade Financial Corp.,*
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................28

*Greer v. Advanced Equities, Inc.,*
    2009 WL 1748410 (N.D. Ill. June 19, 2009) ........................................................54

*Herman & Maclean v. Huddleston,*
    459 U.S. 375 (1983).............................................................................................15

*Higgiston v. Lockheed Aircraft Corp.,*
    1971 WL 280 (S.D.N.Y. July 13, 1971) ...............................................................16

*Holmes v. Greyhound Lines, Inc.*,
   757 F.2d 1563 (5th Cir. 1985) ...........................................................................51

*Hundahl v. United Benefit Life Ins. Co.*,
   465 F. Supp. 1349 (N.D. Tex. 1979) (Higginbotham, J.) .......................................16

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
   537 F.3d 527 (5th Cir. 2008) ........................................................................36, 43

*Indus., Inc. v. Green*,
   430 U.S. 462 (1977).......................................................................................33

*Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
   677 F.2d 1045 (5th Cir. 1982) ..........................................................................14

*Kapps v. Torch Offshore, Inc.*,
   379 F.3d 207 (5th Cir. 2004) ............................................................................16

*In re Kosmos Energy Ltd. Sec. Litig.*,
   955 F. Supp. 2d 658 (N.D. Tex. 2013) ...............................................................35

*Krim v. BancTexas Grp., Inc.*,
   989 F.2d 1435 (5th Cir. 1993) ..........................................................................15

*Lapin v. Goldman Sachs & Co.*,
   506 F. Supp. 2d 221 (S.D.N.Y. 2006), *reconsideration denied*, 2009 WL
   275738 (S.D.N.Y. Feb. 4, 2009) ........................................................................28

*Lind v. Vanguard Offset Printers*,
   857 F. Supp. 1060 (S.D.N.Y. 1994).....................................................................52

*Lormand v. U.S. Unwired, Inc.*,
   565 F.3d 228 (5th Cir. 2009) ............................................................................14

*Lovelace v. Software Spectrum, Inc.*,
   78 F.3d 1015 (5th Cir. 1996) ............................................................................45

*Marcus v. J.C. Penny Co., Inc.*,
   2015 WL 5766870 (E.D. Tex. Sept. 29, 2015) ......................................................33

*Martinez v. Cook Cty., Illinois*,
   2015 U.S. Dist. LEXIS 83615 (N.D. Ill. June 26, 2015) .........................................54

*Mayle v. Felix*,
   545 U.S. 644 (2005)........................................................................................51

*McClellon v. Lone Star Gas Co.*,
   66 F.3d 98 (5th Cir. 1995) ..........................................................................49, 50

*McGregor v. La. State Univ. Bd. of Supervisors*,
   3 F.3d 850 (5th Cir. 1993) ..............................................................................................51, 53

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010)...................................................................................................................47

*In re MF Global Holding Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)......................................................................................28

*NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012)......................................................................................................15

*In re New Century*,
   588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..................................................................................43

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*,
   2010 U.S. Dist. LEXIS 34459 (S.D.N.Y. Mar. 31, 2010) ......................................................51

*Northumberland Cty. Ret. Sys. v. Kenworthy*,
   2013 U.S. Dist. LEXIS 131655 (W.D. Okla. Sept. 16, 2013) ................................................34

*In re OPUS360 Corp. Sec. Litig.*,
   2002 U.S. Dist. LEXIS 18558 (S.D.N.Y. Sept. 30, 2002)......................................................35

*In re Paracelsus Corp.*,
   6 F. Supp. 2d 626 (S.D. Tex. 1998) ........................................................................................35

*Pierce v. Morris*,
   2006 U.S. Dist. LEXIS 57366 (N.D. Tex. Aug. 16, 2006)...............................................15, 35

*Pinter v. Dahl*,
   486 U.S. 622 (1988).............................................................................................................34, 35

*Richman v. Goldman Sachs Gp., Inc.*,
   2012 WL 2362539 (S.D.N.Y. June 21, 2012) .........................................................................32

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ...................................................................................................15

*Rubinstein v. Collins*,
   20 F.3d 160 (5th Cir.1994) .................................................................................................24, 36

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001).......................................................................................................22

*Sharp v. Texas Dep't of Family & Protective Services*,
   2014 U.S. Dist. LEXIS 158170 (N.D. Tex. Nov. 7, 2014)......................................................49

*Shofstall v. Allied Van Lines, Inc.*,
   455 F. Supp. 351 (N.D. Ill. 1978) ........................................................................16

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
   707 F.3d 95 (1st Cir. 2013).................................................................................23

*Slayton v. Am. Express Co.*,
   460 F.3d 215 (2d Cir. 2006)...........................................................................51, 52

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ...............................................................36, 37, 41, 44

*Starr v. Baca*,
   652 F.3d 1202 (9th Cir. 2011) ............................................................................17

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008).........................................................................................36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................4, 37, 44

*Trendsetter Inv., LLC v. Hyperdynamics Corp.*,
   2007 WL 172627 (S.D. Tex. Jan. 18, 2007)...........................................................47

*Truk Int'l Fund LP v. Wehlmann*,
   737 F. Supp. 2d 611 (N.D. Tex. 2009) .................................................................30

*Tsirekidze v. Syntax-Brillian Corp.*,
   2009 U.S. Dist. LEXIS 8464 (D. Ariz. Jan. 30, 2009) .............................................35

*United States v. Gutierrez*,
   548 F. App'x 181 (5th Cir. 2013) .......................................................................49

*United States v. Safeco Ins. Co. of Am.*,
   2010 U.S. Dist. LEXIS 40245 (S.D. Miss. Apr. 23, 2010)........................................49

*Wallace v. Tesoro Corp.*,
   796 F.3d 468 (5th Cir. 2015) .............................................................................23

*In re Westinghouse Sec. Litig.*,
   90 F.3d 696 (3d Cir. 1996) (Alito, J.) .............................................................25, 34

*Zagami v. Natural Health Trends Corp.*,
   540 F. Supp. 2d 705 (N.D. Tex. 2008) .................................................................33

**Statutes**

12 C.F.R. 225.8 .................................................................................. *passim*

15 U.S.C. § 77l(a) ..................................................................................................15

15 U.S.C. § 77o ......................................................................................................35

15 U.S.C. § 77t(a) ..................................................................................................47

15 U.S.C. § 78u-4(b)(2) .........................................................................................37

15 U.S.C. § 78u-5(b)(2)(D) ...............................................................................24, 46

17 C.F.R. § 210.4-08 ....................................................................................... *passim*

17 C.F.R. § 229.201 .............................................................................................7, 17

17 C.F.R. § 229.503 ...............................................................................................23

17 C.F.R. § 230.159 ...............................................................................................35

**Other Authorities**

Fed. R. Civ. P. 9(b) ......................................................................................15, 36, 47

Fed. R. Civ. P. 15(c)(1)(B) .................................................................................5, 49

Lead Plaintiffs Deka Investment GmbH and City of Dearborn Heights Act 345 Police & Fire Retirement System respectfully submit this memorandum of law in opposition to the motions to dismiss the First Amended Class Action Complaint ("AC") by defendants Santander Consumer USA Holdings Inc. ("SCUSA"), the Individual Defendants (as defined below) and the Underwriter Defendants (as defined below) (collectively, "Defendants").[1]

## PRELIMINARY STATEMENT

The Securities Act Claims

The AC timely asserts claims under, *inter alia*, § 11 and § 12(a)(2) of the Securities Act of 1933 ("Securities Act") against Defendants related to SCUSA's January 2014 $2 billion initial public offering ("IPO") of its common stock.  In sum, the AC alleges that in violation of the securities laws, SCUSA told investors to expect dividends but failed to disclose restrictions on its ability to pay dividends imposed by the "capital plan rule," a regulation promulgated in connection with the annual Comprehensive Capital Analysis and Review ("CCAR") of bank holding companies by the Federal Reserve (the "Fed").  SCUSA was subject to CCAR because it was majority-owned and controlled by Santander Holdings USA, Inc. ("SHUSA"), a bank holding company (hereafter "BHC").  The capital plan rule provides that a BHC must submit a capital plan to the Fed detailing, *inter alia*, intended capital distributions, including dividend payments, compliance and risk management procedures and the BHC's financial reactions to various "stress test" scenarios.  The rule's purpose was to establish prior approval requirements

---

[1] SCUSA and the Individual Defendants are referred to as the "SCUSA Defendants."  The briefs by the SCUSA Defendants and the Underwriter Defendants are referred to as the "SDBr." and "UDBr.," respectively.  "Def. App." refers to the appendix to the SDBr.  "Pl. App." refers to the appendix to this brief.  All references to "¶__" are to paragraphs in the AC unless otherwise stated.  All emphases are added and citations omitted unless otherwise stated.

for capital distributions, such as dividends, by BHCs.  SHUSA submitted its capital plan to the Fed on January 6, 2014, prior to the IPO.  The rule provided that the Fed would examine the capital plan and report whether SHUSA passed the "stress test" by March 31, 2014.  Until then, no unauthorized capital distributions, including dividends, were to be paid.  SCUSA also told investors that its compliance structure and processes ensured compliance with the law but failed to disclose systemic violations of the law as a result of processes that were severely lacking.

Defendants claim that when they stated in connection with the IPO that, *inter alia*, SCUSA "**will 'pay out** 30+% of [its] net income in the form of dividends'" and that SCUSA had "shared best practices in compliance and risk management" with SHUSA, *see infra* at 16, 26, they made no materially misleading statements or omissions.  Their primary argument is that on its face the capital plan rule restricts dividend payments only by a BHC, not its subsidiaries.  This argument is meritless.  As explained below, the rule does not require that the dividend be paid by the BHC.  It is clear that a dividend by SCUSA — a controlled and consolidated subsidiary of the BHC — was a distribution of capital by SHUSA within the plain meaning of the rule.  This is consistent with the settlement agreement SHUSA entered into with the Fed over SCUSA's unauthorized payment of dividends after the IPO, which expressly stated "that the declaration of cash dividends [by SCUSA] … constituted an unauthorized capital distribution under [the capital plan rule]."  *See infra* at 18.  Thus, contrary to Defendants' arguments, the Fed itself interprets the capital plan rule to mean that the payment of common stock dividends by SCUSA was a capital distribution by SHUSA.  Defendants' further argument that the rule only kicks in after the Fed objects to the capital plan and that that did not happen until after the IPO is also meritless because, as discussed below, it contradicts the Fed's own interpretation of the rule, SCUSA's (and SHUSA's) own statements to the contrary and the statements of other BHCs.

The capital plan rule's limitation on dividends was not disclosed to investors during the IPO but only later conceded by SCUSA.

Defendants' argument that they are insulated from liability under the Securities Act by the bespeaks caution doctrine is unfounded because:  (a) the doctrine is only applicable to forward-looking statements, not to misrepresentations of current fact, and here Defendants' failure to disclose the CCAR dividend restrictions were then-current facts; and (b) the generalized cautionary language cited by Defendants was not tailored to the particular situation regarding CCAR and the capital plan rule and, thus, was not meaningfully cautionary.

Defendants' contention that statements in the Offering Documents (defined below) regarding compliance (*e.g.*, SCUSA was committed to "manag[ing] regulatory in a comprehensive compliance management program and overall risk in an enterprise risk program") are non-actionable puffery is meritless.  Numerous cases (discussed *infra*) have found that similar statements about the effectiveness of a company's risk management and legal and regulatory compliance are not puffery.  Defendants' further assertion that the need to hire 100 additional compliance professionals five months after the IPO was just a "business decision" due to a "changing regulatory environment" is merely an impermissible attempt on a motion to dismiss to change the allegations of the AC, which must be taken as true.  The AC specifically alleges that *nothing had changed* from a regulatory perspective.  The CCAR and other compliance deficiencies clearly existed at the IPO since, *inter alia*, the Fed's findings about those deficiencies were based on the capital plan that was submitted *prior to the IPO*.

The Exchange Act Claims

Claims for violations of, *inter alia*, § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") are asserted against SCUSA, its then CEO Thomas Dundon and its then CFO

Jason Kulas (the "10(b) Defendants").  The AC pleads a cogent and compelling inference of scienter as required under *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).  At a minimum, Defendants were severely reckless in not knowing about the dividend restrictions and drastic CCAR and other compliance and risk management failures, as evidenced by, among many other things, CEO Dundon's admission that prior to the IPO, SCUSA was "***not aware of the expectations***" associated with the CCAR process.  *See infra* at 11.  Defendants' argument that their opposing inferences of non-fraudulent intent are more compelling is unavailing.  Their main argument is that SCUSA had a subjective belief — even after the Fed's March 26, 2014 objection letter which expressly stated no capital distributions were to be made and detailed the drastic compliance failures — that there were no dividend restrictions or compliance inadequacies.  While this argument is patently unbelievable and cannot be taken as true on this motion to dismiss, it is irrelevant under Fifth Circuit precedent (discussed *infra*) because a claim is stated based on severe recklessness.  Moreover, Defendants make no credible arguments that they were unaware of the systemic violations of lending laws that led to numerous lawsuits (including multi-million dollar class actions) detailing egregious control weaknesses in ensuring that SCUSA was in compliance with state and federal lending laws.  Further, while no motive allegations are necessary under *Tellabs*, the AC explains the substantial financial incentives for Dundon and Kulas to commit fraud, which contribute to a strong inference of scienter.

Statute of Limitations

Defendants concede that the Exchange Act claims are timely, but argue that the Securities Act claims are time-barred because plaintiffs supposedly had all the information they needed to assert those claims by no later than June 12, 2014 – the date of the last alleged corrective disclosure about CCAR dividend restrictions and compliance deficiencies.  Since no amended

complaint was filed by June 12, 2015, Defendants assert the applicable one-year statute of limitations has run, and further that the AC does not relate back to the initial complaint ("IC"), Dkt. No. 1, filed prior to transfer of the case to this Court.  Defendants' arguments are meritless.

First, their statute of limitations argument is premature because they have not established facts necessary to determine when the statute began running.  As explained below, there were numerous facts that occurred within one year of the October 30, 2015 filing of the AC that were necessary for plaintiffs to be able to properly state their claims.  For example, the settlement agreement with the Fed containing the key admission that SHUSA and SCUSA violated the capital plan rule was not mentioned in SCUSA's SEC filings until November 3, 2014.  The AC was timely-filed within one year of that date.  Resolution of when the statute begins to run is inappropriate on a motion to dismiss where, as here, critical facts relating to notice are in dispute.

Second, the AC relates back to the IC.  Defendants were on notice of the claims related to dividends and compliance.  Among other things, the IC specifically alleged the falsity of press releases discussing, *inter alia*, SCUSA's supposed "confiden[ce] in the financial objectives *discussed prior to our IPO* with regard to dividend payments of 30 percent" and "sophisticated risk management."  *See infra* at 49.  And Defendants were on notice of SCUSA's representation that its processes "ensure[d] compliance with appropriate regulatory laws…."  *See infra* at 51.  Thus, the AC arose out of the conduct that "was set out or attempted to be set out in the original pleading" within the meaning of Fed. R. Civ. P. 15(c)(1)(B) and there is relation back.

Third, as explained below, Lead Plaintiffs were precluded from filing an amended complaint earlier than they did because of the proceedings in the transferor court and, therefore, even if this Court were to find the statute has run, the statute should not be enforced strictly here to avoid inequity under the doctrine of equitable estoppel.

# BACKGROUND FACTS

## A.   SCUSA IS CONTROLLED BY SHUSA

SCUSA is a subprime auto lender and a controlled subsidiary of SHUSA.  ¶¶31-35.  Both companies are subject to Fed oversight.  ¶36.  SHUSA: (a) owned more than 60% of SCUSA's shares; (b) consolidated SCUSA's financial results with SHUSA's results; (c) controlled SCUSA through its majority ownership and a shareholders' agreement; and (d) controlled SCUSA's ability to declare and pay dividends.  ¶¶31-36.  SHUSA placed eight executives of SHUSA or its parent (Banco Santander, S.A. ("Santander")) on SCUSA's 11-person board.[2]  ¶¶34, 38-53.

## B.   THE CCAR RESTRICTIONS ON CAPITAL DISTRIBUTIONS

As SCUSA and SHUSA were preparing for SCUSA's IPO in late 2013, the Fed released instructions (hereafter "CCAR Instructions") explaining that SHUSA was required to submit a capital plan. *See* ¶77.  Significantly, in reviewing the capital plan, the Fed was required to take into account:   (1) "potential risks stemming from activities *across the firm*," 12 C.F.R. § 225.8(e)(1)(i)(A); and (2) all "[r]elevant supervisory information about the [BHC] *and its subsidiaries*."  12 C.F.R. § 225.8(e)(1)(ii)(A).   Thus, the capital plan was required to include "[a]n assessment of the expected uses and sources of capital over the planning horizon that reflects the [BHC's] size, complexity, risk profile *and scope of operations*…."  12 C.F.R. §

---

[2] The Individual Defendants, who all signed the Offering Documents (defined below), are:  (1) Dundon, SCUSA's Chairman and CEO, and a SHUSA director since 2011; (2) Kulas, SCUSA's CFO; (3) Juan Carlos Alvarez, a SCUSA director until April 29, 2014, and CFO of SHUSA; (4) Roman Blanco, a SCUSA director and President of SHUSA; (5) Gonzalo de Las Heras, a SCUSA director and SHUSA director since October 2006; (6) Stephen Ferriss, a SCUSA director and SHUSA director; (7) Matthew Kabaker, a SCUSA director; (8) Tagar Olson, a SCUSA director; (9) Alberto Sanchez, a SCUSA director and SHUSA director since January 2009; (10) Javier San Felix, a SCUSA director and Senior Vice President of Santander since May 2013; (11) Juan Andres Yanes, a SCUSA director, SHUSA director since September 2009, and SHUSA's Chief Risk Officer; and (12) Daniel Zilberman, a SCUSA director.  ¶¶38-55.

225.8(d)(2)(i).[3]  A main purpose was to establish "prior notice and approval requirements for capital distributions" (such as dividends) by BHCs, ¶75; 12 C.F.R. § 225.8(a).  Because SCUSA was a consolidated and controlled subsidiary of SHUSA, SCUSA's inclusion in SHUSA's stress tests and capital plans was required.  ¶¶8, 36.

SCUSA's IPO was completed on January 23, 2014.  ¶32.  Prior to the IPO, SCUSA had formed the "Board Enterprise Risk Committee" ("BERC") to assist SCUSA's board of directors with "risk practices relating to enterprise-wide risk and compliance with regulatory guidance." ¶¶5, 80.  In the Offering Documents, SCUSA told shareholders that all directors had extensive compliance training, ¶¶38-53, and that BERC directors were selected because their "experiences and qualifications" could lead to "***informed views*** on risk matters facing [SCUSA] and the financial services industry, including…compliance [and] legal" issues, ¶82.  The BERC charter stated that its responsibilities included consideration of CCAR "stress test" processes and related regulatory and compliance issues.[4]  ¶81.  At the management level, Kulas oversaw CCAR.  ¶40.

Prior to SCUSA's IPO, SCUSA and SHUSA contemplated that SCUSA would pay out dividends after the IPO was completed.  *See* ¶¶32, 91-94.  Further, Defendants were aware that Regulation S-K, Item 201(c), 17 C.F.R. § 229.201(c), required that current and/or likely future restrictions on an issuer's ability to pay dividends were affirmatively required to be disclosed in the IPO Offering Documents, and that Regulation S-X, Rule 4-08(e), 17 C.F.R. § 210.4-08(e), required that SCUSA's financial statements also describe such restrictions.  ¶¶86-90.  Pre-IPO, other BHCs subject to CCAR, including affiliates of certain Underwriter Defendants, *see* ¶¶56-

---

[3] Title 12 of the C.F.R. is updated on January 1 each year.  The version of the capital plan rule in effect at the IPO (*i.e.*, for 2014) and cited in this brief is attached to the Pl. App. as Ex. A.
[4] This is based on the charter on SCUSA's website post-IPO.  The one in effect at the IPO is unknown absent discovery.  ¶81 n.4.  BERC members were Kabaker, Sanchez and Yanes.  ¶82.

73, made clear in publicly-available SEC filings that no capital distributions were allowed unless and until the Fed issued a prior non-objection. ¶84.

SHUSA submitted its capital plan to the Fed on January 6, 2014 (prior to SCUSA's IPO). ¶79. CCAR regulations (cited in the CCAR Instructions) specified that the Fed's review and its decision on whether capital distributions are permitted would be announced by March 31, 2014. ¶77. The CCAR regulations also stated: "If the [Fed] … objects to a capital plan and until such time as the Board … issues a non-objection to the [BHC's] capital plan, the [BHC] **may not make any capital distribution**, other than … capital distributions with respect to which the [Fed] has indicated in writing its non-objection." ¶78.[5]

### C.   SCUSA TOUTS DIVIDENDS, COMPLIANCE AND RISK MANAGEMENT DURING ITS ROADSHOW AND IN THE IPO OFFERING DOCUMENTS

During a January 2014 roadshow presentation, SCUSA's management stated that SCUSA "**will 'pay out** 30+% of [its] net income in the form of dividends.'" ¶94. The Offering Documents[6] stated that: "Following the completion of [the IPO], *we currently intend* to pay dividends on a quarterly basis…." ¶95. Defendants made no disclosure that SCUSA was restricted from paying dividends unless and until the Fed found that SHUSA passed its "stress test," or that SCUSA's ability to pay dividends may be affected by the CCAR process. ¶¶93, 96.

During the roadshow, SCUSA also boasted about its purportedly extensive compliance and risk management stating that SCUSA and SHUSA/Santander had "[e]xtensive risk

---

[5] ¶78 and n.3 contain an error. The cite to 12 C.F.R. § 225.8(*f*)(2) should have been to 12 C.F.R. § 225.8(*e*)(2) and the cite to 12 C.F.R. § 225.8(*d*) should have been to 12 C.F.R. § 225.8(*c*).

[6] The "Offering Documents" refers to (a) the Form S-1 registration statement, as amended, and final Form S-1/A (collectively, the "Registration Statement") and (b) the final prospectus dated January 22, 2014 (the "Prospectus"), both of which SCUSA filed with the SEC for the IPO. ¶32.

management … procedures" and "[c]ompliance."   ¶¶93-94.  The Offering Documents similarly stated, *inter alia*, that:  (a) Fed oversight "led [SCUSA] to develop and maintain *extensive risk management and reporting procedures*" and "helped [SCUSA] *to continually adapt to the evolving regulatory requirements*," ¶99; and (b) SCUSA (i) "derive[d] significant benefits from [its] relationship with Santander, including … *shared best practices in compliance and risk management*," *id.*, (ii) had an "*extensive enterprise-wide compliance framework*," ¶100, and (iii) was committed to "manag[ing] regulatory in *a comprehensive compliance management program and overall risk in an enterprise risk program*," ¶101.

### D.   IN ITS FIRST FORM 10-K FOLLOWING THE IPO, SCUSA REPEATS THE INTENTION TO PAY DIVIDENDS WITHOUT DISCLOSING THE RESTRICTIONS

While SHUSA's capital plan was still under Fed review, SCUSA filed its 2013 Form 10-K on March 6, 2014 ("2013 Form 10-K"), and repeated its intention to pay quarterly dividends. ¶104.  The 2013 Form 10-K also emphasized SCUSA's supposedly extensive compliance and risk management framework, stating, *inter alia*:  "To manage our legal and compliance risk, *we maintain an extensive compliance, internal control, and monitoring framework*," ¶105, and SCUSA relies on its relationship "with Santander, through SHUSA, for several *competitive advantages* including…*regulatory best practices*," ¶106.  Once again, SCUSA failed to disclose that its ability to pay dividends was restricted by CCAR or the drastic compliance and risk management inadequacies.  ¶¶108-109.  Dundon and Kulas signed certifications that the 2013 Form 10-K contained no material misstatements or omissions.  ¶107.

### E.   THE FED OBJECTS TO SHUSA'S CAPITAL PLAN BUT SCUSA SAYS NOTHING TO INVESTORS

On March 26, 2014, the Fed found that SHUSA failed its stress test and objected to SHUSA's capital plan (hereafter "2014 CCAR Results").  ¶110.  Contrary to, among other things, the Offering Documents' representation that SCUSA had "shared best practices in

compliance and risk management" with SHUSA and "extensive risk management and reporting procedures," the 2014 CCAR Results stated that: "The Fed objected to the … plan … due to *widespread and significant deficiencies* across [SHUSA's] capital planning processes," ¶112, and reiterated that under the CCAR regulations capital distributions (including dividends) were to be paid only "*[i]f the Fed does not object to a BHC's capital plan.*" ¶111.

SCUSA said nothing to its shareholders about the existence of the failed stress test, or the "widespread and significant deficiencies" in compliance and risk management, or the prohibition on capital distributions. ¶111. Instead, SCUSA issued a May 1, 2014 press release stating "[*w*]*e are confident in the financial objectives discussed prior to our IPO with regard to dividend payments of 30 percent*…," ¶115, and, during a May 1, 2014 conference call, Kulas stated: "[W]e continue to anticipate *a dividend payout ratio of 30% of annual earnings*….," ¶114, while Dundon added that: "[O]ur Board …declared a quarterly cash dividend of $0.15 per share payable on May 30, 2014 … [W]e expect this dividend to be about $52.3 million." ¶114.

### F.  SCUSA MAKES ITS FIRST MENTION OF SHUSA'S FAILED STRESS TEST BUT CONTINUES TO MAKE MISLEADING STATEMENTS

In a May 15, 2014 Form 10-Q, SCUSA stated for the first time that the Fed's power over SCUSA includes "*the authority to prohibit or limit the payment of dividends*," ¶118, and:

> [C]ertain … [BHCs], including SHUSA, are required to perform a stress test and submit a capital plan to the Fed on an annual basis, *and to receive a notice of non-objection to the plan from the Fed before taking capital actions, such as paying dividends…This requirement could have a negative impact on SCUSA.*

*Id*. These disclosures were *not* contained in the Offering Documents.[7]

---

[7] In August 2014 offering materials, SCUSA also added a risk factor specifically explaining, *inter alia*, the Fed's ability to restrict dividend payments. ¶¶136-137. This risk factor was not included in the Offering Documents.

The 10-Q also referenced the March 26 objection letter, ¶120, but did not disclose the drastic compliance inadequacies the Fed had found. ¶121. Instead, the 10-Q misleadingly stated only that the stress test failure was "based on qualitative concerns" and the failure "**could have** a negative impact on SCUSA." ¶120. No mention was made of restrictions on SCUSA's ability to pay dividends, and SCUSA repeated that the previously announced dividend would be paid. ¶¶117-20. This 10-Q also reassured investors that SCUSA had, *inter alia*, an "*extensive enterprise-wide compliance framework*." ¶121. Dundon and Kulas signed certifications that this 10-Q contained no material misstatements or omissions. ¶302. In an investor presentation on May 21, 2014, SCUSA continued to emphasize its supposedly "*established compliance program*" and its "[r]esponsibility of *assuring day to day compliance with applicable laws*," again without any disclosure about the drastic compliance failures the Fed had found. ¶¶122-24.

### G.    SCUSA'S SHARES DROP SUBSTANTIALLY AS THE TRUTH IS REVEALED

SCUSA issued a Form 8-K on May 29, 2014, announcing that: (a) the Fed would permit it to pay the May 30 dividend *only if* Santander contributes $20.9 million in capital to SHUSA, which Santander did; (b) "*SCUSA does not expect to pay [any other] dividends during the remainder of 2014*;" and (c) SCUSA will incur higher costs "*in connection with compliance with, and assisting SHUSA in, the CCAR process*." ¶125. This was a reversal from SCUSA's prior representations to investors that, *inter alia*, SCUSA "will pay out 30+%" of its earnings as dividends and that its shared compliance with SHUSA was not only extensive, but gave SCUSA a competitive advantage. *See, e.g.*, ¶¶93-95, 104, 114.

On this news, SCUSA's shares dropped 4.63% to $19.76 from the prior day's close of $20.72 on extremely high volume. ¶126. Wall Street analysts attributed the drop to the announcement about the dividend and drastic compliance inadequacies. *See* ¶¶126-127 (citing, *inter alia*, RBC Capital Markets, LLC analysts reporting dividend restrictions were "*clearly*

11

*disappointing for investors that expected a roughly 30% dividend payout ratio/*roughly 4% dividend yield for 2014").

During a June 11, 2014 presentation, analysts pressed Dundon for answers.   ¶128. Dundon flat out admitted that SCUSA was "*not aware of the expectations*" associated with the CCAR process, but that going forward SCUSA was "trying to work closely with the regulators to build out our enterprise risk processes, CCAR process, compliance processes … *to be best in class*...."   *Id.*   These admissions directly contradicted the Offering Documents' representation that SCUSA and SHUSA *already had* "shared best practices in compliance and risk management." *Id.*   SCUSA's shares dropped 8.55% (on enormous volume exceeding 10.5 million shares) from $21.05 on June 10, 2014 to $19.25 on June 11, 2014. ¶129.

On June 12, 2014, SCUSA disclosed that it "expect[ed] to incur additional compliance costs…*related to regulatory compliance, including CCAR … [and] an incremental staffing requirement of approximately 100 full time employees at approximately $125,000 average annual cost per person*."   ¶130.   The (at least) $12.5 million annual compliance salary costs (*i.e.*, $125,000 x 100 employees) represented a significant increase over SCUSA's salary and benefits expenses from each of the four previous fiscal years for not just compliance personnel, but personnel in the entire company.   ¶131.   SCUSA also stated that these additional employees were brought on because it was "*developing a best-in-class compliance capability*."   ¶130.   This admission that SCUSA needed to "*develop*" a "best-in-class" compliance capability was directly contrary to the Offering Documents' representation that SCUSA *already had* "shared best practices in compliance and risk management" with Santander.   ¶132.   As a result of these disclosures, SCUSA's stock dropped another 1.33% on June 12, 2014 to close at $18.99.   ¶133.

### H.   SHUSA SETTLES AN ENFORCEMENT ACTION WITH THE FED

On September 15, 2014, SHUSA and the Fed executed an agreement (the "Settlement

Agreement") to settle the Fed's enforcement action over payment of the May 2014 SCUSA dividend.  ¶138.  The Settlement Agreement states:  (a) "the [Fed] authorized [SHUSA] to make quarterly payments on certain preferred stock instruments in the [March 26, 2014] Objection Letter but did not authorize any other capital distributions by [SHUSA]";[8] (b) "despite the [March 26, 2014] Objection Letter, [SCUSA] declared a cash dividend on its common stock …, which was not specifically authorized in advance by the Fed at the time of, or after, the issuance of the Objection Letter;" (c) "due to the ownership of a portion of [SCUSA's] shares by parties other than [SHUSA], the declaration of the cash dividend [by SCUSA] decreased [SHUSA's] consolidated capital and constituted a capital distribution under 12 CFR 225.8(c)(2);" and (d) "in order to mitigate this violation, [Santander]… contributed $21 million to [SHUSA]."  ¶¶139-140; Def. App. Ex. M at App. 429.

SHUSA's and SCUSA's shared compliance and risk management framework was so inexorably flawed that SHUSA failed yet another stress test in March 2015, and SHUSA entered into a second settlement agreement in which SHUSA agreed, *inter alia*, that it would, again, attempt to strengthen board oversight, including over SCUSA's operations.  ¶141.  As of today, SCUSA has not paid any common stock dividends to its shareholders besides the *unauthorized* May 2014 dividend.

## I.   OTHER COMPLIANCE AND RISK MANAGEMENT FAILURES

The Offering Documents also misrepresented that SCUSA had the systems, processes, controls and procedures in place to ensure compliance with federal and state consumer protection laws.  ¶142.  The Offering Documents acknowledged that SCUSA must comply with (i) federal

---

[8] SHUSA included capital distributions it intended to make in the form of preferred stock dividends in its plan, but as explained below, failed to include the intended SCUSA dividends.

consumer protection laws, including the Telephone Consumer Protection Act ("TCPA"), the Fair Debt Collection Practices Act ("FDCPA"), the Truth in Lending Act ("TILA"), the Fair Credit Reporting Act ("FCRA") and the Servicemembers Civil Relief Act ("SCRA"), and (ii) state and local consumer protection laws.  *Id.*  The Offering Documents further stated, *inter alia*, that:  (a) "We [*i.e.*, SCUSA] *are in compliance* with state laws and regulations applicable to our lending operations in each state"; and (b) "We have made significant technology investments in our servicing systems *to ensure* that our servicing activities are in compliance with federal and local consumer lending rules in all 50 states." ¶¶143-147.   Yet, SCUSA did not have the processes, controls or systems in place to ensure such compliance.  Rather, its systems and controls were materially deficient as reflected by the nature and breadth of more than 100 cases against SCUSA for violations of lending laws.  The AC details tens of millions of dollars that SCUSA agreed to pay as a result of violations as well as SCUSA's concessions as to the inadequacy of its compliance policies and practices, ¶¶148-188, and, as discussed above, the markedly higher compliance costs including the need to hire 100 additional full-time compliance professionals. ¶¶130-131, 184.

## ARGUMENT

### I.     THE SECURITIES ACT CLAIMS ARE ACTIONABLE

A motion to dismiss "'is viewed with disfavor and is rarely granted.'"  *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982).  A plaintiff need only plead enough facts "to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible when it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  This Court must accept all well-pleaded facts as true and draw all reasonable inferences in plaintiffs' favor.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239 (5th

Cir. 2009).  Defendants here concede that simple notice pleading applies to the Securities Act claims.  *See Pierce v. Morris*, 2006 U.S. Dist. LEXIS 57366, at *15 (N.D. Tex. Aug. 16, 2006).[9]

### A.   THE ELEMENTS OF THE SECURITIES ACT CLAIMS

To state a *prima facie* case under § 11, a securities purchaser "need only show a material misstatement or omission" in a registration statement.  *Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983).  "Liability against the issuer of a security is virtually absolute, even for innocent misstatements.  Other defendants bear the burden of demonstrating due diligence."  *Id.* "Neither scienter, reliance, nor loss causation is an element of § 11 or § 12(a)(2) claims …." *NECA–IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012).  A plaintiff need only show, and plaintiffs here have shown, that the registration statement "'contained an untrue statement of material fact or omitted … a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 861 (5th Cir. 2003).  Under § 12(a)(2), any person who sells a security using a prospectus or oral communication that includes a material misrepresentation or omission is liable "to the person purchasing such security from him."  15 U.S.C. § 77l(a); *see Rosenzweig*, 332 F.3d at 861.

"A 'material' fact is one which a reasonable investor would consider significant in the decision whether to invest, such that it alters the 'total mix' of information available …."  *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1445 (5th Cir. 1993).  With respect to omissions, an issuer has an affirmative duty to disclose information that is either (1) specifically required to be disclosed by the securities laws or (2) necessary to render other statements made not materially

---

[9] Defendants make no argument that the Securities Act claims "sound in fraud" such that Fed. R. Civ. P. 9(b) should apply, nor could they since fraud is expressly disclaimed.  ¶22.

misleading.  *See Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 212 n.6 (5th Cir. 2004).

**B.    DEFENDANTS' FAILURE TO DISCLOSE THE RESTRICTIONS ON DIVIDENDS WAS MATERIALLY MISLEADING**

Despite Defendants' efforts to confuse the issues with their erroneous interpretation of the capital plan rule, the failure to disclose dividend restrictions is actionable under the securities laws.  *See Shofstall v. Allied Van Lines, Inc.*, 455 F. Supp. 351, 355 (N.D. Ill. 1978) (issuer's omission of a government-imposed restriction on dividends was misleading); *Bisso v. Rambusch*, 1977 WL 1017, at *6-*7 (S.D.N.Y. May 12, 1977) (finding failure to disclose restriction was material omission).[10]  Here, Defendants made statements regarding dividends but failed to disclose restrictions on SCUSA's ability to pay dividends.  For example, during the roadshow, SCUSA stated it "***will 'pay out*** 30+% of [SCUSA's] net income in the form of dividends,'" ¶¶94, 206, and the Offering Documents also stated that post-IPO "we currently intend to pay dividends on a quarterly basis."  ¶202.  These statements were misleading because Defendants omitted the then-current restriction on dividends,[11] and the facts about SCUSA's inadequate CCAR compliance and risk management procedures which were likely to, as they did, contribute to the Fed's express restriction on dividends.  *See Kapps*, 379 F.3d at 212 n.6; *In re Enron Corp. Sec.*, 235 F. Supp. 2d 549, 603-04 (S.D. Tex. 2002) (even where there is lack of an affirmative duty to speak, once a person commences speaking, they must speak truthfully and completely).

---

[10] *See also Higgiston v. Lockheed Aircraft Corp.*, 1971 WL 280 (S.D.N.Y. July 13, 1971) (triable issues concerning an undisclosed restriction on Lockheed's ability to pay dividends that was partially imposed by the Defense Department); *Hundahl v. United Benefit Life Ins. Co.*, 465 F. Supp. 1349, 1365 (N.D. Tex. 1979) (Higginbotham, J.) (court acknowledged that had an insurer stopped making disclosures about a dividend restriction it would have faced liability for securities fraud:  "It does not follow that defendants could stop disclosing the fact of the [dividend] restriction.  That omission could indeed have created liability under Rule 10b-5.").

[11] The roadshow statements are only actionable under § 12(a)(2), while the statements in the Offering Documents are actionable under both § 11 and § 12(a)(2).

Therefore, Defendants violated the securities laws.

Defendants' claim that there was no dividend restriction at the time of the IPO is wrong, but also misses the point.  Having spoken, Defendants had a duty not to mislead.  As set forth below, Defendants' attempt to divert from this central tenet of the securities laws is also contrary to any plausible interpretation of the federal regulations and SCUSA's own admissions.  Further, "[i]f there are two alternative explanations . . . both of which are plausible, plaintiff's complaint survives a motion to dismiss."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

### 1. Defendants Violated Their Affirmative Duty to Dislose the Restrictions on SCUSA's Payment of Dividends

Defendants do not dispute that dividend restrictions imposed by government regulation must be disclosed under Regulation S-K, Item 201(c)(1), which provides:

> Where there are restrictions … that currently materially limit the registrant's ability to pay … dividends or that the registrant reasonably believes are likely to limit materially the future payment of dividends on the common equity so state and either (i) describe briefly (where appropriate quantify) such restrictions, or (ii) cross reference to the specific discussion of such restrictions in the … registrant's financial statements.

17 C.F.R. § 229.201(c)(1).  They also concede that Rule 4-08(e) of Regulation S-X requires that financial statements describe the "sources [and] … pertinent provisions" of dividend restrictions. 17 C.F.R. § 210.4-08(e).  The gravamen of their specious argument is that SCUSA was exempt from disclosure based on a tortured interpretation of these regulations and the capital plan rule.

As an initial matter, SCUSA itself conceded post-IPO that (i) CCAR was material to SCUSA and (ii) the Fed's ability to impose dividend restrictions could have a negative impact on SCUSA.  For example, in a May 15, 2014 Form 10-Q, SCUSA disclosed:

> SHUSA … [is] required to perform a stress test and submit a capital plan to the Fed on an annual basis, and to receive a notice of non-objection to the plan from the Fed before taking capital actions, such as paying dividends….  As a consolidated subsidiary of SHUSA, SCUSA is included in SHUSA's stress tests and capital plans. On March 26, 2014, the Fed announced that, based on

qualitative concerns, it objected to, and is requiring resubmission of, SHUSA's capital plan.  This action could have a negative impact on SCUSA.

¶120.  Later, in its May 29, 2014 Form 8-K, SCUSA admitted when speaking about the CCAR process that: "The suspension of SCUSA's ability to pay dividends or other limitations placed on SCUSA by the Fed … and additional costs associated with regulatory compliance could have a material adverse effect on SCUSA and … its common stock."  ¶125.  Then, on August 22, 2014, SCUSA specified in a prospectus that the Fed "*has the authority to approve or disallow… the payment of dividends*."  ¶136.  These admissions underscore Defendants' failure to inform investors that SCUSA's dividends required the Fed's prior non-objection to SHUSA's capital plan and that the Fed's dividend restrictions could have a material impact on SCUSA.

SCUSA's own statements and the Fed's interpretation of the capital plan rule belie Defendants' assertion that the capital plan rule is only applicable to dividends paid by a BHC.  In the statements in the preceding paragraph, SCUSA stated that payment of its dividend is subject to Fed approval of SHUSA's capital plan and, thus, it acknowledges the applicability of the rule to its dividend payments.  In addition, the Fed found that payment of the SCUSA dividend was an unauthorized capital action and capital distribution under the capital plan rule. ¶139 ("the declaration of cash dividends [by SCUSA] … constituted an unauthorized capital distribution under 12 CFR 225.8(c)(2)").[12]  Thus, the Fed itself clearly interprets the capital plan rule to mean that the payment of dividends by SCUSA was capital action and a capital distribution by

---

[12] The reason this determination was made later is because SCUSA's plan to make dividend payments (and SHUSA's intention to exercise its power to allow SCUSA to do so) was not even included in SHUSA's capital plan in the first instance for the Fed to review.  The Fed first found out about the proposed dividend in May 2014.  The capital plan rule, however, required that an intention to pay such a dividend be included in SHUSA's capital plan because it was a capital distribution (and also because it was a *source* of capital for SHUSA).

SHUSA.  *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) ("An agency's interpretation of its own regulations…is typically given controlling weight unless it is plainly erroneous or inconsistent with the regulation[s]."). Thus, whether the dividend was paid by the BHC or its separately-defined consolidated subsidiary is irrelevant.[13] Defendant Dundon admitted as much on June 11, 2014 when he stated that "I think what we have learned in the CCAR process is as a subsidiary we are going to be treated like a bank."  ¶128.

Defendants' suggestion that the Fed erroneously found that SCUSA's dividend was an impermissible capital distribution, SDBr. at 15-16, also fails based on the rule's definitions. "Capital action" was defined to "mean[] … *any* capital distribution," 12 C.F.R. 225.8(c)(2), and "*any* similar action that the [Fed] determines could *impact* a [BHC's] *consolidated* capital," *id*. "Capital distribution," in turn, was defined to include "a payment of common…stock dividends," 12 C.F.R. § 225.8(c)(3), and "any similar transaction that the [Fed] determines to be in substance a distribution of capital," *id.*  The SCUSA dividend, which SHUSA had the power to control, was "a payment of common stock dividends" within the meaning of "capital distribution."  In addition, the definition of "capital action" includes *any* capital distribution impacting "consolidated capital."  It does *not* state that the planned dividend payment needs to be a payment of dividends *by the BHC* — rather, *impact* on consolidated capital is the key.  Impact would be felt here because (i) SHUSA's consolidated capital included SCUSA's capital, which in turn included the cash SCUSA would use to pay dividends and (ii) the dividends would be paid, in part, to shareholders other than SHUSA and, thus, consolidated capital would exit the

---

[13] If Defendants' proposed interpretation (*i.e.*, a consolidated subsidiary's dividends are not subject to the rule) were correct, the Fed would have been unable to determine, as it did, that the SCUSA dividend was an unauthorized capital action and capital distribution.  Tellingly, Defendants presented no such twisted argument then, and it is unavailing now.

BHC structure.[14]

Because the payment of a dividend by SCUSA was — via SHUSA's ownership and control of SCUSA and the consolidation of assets for regulatory purposes — capital action and a capital distribution by SHUSA, it was required to be included in SHUSA's capital plan and was subject to the Fed's "***prior*** notice and approval requirements."  12 C.F.R. § 225.8(a).  Under 12 C.F.R. § 225.8(e)(2), the Fed could object to a capital plan on any one of a number of grounds, including, for example, unresolved issues with the BHC's capital adequacy process or the proposed capital distribution constitutes an unsafe or unsound practice, *see* 12 C.F.R. § 225.8(e)(2)(ii)(A)&(D) and 12 C.F.R. § 225.8(e) (listing other reasons).  Regardless, capital distributions were not to be made unless and until the Fed issued a non-objection.  *See* 12 C.F.R. § 225.8(e)(2)(iv).  But since SCUSA's plan to pay dividends was not included in the capital plan, the Fed was not given the opportunity to object to the proposed dividends, *ex ante*.[15]

Defendants' argument that there was no *current* restriction on paying dividends at the IPO because, under the definitions of "capital action" and "capital distribution," the Fed did not make a "determination" that the dividend was unauthorized until May 2014 also fails.

---

[14] Defendants cannot dispute that SCUSA's assets (*i.e.*, capital) were consolidated with SHUSA's for purposes of the rule or that a SCUSA dividend reduced consolidated capital.  *See* Def. App. Ex. M at App. 429 ("[T]he declaration of the cash dividend decreased [SHUSA's] consolidated capital and constituted a capital distribution under 12 CFR 225.8(c)(2)."); Def. App. Ex. N at App. 469 (SHUSA 2013 Form 10-K) ("[C]onsolidation of SCUSA's financial results … will result in a material increase in our total assets ….  [H]igher capital requirements … apply to us as a result of our consolidation of SCUSA's … results ….").

[15] Although the capital plan is unavailable publicly, ¶79, and, thus, not obtainable without discovery, *id.*, a reasonable inference from the after-the-fact settlement is that SCUSA's plan to pay dividends was not included in the plan.  Even if it was included, however, the result is the same because:  (1) in no event was a capital distribution permitted by the rule unless and until approved; (2) given the stress test failure, no approval was given; and (3) the dividend was found to be an unauthorized capital distribution.

Defendants ignore that, on its face, the definition of capital distribution included any payment of common stock dividends, without reference to a "determination" by the Fed. *See* 12 C.F.R. § 225.8(c)(3). Thus, no "determination" by the Fed was necessary for a current restriction on dividends to exist. They also misinterpret the time when the "determination" is supposed to occur. The determination to which the definitions of "capital action" and "capital distribution" refer (*i.e.*, "any similar action that the [Fed] *determines* could impact a [BHC's] consolidated capital," and "any similar transaction that the Fed *determines* to be in substance a distribution of capital") is one that the Fed is supposed to make *during the pendency* of its review of the capital plan. Here, SCUSA's proposed dividends were not included in the capital plan and when the Fed learned of them, it required an additional capital infusion by Santander.

Defendants' further argued-for interpretation that the rule "only kicks in if the Fed objects to the capital plan in the first instance," SDBr. at 15, is also meritless because it:

1. contradicts the Fed's statements. ¶111 (citing 2014 CCAR Results at 6 n.8) ("***If the Fed does not object*** to a BHC's capital plan, the BHC may make its planned capital distributions ….").

2. contradicts SCUSA's own SEC filings. ¶118 (quoting May 15, 2014 10-Q) ("SHUSA … [is] … required to … submit a capital plan…, and *to receive a notice of non-objection to the plan from the Fed **before** taking capital actions*").

3. contradicts statements by other BHCs, which were available to Defendants pre-IPO. ¶84 (citing 2012 Wells Fargo Form 10-K) ("[T]he [Fed's] … rules … require … [BHCs] to submit capital plans annually for review to determine if the [Fed] had any objections ***before*** making any capital distributions.").

4. contradicts the Settlement Agreement. ¶139 ("[SCUSA] declared a cash dividend…, *which was not specifically authorized **in advance** by the Fed **at the time of***, or after, the issuance of" the March 26 objection to the plan).

5. would defeat the rule's purpose, which was to allow the Fed to review *intended* capital distributions and approve (or disapprove) of them prior to the capital taking flight from the bank. *See* 12 C.F.R. § 225.8(a) ("*prior notice and approval requirements* for capital distributions"); 12 C.F.R. § 225.8(e)(2)(D) (Fed should "consider whether the [BHC] is and would remain in sound financial condition

after giving effect to … all *proposed* capital distributions"). A regulation should not be interpreted in a manner that defeats the regulatory scheme. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must ... interpret the statute 'as a symmetrical and coherent regulatory scheme,' … and 'fit, if possible, all parts into an harmonious whole ….'").

Further still, Defendants had an obligation to disclose a *likely future* restriction on dividends because, at the IPO, Defendants knew or should have known, *inter alia*, that: (1) the Fed had authority to object to a SCUSA dividend, *see* ¶¶218-226; (2) SCUSA's dividends were to be included under the capital plan rule and approved by the Fed prior to their payment, *id.*; and (3) SCUSA's CCAR compliance procedures and supposed "shared best practices" in CCAR compliance with Santander and SHUSA were woefully inadequate, which itself was an independent reason for the Fed to impose a dividend restriction. *Id.* Defendants' knowledge or neglect is highlighted by the fact that the SCUSA's shared CCAR compliance processes with SHUSA — which were represented to prospective shareholders as "best practices" — were so inexorably flawed at the time of the IPO that more than two years later they remain deficient. SHUSA failed its second stress test in March 2015 due in large part to lax board oversight and management of the consolidated organization, ¶141, and has not paid any authorized dividends since the IPO, ¶125. *Cf. In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (plaintiffs may "rel[y] on post-class period [statements] to confirm what a defendant should have known during the class period").

Defendants' contention that they had no disclosure obligations under Item 201(c) because they did not have a subjective belief about likely dividend restrictions is unavailing. Given the negligence and strict liability standard, *see supra* at 15, Defendants' disclosure obligations are not based solely on whether the issuer actually held a *subjective* belief about a likely dividend restriction, but rather should include an assessment of whether a reasonable issuer would have

formed the belief that there were probable future restrictions or informed itself of circumstances that were likely to lead to them given that it had represented dividends would be paid.  Indeed, any other interpretation of the regulation would fail to give meaning to the word "reasonably." *Cf. Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("'[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'").   To credit Defendants' interpretation would mean that wherever a regulation triggers a disclosure obligation off what an issuer "reasonably" believes, a defendant could simply take no action to inform itself about a matter the law says it has an obligation to know and therefore be immune from liability.  Moreover, the drafters of the regulation did not write that an issuer should disclose limits on future dividends if it *subjectively* believes they are likely; instead, they included "reasonably."  *See generally Wallace v. Tesoro Corp.*, 796 F.3d 468, 474-75 (5th Cir. 2015) (interpreting "reasonably believes" as used in Sarbanes-Oxley whistle-blower law as requiring "evaluat[ion] under both an objective and a subjective standard").

Finally, SCUSA was also subject to Item 503(c) of Regulation S-K which requires that an issuer provide in its offering materials a "discussion of the most significant factors that make the offering speculative or risky."  17 C.F.R. § 229.503(c).  A "clear and concise" discussion "must 'describe the most significant factors that may adversely affect the issuer's business'" and go beyond "[g]eneric or boilerplate discussions" to explain specifically how the risk affects the securities being offered.  *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013).  The material facts concerning the restriction on SCUSA's dividends and/or SCUSA's inexorably flawed compliance framework (i.e. known events) was one of the most significant factors that made the SCUSA IPO risky or speculative.  This is so especially since SCUSA stated that it "will pay" investors 30% of its annual earnings in the form of dividends.  *See id.* at 103-04

(reversing district court and finding that a company's failure to disclose adverse events associated with a drug, which occurred pre-stock offering and were likely to lead to regulatory action having a material impact on the issuer, was actionable under Item 503).

## 2. The PSLRA Safe Harbor And Bespeaks Caution Doctrine Are Inapplicable To The Securities Law Claims

The safe harbor for forward-looking statements in the Private Securities Litigation Reform Act of 1995 ("PSLRA") does not apply to statements made in connection with an IPO, 15 U.S.C. § 78u-5(b)(2)(D), and thus it is inapplicable to the Securities Act claims.

The bespeaks caution doctrine is also inapplicable because it only applies to forward-looking statements, not to misrepresentations of present or historical fact, and here Defendants' failure to disclose the then-existing and/or reasonably likely dividend restrictions were then-current facts. *See Rubinstein v. Collins*, 20 F.3d 160, 167–68, 170-71 (5th Cir.1994) ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts"). The risk (supposedly) warned of (*i.e.*, the then-current or likely future dividend restrictions) had already materialized by virtue of the capital plan rule's requirements. Thus, Defendants' argument that they are insulated from liability because they stated (i) that the Fed "'*could* limit the activities and types of businesses that [SCUSA] may conduct,'" (ii) "'[a]ny future determination to pay dividends … will be dependent upon … government regulations,'" and (iii) "'dividends, *if any*'" will be paid, *see* SDBr. at 16-18; UDBr. at 5-6, is misplaced. Generalized warnings about what the Fed "could" do, or how changes to unspecified government regulations might have a *potential* to effect dividend payments are ineffectual because Defendants already knew (indeed had an affirmative duty under Item 201(c) to know) a restriction was in place. *See Rubinstein*, 20 F.3d at 171 ("As we wrote: 'To warn that the untoward may occur when the event is contingent is prudent; to caution

that it is only possible for the unfavorable events to happen when they have already occurred is deceit.'") (quoting *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1983), *rev'd on other grounds*, 459 U.S. 375 (1983)); *supra* at 15 (citing *Shofstall, et al.*, finding failure to disclose dividend restrictions actionable even with "if any" language).

In addition, boilerplate warnings are generally ineffectual under the securities laws. *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 707 (3d Cir. 1996) (Alito, J.) ("'Of course, a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation.'"). "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.'" *Id.* Here, the generalized caution that the Fed "could limit the activities and types of businesses that [SCUSA] may conduct," does not mention anything about a potential or actual restriction on dividends but rather discusses the Fed's authority "to approve or disallow acquisitions" and other activities that "may limit [SCUSA's] future growth plans." ¶97. Defendants' purported warnings are not sufficiently specific to warn investors that there were actual or likely restrictions on dividends. For example, Item 201(c) affirmatively required that the restrictions not only be "describe[d]" but "quanti[fied], if possible," *see supra* at 17. Given this requirement, the Offering Documents should not only have described the restrictions imposed by the capital plan rule but also quantified the amount of dividends SCUSA was then permitted to pay as "zero." In fact, SCUSA said the exact opposite – that it "will pay" dividends of 30% of its earnings.

Defendants' argument that they are insulated from liability by the statement that SCUSA's board "may … change or eliminate the payment of future dividends at its discretion, without prior notice to our stockholders, and our dividend policy and practice may change at any

time and from time to time in the future," SDBr. at 18 (citing ¶¶95, 104), also misses the mark because this generalized caution is inapplicable to the circumstances at the time of the IPO. The dividend restrictions at issue did not arise because the board exercised its discretion to change or eliminate the dividend or SCUSA's policies or practices had changed. Rather, it arose because of the pre-existing capital plan rule. Defendants' further argument based on the general statement that "'[a]ny future determination to pay dividends … will be dependent upon our financial condition, results of operation, capital needs, government regulations, and any other factors that our board … may deem relevant at such time and from time to time,'" SDBr. at 18, is also meritless. The dividend restrictions had nothing to do with post-IPO changes involving these factors but rather arose because of their disclosure obligations at the IPO.

### C.   DEFENDANTS MADE ACTIONABLE MISSTATEMENTS DURING THE ROADSHOW AND IN THE OFFERING DOCUMENTS REGARDING CCAR COMPLIANCE

The Offering Documents made several false or misleading statements regarding SCUSA's compliance and risk management, as follows (*see* ¶204):

- "Because of our relationship with Santander, we are subject to the regulatory oversight of the Fed[] … [which] has led us to develop and maintain extensive risk management and reporting procedures and has helped us to continually adapt to the evolving regulatory requirements."

- SCUSA "derived significant benefits from [its] relationship with Santander, including … shared best practices in compliance and risk management;"

- "[W]e have an extensive enterprise-wide compliance framework ….;"

- "[W]e … manage regulatory in a comprehensive compliance management program and overall risk in an enterprise risk program;" and

- "To manage our legal and compliance risk, we maintain an extensive compliance … framework, which includes … ongoing compliance monitoring with all applicable regulations …."

All these statements of existing fact were materially misleading because, at the IPO,

SCUSA's compliance and risk management framework and controls were anything but "extensive," "comprehensive" or "shared best practices" respecting the capital plan rule and the CCAR process – they were woefully inadequate. SCUSA revealed as much when it announced five months after the IPO that it must hire 100 additional compliance professionals (at least 20 of which were hired because SCUSA's regulatory compliance with CCAR was drastically flawed) at a cost of $12.5 million annually. ¶130. Defendants knew or were negligent in not knowing of these severe inadequacies that existed at the time of the IPO, especially since: (1) Kulas was responsible for CCAR since the IPO, ¶40; (2) the BERC, which was established prior to the IPO, was responsible for risk management, compliance and stress testing associated with the CCAR process, including how SCUSA's "capital management policies" would affect SHUSA "stress testing exercises," ¶81; and (3) investors were told that BERC members' "experiences and qualifications" could lead to an "*informed view* on risk matters facing [SCUSA] …, including … risk matters that address … compliance [and] legal matters," such as CCAR. *See* ¶82.

Post-IPO, SCUSA claimed that it was unaware of regulatory expectations related to the CCAR process at the time of the IPO. ¶205. Taking Defendants at their word, the BERC could not have had an informed view of CCAR risks facing SCUSA at the time of the IPO. Further, the Fed's oversight could not have led SCUSA to both "develop" and "maintain" reporting and risk management procedures applicable to CCAR that were extensive or that included "ongoing compliance monitoring" with CCAR. In addition, Dundon's claim that SCUSA had not been aware of regulators' expectations respecting the CCAR process and acknowledgment that SCUSA *needed to become* "best-in-class" in its CCAR compliance capabilities, *see supra* at 12, was directly contrary to the Offering Document's representation that SCUSA *already had* "shared best practices in compliance and risk management" with Santander and SHUSA. ¶128.

Further, the Fed found that those supposedly "best practices" were woefully deficient not once but twice (*i.e.*, after SHUSA's failure of its *second* stress test).  *See* ¶¶110, 141.  The fact that the compliance failures were still uncorrected well over a year after they were first identified further demonstrates how extensively inadequate SCUSA's and SHUSA's shared regulatory practices were at the IPO.[16]

Contrary to Defendants' arguments, SDBr. at 21, a company's statements about the effectiveness of its risk management and legal and regulatory compliance when the company knew or should have known they were ineffective are actionable.  *In re MF Global Holding Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (finding statements that internal controls were "robust," "effective," "adequate," "comprehensive" and "designed to … manage the risks [the company] assume[d]" were actionable where the complaint alleged the company was in possession of contrary information when the statements were made); *Freudenberg v. E\*Trade Financial Corp.*, 712 F. Supp. 2d 171, 185, 189 (S.D.N.Y. 2010) (finding statements including "we … maintained strict discipline with respect to risk mitigation" actionable;  "Misstatements regarding risk management … are not puffery where … they were misrepresentations of existing facts."); *Lapin v. Goldman Sachs & Co.*, 506 F. Supp. 2d 221, 229 (S.D.N.Y. 2006) (statements that company was "dedicated to complying fully with the letter and spirit of the laws, rules and ethical principles that govern us" actionable), *reconsideration denied*, 2009 WL 275738 (S.D.N.Y. Feb. 4, 2009); *see also Burges v. Bancorpsouth, Inc.*, 2015 WL 4198795, at \*5 (M.D. Tenn. July 10, 2015) (denying motion to dismiss; "[b]ecause Defendants chose to speak [about]

---

[16] During the roadshow, SCUSA also made misleading statements about its "[e]xtensive risk management" and "compliance" and Santander "help[ing] [to] bring global risk management compliance and oversight into the business mix."  ¶¶94, 206.  These oral statements are misleading for the same reasons and are actionable under § 12(a)(2).

… their compliance with banking laws and regulations, a reasonable juror could conclude that those statements, without some qualification or accompanying disclosure of their non-compliance … were misrepresentations because they were, at a minimum, incomplete."); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, 2013 WL 1100819, at *1 (W.D. La. Mar. 15, 2013) (statements "touting … quality … of [company's] compliance department" and representing "that its compliance program represented a competitive advantage" actionable).

Defendants do not even attempt to explain how Dundon's claim that SCUSA was unaware at the time of the IPO of the Fed's regulatory expectations regarding CCAR could mean anything other than that the foregoing statements in the Offering Documents were materially false or misleading when they were made. Instead, Defendants "suggest" the "*changing regulatory environment*" required the hire of 100 additional compliance professionals. SDBr. at 19. This assertion impermissibly seeks to recast the AC's allegations, which must be taken as true; as set forth in the AC, nothing had *changed* from a regulatory perspective. *See supra* at 3. Indeed, the systemic CCAR compliance deficiencies existed at the IPO since the Fed's conclusions were based on the capital plan submission that was made *prior to* the IPO.[17] *See* ¶79. Defendants were aware of or neglected the facts indicating they needed to comply with the capital plan rule and CCAR process *well before the IPO*. ¶¶216-226. In other words, the need to have adequate compliance systems and personnel to support those systems existed at the IPO, but Defendants failed to inform themselves of what the CCAR requirements were. Thus, Defendants had no basis to tell shareholders that, *inter alia*, SCUSA and SHUSA had combined

---

[17] The assertion that increased compliance cost was due to post-IPO changes in CCAR regulation is also belied by the statement in SCUSA's May 29, 2014 8-K that it: "expects to incur higher costs than *originally anticipated* in connection with compliance with and assisting SHUSA in, the CCAR process." Pl. App. Ex. B at App. 13. The "original anticipation" occurred pre-IPO.

"best practices" in risk management and compliance.

Defendants' contention that the boilerplate warning that "*changes* in [U.S. federal government] policies … could have a material adverse effect on us through … costs of compliance with *increased* regulation" SDBr. at 19, is unfounded.  There were no changes by the Fed in its CCAR polices and there was no increased regulation after the IPO that caused SCUSA to have to hire more compliance professionals.[18]  The capital plan rule and CCAR requirements were already in place prior to the IPO and required that SCUSA have the necessary procedures and personnel in place to comply with CCAR.  SCUSA did not.  Thus, the AC's claims are actionable.

### D. THE OFFERING DOCUMENTS CONTAIN ACTIONABLE MISSTATEMENTS ABOUT COMPLIANCE PERTINENT TO SCUSA'S LENDING OPERATIONS

The statements in the Offering Documents that SCUSA had, *inter alia*, an "extensive" and "comprehensive" compliance framework and "shared best practices in compliance and risk management" and other statements discussed above, *see supra* at 26, were misleading for the additional reason that, at the IPO, SCUSA did not have extensive compliance and best practices in place with respect to *its lending operations*.  The falsity of these statements is further evidenced by the fact that just five months after the IPO, SCUSA was forced to hire at least 80 generalized compliance professionals (in addition to the 20 that were necessary for CCAR compliance), which increased salary expense by $12.5 million annually — an increase of as much as 8.2% for employees *in the entire company* over previous years.  ¶¶130-131.

Defendants also made false statements that SCUSA was in compliance with state and

---

[18] Defendants' reliance on *Truk Int'l Fund LP v. Wehlmann*, 737 F. Supp. 2d 611 (N.D. Tex. 2009), is misplaced because there, unlike here, there was no allegation that the omitted information existed at the time the allegedly misleading offering documents were issued.

federal laws and regulations regarding its lending operations.   For example, the Offering

Documents stated that:   "[w]e *are in compliance* with state laws and regulations applicable to

our lending operations in each state," ¶208; and:   "[m]ost of our servicing processes and quality-

control measures … *ensure* compliance with the appropriate regulatory laws."   ¶212; *see also*

¶¶210, 214 (citing similar statements).   These statements were materially false or misleading

because Defendants knew, or were negligent in not knowing, that SCUSA's processes and

controls were fundamentally flawed resulting in systemic violations of state and federal laws at

the time of the IPO.   *See* ¶¶149-183 & Ex. B (a plethora of lawsuits detail facts existing at the

time of the IPO that SCUSA was, contrary to its affirmative statements in the Offering

Documents, most definitely *not* in compliance with virtually every state and federal law and

regulation applicable to its lending operations).

Defendants ignore that these lawsuits bear directly on the veracity of their statements in

the Offering Documents regarding compliance when they assert that the suits involve "individual

borrowers" as well as "run-of-the-mill litigation."  SDBr. at 19.   The factual detail set forth in

the AC regarding SCUSA's lending law violations is sufficient at the pleading stage to

demonstrate that SCUSA's compliance systems and controls did not "ensure compliance with the

appropriate regulatory laws." ¶145.  Nor were SCUSA's controls robust or extensive, as they had

claimed. ¶¶146-147.  The breadth and nature of the cases detailed in the AC are sufficient to

infer that SCUSA lacked the controls and processes Defendants touted to investors.   For

example, despite acknowledging that SCUSA must comply with these laws, ¶142, at least 23

cases were filed against SCUSA for violations of the TCPA and corresponding state laws, ¶¶159-

161, 46 cases for violations of the FDCPA and corresponding state laws, ¶¶162-165, 28

complaints were filed for violations of TILA and corresponding state laws, and at least 20 cases

were filed evidencing SCUSA's repeated violations of the FCRA, ¶¶166-170.

Regardless of the sheer number of the suits, the conduct alleged in them (including conduct prior to the IPO) and admissions stemming from these cases evidence SCUSA's defective compliance systems.  For example, in one matter (involving nearly 40,000 class members) SCUSA failed to comply with notice requirements of the law prior to repossessing cars and improperly claimed that consumers owed deficiency balances.  ¶¶149-151.  SCUSA settled the action agreeing to several terms that included monetary repercussions to SCUSA as well as being enjoined from certain collection efforts.  ¶152.  In another class action, SCUSA agreed to waive $23 million in deficiency balances, among other terms, related to allegations of wrongful application of late fees.  ¶¶154-157.  In another example, SCUSA entered into a Consent Order (approved by the Honorable Jane J. Boyle of this Court) in which it:  (i) agreed to pay $9.4 million, the largest U.S. settlement for illegal automobile repossessions, and improve its compliance training and policies, ¶¶180-182; and (ii) essentially admitted that it had no systems to prevent unlawful repossession of the cars of active duty military personnel.  ¶¶175-183.

Contrary to the inapposite cases on which Defendants rely (SDBr. at 20-21), the foregoing statements of existing fact are actionable.  *Richman v. Goldman Sachs Gp., Inc.*, 2012 WL 2362539, at *11 (S.D.N.Y. June 21, 2012) (statements of compliance with laws and regulations actionable); *Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 2012 WL 1080366, at *13-*14 (S.D.N.Y. Mar. 30, 2012) (statements regarding compliance with environmental laws actionable); *supra* at 28-29 (citing *Burges* and other cases).

Defendants' argument that the Offering Documents were "rife with warnings" about compliance risks, SDBr. at 19-20, is as meritless with respect to SCUSA's lending operations as it was with respect to CCAR compliance.  The boilerplate warnings about SCUSA's lending

operations, *id.* at 20, are not meaningfully cautionary because the risks of SCUSA facing litigation and inadequate processes had already materialized. *Marcus v. J.C. Penny Co., Inc.*, 2015 WL 5766870, at *3 (E.D. Tex. Sept. 29, 2015). As discussed *supra*, the bespeaks caution doctrine only applies to forward-looking statements and not to the misrepresentations of existing fact at issue here, and the cases relied upon (SDBr. at 20-21) are inapplicable for that reason.

Defendants characterize SCUSA's addition of more than 100 compliance professionals as a mere "business decision" in light of a "changing regulatory environment." SDBr. at 19. This inaccurate assertion ignores and improperly seeks to contradict the allegations of the AC, which make clear that the regulatory environment had not changed in the mere five months that had elapsed since the IPO. *See* ¶¶216-226. SCUSA's compliance systems were materially defective at the IPO and Defendants knew or were negligent in not knowing it. Defendants further inappropriately argue that the allegations regarding SCUSA's woefully deficient compliance framework state nothing more than a corporate mismanagement claim. SDBr. at 22-23. This argument also improperly seeks to contradict the allegations that Defendants knew or should have known of the widespread compliance failures existing at the time of the IPO but failed to disclose them. ¶¶216-226. Defendants' attempt to recast the AC as a corporate mismanagement case is meritless, *see Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 715 (N.D. Tex. 2008) ("Because plaintiffs have adequately alleged each element of a § 10(b) claim, *Santa Fe* [*Indus., Inc. v. Green*, 430 U.S. 462 (1977)] is inapposite."), and the cases they cite, SDBr. at 22-23, are inapplicable for that reason.

Finally, Defendants' argument that the non-CCAR compliance allegations are "wholly untethered to any allegation of a corrective disclosure," SDBr. at 19, even if accurate, which it is not, is irrelevant on a motion to dismiss because loss causation is not an element of a plaintiffs'

*prima facie* case under the Securities Act.  *See supra* at 15.

   E.   **DEFENDANTS ARE STATUTORY SELLERS UNDER § 12(a)(2)**

   Liability under §12(a)(2) may attach to "those who pass title" to the plaintiffs, *or* who directly "solicit[] the purchase [of securities] motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner."  *Pinter v. Dahl*, 486 U.S. 622, 646-47 (1988).  Here, the Underwriter Defendants directly passed title to the plaintiffs and each of the Defendants solicited the sale of SCUSA shares in the IPO motivated by financial interests.

   Contrary to the Underwriter Defendants' suggestion, "plaintiffs are [not] required to allege which underwriter sold securities to each plaintiff."  *Westinghouse*, 90 F.3d at 718.  The AC sufficiently alleges they are statutory sellers because it specifies each underwriter's role in the IPO and the precise number of shares each agreed to purchase to resell to investors.  ¶¶56-72; *see Northumberland Cty. Ret. Sys. v. Kenworthy*, 2013 U.S. Dist. LEXIS 131655 (W.D. Okla. Sept. 16, 2013) (allegations sufficient where each underwriter and number of shares applicable to each were identified).  The Underwriter Defendants also (i) passed title to the Lead Plaintiffs and other members of the class for value, and (ii) solicited the purchase of the IPO shares for financial gain.  ¶¶191, 248.  Either allegation is sufficient at the pleading stage, *Pinter*, 486 U.S. at 647, and the quibble that more should be pled is unfounded.  *In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658, 681 (E.D. Tex. 2004) ("Defendants provide no authority for their assertion that Plaintiffs must plead facts affirmatively establishing the 'seller' element …. Accordingly, the Court finds no reason for requiring fact pleading on this issue.").

   The SCUSA Defendants' argument that they are not statutory sellers, SDBr. at 23-24, fares no better.  SCUSA was the original owner of the stock and the Individual Defendants acted as agents of the original owner and clearly solicited "the purchase, motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner."  *Pinter*, 486 U.S.

at 647. The AC specifically alleges solicitation by each of the SCUSA Defendants motivated by their financial interests. ¶¶5-6, 9-10, 34-35, 38, 43-49, 51, 54, 93-94, 243-247. "In the context of a firm commitment underwriting, an allegation that the defendant participated in the preparation of the registration statement and in roadshows promoting the IPO, while motivated by the prospect for financial gain, is sufficient to constitute the active solicitation of securities." *In re OPUS360 Corp. Sec. Litig.*, 2002 U.S. Dist. LEXIS 18558, at *31 (S.D.N.Y. Sept. 30, 2002); *see Tsirekidze v. Syntax-Brillian Corp.*, 2009 U.S. Dist. LEXIS 8464, at *29-*32 (D. Ariz. Jan. 30, 2009) (director had a financial interest in selling company's securities, and thus, qualified as a statutory seller). As to SCUSA, it was the issuer of its own stock in the IPO and a statutory seller. *See* 17 C.F.R. § 230.159(a) (seller defined to include issuer).[19] The SCUSA Defendants' (like the Underwriter Defendants') quibbles about their role in soliciting stock is also a factual dispute unripe for resolution. *In re Paracelsus Corp.*, 6 F. Supp. 2d 626, 632 (S.D. Tex. 1998) (§12(a)(2) claims "should be considered in an evidentiary context").

## F. § 15 CONTROL PERSON LIABILITY IS ADEQUATELY PLED

To state a § 15 claim, *see* 15 U.S.C. § 77o, a complaint need only allege a primary violation and control over the primary violator. *Pierce*, 2006 U.S. Dist. LEXIS 57366, at *14. Here, the Individual Defendants concede, as they must, that control of SCUSA is properly alleged. *See* ¶¶259-261. They argue only that no primary violation was pled, SDBr. at 30, but, as stated above, such a violation has been adequately alleged and, thus, so has the § 15 claim.

---

[19] The SEC's interpretation controls because: (i) statutory seller is not defined; (ii) Congress delegated interpretation to the SEC; and (iii) Rule 159A is not arbitrary. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843 (1984). Courts that have not applied Rule 159A overlooked the Supreme Court's express finding that "statutory seller" is ambiguous. *Compare In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 672 (N.D. Tex. 2013) (finding "statutory seller" unambiguous), *with Pinter*, 486 U.S. at 642 ("[T]he Securities Act nowhere delineates who may be regarded as a statutory seller, and the sparse legislative history sheds no light on the issue.").

## II.     THE EXCHANGE ACT CLAIMS ARE ACTIONABLE

### A.     THE REQUIREMENTS FOR PLEADING FRAUD UNDER § 10(b)

The elements of a securities fraud claim are:   "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."   *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  The 10(b) Defendants concede that elements 3 through 6 are adequately pled and contest only 1 and 2.

To satisfy element 1, the PSLRA's pleading standard requires that a complaint allege with particularity why each of defendants' statements was materially misleading.  *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532-33 (5th Cir. 2008).[20] Omitted or misrepresented information is material if it "would have been significant to a reasonable investor in making their investing decision[s]."  *Bachow*, 2010 WL 70520, at *3.  A statement is actionable if it is materially false or rendered materially misleading by failure to state omitted information, or if a defendant omits facts affirmatively required by the federal securities laws.  *See supra* at 15.

"For securities fraud cases, '[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact.'"  *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 & n.24 (5th Cir. 2014).  "[A] duty to speak the full truth arises when a defendant undertakes a duty to say anything."  *Rubinstein*, 20 F.3d at 170.  Thus, where one speaks, there is a duty to

---

[20] To satisfy Rule 9(b), a complaint must also plead with particularity the who, what, where, when and how of the fraud. *Bachow v. Swank Energy Income Advisers, L.P.*, 2010 WL 70520, at *3 (N.D. Tex. Jan. 6, 2010).

tell the whole truth and disclose "material, firm-specific adverse facts that affect the validity or plausibility" of the statement or prediction.  *Id.*

To satisfy element 2, a plaintiff must plead facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u-4(b)(2); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 961-62 (5th Cir. 1981).  Scienter encompasses both "an intent to deceive, manipulate, or defraud" or "severe recklessness."  *Id.* at 961.  "To allege scienter based on conscious behavior, or intent, a plaintiff must plead sufficient circumstantial evidence of misbehavior." *Bachow*, 2010 WL 70520, at *6.  Severe recklessness, on the other hand, encompasses:

> "highly unreasonable omissions or misrepresentations," not simply of inexcusable or simple negligence, but of "an extreme departure from the standards of ordinary care," and which poses a risk of misleading buyers and/or sellers, which either the defendant knows or it is so obvious that the defendant must have been aware of it.

*Id.* (quoting *Fener v. Belo Corp.*, 425 F. Supp. 2d 788, 795 (N.D. Tex. 2006) (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 408 (5th Cir. 2001)).  Motive and opportunity allegations can strengthen scienter, *Bachow*, 2010 WL 70520, at *6 (citing *Nathenson*, 267 F.3d at 412), and scienter allegations are considered cumulatively.  *Bachow*, 2010 WL 70520, at *6.  Scienter is adequately pled "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324, and a tie in competing inferences goes to plaintiffs.  *Spitzberg*, 758 F.3d at 686-87.

## B.    MATERIAL MISSTATEMENTS AND OMISSIONS ARE ADEQUATELY PLED

As set forth above in §I.B., having spoken about paying dividends, Defendants were required to disclose any restrictions.  Further, an affirmative duty to disclose dividend restrictions was imposed by Regulation S-X, Rule 4-08(e), which required that financial statements describe the "sources" and "pertinent provisions" of the restrictions.  17 C.F.R. § 210.4-08(e).  No disclosure was made in SCUSA's 2013 Form 10-K, and the disclosure in

SCUSA's May 15, 2014 Form 10-Q was inadequate because it merely stated that the Fed "could" impose dividend restrictions when the Fed stated in the March 26 objection letter that no capital distributions could be made.  *See* ¶¶112, 280, 302.  Thus, for the reasons stated above and in ¶¶298, 301, 303 and 305, the AC pleads actionable misrepresentations.[21]  The certifications by Dundon and Kulas that the Forms 10-K and 10-Q were free of material misstatements or omissions were also false due to the failure to sufficiently disclose the restrictions.  *Id.*

In addition, the 10(b) Defendants made the following misleading statements during the Exchange Act Class Period (January 23, 2014 to June 12, 2014, inclusive, ¶264):

- the statements in SCUSA's 2013 Form 10-K that:  (a) "[w]e currently intend to pay dividends on a quarterly basis," ¶297; (b) "we have an extensive enterprise-wide compliance framework," *id.*; (c) "[t]o manage our legal and compliance risk, we maintain an extensive compliance, internal control, and monitoring framework," *id.*; and (d) SCUSA has a competitive advantage from combined "regulatory best practices" with SHUSA (the related certifications are also actionably false because they certified there were no misstatements, *id.*).[22]

These statements are actionably misleading for the same reasons discussed above under the Securities Act.  *See* ¶¶297-298; *supra* § I.B.

In addition, the 10(b) Defendants continued their misleading statements after (i) the Fed's March 26 finding that SHUSA failed its stress test due to widespread and significant CCAR compliance deficiencies across the organization and (ii) becoming aware of the express statement in the Fed's objection that no capital distributions are permitted, as follows:

---

[21] The assertion that the general warnings in the Form 10-K satisfied SCUSA's obligations under Rule 4-08(e), SDBr. at 25 n.6, are meritless for the same reasons stated above.  *See supra* § I.B.2.

[22] Prior to the Exchange Act Class Period, Defendants also misleadingly stated during the IPO roadshow that SCUSA "will 'pay out 30+% of their net income in the form of dividends'" and had "[e]xtensive risk management and reporting procedures" and "[c]ompliance," ¶¶272-73, and made the same misleading statements in the Offering Documents discussed above.  ¶¶292-296.

- a May 1, 2014 press release:  (i) stating SCUSA "had declared a quarterly cash dividend of $0.15 per share payable on May 30, 2014," ¶300; (ii) quoting Dundon as follows, "[w]e are confident in the financial objectives discussed prior to our IPO with regard to dividend payments of 30 percent," *id.*; and (iii) quoting Kulas as follows:  "[a] further testament to our shareholder commitment is [the] dividend on earnings from our first quarter as a public company," *id.*;

- a May 1, 2014 SCUSA earnings call in which Kulas stated "we continue to anticipate a dividend payout ratio of 30% of annual earnings," *id.*;

- a May, 15, 2014 10-Q stating:  (a) "SCUSA's Board … declared a cash dividend of $0.15 per share to be paid on May 30, 2014," ¶302; (b) the Fed's objection to SHUSA's capital plan was based on unspecified "qualitative concerns" and "could have a negative impact on SCUSA," *id.*; (c) "[t]o manage … legal and compliance risk, [SCUSA] maintain[s] an extensive compliance, internal control, and monitoring framework," *id.*; (d) "[SUCSA] ha[s] an extensive enterprise-wide compliance framework," *id.*; (e) SCUSA has a competitive advantage from combined "regulatory best practices" with SHUSA (the related certifications are also actionable false because they certified there were no misstatements, *id.*); and

- a May 21, 2014 investor slide presentation which omitted any discussion of the failed stress test and CCAR compliance deficiencies identified by the Fed and discussed SCUSA's "established compliance program."  ¶304.

Contrary to the 10(b) Defendants' arguments, SDBr. at 25, the AC particularizes in great detail how and why each one of these statements is misleading.  Paragraphs 297-305 detail that Defendants knew, or were severely reckless in not knowing, that, *inter alia*:  (a) SCUSA had been unable to pay dividends unless and until the Fed issued a non-objection; (b) the Fed had already found that SHUSA failed its stress test, but Defendants failed to explain that there were "widespread and significant" compliance deficiencies or that they had been totally unaware of CCAR expectations; (c) the Fed's rejection letter expressly prohibited capital distributions; (d) SCUSA's CCAR compliance and risk management procedures were far from extensive or established; and (e) SCUSA and SHUSA did not have shared regulatory best practices with respect to CCAR and, therefore, no SCUSA dividends were likely to be permitted going forward.

Thus, both the PSLRA and Rule 9(b) are satisfied.[23]  *See Bachow*, 2010 WL 70520, at *5.

### C.   THE AC PLEADS A STRONG INFERENCE OF SCIENTER

#### 1.   The Scienter Allegations Are Cogent And Compelling

Eight of the eleven SCUSA directors, including Dundon, were also directors and/or senior executive officers of SHUSA for years prior to the IPO.  *Supra* at 6.  All the directors received extensive compliance training.  *Id.*  The Fed announced prior to the IPO that SHUSA and SCUSA were subject to the CCAR process.  *Supra* at 8.  Thus, prior to the IPO, SCUSA formed the BERC for the express purpose of overseeing SCUSA's "enterprise-wide" risk and compliance with law and regulation, in particular compliance with CCAR requirements and SHUSA's capital planning and stress testing.  *Supra* at 7.  SCUSA placed three directors on the BERC and told shareholders those directors had the training and experience necessary to discharge their obligations.  *Supra* at 7 & n.4.  Separately, Kulas (who was CFO but not a SCUSA director) was appointed to oversee the CCAR regulatory function at the SCUSA managerial level.  *Supra* at 7.  The 10(b) Defendants, and SHUSA, knew well prior to the IPO that SCUSA intended to pay out 30% of its earnings as dividends and that SCUSA was going to tell prospective IPO investors as much as a key selling point during the IPO roadshows.  *Id.*

Given the foregoing base of knowledge regarding the CCAR process, the 10(b) Defendants were in a particularly good position to know and did know (or were severely reckless in not knowing) the following additional facts (discussed *supra* at 6-14):

> (a) SHUSA was a BHC and SCUSA was a controlled subsidiary subject to the CCAR process for bank regulatory purposes;

---

[23] The assertion that the AC contains improper group pleading allegations, SDBr. at 29, is wrong because the AC details each one of the 10(b) Defendants' allegedly fraudulent acts.

(b) SHUSA's consolidated assets included SCUSA's assets;

(c) SHUSA, given, *inter alia*, its ownership of approximately 61% of SCUSA's shares post-IPO, had the ability to control whether SCUSA paid dividends;

(d) non-SHUSA shareholders would receive a substantial part of any post-IPO dividend payments by SCUSA;

(e) SHUSA was required to submit a capital plan to the Fed;

(f) the capital plan rule required that the plan include detailed descriptions of all sources of capital and all planned capital actions (including dividend payments) over a nine-quarter planning horizon that began prior to the IPO;

(g) the entire purpose of the CCAR process was to establish prior notice and approval requirements for capital distributions, such as dividends;

(h) the Fed must issue a non-objection to the plan *before* capital distributions are made as other companies subject to CCAR publicly stated and the capital plan rule stated;

(i) SCUSA's intention to pay out dividends in the amount of 30% of its annual earnings was not included in the capital plan submitted to the Fed;

(j) the CCAR Instructions expressly stated that "[a]fter performing appropriate analysis, the Fed will, by March 31, either object or provide a notice of non-objection to the submitted capital plan";

(k) Item 201(c) and Rule 4-08(e) required disclosure of dividend restrictions; and

(l) SCUSA's compliance framework was woefully inadequate to comply with the CCAR regulatory process requirements or completely non-existent.

These well-pleaded facts raise a cogent and compelling inference that the 10(b) Defendants knew or, at a minimum, were severely reckless in not disclosing the dividend restrictions and drastic CCAR compliance inadequacies. *See Spitzberg*, 758 F.3d at 685 (reversing district court because severe recklessness adequately pled as to misleading predictive statements about oil reserves); *Bachow*, 2010 WL 70520, at *6 (strong inference of scienter pled where complaint showed knowledge or severe recklessness in not knowing that it was "highly unlikely" an investment fund would actually use a tax deferred asset referenced in SEC filings). In fact, Dundon

essentially admitted severe recklessness when he acknowledged that SCUSA had not bothered to inform itself of CCAR regulatory expectations at the time of the IPO.

Further, on March 26, 2014, the 10(b) Defendants learned that SHUSA failed its stress test due to widespread CCAR compliance failures across the SHUSA/SCUSA enterprise and the Fed's objection letter *expressly* stated what the capital plan rule already provided — that no capital distributions were to be made unless the Fed gave its prior approval. *See supra* at 9-11. Instead of coming clean, the 10(b) Defendants said nothing to SCUSA's shareholders and reiterated that which they already knew (or were severely reckless in not knowing) could not be done — they repeated their statements made during and after the IPO that SCUSA would pay out 30% of its earnings as dividends. *Id.* And they continued to trumpet SCUSA's supposedly extensive compliance and shared regulatory best practices despite the Fed having informed them that those practices were woefully deficient, which they concealed from shareholders by misleadingly stating only that the stress test failure was based on "qualitative concerns." *Id.* These additional facts occurring after the objection letter bolster the strong inference of scienter.

As to SCUSA's systemic violations of lending laws and wide-spread control deficiencies, the 10(b) Defendants do not even attempt to claim that they were unaware of the allegations against SCUSA contained in the lawsuits detailing violations of lending laws or that SCUSA entered into a settlement acknowledging SCUSA's lack of compliance controls in at least one of these cases. *See supra* at 13-14. Nor are they able to explain away the subsequent admission of control deficiencies requiring the hiring of additional employees using the improper, AC-contradicting assertion that the regulatory landscape had changed since the IPO. *See id.*

## 2. The Motive And Opportunity Allegations Strengthen Scienter

The motive and opportunity allegations also strengthen the strong inference of scienter. The Fifth Circuit recognizes that "[i]ncentive compensation packages ... in conjunction with

42

other scienter allegations" are probative of scienter.  *See Shaw Grp.*, 537 F.3d at 544.  Dividend declarations with other facts can also be probative of scienter.  *See In re New Century*, 588 F. Supp. 2d 1206, 1232 (C.D. Cal. 2008) ("A motive to defraud based on compensation incentives such as bonuses and dividends also may strengthen an inference of scienter.").

Here, Dundon and Kulas were motivated to conceal SCUSA's inability to pay dividends and compliance inadequacies for numerous reasons.  Dundon's and Kulas's motivation included a desire to receive:  (1) $2 billion and $21 million, respectively, in proceeds for the shares they sold in the IPO, which would not have been priced as high as $24 if SCUSA had not disclosed it "will pay" out 30% of its earnings in dividends; (2) bonuses of $2,625,000 and $890,000, respectively, which would not be paid if SCUSA failed to meet its objectives, including the 30% dividend payout, *see* ¶¶311-314; (3) other unspecified bonuses under SCUSA's executive compensation and stock option plans, *see id.*; and (4) an additional approximately $12,422,072 and $130,867, respectively, as a result of SCUSA's payment of the unauthorized May 2014 dividend (based on post-IPO holdings), *see* ¶¶285, 315.  In addition, they had a motive to maintain the artificial inflation present in the stock that they owned, respectively, and that by March 26, 2014 had begun to sink below the $24 IPO price resulting in millions of dollars in paper losses.  *See* ¶315.  Disclosure of the dividend restrictions and compliance deficiencies at that time would have caused the stock price to plunge, as it ultimately did about three months later when the truth was revealed.[24]  *See supra* at 11-12.

---

[24] The 10(b) Defendants do not dispute that they had opportunity to commit fraud.  They claim only that the AC contains "bare" allegations of motive that by themselves are insufficient to plead scienter.  SDBr. at 30.  This assertion is misplaced because, as discussed herein, the AC hardly relies solely on motive and opportunity allegations to plead scienter and, in any event, the motive allegations are specific, not "bare."  As stated above, the Fifth Circuit recognizes that
*(Cont'd)*

### 3.      Defendants' Opposing Inferences Are Meritless

Defendants argue that their explanation of non-fraudulent intent is more compelling under *Tellabs* because:  (1) they subjectively believed there were no dividend restrictions as evidenced by Dundon's admission that SCUSA had been completely unaware of CCAR expectations; (2) SHUSA subjectively did not believe there were restrictions; (3) analysts did not know about and were surprised by the revelation of restrictions; and (4) the Fed (supposedly) acknowledged in the CCAR Instructions that SCUSA and SHUSA were "likely to be unaware" of CCAR regulatory expectations.  *See* SDBr. at 25-29.  These arguments are without merit.

First, the 10(b) Defendants' (and SHUSA's) supposed subjective belief that there were no dividend restrictions, while patently unbelievable under the circumstances (particularly after the Fed's March 26 objection letter), is irrelevant at this stage because a claim is stated based on severe recklessness.  *See Spitzberg*, 758 F.3d at 685 (what defendants actually believed was irrelevant to whether plaintiff properly alleged that defendants' misleading statements were severely reckless); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 832 (S.D. Tex. 2014) ("Whether defendants actually believed that Uni-Pixel could solve the manufacturing problems … and, if so, whether that belief was reasonably [sic], is irrelevant at this [motion to dismiss] stage …."); *id.* at 833 ("Even if … subjective beliefs support a strong inference as to a lack of scienter, [the PSLRA] is nonetheless satisfied [where] the competing inference of severe recklessness is at least as cogent and compelling.").

Second, the SHUSA filing, which merely stated that SHUSA did not expect CCAR to

---

scienter can be enhanced by motive and opportunity allegations, and the AC does so here.  The cases Defendants cite, *id.*, are not to the contrary.

materially adversely impact *SHUSA's* activities, SDBr. at 27, said nothing about impact *on SCUSA*.   SHUSA's supposed belief about how CCAR affected *SHUSA* is irrelevant to the question at hand.   In addition, the SHUSA filing was made on March 14, 2014, *before* the Fed objected to SHUSA's capital plan and, thus, the filing says nothing about what SHUSA's subjective belief may or may not have been after the March 26 objection letter.   In any event, at best, the Court may consider this SHUSA filing for what it states, not for the truth of what the 10(b) Defendants argue it means (*i.e.*, that SHUSA believed there was no restriction on SCUSA's ability to pay dividends).   *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996) (SEC filings "should be considered [to] … determin[e] what statements the documents contain, not to prove the truth of the documents' contents.").

Third, even assuming, *arguendo*, that an analyst was actually "surprised," that does not dispel the strong inference of scienter.   The 10(b) Defendants — not analysts — had a duty to know about the CCAR dividend restrictions and to inform themselves of the CCAR expectations SCUSA admits it ignored.   Thus, to the extent an analyst was surprised, it was because SCUSA failed to tell investors about the restrictions that SCUSA had an affirmative duty — especially since SCUSA said it "will pay" 30% in dividend payouts — to disclose.

Fourth, the routine statement in the CCAR Instructions that as a regulator the Fed recognizes BHCs face "'challenges'" and "'will continue to work to enhance their capital planning systems and processes to meet supervisory expectations,'" SDBr. at 28, does nothing to excuse SCUSA's severe recklessness regarding such failure or its statements to investors to the contrary.   SCUSA's statements were not that they were "working to enhance" their regulatory processes, but rather that SCUSA *already had* combined regulatory best practices with SHUSA that provide a competitive advantage to SCUSA.   Moreover, the statement did not allow for non-

compliance with the capital plan rule.  If anything, the Fed's statement, which was contained in the CCAR Instructions that the 10(b) Defendants did or should have read prior to the IPO, was all the more reason SCUSA should have complied with the CCAR Instructions or checked with the Fed about its expectations.  Instead, as Dundon admitted, the 10(b) Defendants — at a minimum — were severely reckless in not informing themselves of the CCAR requirements.

Finally, the argument that the AC pleads fraud by hindsight, SDBr. at 28-30, is meritless and the cases cited, *id.*, are inapplicable because Defendants simply ignore the abundant allegations of knowing or severely reckless conduct at the time of and after the IPO.

### D.   THE PSLRA SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE DO NOT APPLY TO THE EXCHANGE ACT CLAIMS

The 10(b) Defendants concede that the vast majority of statements are not protected by the PLSRA safe harbor or bespeaks caution doctrine as they raise no arguments with respect to them, but make the meritless contention that three statements are protected.  SDBr. at 29 n.7.

The May 1, 2014 statements that "we are confident in the financial objectives discussed prior to our IPO with regard to dividend payments of 30 percent" and "we continue to anticipate a dividend payout of 30% of annual earnings" are statements of SCUSA's *then-present* "confidence" and "anticipation."  Thus, they are not forward-looking statements to which the safe harbor and bespeaks caution doctrine are applicable, *see supra* § I.B.2.  Further, they are not entitled to protection because these were not genuinely held beliefs, ¶301, in light of Defendants' actual knowledge of, *inter alia*, the Fed's prior finding that SHUSA failed its stress test.  Additionally, the statement that "we are confident in the financial objectives *discussed prior to our IPO* with regard to dividend payments of 30 percent" merely repeats a statement made in the IPO and, therefore, is exempted from protection as a statement "made in connection with an initial public offering." 15 U.S.C. § 78u-5(b)(2)(D).  While the March 6, 2014 statement that

"[w]e currently intend to pay dividends on a quarterly basis" may be partly forward-looking, it is not subject to protection because it too was made with actual knowledge of falsity and failed to sufficiently disclose the restrictions on payment of said dividends.[25] *See supra* § I.B.2. In addition, the warnings that accompanied these statements were not meaningfully cautionary for the reasons stated earlier.[26] *See id.*

## III. THE SECURITIES ACT CLAIMS ARE NOT TIME BARRED

### A. THE STATUTE OF LIMITATIONS ARGUMENT IS PREMATURE

Defendants' statute of limitations argument is premature because "[d]etermining when a plaintiff has sufficient information for the limitations period to begin is often fact specific and inappropriate for a motion to dismiss . . . ." *See In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2016 U.S. Dist. LEXIS 5702, at *30-*31 (S.D. Tex. Jan. 19, 2016).

Here, Defendants have not established that plaintiffs had adequate information prior to October 30, 2014 to plead Securities Act claims with sufficient detail to survive a dismissal motion. *See Merck & Co. v. Reynolds*, 559 U.S. 633, 652-53 (2010) (inquiry notice does not automatically trigger the limitations period). The following critical facts occurred after October

---

[25] The 10(b) Defendants argue that they did not act with actual knowledge of falsity because "plaintiffs freely admit that SCUSA did not [actually] know that the Fed would ultimately take the actions that it did in late May." SDBr. at 29 n.7 (citing ¶¶288, 291). Defendants miss the point. The relevant actual knowledge with respect to the March 6 statement was of the dividend restrictions that were already in place prior to the IPO based on the capital plan rule. No action by the Fed — in May 2014 or otherwise — was required for those restrictions to exist.

[26] A § 20(a) claim must allege a primary violation and direct or indirect control of the primary violator. 15 U.S.C. § 77t(a); *see Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 509 (5th Cir. 1990). The PSLRA's heightened pleading requirements and Rule 9(b) do not apply. *See Trendsetter Inv., LLC v. Hyperdynamics Corp.*, 2007 WL 172627, at *15 (S.D. Tex. Jan. 18, 2007). Here, the § 20(a) claim is against Dundon and Kulas who concede that they controlled SCUSA, *see* ¶346, and argue only that there was no primary violation. But, as discussed above, they are wrong. A primary violation has been adequately pled and, thus, so has a § 20(a) claim.

47

30, 2014:  (a) the Settlement Agreement containing the key admission that there was a violation of the capital plan rule was not filed in a Form 8-K at the time of the settlement and was first referenced in a SCUSA Form 10-Q on November 3, 2014 (although even this filing did not state the rule was violated by the SCUSA dividend), ¶¶138-140, *see* Pl. App. Ex. C at App. 54; (b) SHUSA failed its second stress test and agreed to submit a plan to strengthen board oversight of the consolidated organization, including SCUSA's operations and activities, in March 2015, ¶141; (c) the BERC charter was not on SCUSA's website until July 2015, ¶¶80-81; (d) Kulas's oversight of CCAR was not disclosed until a July 2015 press release, ¶40; and (e) therefore, plaintiffs could not have known that the BERC and Kulas had express responsibilities for CCAR until then.  Further, many of the complaints filed that when viewed in totality evidence systemic violations of SCUSA's processes to ensure compliance were not revealed until after October 30, 2014.[27]  These facts go directly to whether the Offering Documents were materially misleading and/or are key facts necessary for plaintiffs to be on notice of and properly allege Defendants' negligence.  Plaintiffs could not reasonably be expected to have discovered these facts within one year of the AC's filing.  *See Cobalt*, 2016 U.S. Dist. LEXIS 5702, at *31-*32 (motion to dismiss denied where it was "plausible that the allegations in the [c]omplaint could support a finding that the statute of limitations did not begin" running until the time frame alleged therein).

### B.   THE AC RELATES BACK TO THE IC

"Where, as here, [an] amendment does not add a new defendant, the inquiry is simply whether 'the amendment asserts a claim or defense that arose out of the conduct, transaction, or

---

[27] *See* ¶¶170, 175, 180-182, & AC Ex. B (referencing Attorney General's complaint and settlement regarding SCRA violations, and *Woods*, *Wells*, *Paliana*, *Rodriguez* and *Pettye* complaints, all of which contain information regarding SCUSA's inadequate compliance systems and systemic violations of lending laws that were not revealed until after October 30, 2014).

occurrence set out – *or attempted to be set out* – in the original pleading.'" *Chauvin v. Nat'l Gypsum Servs.*, 2014 U.S. Dist. LEXIS 98627, at *13-*14 (E.D. La. July 21, 2014) (quoting Fed. R. Civ. P. 15(c)(1)(B)). Allegations arise from the same conduct, transaction or occurrence as the original complaint if they share a "common core of operative facts" so that the adverse party has fair notice of the allegations against it. *See United States v. Gutierrez*, 548 F. App'x 181, 183 (5th Cir. 2013). "The relation-back doctrine is 'liberally applied based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitation than one who is informed of the precise legal description of the rights sought to be enforced.'" *Sharp v. Texas Dep't of Family & Protective Services*, 2014 U.S. Dist. LEXIS 158170, at *7 (N.D. Tex. Nov. 7, 2014) (quoting *Williams v. United States*, 405 F.2d 234, 236 (5th Cir. 1968)). Here, the IC's allegations gave Defendants notice of claims against them for material misstatements and omissions in the IPO. *McClellon v. Lone Star Gas Co.*, 66 F.3d 98, 102 (5th Cir. 1995) ("Amendments that … expand the facts alleged in the original pleading satisfy the relation back requirements.").

The IC generally alleged that the Offering Documents were misleading because of the failure to disclose that SCUSA had "engaged in *improper practices* related to [SCUSA's] subprime auto lending business." IC ¶49. The AC "merely clarif[ies] the facts and allegations" *attempted* to be set out in the IC. *United States v. Safeco Ins. Co. of Am.*, 2010 U.S. Dist. LEXIS 40245, at *8-*9 (S.D. Miss. Apr. 23, 2010). Defendants' contention that the IC contained no allegations whatsoever giving them fair notice that SCUSA's dividend promises during the IPO were at issue, *see* UDBr. at 7 & n.4, 11; SDBr. at 8-13, is wrong because the IC expressly identifies the following statements in press releases as "False and/or Misleading:"

- "'We are confident in the financial objectives discussed prior to our IPO with regard to dividend payments of 30 percent ….'" IC, ¶53.

- "'A … testament to our shareholder commitment is our Board['s] … decision to declare a dividend …. Our … robust profitability … continue[s] to drive total shareholder return,' said Jason Kulas . . . ." *Id.*

- "The Board has declared a cash dividend of $0.15 per share …. *Id.*

*See also* IC ¶26 ("Each defendant was provided with … the … press releases … [and] knew … [they] were then materially false and/or misleading."). These press release statements are *identical* to those alleged in the AC. *Compare* IC ¶53, *with* ¶300. The IC also alleged a press release about SCUSA's supposedly extensive risk management was misleading, IC ¶55 (positive quarterly "'results are attributable to SCUSA's sophisticated risk management'").

The AC's expansion of the facts as to why the statements regarding dividends and risk management were misleading (*i.e.*, the capital plan rule's dividend restrictions and failures relating to risk management) squarely falls within the liberal meaning of "relation back" as interpreted by courts. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Conner*, 20 F.3d 1376, 1386 (5th Cir. 1994) ("[I]f a plaintiff seeks to correct a technical difficulty, state a new legal theory of relief, or amplify the facts alleged in the prior complaint, then relation back is allowed."); *McClellon*, 66 F.3d at 102 (relation back doctrine applies where the amendment provides greater particularity or amplification of the details of the complaint); *see also Barthel v. Stamm*, 145 F.2d 487, 491 (5th Cir. 1944) ("Limitation is suspended by the filing of a suit because the suit warns the defendant to collect and preserve his evidence in reference to it…. [T]he defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be …."); *Belodoff v. Netlist, Inc.*, 2009 U.S. Dist. LEXIS 39903, at *37 (C.D. Cal. Apr. 17, 2009) ("defendants are considered to be put on notice of the 'whole transaction'"). Defendants are wrong when they complain that new legal theories do not relate back. *See Alpern v. UtiliCorp United Inc.*, 84 F.3d 1525, 1542-44 (8th Cir. 1996); *Chauvin*, 2014 U.S. Dist. LEXIS 98627, at *14-*15. Further, like the AC, the IC clearly referred to Defendants' failure under SEC regulations to disclose "known trends,

50

events or uncertainties." *Compare* IC ¶49 *with* ¶¶109, 298.   As explained in *Slayton v. Am. Express Co.*, 460 F.3d 215 (2d Cir. 2006), even a general allegation like this satisfies the relation back rule:

> [T]he original complaint alleged that Amex misstated and/or omitted material facts in its filings with the SEC in violation of SEC regulations requiring accurate representations of Amex's operations and financial conditions. ***Although these were very general allegations***, the assertions in the amended complaint that some of these misstatements and/or omissions relate to valuation and accounting irregularities simply delineate with more detail those general allegations.

*Id.* at 229.[28]

The IC also identified as "False and/or Misleading" other statements that are identical to what the AC alleges to be misleading, *compare* IC ¶52 ("'Most of our *servicing processes* and *quality-control measures* also serve a dual purpose in that they … *ensure compliance with the appropriate regulatory laws* ….'"), *with* ¶¶18, 145, 212 (same), and specifically identified SCUSA's "vehicle finance loan origination and *servicing*" as an issue.  IC ¶52.[29]  The original allegations regarding SCUSA's improper lending practices and failure to disclose known trends,

---

[28] Defendants' cases are inapposite because, unlike here, there was no mention of facts related to the claim sought to be added.  *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 U.S. Dist. LEXIS 34459, at *26-*27 (S.D.N.Y. Mar. 31, 2010) (first complaint did not "complain of, **or discuss**" facts related to proposed claim); *In re Alcatel Sec. Litig.*, 382 F. Supp. 2d 513, 528 (S.D.N.Y. 2005) (there was not "***any language*** in the initial complaints that … provided the notice required"); *In re Commonwealth Oil Tesoro Petroleum Grp. Sec. Litig.*, 467 F. Supp. 227, 260 (W.D. Tex. 1979) ("[Plaintiff] alleges new events **not even mentioned** in [first pleading]."); *see also Caldwell v. Berlind*, 543 F. App'x 37, 40 (2d Cir. 2013) ("Neither this accounting treatment nor any other accounting practice … is to be found in the original complaints."); *McGregor v. La. State Univ. Bd. of Supervisors*, 3 F.3d 850, 864 (5th Cir. 1993) (first complaint alleging discrimination contained no reference to amendments' scheduling accommodations or advancement allegations); *Holmes v. Greyhound Lines, Inc.*, 757 F.2d 1563, 1566 (5th Cir. 1985) (first pleading was that arbitration award should be vacated due to improper conduct, but amendment "focused entirely upon … the Union['s] breach[] [of] its duty of fair representation").  *Mayle v. Felix*, 545 U.S. 644, 657 (2005), is limited to *habeas* cases.

[29] *See also* IC ¶52 ("'[T]echnology investments … [were made] to ensure … our servicing activities are in compliance with federal and local … lending rules ….'"); ¶144 (same).

events or uncertainties directly relate to the AC's claims. It is axiomatic that "improper automobile lending practices" include systemic violations of federal and state lending laws, including the FDCPA, TCPA, FCRA, TILA and their state counterparts, as well as the SCRA, as set forth in the AC. ¶¶142-183. "[N]o leap of imagination is required" to expect that the inadequacy of risk management controls might be one reason behind the improper practices related to SCUSA's lending business. *Slayton*, 460 F.3d at 228-29 (finding defendants had sufficient notice of plaintiffs' risk management claims and that the amended complaint merely amplified the original allegations). "Therefore, [Defendants] had sufficient notice of [plaintiffs'] risk management claims, and they relate back to the original complaint." *Id.* at 229; *see also Lind v. Vanguard Offset Printers*, 857 F. Supp. 1060, 1069 (S.D.N.Y. 1994) (complaint relates back because it alleged *additional* omissions and misrepresentations); *Bond Opportunity Fund II, LLC v. Heffernan*, 340 F. Supp. 2d 146, 155 (D.R.I. 2004) (complaint relates back where new allegations relate to same filings referenced in the original complaints and do not alter the claims that those filings omitted material facts).

The contention that the Underwriter Defendants were not on notice of the § 12(a)(2) claim, UDBr. at 12-14, is meritless. They were because: (1) the IC referenced the "False and/or Misleading Registration Statement *and Prospectus*," IC at 9; and (2) the § 12(a)(2) claim arises out of the same transactions alleged in the IC, *see Alpern*, 84 F.3d at 1543 (allowing addition of § 11 claim where only Exchange Act claims had been previously pled). The Underwriter Defendants will suffer no prejudice because the §§ 11 and 12(a)(2) claims have virtually identical elements, and, indeed, they fail to explain how adding the claim prevents them from defending on the merits where there has been no answer or discovery. *See Conner*, 20 F.3d at 1386 (no prejudice where defendants failed to allege amendment will interfere with defenses).

### C.      EQUITABLE ESTOPPEL APPLIES TO THE SECURITIES ACT CLAIMS

Even if the Court finds the Securities Act claims were asserted outside of the one-year statute, the statute should not be enforced to avoid inequity under the doctrine of equitable estoppel. The doctrine "does not hinge on intentional misconduct…. Rather, the issue is whether the defendant's conduct, innocent or not, reasonably induced the plaintiff not to file suit within the limitations period." *McGregor*, 3 F.3d at 865-66. Here, as explained below, it did.

Defendants argue that plaintiffs should have known about the dividend claims no later than June 12, 2014 and that an amended complaint asserting such claims on behalf of the class had to be filed by June 12, 2015 to satisfy the one-year statute of limitations. *See* SDBr. at 10, 13. But filing the AC on behalf of the class at that time was impossible due to Defendants' actions in the transferor court described below.

Defendants entered into a stipulation with the plaintiff who filed the IC, which was entered as a court scheduling order. Dkt. No. 14. It provided that the lead plaintiff who was eventually appointed would either stand on the IC or file a consolidated amended complaint "[o]n or before 60 days *following* entry of an order appointing lead[s]." *Id.* at 2. Defendants then made a motion to transfer the case to this Court and, *over plaintiffs' objections*, repeatedly urged the transferor court not to appoint a lead plaintiff until the motion to transfer was decided, Dkt. Nos. 29, 31, 44-45, claiming "'it is doubtful Plaintiffs will experience any prejudice by transfer.'" Dkt. No. 24 at 7. Defendants were successful. The transferor court did not appoint a lead plaintiff during the pendency of the motion to transfer and ultimately, by order dated June 17, 2015, granted the motion to transfer and denied the lead plaintiff motions without prejudice to re-filing in this Court. *See* Dkt. No. 48 at 18. That order was issued five days *after* the June 12, 2015 date by which Defendants contend an amended complaint on behalf of the class needed to be filed to satisfy the statute of limitations. But such a filing was impossible. Under the

express terms of the scheduling order, and because Defendants had urged that no lead plaintiff be appointed while their motion to transfer was being considered, there was no lead plaintiff appointed in the case who could possibly have filed an amended complaint to satisfy a statute of limitations that ran on June 12, 2015.  Lead Plaintiffs were not appointed until September 3, 2015, Dkt. No. 99, after which the scheduling order in the transferor court was replaced by one in this Court providing that the AC be filed by October 30, 2015, Dkt. No. 103.  The AC was filed on that date.  Thus, Lead Plaintiffs filed the AC as soon as they were permitted to do so.

Under these circumstances where no lead plaintiff was empowered to prepare and file an amended complaint until September 3, 2015 by virtue of Defendants motion to transfer and a court-ordered stipulation (to which Defendants' stipulated prior to the appointment of the lead plaintiffs), equitable estoppel should apply.  Courts have applied equitable estoppel to avoid injustice in circumstances similar to these and this Court should do the same.  *See Greer v. Advanced Equities, Inc.*, 2009 WL 1748410, at *4-*5 (N.D. Ill. June 19, 2009) (equitable estoppel applied in a securities case and motion to dismiss denied); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 310 F. Supp. 2d 819, 857-58 (S.D. Tex. 2004) (recognizing equitable estoppel should apply in a securities case where plaintiffs refrained from filing an amended complaint within the one-year period based on a scheduling order, but not employing it because, unlike here, the three-year statute of repose had also expired); *see also Martinez v. Cook Cty., Illinois*, 2015 U.S. Dist. LEXIS 83615, at *8 (N.D. Ill. June 26, 2015) (though statute had run, court found the action was timely because plaintiff "filed his amended complaint *on the deadline date set by the Court*").

## CONCLUSION

For the foregoing reasons, the motions to dismiss should be denied.  In the event that the

Court grants any part of the motions to dismiss, plaintiffs respectfully request leave to amend.

Dated:  February 5, 2016                        Respectfully submitted,

**KENDALL LAW GROUP, PLLC**
/s/ Joe Kendall
Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jamie J. McKey
Texas Bar No. 24045262
jmckey@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Tel.: (214) 744-3000
*Local Counsel for the Class*

**GRANT & EISENHOFER P.A.**
James J. Sabella (*pro hac vice*)
Charles T. Caliendo (*pro hac vice*)
Robert D. Gerson (*pro hac vice*)
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel.:  (646) 722-8500

**ROBBINS GELLER RUDMAN & DOWD LLP**
Willow E. Radcliffe (*pro hac vice*)
Sunny Sarkis (*pro hac vice*)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel.:  (415) 288 4545

*Co-Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 5, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those who have registered with the Court.  All others were served a copy via U.S. mail postage prepaid.

/s/ Jamie J. McKey
Jamie J. McKey