UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

| | | |
|---|---|---|
| DEKA INVESTMENT GMBH, et al., Individually and on Behalf of All Others Similarly Situated, | § § § § | Civil Action No. 3:15-cv-02129-K |
| | § | CLASS ACTION |
| Plaintiffs, | § § | Hon. Ed Kinkeade |
| vs. | § § | |
| SANTANDER CONSUMER USA HOLDINGS INC., et al., | § § § | |
| Defendants. | § § | |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT .................................................................................1

II.   FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY ...............2

    A.    Lead Plaintiffs.................................................................................................2

    B.    Defendants ......................................................................................................3

    C.    Allegations Against Defendants .....................................................................4

III.  ARGUMENT ..........................................................................................................7

    A.    Rule 23(a) Is Satisfied....................................................................................7

        1.    Both the Proposed Exchange Act Class and Securities Act Class
             Are so Numerous that Joinder of All Respective Class Members Is
             Impracticable........................................................................................8

        2.    Questions of Law and Fact Are Common to Members of Both the
             Proposed Exchange Act Class and Securities Act Class ..........................10

        3.    The Proposed Class Representatives' Claims Are Typical.......................11

        4.    The Representative Parties and Their Counsel Are Adequate..................12

            a.    Deka and Dearborn Heights Are Adequate to Serve as
                    Class Representatives.................................................................13

            b.    Proposed Class Counsel Is Adequate..........................................16

            c.    Local Rule 23.2(c) & (g)............................................................16

            d.    Local Rule 23.2(e) .....................................................................17

    B.    The Proposed Classes Satisfies Rule 23(b)(3) ..............................................18

        1.    Securities Act Class ...........................................................................18

        2.    Exchange Act Class ...........................................................................19

             a.    Common Questions of Law and Fact Predominate over
                  Individual Questions ..................................................................19

            b.    SCUSA Common Stock Traded in an Efficient Market
                  During the Class Period ..............................................................20

                (1)    SCUSA Common Stock Experienced a High
                      Weekly Trading Volume.................................................20

                (2)    Numerous Financial Analysts Covered and
                      Reported on SCUSA During the Class Period..................21

- i -

**Page**

(3) SCUSA Had a Designated Market Maker During the Class Period................................................................21

(4) SCUSA's Market Capitalization and Public Float Sufficiently Satisfy the Remaining SEC Form S-3 Eligibility Requirements During the Class Period.............22

(5) The Price of SCUSA's Common Stock Reacted to New, Company-Specific Information During the Class Period .................................................................23

(6) SCUSA's Market Capitalization and Float.......................23

(7) The Bid-Ask Spread of SCUSA's Common Stock ...........24

3. A Class Action Is Superior to Other Available Methods of Adjudication.................................................................................24

IV. CONCLUSION ............................................................................................25

## TABLE OF AUTHORITIES

Page

**CASES**

*Amchem Prods. v. Windsor*,
  521 U.S. 591 (1997).............................................................................................13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  __U.S.__, 133 S. Ct. 1184 (2013)......................................................................8, 18

*Barrie v. InterVoice-Brite, Inc.*,
  No. 3:01-CV-1071-K, 2009 U.S. Dist. LEXIS 99253
  (N.D. Tex. Oct. 26, 2009) ............................................................................ *passim*

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...........................................................................................19

*Beaver Cnty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.*,
  No. 14-786 ADM/TNL, 2016 U.S. Dist. LEXIS 99479
  (D. Minn. July 28, 2016)...........................................................9, 10, 14, 18

*Berger v. Compaq Computer Corp.*,
  279 F.3d 313 (5th Cir. 2002) .............................................................................14

*Buettgen v. Harless*,
  No. 3:09-cv-00791-K, 2013 U.S. Dist. LEXIS 193649
  (N.D. Tex. Nov. 13, 2013) .........................................................................16, 17

*Buettgen v. Harless*,
  No. 3:09-CV-791-K, 2011 U.S. Dist. LEXIS 53888
  (N.D. Tex. May 19, 2011).......................................................................... *passim*

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D. N.J. 1989) .....................................................................20

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
  No. 6:12-1609, 2015 U.S. Dist. LEXIS 26051
  (W.D. La. Feb. 11, 2015) ............................................................................9, 25

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)...........................................................................................20

*Feder v. Elec. Data Sys. Corp.*,
  429 F.3d 125 (5th Cir. 2005) .....................................................................12, 16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  __U.S.__, 134 S. Ct. 2398 (2014)......................................................................19

Page

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ............................................................21

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
   No. CV 11-2768 PSG, 2013 U.S. Dist. LEXIS 155091
   (C.D. Cal. Oct. 25, 2013) ...............................................................9, 11

*In re Constar Int'l Inc. Sec. Litig.*,
   585 F.3d 774 (3d Cir. 2009)........................................................18, 19

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ...............................................8, 10, 13, 18

*In re Deepwater Horizon*,
   785 F.3d 1003 (5th Cir. 2015) ...............................................................13

*In re Diamond Foods, Inc.*,
   295 F.R.D. 240 (N.D. Cal. 2013)............................................................21

*In re Dynegy, Inc. Sec. Litig.*,
   226 F.R.D. 263 (S.D. Tex. 2004)..............................................................9

*In re Groupon Inc. Sec. Litig.*,
   No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334
   (N.D. Ill. Mar. 5, 2015)...........................................................................22

*In re HealthSouth Corp. Sec. Litig.*,
   257 F.R.D. 260 (N.D. Ala. 2009).............................................................15

*In re HealthSouth Corp. Sec. Litig.*,
   261 F.R.D. 616 (N.D. Ala. 2009).............................................................10

*In re Nature's Sunshine Prods.*,
   251 F.R.D. 656 (D. Utah 2008) ...............................................................21

*In re NII Holdings, Inc. Sec. Litig.*,
   311 F.R.D. 401 (E.D. Va. 2015) ...............................................................9

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
   No. 09-md-02063-JLK-KMT, 2015 U.S. Dist. LEXIS 141073
   (D. Colo. Oct. 15, 2015) ...............................................................11, 18

*In re Pfizer Sec. Litig.*,
   282 F.R.D. 38 (S.D.N.Y. 2012) ...............................................................16

**Page**

*In re PolyMedica Corp. Sec. Litig.*,
   432 F.3d 1 (1st Cir. 2005) ...........................................................................................20

*In re Reliant Sec. Litig.*,
   No. H-02-1810, 2005 U.S. Dist. LEXIS 9716
   (S.D. Tex. Feb. 18, 2005) .............................................................................................11

*In re Smart Techs., Inc.*,
   295 F.R.D. 50 (S.D.N.Y. 2013) ....................................................................................18

*James v. City of Dallas*,
   254 F.3d 551 (5th Cir. 2001) ...................................................................................11, 12

*KB Partners I, L.P. v. Barbier*,
   No. A-11-CA-1034-SS, 2013 U.S. Dist. LEXIS 78108
   (W.D. Tex. June 4, 2013) ..................................................................................... *passim*

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) .................................................................................20

*Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
   762 F.3d 1248 (11th Cir. 2014) ...............................................................................14, 22

*Marcus v. J.C. Penney Co.*,
   No. 6:13-cv-736-MHS-KNM, 2016 U.S. Dist. LEXIS 115795
   (E.D. Tex. Aug. 29, 2016) ............................................................................................15

*Ross v. Abercrombie & Fitch Co.*,
   257 F.R.D. 435 (S.D. Ohio 2009) .................................................................................14

*Tatz v. Nanophase Techs. Corp.*,
   No. 01 C 8440, 2003 U.S. Dist. LEXIS 9982
   (N.D. Ill. June 13, 2003) ...............................................................................................21

*Torres v. S.G.E. Mgmt., L.L.C.*,
   838 F.3d 629 (5th Cir. 2016) ...............................................................................7, 18, 24

*Tyson Foods, Inc. v. Bouaphakeo*,
   __U.S.__, 136 S. Ct. 1036 (2016) .................................................................................18

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) .....................................................................................20, 22

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .......................................................................................................10

- v -

Page

*Ziedman v. J. Ray McDermott & Co.*,
  651 F.2d 1030 (5th Cir. 1981) ..................................................................................8

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §77.................................................................................................... *passim*
  §77j(b)....................................................................................................7
  §77k....................................................................................................7, 18, 19
  §77k(e)..................................................................................................18
  §77l(a)(2)................................................................................................7
  §77o......................................................................................................7
  §77t(a)...................................................................................................7
  §77v......................................................................................................2
  §77z-1...............................................................................................2, 13, 14, 15
  §78.................................................................................................... *passim*
  §78aa.....................................................................................................2
  §78u-4(a)(3)(B)(i)......................................................................................15

28 U.S.C.
  §1331......................................................................................................2

Federal Rules of Civil Procedure
  Rule 23(a)................................................................................................1
  Rule 23(b)(3)............................................................................................1

17 C.F.R.
  §229.404..................................................................................................1
  §240.10b-5..............................................................................................19

**SECONDARY AUTHORITIES**

Herbert B. Newberg & Alba Conte,
  5 *Newberg on Class Actions* (1977)
  §8812......................................................................................................8

Lead Plaintiffs Deka Investment GmbH ("Deka") and City of Dearborn Heights Act 345 Police & Fire Retirement System ("Dearborn Heights") (collectively, "Lead Plaintiffs" or "Plaintiffs"), on behalf of themselves and the putative Classes, by their undersigned attorneys, respectfully submit this memorandum of law in support of Lead Plaintiffs' Motion for Class Certification, appointment of Deka and Dearborn Heights as class representatives and appointment of Grant & Eisenhofer P.A. ("G&E") and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as lead class counsel, and Kendall Law Group, LLP ("Kendall") and the Balon B. Bradley Law Firm ("Bradley") as liaison class counsel.

## I.    PRELIMINARY STATEMENT

The corporate issuer defendant in this case – Santander Consumer USA Holdings Inc. ("SCUSA" or the "Company") – is a New York Stock Exchange ("NYSE") listed company.  This action is brought under the Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") alleging material misrepresentations or omissions made in connection with, and subsequent to, SCUSA's January 23, 2014 initial public offering ("IPO") of its common stock. Pursuant to Rule 23(a) & (b)(3) of the Federal Rules of Civil Procedure ("Rule 23") and in accordance with Local Rule 23.2 of the Local Civil Rules of the United States District Court for the Northern District of Texas ("L.R."), Lead Plaintiffs seek certification on behalf of all persons who:

> (i) purchased or otherwise acquired SCUSA common stock in or traceable to SCUSA's January 23, 2014 IPO, and were damaged thereby (collectively, the "Securities Act Class"); and

> (ii) purchased or otherwise acquired SCUSA common stock between January 23, 2014 and June 12, 2014, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Exchange Act Class").[1]

Lead Plaintiffs request that, pursuant to Rule 23, the Court certify this case as a class action and: (a) appoint Deka and Dearborn Heights as class representatives; and (b) appoint current co-lead

---

[1]    Excluded from both the Securities Act Class and the Exchange Act Class are defendants, present or former executive officers of the corporate defendant and their immediate family members (as defined in 17 C.F.R. §229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)), Santander Holdings USA, Inc. ("SHUSA") and the other selling stockholders identified in the Offering Documents and present or former executive officers of SHUSA and the other selling stockholders identified in the Offering Documents and their immediate family members (as defined in 17 C.F.R. §229.404 (Instructions (1)(a)(iii) and (1)(b)(ii)).

counsel, G&E and Robbins Geller, as lead class counsel, and current local counsel Kendall and Bradley (additional local counsel) as liaison class counsel.

As demonstrated below, this case meets all the requirements of Rule 23 and L.R. 23.2.  The class members are so numerous that joinder would be impracticable.  The proposed class representatives' claims brought pursuant to the federal securities laws present common questions of law and fact, are typical of other class members' claims and Plaintiffs are more than adequate to serve as class representatives.  The common questions here predominate over any individual questions, and the class action mechanism is the superior way to adjudicate these claims.  Accordingly, this case seeking to vindicate the rights of injured SCUSA investors is suitable for class treatment, with the Lead Plaintiffs serving as class representatives and their attorneys serving as class counsel.[2]

## II.   FACTUAL BACKGROUND AND RELEVANT PROCEDURAL HISTORY

### A.   Lead Plaintiffs

On September 3, 2015, this Court appointed Deka and Dearborn Heights as Lead Plaintiffs for this action brought pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 77z-1, *et seq.*, for this litigation and further appointed G&E and Robbins Geller as co-lead counsel and Kendall as local counsel.  Dkt. No. 99.

The First Amended Class Action Complaint (Dkt. No. 104) ("Complaint")[3] filed with this Court on October 30, 2015 alleges that Deka is organized as a Kapitalverwaltungsgesellschaft ("KVG") under the laws of Germany.  Under the German investment law, a KVG makes investments in its own name for a third party – here, the investment funds managed by Deka for the

---

[2]   Because this Court has jurisdiction over the subject matter of this action based on federal questions under 28 U.S.C. §1331, §22 of the Securities Act, 15 U.S.C. §77v, and §27 of the Exchange Act, 15 U.S.C. §78aa, L.R. 23.2(d), which requires a statement of the basis for determining any required jurisdictional amount, is inapplicable.

[3]   Given the Court's familiarity with the allegations in this matter from having denied defendants' motions to dismiss (*see* Dkt. No. 128), Plaintiffs have not provided a full summary of the wrongdoing alleged in the Complaint.  Unless otherwise stated herein, all capitalized terms have the meanings ascribed to them in the Complaint, all references to "¶_" and "¶¶_" are to paragraphs in the Complaint, and all internal citations and footnotes are omitted and all emphasis is added.

benefit of others – and a KVG's investment power under the German Investment Act ("GIA") carries with it the statutory right and obligation under the GIA to bring legal claims, in its own name, to recover losses incurred by the funds for which the KVG makes investments. ¶29. Deka purchased 393,113 shares of SCUSA stock in or traceable to SCUSA's January 23, 2014 IPO on behalf of funds that suffered losses.[4] Complaint, Ex. A. Deka purchased 267,600 of those shares on the date of the IPO for the IPO price of $24. *Id.*

Dearborn Heights is a pension fund that manages investments for the benefit of police officers and firefighters in the City of Dearborn, Michigan. ¶30. Dearborn Heights purchased 8,235 shares of SCUSA stock in or traceable to the IPO; 3,766 shares of SCUSA common stock were purchased at the IPO price of $24. Complaint, Ex. A; *see also* Dkt. No. 133, ¶32; Dkt. No. 132, ¶32.

### B.     Defendants

Defendants in this action are: (1) SCUSA; (2) SCUSA's former Chairman and CEO Thomas G. Dundon ("Dundon"), SCUSA's former CFO and currently the Company's CEO Jason Kulas ("Kulas"), and SCUSA's other directors at the time of the IPO – Juan Carlos Alvarez, Roman Blanco, Gonzalo de Las Heras, Stephen A. Ferriss, Matthew Kabaker, Tagar Olson, Alberto Sanchez, Javier San Felix, Juan Andres Yanes and Daniel Zilberman (collectively, the "Individual Defendants"); and (3) the 17 underwriters for the IPO – Citigroup Global Markets Inc., J.P. Morgan Securities LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Deutsche Bank Securities Inc., Santander Investment Securities Inc., Barclays Capital Inc., Goldman, Sachs & Co., Morgan Stanley & Co. LLC, RBC Capital Markets, LLC, BMO Capital Markets Corp., Credit Suisse Securities (USA) LLC, UBS Securities LLC, Wells Fargo Securities, LLC, KKR Capital Markets LLC, Sandler O'Neill & Partners, L.P., Stephens Inc. and LOYAL3 Securities, Inc. (collectively, the "Underwriter Defendants").

---

[4]     As reflected in Exhibit A attached to the Complaint, Deka also purchased SCUSA shares on behalf of funds that did not suffer losses as a result of investments in SCUSA common stock, and which, as a result, are not part of the putative Classes.

C.      **Allegations Against Defendants**

SCUSA is a multi-billion dollar company whose stock currently trades on the NYSE under the ticker symbol "SC." ¶33.[5] During the roadshows leading up to SCUSA's January 2014 IPO, SCUSA enticed investors with promises of a payout of 30% of its annual earnings in the form of dividends, and in the IPO Offering Documents stated that it intended to pay dividends on a quarterly basis at an initial amount of $0.15 per share. *See* ¶¶3, 91, 93-94, 114, 127, 206. Investors were misled, however, because SCUSA failed to disclose that there were already existing, and likely additional future, restrictions on its ability to pay dividends. ¶¶5-6, 12, 109, 203, 298.

The restrictions were attributable to SCUSA's relationship with SHUSA, a large bank holding company ("BHC") with more than $50 billion in assets that is subject to oversight by the Federal Reserve (the "Fed"). ¶¶6-7, 75, 84. SHUSA owned more than 60% of SCUSA's shares and controlled SCUSA, including its ability to pay dividends, and, as a result, SCUSA was itself subject to Fed oversight. ¶¶6, 34. Federal regulations required that SHUSA submit a capital plan to the Fed detailing, *inter alia*, intended capital distributions, including payment of dividends, compliance and risk management procedures and SHUSA's financial reactions to various "stress test" scenarios. ¶¶7, 76. Since SCUSA was a consolidated and controlled subsidiary of SHUSA, SCUSA's inclusion in SHUSA's stress tests and capital plans was required. The capital plan and stress test were required to be, and were, filed with the Fed on January 6, 2014, prior to SCUSA's January 23, 2014 IPO. ¶¶8, 306. The regulations (known as the "capital plan rule") provided that the Fed would examine the capital plan and report whether SHUSA passed the "stress test" no later than March 31, 2014; until that time, no unauthorized capital distributions, including dividends, were permitted. ¶¶8, 279. These regulations and the Fed's associated review process were known as the annual Comprehensive Capital Analysis and Review ("CCAR"). ¶8. Despite the CCAR regulatory scheme, the IPO Offering Documents and "roadshow" presentations made no disclosure about the Fed's

---

[5]     According to the Company's Form 10-K filed with the Securities and Exchange Commission ("SEC") on March 6, 2014, as of February 28, 2014, there were 348,710,767 shares of common stock outstanding.

ability to restrict dividends, which, in and of itself, violated the federal securities laws because such restrictions were required to be affirmatively disclosed by SEC regulations.  ¶¶9, 277.

In addition, SCUSA falsely represented in roadshows, in the Offering Documents and in SEC filings thereafter, that SCUSA's compliance and risk management frameworks were "extensive" and "comprehensive" and the result of "shared best practices in compliance and risk management" with SHUSA and its parent company – Banco Santander S.A. ("Santander").  ¶¶93-94.  As SCUSA later admitted, however, not only were SCUSA's compliance and risk management frameworks not "extensive" or "comprehensive" or the product of "shared best practices" with SHUSA and Santander, SCUSA was not even aware of the Fed's expectations for CCAR compliance.  ¶128.

Defendants' disclosure violations continued after the IPO.  In its March 2014 annual report, SCUSA again failed to disclose the CCAR dividend restrictions.  ¶¶12, 87 n.5, 104, 280, 297-298. Then, on March 26, 2014, the Fed found that SHUSA failed its stress test and that compliance and risk management within the BHC framework was severely lacking, and specifically told SHUSA that it was not permitted to implement its plan for capital distributions.  ¶¶13, 110-112.  SCUSA specifically refrained from informing SCUSA shareholders of the failed stress test.  ¶111.

Instead, on May 1, 2014, SCUSA repeated its statements about the supposedly extensive compliance framework and repeated its intention to pay a current quarterly dividend in May 2014 and, further, its intention to pay additional quarterly dividends in the amount of 30% of its annual earnings.  ¶¶13, 285-286.  In May and June 2014, SCUSA was forced to admit that it would not pay dividends (other than a single dividend that was permitted by the Fed only on the condition that Santander infuse additional capital into SHUSA) and that shared compliance and risk management with SHUSA/Santander was severely inadequate.  ¶¶10, 15, 125, 128, 222, 226, 298, 291.

For example, on May 29, 2014, SCUSA issued a Form 8-K announcing that: (a) the Fed would permit it to pay the May 30 dividend only if Santander contributed $20.9 million in capital to SHUSA, which Santander did; (b) "SCUSA does not expect to pay [any other] dividends during the remainder of 2014"; and (c) SCUSA will incur higher costs "in connection with compliance with, and assisting SHUSA in, the CCAR process."  ¶125.  This was a reversal from SCUSA's prior

representations to investors that, *inter alia*, SCUSA "will 'pay out 30+%'" of its earnings as dividends and that its shared compliance with SHUSA was not only extensive, but gave SCUSA a competitive advantage.  ¶¶93-95, 104, 114.   On this news, SCUSA's shares dropped 4.63% to $19.76 from the prior day's close of $20.72 on extremely high volume.  ¶126.

During a June 11, 2014 presentation, analysts pressed Dundon for answers.  ¶128.  Dundon flat out admitted that SCUSA was "not aware of the expectations" associated with the CCAR process, but that going forward SCUSA was "trying to work closely with the regulators to build out our enterprise risk processes, CCAR process, compliance processes . . . to be best in class."  *Id*.  These admissions directly contradicted the Offering Documents' representation that SCUSA and SHUSA already had "shared best practices in compliance and risk management."  *Id*.  SCUSA's shares dropped 8.55% (on enormous volume exceeding 10.5 million shares) from $21.05 on June 10, 2014 to $19.25 on June 11, 2014.  ¶129.

And on June 12, 2014, SCUSA further explained that it "expect[ed] to incur additional compliance costs . . . related to regulatory compliance, including CCAR . . . [and] an incremental staffing requirement of approximately 100 full time employees at approximately $125,000 average annual cost per person."  ¶130.  The $12.5 million (at least) annual compliance salary costs represented a significant increase over SCUSA's salary and benefits expenses from each of the four previous fiscal years for not just compliance personnel, but personnel in the entire company.  ¶131.  SCUSA explained that these additional employees were brought on because it was "developing a best-in-class compliance capability."  ¶130.  Yet, the Offering Documents represented that SCUSA already had "shared best practices in compliance and risk management" with Santander.  ¶132.  As a result of this news, SCUSA's stock dropped another 1.33% on June 12, 2014 to close at $18.99.  ¶133.

In a November 4, 2014 SEC filing, SCUSA disclosed that SHUSA settled a Fed enforcement action in which it admitted that the capital plan rule was violated.  *See* Dkt. No. 118, Ex. C.  SHUSA failed additional CCAR stress tests in March 2015 and June 2016.  ¶141; *see* Appendix in Support of Lead Plaintiffs' Motion for Class Certification ("App.") at App. 1-App. 100 (attaching results of

2016 CCAR which show that SCUSA's and SHUSA's shared compliance was so inexorably flawed at the time of the IPO that more than two years later the issues still cannot be corrected as SHUSA failed a third stress test), filed concurrently herewith.

The Offering Documents also contained misleading statements about SCUSA's controls, processes and procedures related to other aspects of SCUSA's consumer finance business, and its compliance with laws and regulations (*e.g.*, "We [*i.e.*, SCUSA] are in compliance with state laws and regulations applicable to our lending operations in each state."). ¶¶18, 143, 161, 208. Contrary to its representations, SCUSA repeatedly violated federal and state laws and regulations, and its compliance framework with respect to not only CCAR, but also state and federal consumer protection laws, was severely inadequate. ¶¶142-183.

The Complaint alleges that defendants violated §§11, 12(a)(2) and 15 of the Securities Act (*see* ¶¶227-263) and §§10(b) and 20(a) of the Exchange Act (*see* ¶¶333-349). The Securities Act claims are asserted against SCUSA, the Individual Defendants and the Underwriter Defendants. ¶¶227-263. The Exchange Act claims are asserted against SCUSA, Dundon and Kulas, who are collectively referred to as the "Exchange Act Defendants." ¶¶333-349. The Court denied defendants' motions to dismiss the Complaint on June 13, 2016. Dkt. No. 128. In a Class Certification Scheduling Order issued on September 21, 2016, the Court, *inter alia*, set December 2, 2016 as the date by which Plaintiffs must file their motion for class certification, which "must comply with Local Rule 23.2 (except paragraph (f)), and must be accompanied by a supporting brief and all supporting evidence, including expert testimony, if any." Dkt. No. 143, ¶1.

## III.   ARGUMENT

### A.   Rule 23(a) Is Satisfied

To obtain class certification, parties must satisfy Rule 23(a)'s requirements of numerosity, commonality, typicality and adequacy of representation as well as one of Rule 23(b)'s three subsections. *See Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 635 (5th Cir. 2016) (en banc). Rule 23(a) requires a class member seeking to sue as a representative of the entire class to demonstrate that: (1) the class is so numerous joinder of all members is impracticable; (2) there are questions of

law or fact common to the class; (3) the claims or defenses of the representatives are typical of those of the class; and (4) the representatives will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

Under Rule 23(b)(3), the provision relevant to the instant motion, a plaintiff must establish "that 'the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, __U.S.__, 133 S. Ct. 1184, 1191 (2013); *see also In re Deepwater Horizon*, 739 F.3d 790, 798 (5th Cir. 2014) ("*Deepwater Horizon I*") ("'Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.'") (quoting *Amgen*, 133 S. Ct. at 1194-95).

### 1. Both the Proposed Exchange Act Class and Securities Act Class Are so Numerous that Joinder of All Respective Class Members Is Impracticable

In putative class actions, like the one here, involving securities traded on national exchanges, such as the NYSE, Rule 23(a)(1)'s numerosity standard is easily satisfied. *See KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 U.S. Dist. LEXIS 78108, at *32-*33 (W.D. Tex. June 4, 2013) ("The numerosity requirement 'is generally assumed to have been met in class action suits involving nationally traded securities.'") (quoting *Ziedman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981)). To meet the numerosity requirement, a plaintiff need only provide "some evidence of a reasonable numerical estimate of purported class members." *Buettgen v. Harless*, No. 3:09-CV-791-K, 2011 U.S. Dist. LEXIS 53888, at *10 (N.D. Tex. May 19, 2011) ("*Idearc*"); *see also Ziedman*, 651 F.2d at 1039 ("'federal trial courts are quite willing to accept common sense assumptions in order to support a finding of numerosity'") (quoting Herbert B. Newberg & Alba Conte, 5 *Newberg on Class Actions* §8812 (1977)).

As stated earlier, SCUSA's common stock trades on the NYSE and SCUSA's SEC filings acknowledged that there were more than 348 million shares of common stock outstanding as of

- 8 -

February 28, 2014. ¶33; *see also City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. 6:12-1609, 2015 U.S. Dist. LEXIS 26051, at *26 (W.D. La. Feb. 11, 2015) (numerosity met where company "had more than 18 million shares of common stock issued and outstanding, which was actively traded on the NASDAQ"); *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 406 (E.D. Va. 2015) ("As Lead Plaintiffs point out, numerosity is rarely disputed in securities fraud class actions, and this class action is no different. . . .  During the class period, between 166 million and 173 million shares of NII stock were outstanding . . . .").  Moreover, during the Class Period, SCUSA's common stock had a weekly trading volume of approximately 7.1 million shares.  *See* Expert Report of Professor Frank C. Torchio ("Torchio Report") (App. 101-App. 362) at App. 111, ¶27; *see also Barbier*, 2013 U.S. Dist. LEXIS 78108, at *33 (weekly trading volume of approximately two million shares supported finding of numerosity).  Accordingly, the proposed Exchange Act Class is sufficiently numerous to make joinder of all members impracticable.

The proposed Securities Act Class includes those who acquired shares of SCUSA common stock in or traceable to the Company's January 23, 2014 IPO.  Here, as defendants admit, over 85 million shares of SCUSA common stock were issued by SCUSA and the Underwriter Defendants in the IPO.  *See* Dkt. No. 132, ¶190; Dkt. No. 133, ¶190.  As courts consistently hold, the issuance of millions of shares in an offering supports a finding of numerosity.  *See, e.g.*, *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 275 (S.D. Tex. 2004) ("Because there can be no doubt that the December 20, 2001, stock offering consisted of millions of shares of stock, that the proposed 1933 Act Class is a nationwide class, or that the identities of its individual members are not readily ascertainable, the court concludes that joinder of all class members is impracticable."); *see also Beaver Cnty. Emps. Ret. Fund v. Tile Shop Holdings, Inc.*, No. 14-786 ADM/TNL, 2016 U.S. Dist. LEXIS 99479, at *37 (D. Minn. July 28, 2016) (The sale of over five million shares in public offering is sufficient to establish numerosity.); *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, No. CV 11-2768 PSG (SSx), 2013 U.S. Dist. LEXIS 155091, at *10 (C.D. Cal. Oct. 25, 2013) (6.6 million sold).

Thus, based on the issuance of over 85 million SCUSA common stock shares on the NYSE, the Securities Act Class, at the very least, encompasses thousands of investors (most likely

- 9 -

geographically disbursed throughout the country) making joinder impractical.  *See Tile Shop*, 2016 U.S. Dist. LEXIS 99479, at \*37 ("Rule 23(a)(1) 'requires only impracticability, not impossibility,' of joinder."); *In re HealthSouth Corp. Sec. Litig.*, 261 F.R.D. 616, 625 (N.D. Ala. 2009) ("Plaintiffs 'need only show that it would be extremely difficult or inconvenient to join all members of the class.'").[6]

### 2.     Questions of Law and Fact Are Common to Members of Both the Proposed Exchange Act Class and Securities Act Class

Under Rule 23(a)(2), in order to sufficiently demonstrate "commonality," a plaintiff must demonstrate that there are "questions of law or fact common to the class."  As the Fifth Circuit holds, Rule 23's commonality requirement simply requires that class members ""have suffered the same injury"" and "raise at least one contention that is central to the validity of each class member's claims."  *Deepwater Horizon I*, 739 F.3d at 810 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011)).  But, "the legal requirement that class members have all 'suffered the same injury' can be satisfied by an instance of the defendant's injurious conduct, even when the resulting injurious effects – the damages – are diverse."  *Deepwater Horizon I*, 739 F.3d at 810-11.  And while the amount of each individual class member's claim for damages may ultimately differ, both the Exchange Act Class and the Securities Act Class allege theories of defendants' liability that respectively "'generate common ***answers*** apt to drive the resolution of the litigation.'"  *Id*. at 811 (emphasis in original).  For example, similar to the class certified by this Court in *Idearc*, the Exchange Act Class here alleges that SCUSA and the Individual Defendants "made misleading statements that incorrectly inflated [SCUSA's] share price during the class period and later made corrective disclosures that caused [SCUSA's] share price to fall, damaging investors."  *Idearc*, 2011 U.S. Dist. LEXIS 53888, at \*11-\*12; *see also* ¶¶318-325; *Barbier*, 2013 U.S. Dist. LEXIS 78108, at \*33-\*34 ("There are a number of common issues in this case, as every class member's allegations of securities fraud arise from the same basic set of facts."); *HealthSouth*, 261 F.R.D. at 626 ("If

---

[6]     For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(a)(1)'s numerosity requirement, L.R. 23.2(b)(1) is also satisfied.

- 10 -

prosecuted separately, all class members would have to prove the identical facts and address the same legal issues.").

Similarly, the Securities Act Class's claims "'arise from the same alleged course of conduct and are based on legal theories similar to those of all the class members,'" and because they stem from the same material misstatements made in the same Offering Documents, "the commonality requirement is easily met." *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 U.S. Dist. LEXIS 9716, at *20-*21 (S.D. Tex. Feb. 18, 2005); *see* ¶¶216-238, 255-263; *see also In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, No. 09-md-02063-JLK-KMT, 2015 U.S. Dist. LEXIS 141073, at *34 (D. Colo. Oct. 15, 2015) ("There are numerous common questions in this case, including whether the Fund's offering documents contain misstatements or omissions, whether those misstatements and omissions were material, and whether Class members sustained monetary losses."); *China Intelligent*, 2013 U.S. Dist. LEXIS 155091, at *12 (finding commonality where "the members of the Class were all allegedly injured by the same misstatements and omissions in the Offering Documents").

Thus, as demonstrated above, Rule 23(a)'s commonality requirement is satisfied as to both the Exchange Act Class and Securities Act Class.[7]

### 3.     The Proposed Class Representatives' Claims Are Typical

To satisfy Rule 23(a)(3)'s typicality requirement, the claims of the proposed class representatives must be typical of the claims of the class.  For typicality, "[t]he critical inquiry is whether the proposed class representatives' claims 'have the same essential characteristics of those of the putative class.  If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.'" *Idearc*, 2011 U.S. Dist. LEXIS 53888, at *12 (quoting *James v. City of Dallas*, 254 F.3d 551, 571 (5th Cir. 2001)); *see also Barrie v. InterVoice-Brite, Inc.*, No. 3:01-CV-1071-K, 2009 U.S. Dist. LEXIS 99253, at *18 (N.D. Tex. Oct. 26, 2009) ("*IVB*") (same).

---

[7]   For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(a)(2)'s commonality requirement, L.R. 23.2(b)(4) is also satisfied.

1205850_1

Here, Lead Plaintiffs' claims are typical of other putative Exchange Act Class members because both sets of investors purchased (or acquired) SCUSA common stock during the Class Period, and both were deceived by the same false and/or misleading statements publicly disseminated by the Exchange Act Defendants – despite the possibility that the amount of damages suffered by each putative class member may vary. *See* ¶¶29-30, 266; Complaint, Ex. A. Similarly, the claims of Lead Plaintiffs are also typical of other putative Securities Act Class members as well, since both groups: (1) purchased shares of SCUSA common stock in or traceable to the IPO; (2) allege that defendants' IPO Offering Documents contained material misstatements that were made uniformly to all class members; and (3) sustained damages as a result of the same conduct by defendants. *See* ¶¶29-30, 191; Complaint, Ex. A; *see also James*, 254 F.3d at 571 ("[T]he test for typicality is not demanding.  It focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent. . . .  Typicality does not require a complete identity of claims.'"); *Idearc*, 2011 U.S. Dist. LEXIS 53888, at *12; *IVB*, 2009 U.S. Dist. LEXIS 99253, at *18.[8]

### 4.    The Representative Parties and Their Counsel Are Adequate

Rule 23(a)(4)'s adequacy prong requires that "the representative parties will fairly and adequately protect the interests of the class."  To determine adequacy, courts in the Fifth Circuit utilize a three-prong test, wherein the proposed class representatives must show that:

> (1) there are no conflicts of interest between them and the proposed class; (2) the proposed class representatives have the willingness and ability to play an active role in the litigation and vigorously represent the class, while protecting the interests of the absentee class members; and (3) that class counsel has the competence and ability to vigorously conduct the litigation.

*Idearc*, 2011 U.S. Dist. LEXIS 53888, at *13 (citing *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129-30 (5th Cir. 2005)).

As demonstrated *infra*, the adequacy prong of Rule 23(a) is sufficiently satisfied.

---

[8]    For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(a)(3)'s typicality requirement, L.R. 23.2(b)(3) is also satisfied.

a.      **Deka and Dearborn Heights Are Adequate to Serve as Class Representatives**

The crux of the inquiry regarding the adequacy of proposed class representatives is whether they are """"part of the class and possess the same interest and suffer the same injury as the class members"""" interests are antagonistic to the rest of the class.  *In re Deepwater Horizon*, 785 F.3d 1003, 1015 (5th Cir. 2015) ("*Deepwater Horizon II*") (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)).  Like commonality, the "same injury" requirement does not mean the damages must be identical.  In fact, """"[c]lass certification is not precluded simply because a class may include persons who have not been injured by the defendant's conduct."""  *Id.* (quoting *Deepwater Horizon I*, 739 F.3d at 801-02); *see also id.* ("We upheld the district court's adequacy determination, even accepting BP's argument that the class included individuals with no loss at all.").  Here, Lead Plaintiffs' interests (and injuries) are aligned with members of each proposed Class they seek to represent, and no conflicts or antagonism exist between these two groups that would undermine a finding of adequacy.

First, as discussed above, like other potential Exchange Act Class members, Deka and Dearborn Heights purchased SCUSA common stock during the Class Period, and both were subjected to the same fraudulent course of conduct by the Exchange Act Defendants.  *See* §III.A.2.-3., *supra*; *see also IVB*, 2009 U.S. Dist. LEXIS 99253, at *20 ("All class members (including Lead Plaintiffs) will bring claims based upon the same conduct and under the same legal theories, claiming that due to Defendants' alleged conduct, they purchased IVB stock at artificially inflated prices and suffered damages thereafter when IVB's stock price fell.").  Additionally, like other Securities Act Class members, Deka and Dearborn Heights purchased shares of SCUSA common stock in or traceable to the IPO, wherein the IPO Offering Documents contained uniformly made and disseminated material misstatements.  *Id.*

Moreover, both of these institutional investor Lead Plaintiffs remain actively engaged in the progress of the litigation and regularly communicate with counsel regarding the status of the case. *See Barbier*, 2013 U.S. Dist. LEXIS 78108, at *36 ("The Fifth Circuit has 'emphasize[d] that Congress enacted the "lead plaintiff" provisions of the PSLRA . . . to direct courts to appoint, as lead

- 13 -

plaintiff, the ***most sophisticated*** investor available and willing so to serve in a putative securities class action.'") (quoting *Berger v. Compaq Computer Corp.*, 279 F.3d 313, 313 (5th Cir. 2002)) (emphasis in original); *see also* App. 362-App. 368.  For example, in response to defendants' document requests, each proposed class representative searched for, and produced relevant and responsive materials.  And as for defendants' first set of interrogatories, both proposed class representatives reviewed and provided verified objections and responses.  *See, e.g.*, *Idearc*, 2011 U.S. Dist. LEXIS 53888, at *14 ("The Pension Trust Fund's board of directors has been ***kept informed of the progress of this lawsuit***, has moved this Court to appoint it lead plaintiff, has designated a representative for depositions, ***and is producing documents pursuant to discovery requests***.").

Second, Lead Plaintiffs are exactly the types of institutional investors Congress sought to encourage to lead securities class actions when it enacted the PSLRA.  The PSLRA encourages courts to place institutional investors (such as Plaintiffs here) in charge of securities fraud class actions.  *See Barbier*, 2013 U.S. Dist. LEXIS 78108, at *36; *Tile Shop*, 2016 U.S. Dist. LEXIS 99479, at *14 ("'both Congress and the courts have recognized that [large institutional] investors are generally preferred as class representatives in securities litigation'") (quoting *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014)).

For example, Deka acted as co-lead plaintiff in a class action brought pursuant to the federal securities laws against, *inter alia*, General Motors and Deloitte & Touche that resulted in a $303 million recovery for the class in that case, *see In re General Motors Corp. Securities and Derivative Litigation*, MDL No. 1749, Master Case No. 06-md-1749, Dkt. Nos. 131, 140 (E.D. Mich. Dec. 22, 2008, Jan. 6, 2009).

Similarly, in *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435 (S.D. Ohio 2009), the court there certified a 10b-5 class action and appointed Dearborn Heights as class representative because the evidence demonstrated that it did, and would continue to, "vigorously prosecute[] the interests of the class through qualified counsel."  *Id*. at 451.

- 14 -

Finally, although Deka and Dearborn Heights initially filed competing motions seeking appointment as lead plaintiff, eventually both agreed "that the interests of judicial economy and the administration of justice would best be served by resolving the competing motions for appointment" and moving the Court to appoint both as Lead Plaintiffs.  Dkt. No. 99 at 3.  This Court agreed, and when it appointed both institutional investors as Lead Plaintiffs, it did so based upon a preliminary determination as to their collective adequacy.  *Id*. at 3, ¶1; *see also Idearc*, 2011 U.S. Dist. LEXIS 53888, at \*27 ("[T]his Court selected the Pension Trust Fund as lead plaintiff" and "stands by its earlier determinations of the ability and willingness of the Pension Trust Fund . . . to participate in this litigation and to protect the rights of absentee plaintiffs."); *In re HealthSouth Corp. Sec. Litig*., 257 F.R.D. 260, 275 (N.D. Ala. 2009) ("The court previously examined the qualifications of the Class Representatives and class counsel when selecting them as required by the [PSLRA].").  For as the PSLRA states:

> [T]he court shall . . . appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be the most capable of adequately representing the interests of class members . . . the "most adequate plaintiff . . . ."

15 U.S.C. §78u-4(a)(3)(B)(i).

Since their appointment as Co-Lead Plaintiffs, Deka and Dearborn Heights vigorously opposed, and defeated, defendants' motions to dismiss the Complaint.  *See Marcus v. J.C. Penney Co.*, No. 6:13-cv-736-MHS-KNM, 2016 U.S. Dist. LEXIS 115795, at \*11-\*12 (E.D. Tex. Aug. 29, 2016) ("When the Court originally appointed the Fund as Lead Plaintiff, the Court found that the Fund 'is accustomed to acting solely in another party's interest and avoiding conflicts of interest.'. . . Since its appointment, the Fund has been actively directing litigation and has successfully opposed a motion to dismiss.").  Given Lead Plaintiffs' successful opposition to defendants' motions to dismiss and active involvement in class certification discovery, the Court has no reason to doubt that Deka and Dearborn Heights will continue to uphold their duties and responsibilities as Lead Plaintiffs if also certified as class representatives by the Court.

### b.      Proposed Class Counsel Is Adequate

Additionally, the proposed class representatives have retained attorneys who are qualified, experienced and able to vigorously conduct the proposed litigation. *Idearc*, 2011 U.S. Dist. LEXIS 53888, at *13. Both G&E and Robbins Geller have extensive experience litigating complex securities fraud class actions on behalf of injured investors throughout the country. *See, e.g.*, *In re Pfizer Sec. Litig.*, 282 F.R.D. 38, 47 (S.D.N.Y. 2012) ("It is undisputed that Lead Counsel Grant & Eisenhofer is an experienced class action law firm and has served as lead counsel in dozens of securities fraud class actions. . . . The record of the instant litigation demonstrates amply that Grant & Eisenhofer has devoted considerable resources to this case since it was first filed, and has effectively protected the interests of Plaintiffs and the putative class."); *Idearc*, 2011 U.S. Dist. LEXIS 53888, at *27-*28 ("The Court also concludes, as before, that Robbins Geller is competent and will adequately represent the class. This firm has substantial experience in class actions in general and securities class actions in particular. The firm has demonstrated its knowledge of securities law and its willingness to expend resources to properly pursue this action."); *see also* App. 369-App. 496 (firm résumés of proposed lead class counsel). Proposed liaison counsel Kendall and Bradley have extensive litigation experience practicing before both federal and state courts in the state of Texas.

As such, counsel is qualified, experienced and able to competently and vigorously prosecute this proposed class action.

### c.      Local Rule 23.2(c) & (g)

For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(a)(4)'s adequacy requirement, L.R. 23.2(c) & (g) are also satisfied. All costs associated with this litigation are advanced by lead counsel and would only be reimbursed from a common fund judgment upon application to and approval by this Court. *See Feder*, 429 F.3d at 134 ("'In contingent fee cases, counsel routinely agree to advance the value of their time and other expenses directly related to the litigation.'"); *see also Buettgen v. Harless*, No. 3:09-cv-00791-K, 2013 U.S. Dist. LEXIS 193649, at *40 (N.D. Tex. Nov. 13, 2013) ("*Idearc Settlement*") ("[B]ecause of the

nature of a contingent practice where cases are predominantly 'big cases' lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.").  Similarly, the payment of lead counsel's attorneys' fees would only occur upon application to (and subsequent approval by) the Court in connection with a common fund judgment and, assuming the Court's approval, would be paid from the "common fund created for the benefit of the Class." *Idearc Settlement*, 2013 U.S. Dist. LEXIS 193649, at *32.

### d.      Local Rule 23.2(e)

If the Exchange Act Class and Securities Act Class were respectively certified, Lead Plaintiffs would request defendants produce the stock transfer records for SCUSA common stock during the Class Period and also for SCUSA's January 2014 IPO.   Lead Plaintiffs would subsequently move the Court to approve its notice plan, which would include: (1) the appointment and authorization of a third-party notice administrator, Gilardi & Co. LLC ("Gilardi"), to supervise and administer the notice procedure; (2) the sending through the United States mail, by first class mail, of the approved form of Notice of Pendency of Class Action ("Notice") after receipt of SCUSA's stock transfer records; and (3) the publishing of a Summary Notice on one occasion in the national edition of *Investor's Business Daily* and over the *Business Wire*.  *See id.* at *20-*21 (approving notice procedures effectuated by Gilardi).  Using publicly available trading information on *Bloomberg*, without the benefit of the stock transfer records for SCUSA during the Class Period or for SCUSA's IPO, and based on consultation with Gilardi, Lead Counsel estimates that the Exchange Act Class and Securities Act Class could contain as many as 200,000 class members combined, and that based on that estimate, the cost of Notice and Summary Notice could be approximately $175,000.  The costs of the Notice and Summary Notice processes would be borne by class counsel, and if there was a subsequent common fund judgment, class counsel would then move the Court for approval of reimbursement for the ***actual*** costs and expenses for these notice procedures as well as the ***actual*** costs for the notice procedures effectuated in connection with any final common fund judgment..  *See id.* at *43-*44.

**B.     The Proposed Classes Satisfies Rule 23(b)(3)**

In addition to satisfying the prerequisites of Rule 23(a), this case also meets the requirements of Rule 23(b).  Rule 23(b)(3) requires that a proposed class representative establish that common questions of law or fact predominate over individual questions and that a class action is superior to other available methods of adjudication.  *See Torres*, 838 F.3d at 636.[9]

**1.     Securities Act Class**

Demonstrating predominance pursuant to Rule 23(b)(3) simply requires "a showing that ***questions*** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 133 S. Ct. at 1191 (emphasis in original); *Deepwater Horizon I*, 739 F.3d at 811 ("Rule 23 does not therefore become a dress rehearsal for the merits.").[10]  For the Securities Act Class, common questions such as the falsity and materiality of the alleged misstatements, along with the statutory prescribed formula for calculating damages,[11] all predominate over individual ones.  *See Oppenheimer*, 2015 U.S. Dist. LEXIS 141073, at *42-*43 ("Proof of the falsity or the misleading nature of the statements and omissions in the Fund's offering documents will be the same for all members of the Class.  'Liability will turn first and primarily on whether the Offering Documents contained misstatements and omissions as plaintiff alleges – an issue clearly subject to "generalized proof."'") (quoting *In re Smart Techs., Inc.,* 295 F.R.D. 50, 61 (S.D.N.Y. 2013)).[12]

---

[9]    For the same reasons that the Exchange Act Class and the Securities Act Class satisfy Rule 23(b)(3)'s superiority requirement, L.R. 23.2(b)(5) is also satisfied.

[10]   *Cf. Tyson Foods, Inc. v. Bouaphakeo*, __U.S.__, 136 S. Ct. 1036, 1045 (2016) ("When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'").

[11]   *See* 15 U.S.C. §77k(e); *see also Tile Shop*, 2016 U.S. Dist. LEXIS 99479, at *43 ("The damage calculation for [Securities Act] Subclass members are subject to common methodology determined by statute.  Therefore, common questions cover the claims asserted by the [Securities Act] Subclass, and the demands of Rule 23(b)(3) are met.").

[12]   *Cf. In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 785 (3d Cir. 2009) ("[A]lthough loss causation is an affirmative defense in a §11 case, this defense would not defeat predominance here.  Section 11(e) allows defendants to 'limit damages by showing that plaintiffs' losses were caused by

Thus, Rule 23(b)(3)'s predominance requirement is readily met here for the proposed Securities Act Class.

2.   **Exchange Act Class**

a.   **Common Questions of Law and Fact Predominate over Individual Questions**

Rule 23(b)(3)'s predominance requirement is usually met in a securities fraud class action because plaintiffs are often entitled to a rebuttable presumption of classwide reliance based on the "fraud on the market" theory. *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988).[13] Under this theory, "'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" and, whenever an investor buys or sells stock at the market price in an efficient market, "'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, __U.S.__, 134 S. Ct. 2398, 2408 (2014) (quoting *Basic*, 485 U.S. at 246-47).

Throughout the course of their fraudulent conduct, the entire putative Exchange Act Class relied upon material misrepresentations publicly made by the Exchange Act Defendants, which artificially inflated the price of SCUSA's common stock.  These public misrepresentations were disseminated to shareholders and reflected in the prices they paid for SCUSA common stock through the NYSE.

Courts in the Fifth Circuit consider the following nonexclusive factors when evaluating an efficiently traded security:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate

---

something other than their misrepresentations.'. . .  Any affirmative defense on this ground would present a ***common*** issue – not an individual one.") (emphasis in original).

[13]   Unlike in a 10b-5 action, "reliance is irrelevant in a §11 case." *Constar*, 585 F.3d at 784.  Thus, class actions alleging violations of §11 claims "will never demand individualized proof as to an investor's reliance or knowledge (except where more than twelve months have passed since the registration statement became effective)." *Id.*

response in the stock price"; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005) (citing *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D. N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001)).

As demonstrated below, the market for SCUSA stock was efficient during the Class Period, as all of the above factors are met.  In support of this Motion, Plaintiffs submit the Torchio Report.  Professor Torchio is an adjunct professor of finance at the Simon Business School at the University of Rochester.  *See* App. 107, ¶13.  Here, Professor Torchio analyzed the nonexclusive factors listed in *Unger*, and utilized by courts in the Fifth Circuit, relevant to market efficiency and concluded that the market for SCUSA's common stock, which is traded on the NYSE, was efficient.[14]

### b.   SCUSA Common Stock Traded in an Efficient Market During the Class Period

#### (1)   SCUSA Common Stock Experienced a High Weekly Trading Volume

SCUSA's common stock traded on the NYSE during the Class Period.  Its average weekly trading volume during the Class Period was approximately 7.1 million shares, representing approximately 2% of the total outstanding shares.  *See* App. 111, ¶27; *see also IVB*, 2009 U.S. Dist. LEXIS 99253, at *27-*28 ("Turnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption.") (citing *Cammer*, 711 F. Supp. at 1286).[15]

---

[14]   Some district courts consider additional factors when determining whether a company's stock traded efficiently: (1) the presence of autocorrelation in stock-price returns; (2) constraints on short selling; and (3) violations of put-call parity.  *See In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1 (1st Cir. 2005).  As Professor Torchio explains (and ultimately concludes) in his report, all three factors – when applied to SCUSA's common stock trading during the Class Period – support a finding of market efficiency.  *See* App. 105, ¶7, App. 139, ¶116.

[15]   In *IVB*, this Court denied class certification pursuant to Rule 23(b)(3) because it found that, based on Fifth Circuit precedent at the time, plaintiffs there did not establish loss causation by a preponderance of the evidence.  *See IVB*, 2009 U.S. Dist. LEXIS 99253, at *54.  In 2011, however, the Supreme Court held that demonstrating loss causation is not a condition of obtaining class certification in securities class actions.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 813 (2011).

This weekly trading volume supports a finding that SCUSA's common stock traded in an efficient market.  App. 112, ¶30.

**(2)     Numerous Financial Analysts Covered and
Reported on SCUSA During the Class Period**

An average of ten analysts covered SCUSA during the Class Period; and approximately 50 analyst reports were issued during this time period by firms such as: BTIG, BMO Capital Markets, Credit Suisse, Deutsche Bank, RBC Capital Markets, Wells Fargo, Stephens and JP Morgan.  *See* App. 113, ¶33.   This number of analysts indicates a greater likelihood that investors rely on information provided about the company and therefore supports a finding that the market for SCUSA shares during the Class Period was efficient.  App. 114, ¶35; *see also IVB*, 2009 U.S. Dist. LEXIS 99253, at *29 (holding that the fact that the company was covered and reported on by 12 different securities analysts supported a finding of market efficiency); *In re Diamond Foods, Inc.*, 295 F.R.D. 240, 248 (N.D. Cal. 2013) (13 analysts); *In re Nature's Sunshine Prods.*, 251 F.R.D. 656, 662-63 (D. Utah 2008) (four analysts).

**(3)     SCUSA Had a Designated Market Maker During
the Class Period**

As mentioned previously, during the Class Period, SCUSA common stock traded on the NYSE, an exchange that, since 2008, employs a Designated Market Maker ("DMM") for a given stock.  *See* App. 116, ¶43.  The DMM performs largely the same role for a stock on the NYSE as the role that multiple market makers perform for a stock on the Nasdaq: providing liquidity and facilitating a market in securities.  App. 116, ¶¶43-44.  Some courts have looked to the number of institutional investors holding a particular stock during a class period, finding that "because these investors could easily buy and sell [the] securities on exchanges such as the NYSE . . . they have likely acted as arbitrageurs and facilitated the efficiency of the market."  *In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).  During the Class Period here, "institutions held nearly 100% of the Company's available float during the Class Period."  App. 138, ¶114; App. 158-App. 161, Ex. 3; *see also Tatz v. Nanophase Techs. Corp.*, No. 01 C 8440, 2003 U.S. Dist. LEXIS 9982, at *21 (N.D. Ill. June 13, 2003) (finding market efficiency where "11% to 13% of the total outstanding

- 21 -

common stock of Nanophase was held by numerous large institutional investors during the Class Period").

**(4)   SCUSA's Market Capitalization and Public Float Sufficiently Satisfy the Remaining SEC Form S-3 Eligibility Requirements During the Class Period**

As Professor Torchio notes, in order to be eligible to file a Form S-3 presently, the company in question must be organized and operating under the laws of the United States or its territories, have filed reports under the Exchange Act covering the prior 12 calendar months, have suffered no default of its obligations and have an aggregate market value of common equity held by non-affiliates of $75 million or more.  App. 116-App. 177, ¶46.  During the Class Period, the Company had not yet met the 12-month minimum requirement.  However, "SCUSA's market capitalization [during the Class Period] ranged from approximately $6.6 billion to approximately $9.0 billion" and its public "float ranged from $1.6 billion to $2.2 billion," far exceeding the $75 million threshold requirement.  *Id*.  Thus, both these factors support a finding of market efficiency.  App. 117, ¶47; *see, e.g.*, *In re Groupon Inc. Sec. Litig.*, No. 12 C 2450, 2015 U.S. Dist. LEXIS 27334, at *13 (N.D. Ill. Mar. 5, 2015) ("while Groupon  had not yet met the twelve-month minimum period of filing SEC reports (the Subclass period is within six months of Groupon filing its IPO), Groupon satisfied the remaining S-3 eligibility requirements. . . .  [Plaintiffs' expert] calculated Groupon's market capitalization at $800 million, which is over 10 times the $75 million amount needed for S-3 registration.").  Moreover, even though SCUSA, at the time of the Class Period, was not eligible to file a Form S-3, this does not undermine market efficiency because the factors listed in *Unger* are an "analytical tool" and not a "checklist."  *Unger*, 401 F.3d at 325; *see also Regions*, 762 F.3d at 1257 n.6 ("[T]he Fifth Circuit did not purport to adopt a minimum requirement, and instead cautioned District Courts that *the Cammer factors are no more than an 'analytical tool' that must be applied in ways sensitive to the particulars of the case before it*.").

**(5)** **The Price of SCUSA's Common Stock Reacted to New, Company-Specific Information During the Class Period**

The fifth factor, on which courts in this Circuit focus, is whether plaintiffs have put forth "[e]vidence of a causal relationship between unexpected corporate events or financial releases and an immediate response in the price of the stock." *IVB*, 2009 U.S. Dist. LEXIS 99253, at *31-*32. Here, after performing a thorough event study and significant statistical analysis, Professor Torchio determined that there was a cause-and-effect relationship between the release of unexpected Company-specific information and the price reaction of SCUSA common stock during the Class Period. *See* App. 117-App. 134, ¶¶48-98.  The study revealed immediate stock price reactions to public disclosures of unexpected material information, supporting the conclusion that SCUSA stock traded on an efficient market. *See, e.g.*, App. 119-App. 124, ¶¶52-67; *see also Barbier*, 2013 U.S. Dist. LEXIS 78108, at *26.

**(6)** **SCUSA's Market Capitalization and Float**

Courts also look to a company's market capitalization and "float" – the percentage of shares held by the public, as opposed to corporate insiders – as indicators of market efficiency. *Barbier*, 2013 U.S. Dist. LEXIS 78108, at *30.  The higher a company's market capitalization, the more likely that its shares trade in an efficient market.  As this Court previously noted:

> Market capitalization is calculated as the number of shares multiplied by the prevailing share price, and may indicate market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations. . . . Investors are more confident investing in corporations with large market capitalizations because "large firm size and dollar trading volume tend to reflect the magnitude of economic incentive to eliminate mispricing."

*IVB*, 2009 U.S. Dist. LEXIS 99253, at *34-*35.

As stated earlier, here, "SCUSA's market capitalization [during the Class Period] ranged from approximately $6.6 billion to approximately $9.0 billion" and "SCUSA's [public] float ranged from $1.6 billion to $2.2 billion."  App. 135, ¶105, App. 137-App. 138, ¶113.  Thus, both these factors support a finding of market efficiency.  App. 136, ¶107, App. 138-App. 139, ¶115; *see also IVB*, 2009 U.S. Dist. LEXIS 99253, at *35 ("Lead Plaintiffs state that during the Class Period, IVB had a large market capitalization ranging from $300 million to $1.2 billion. . . .  The court agrees

- 23 -

with Lead Plaintiffs that IVB's large market capitalization weighs in favor of a finding that IVB stock was traded in an efficient market.").

**(7)        The Bid-Ask Spread of SCUSA's Common Stock**

"The bid-ask spread is the difference between the price at which investors are willing to buy the stock and the price at which current stockholders are willing to sell their shares." *Id.*  Large bid-ask spreads are indicative of inefficient markets, as it suggests that the stock is too expensive to trade.  *Id.*  Here, "[t]he average bid-ask spread for SCUSA's common stock during the Class Period was 0.07%."  App. 136, ¶109.  This factor therefore supports a finding of market efficiency. App. 137, ¶111; *see also IVB*, 2009 U.S. Dist. LEXIS 99253, at *35-*36 ("Lead Plaintiffs' expert has calculated the bid-ask spread for IVB stock at 0.5% of the price . . . .  The court agrees that this proof supports the conclusion that the market for IVB stock was efficient.").

Based on the foregoing, Plaintiffs have established that potentially individualized issues (including reliance) for members of the Exchange Act Class do not predominate over common ones. Therefore, pursuant to Rule 23(b)(3), the proposed Classes are "'sufficiently cohesive to warrant adjudication'" and thus demonstrates predominance.  *Torres*, 838 F.3d at 636.

**3.        A Class Action Is Superior to Other Available Methods of Adjudication**

Allowing this case to proceed as a class action is plainly a superior method for resolving Plaintiffs' claims and will provide the most efficient and fair adjudication.  This Court has previously recognized on multiple occasions the desirability of securities fraud cases involving a large number of plaintiffs proceeding as class actions.  *See Idearc*, 2011 U.S. Dist. LEXIS 53888, at *23-*24; *IVB*, 2009 U.S. Dist. LEXIS 99253, at *54-*58.  This case is no different.

In considering superiority under Rule 23(b)(3), courts analyze four factors: (i) "the class members' interest in individually controlling" their separate actions; (ii) "the extent and nature" of existing litigation by class members concerning the same claims; (iii) "the desirability . . . of concentrating the litigation . . . in a particular forum"; and (iv) "the likely difficulties of managing a class action."  *See* Fed. R. Civ. P. 23(b)(3); *IVB*, 2009 U.S. Dist. LEXIS 99253, at *55.

- 24 -

Here, both the Exchange Act Class and Securities Act Class members' interests in individually controlling the prosecution of separate actions are minimal. Indeed, Lead Plaintiffs are not aware of any individual actions that have not been consolidated with this action. *See Idearc*, 2011 U.S. Dist. LEXIS 53888, at *24 (lack of other shareholder suits indicates class members do not have interest in proceeding individually). Moreover, "'[w]hen . . . economic losses are at issue, the interest to personally control the litigation is small. As long as the named plaintiffs seek to maximize the recovery for the class, little else matters.'" *LHC*, 2015 U.S. Dist. LEXIS 26051, at *32. Here, Lead Plaintiffs have committed to, and have every incentive to, seek the maximum recovery possible for the Classes. *See* App. 363-App. 368. Class members' interests would thus be best furthered if their claims could be litigated as a class action.

Consistent with the requirements of Rule 23(b)(3), the certification of this action as a class action would not only be superior to other available methods for fairly and efficiently adjudicating the controversy, it appears to be the ***sole method*** for fairly and efficiently litigating the claims of all members of the proposed Classes.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (a) enter an order certifying this action as a class action pursuant to Rule 23; (b) appoint Deka and Dearborn Heights as class representatives; (c) appoint G&E and Robbins Geller as lead class counsel; and (d) appoint Kendall and Bradley as liaison class counsel.

DATED: December 2, 2016                Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP


s/ MATTHEW I. ALPERT
MATTHEW I. ALPERT (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
WILLOW E. RADCLIFFE (*pro hac vice*)
SUNNY S. SARKIS (*pro hac vice*)
NADIM G. HEGAZI (*pro hac vice*)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

GRANT & EISENHOFER P.A.
JAMES J. SABELLA (*pro hac vice*)
CHARLES T. CALIENDO (*pro hac vice*)
CAITLIN M. MOYNA (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  646/722-8500
646/722-8501 (fax)

GRANT & EISENHOFER P.A.
JEREMY COLE (*pro hac vice*)
123 Justison Street
Wilmington, DE  19801
Telephone: 302/622-7000
302/622-7100 (fax)

Co-Lead Counsel for the Class

KENDALL LAW GROUP, LLP
JOE KENDALL
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
JAMIE J. McKEY
Texas Bar No. 24045262
jmckey@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)

Local Counsel for the Class

BALON B. BRADLEY LAW FIRM
BALON B. BRADLEY
Texas Bar No. 02821700
balon@bbradleylaw.com
5473 Blair Road, Suite 100
Dallas, TX  75231
Telephone:  972/991-1582
972/755-0424 (fax)

Additional Local Counsel for the Class

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 2, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on December 2, 2016.

<u>  s/ MATTHEW I. ALPERT                               </u>
MATTHEW I. ALPERT

ROBBINS GELLER RUDMAN
         & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: malpert@rgrdlaw.com

1205850_1

# Mailing Information for a Case  3:15-cv-02129-K Steck v. Santander Consumer USA Holdings Inc. et al

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Matthew I Alpert**
  malpert@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **David B Anders**
  dbanders@wlrk.com

- **R Thaddeus Behrens**
  thad.behrens@haynesboone.com,kimberly.dean@haynesboone.com

- **Balon B Bradley**
  balon@bbradleylaw.com,balonbb@aol.com,iasanchez@bbradleylaw.com,anneh@bbradleylaw.com

- **Charles T Caliendo**
  ccaliendo@gelaw.com,rfinnimore@gelaw.com,tsaviano@gelaw.com

- **Ashley A Chung**
  aachung@wlrk.com

- **Jeremy S Cole**
  jcole@gelaw.com

- **Michelle L Davis**
  michelle.davis@skadden.com

- **Stephen R DiPrima**
  srdiprima@wlrk.com

- **Caitlin A Donovan**
  cadonovan@wlrk.com

- **Lionel Z Glancy**
  lglancy@glancylaw.com,dmacdiarmid@glancylaw.com,mmgoldberg@glancylaw.com,info@glancylaw.com,rprongay@glancylaw.com

- **Jay B Kasner**
  jay.kasner@skadden.com,jason-skorupka-5600@ecf.pacerpro.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Lauren M Kofke**
  lmkofke@wlrk.com

- **Gregory Bradley Linkh**
  glinkh@glancylaw.com

- **Matthew Adams McGee**
  matt.mcgee@haynesboone.com

- **Jamie Jean McKey**
  jmckey@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Caitlin Marie Moyna**
  cmoyna@gelaw.com

- **Brian P Murray**
  bmurray@glancylaw.com

Case 3:15-cv-02129-K   Document 152   Filed 12/02/16   Page 36 of 36   PageID 3838

- **Robert V Prongay**
  rprongay@glancylaw.com

- **Willow E Radcliffe**
  willowr@rgrdlaw.com,nhegazi@rgrdlaw.com

- **Noelle M Reed**
  noelle.reed@skadden.com,wallis.hampton@skadden.com,rachel.redman@skadden.com,dockethouston@skadden.com

- **Darren J Robbins**
  e_file_sd@rgrdlaw.com,willowr@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com

- **Samuel H Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James J Sabella**
  jsabella@gelaw.com

- **Susan Leslie Saltzstein**
  susan.saltzstein@skadden.com

- **Sunny S. Sarkis**
  ssarkis@rgrdlaw.com,kirstenb@rgrdlaw.com

- **Andrew L Schwartz**
  aschwartz@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)