**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| DEKA INVESTMENT GMBH and CITY OF DEARBORN HEIGHTS ACT 345 POLICE & FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | § § § § § § | |
| *Plaintiffs*, | § § | C.A. No. 3:15-CV-2129-K |
| v. | § § | **ORAL ARGUMENT REQUESTED** |
| SANTANDER CONSUMER USA HOLDINGS INC., *et al.*, | § § § | |
| *Defendants*. | § § | |

**DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**[PUBLIC REDACTED VERSION]**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF THE CASE .............................................................................. 5

ARGUMENT ...................................................................................................... 8

I.   Plaintiffs bear the burden of proving each of the requirements for class
     certification. ............................................................................................. 8

II.  The proposed Securities Act class cannot be certified. ......................... 9

     A.   The statute of repose bars the claims of all unnamed putative class
          members. .......................................................................................... 9

     B.   Neither plaintiffs nor aftermarket purchasers can trace their shares
          to the IPO. ...................................................................................... 13

          1.   Plaintiffs lack standing to assert Section 11 claims. ............... 13

          2.   Aftermarket purchasers lack standing to assert Securities
               Act claims. ....................................................................... 16

     C.   Plaintiffs have not proven that common issues predominate. .............. 17

          1.   Investor knowledge regarding CCAR is an individualized
               issue. ................................................................................ 17

          2.   Plaintiffs' invocation of the discovery rule and equitable
               tolling to avoid the statute of limitations creates
               individualized issues. ......................................................... 19

          3.   In this case, Section 11 standing and damages require
               individualized determinations. ............................................ 20

III. The proposed Exchange Act class cannot be certified. ....................... 22

     A.   Individualized issues of reliance predominate. ................................ 22

          1.   Plaintiffs cannot invoke the fraud-on-the-market
               presumption because they have not shown an efficient
               market. ............................................................................. 23

          2.   Plaintiffs cannot invoke the fraud-on-the-market
               presumption because the alleged misrepresentations did not
               impact SCUSA's stock price. ............................................... 31

     B.   Plaintiffs have not established that damages can be proven on a
          class-wide basis. ............................................................................. 39

IV.    Neither class can be certified because plaintiffs have not proven they are
       adequate class representatives whose claims are typical. ................................... 42

       A.    Plaintiffs are not typical class representatives. ...................................... 42

             1.    Deka is subject to unique defenses............................................. 43

             2.    Dearborn is subject to unique defenses....................................... 45

       B.    Plaintiffs have not proven that they are controlling this litigation
             and monitoring their counsel.................................................................. 47

V.     Plaintiffs' proposed class definitions are unsupportable.................................. 49

CONCLUSION ................................................................................................................ 50

# TABLE OF AUTHORITIES

## Cases

*Am. Express Co.* v. *Italian Colors Rest.*,
133 S. Ct. 2304 (2013) ................................................................................................. 8

*American Pipe & Construction Co.* v. *Utah*,
414 U.S. 538 (1974) ................................................................................................... 10

*Ansari* v. *N.Y. Univ.*,
179 F.R.D. 112 (S.D.N.Y. 1998) ............................................................................... 43

*Apache Corp.* v. *Chevedden*,
696 F. Supp. 2d 723 (S.D. Tex. 2010) ...................................................................... 13

*Auto Ventures, Inc.* v. *Moran*,
No. 92-426-CIV-KEHOE, 1997 WL 306895 (S.D. Fla. Apr. 3, 1997) ................... 45

*Barnett* v. *DynCorp Int'l, L.L.C.*,
831 F.3d 296 (5th Cir. 2016) ..................................................................................... 11

*Barrie* v. *Intervoice-Brite, Inc.*,
No. 3:01-CV-1071-K, 2009 WL 3424614 (N.D. Tex. Oct. 26, 2009) ............... 23, 29

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988) ............................................................................................. 22, 31

*Baydale* v. *Am. Exp. Co.*,
No. 09 Civ. 3016(WHP), 2009 WL 2603140 (S.D.N.Y. Aug. 14, 2009) ................ 43

*Bell* v. *Ascendant Sols., Inc.*,
422 F.3d 307 (5th Cir. 2005) ................................................................................ 23, 31

*Bell Atl. Corp.* v. *AT&T Corp.*,
339 F.3d 294 (5th Cir. 2003) ................................................................................ 17, 41

*Berger* v. *Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001) ................................................................................ 47, 49

*Borochoff* v. *Glaxosmithkline PLC*,
246 F.R.D. 201 (S.D.N.Y. 2007) ............................................................................... 44

*Broussard* v. *Meineke Disc. Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ..................................................................................... 20

*Buettgen* v. *Harless*,
263 F.R.D. 378 (N.D. Tex. 2009) .............................................................................. 44

*California Pub. Emps.' Ret. Sys.* v. *ANZ Sec., Inc.*,
   No. 16-373, 2017 WL 125670 (U.S. Jan. 13, 2017) .......................................... 11, 12

*Cammer* v. *Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ........................................................................ 27

*Castano* v. *Am. Tobacco Co.*,
   84 F.3d 734 (5th Cir. 1996) .............................................................................. 8, 9

*Charles Schwab Corp.* v. *Comm'r of Internal Revenue*,
   107 T.C. 282 (1996) ............................................................................................ 16

*City of Arlington* v. *F.C.C.*,
   668 F.3d 229 (5th Cir. 2012) ............................................................................... 32

*City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ................................................................................ 39

*City of San Antonio* v. *Hotels.com*,
   No. SA-06-CA-381-OG, 2008 WL 2486043 (W.D. Tex. May 27, 2008) ............... 42

*Comcast Corp.* v. *Behrend*,
   133 S. Ct. 1426 (2013) ................................................................................. passim

*Congregation of Ezra Sholom* v. *Blockbuster, Inc.*,
   504 F. Supp. 2d 151 (N.D. Tex. 2007) ................................................................ 39

*Corwin* v. *Marney, Orton Invs.*,
   788 F.2d 1063 (5th Cir. 1986) ............................................................................. 11

*Crown, Cork & Seal Co., Inc.* v. *Parker*,
   462 U.S. 345 (1983) ............................................................................................ 10

*CTS Corp.* v. *Waldburger*,
   134 S. Ct. 2175 (2014) ........................................................................................ 11

*Daubert* v. *Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ...................................................................................... 29, 31

*Degulis* v. *LXR Biotechnology, Inc.*,
   176 F.R.D. 123 (S.D.N.Y. 1997) ......................................................................... 46

*DeMarco* v. *Lehman Bros., Inc.*,
   222 F.R.D. 243 (S.D.N.Y. 2004) ............................................................... 24, 29, 31

*Dusek* v. *JPMorgan Chase & Co.*,
   832 F.3d 1243 (11th Cir. 2016) ........................................................................... 10

*Erica P. John Fund, Inc.* v. *Halliburton Co.*,
   309 F.R.D. 251 (N.D. Tex. 2015) ................................................................... 32

*Franze* v. *Equitable Assurance*,
   296 F.3d 1250 (11th Cir. 2002) ..................................................................... 45

*Freeman* v. *Laventhol & Horwath*,
   915 F.2d 193 (6th Cir. 1990) ......................................................................... 25

*Freidus* v. *Barclays Bank PLC*,
   734 F.3d 132 (2d Cir. 2013) ........................................................................... 16

*Gene & Gene LLC* v. *BioPay LLC*,
   541 F.3d 318 (5th Cir. 2008) .......................................................................... 17

*Genesis Healthcare Corp.* v. *Symczyk*,
   133 S. Ct. 1523 (2013) ................................................................................... 10

*Greenberg* v. *Crossroads Sys., Inc.*,
   364 F.3d 657 (5th Cir. 2004) .......................................................................... 33

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) ........................................................................ 23, 31, 39

*Henson* v. *Fid. Nat'l Fin. Inc.*,
   300 F.R.D. 413 (C.D. Cal. 2014) .................................................................... 20

*Herm* v. *Stafford*,
   663 F.2d 669 (6th Cir. 1981) .......................................................................... 19

*Hopson* v. *MetroPCS Commc'ns, Inc.*,
   No. 3:09-CV-2392-G, 2011 WL 1119727 (N.D. Tex. Mar. 25, 2011) ..................... 39

*Ibe* v. *Jones*,
   836 F.3d 516 (5th Cir. 2016) .......................................................................... 41

*IBEW Local 98 Pension Fund* v. *Best Buy Co., Inc.*,
   818 F.3d 775 (8th Cir. 2016) .................................................................... 31, 32

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*,
   281 F.R.D. 134 (S.D.N.Y. 2012) .................................................................... 21

*In re Century Aluminum Co. Sec. Litig.*,
   729 F.3d 1104 (9th Cir. 2013) ........................................................................ 13

*In re Comverse Tech., Inc. Sec. Litig.*,
   No. 06-CV-1825 (NGG)(RER), 2007 WL 680779 (E.D.N.Y. Mar. 2, 2007) ............ 50

*In re Deepwater Horizon*,
   739 F.3d 790 (5th Cir. 2014) ......................................................................... 41

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008) ..................................................................... 29

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
   529 F. Supp. 2d 644 (S.D. Tex. 2006) ..................................................... 47, 50

*In re Enron Corp. Sec. Litig.*,
   206 F.R.D. 427 (S.D. Tex. 2002) ................................................................... 46

*In re Initial Pub. Offering Sec. Litig.*,
   227 F.R.D. 65 (S.D.N.Y. 2004) ..................................................................... 21

*In re Initial Pub. Offering Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006) ....................................................................... 25, 26

*In re Kosmos Energy Ltd. Sec. Litig.*,
   299 F.R.D. 133 (N.D. Tex. 2014) ........................................................... passim

*In re Lehman Bros. Sec. & Erisa Litig.*,
   655 F. App'x 13 (2d Cir. 2016), *cert. granted in part sub nom.*
   *California Pub. Emps.' Ret. Sys.* v. *ANZ Sec., Inc.*,
   No. 16-373, 2017 WL 125670 (U.S. Jan. 13, 2017) ............................... 11, 12

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ........................................................... 50

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
   No. 14-cv-00722-SI, 2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) ........... 30

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013) .................................................................. 4, 41

*In re SCOR Holding (Switzerland) AG Litig.*,
   537 F. Supp. 2d 556 (S.D.N.Y. 2008) ........................................... 25, 26, 27, 29

*In re Superior Offshore Int'l, Inc. Sec. Litig.*,
   No. H-08-0687, 2010 WL 2305742 (S.D. Tex. June 8, 2010) ................. 17, 19

*In re U.S. Healthcare, Inc. Sec. Litig.*,
   No. 88-0559, 1988 WL 102671 (E.D. Pa. Sept. 29, 1988) ........................... 45

*Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016) ............................................................................ 39

*Johnson* v. *CBD Energy Ltd.*,
   No. H-15-1668, 2016 WL 3654657 (S.D. Tex. July 6, 2016) ..................... 14

*Johnson* v. *Kansas City S. Ry. Co.*,
  208 F. App'x 292 (5th Cir. 2006) ........................................................... 20

*Joseph* v. *Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ............................................................. 11

*Kaiser Steel Corp.* v. *Charles Schwab & Co., Inc.*,
  913 F.2d 846 (10th Cir. 1990) .............................................................. 16

*Karnes* v. *Fleming*,
  No. H-07-0620, 2008 WL 4528223 (S.D. Tex. July 31, 2008) ......................... 47, 50

*Koenig* v. *Benson*, 117 F.R.D.
  330 (E.D.N.Y. 1987) ........................................................................ 46

*Krim* v. *pcOrder.com, Inc.*,
  402 F.3d 489 (5th Cir. 2005) ......................................................... passim

*Krogman* v. *Sterritt*,
  202 F.R.D. 467 (N.D. Tex. 2001) ........................................................... 27

*Lampf* v. *Gilbertson*,
  501 U.S. 350 (1991) ........................................................................ 11

*Lehocky* v. *Tidel Techs., Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004) ........................................................ 42, 45

*Leroy* v. *Paytel III Mgmt. Assocs., Inc.*,
  No. 91 Civ. 1933 (JFK), 1992 WL 367090 (S.D.N.Y. Nov. 24, 1992) ................... 45

*Loritz* v. *Exide Techs.*,
  No. 2:13-cv-02607-SVW-E, 2015 WL 6790247 (C.D. Cal. July 21, 2015) ............... 24

*Ludlow* v. *BP, P.L.C.*,
  800 F.3d 674 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1824 (2016) ....... 4, 21, 40, 41

*Morlan* v. *Universal Guar. Life Ins. Co.*,
  298 F.3d 609 (7th Cir. 2002) ............................................................. 10

*O'Sullivan* v. *Countrywide Home Loans, Inc.*,
  319 F.3d 732 (5th Cir. 2003) ........................................................... 9, 41

*Ogden* v. *AmeriCredit Corp.*,
  225 F.R.D. 529 (N.D. Tex. 2005) ........................................................... 47

*Petrie* v. *Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) .......................................................... 27

*Pipefitters Local No. 636 Defined Ben. Plan* v. *Bank of Am. Corp.*,
    275 F.R.D. 187 (S.D.N.Y. 2011) ............................................................... 43

*Police & Fire Ret. Sys. of City of Detroit* v. *IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013).............................................................. 10, 11

*Regents of Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*,
    482 F.3d 372 (5th Cir. 2007)..................................................................... 39

*Sandwich Chef of Tex., Inc.* v. *Reliance Nat'l Indem. Ins. Co.*,
    319 F.3d 205 (5th Cir. 2003)..................................................................... 17

*Seeligson* v. *Devon Energy Prod. Co.*,
    No. 3:16-CV-00082-K, 2017 WL 68013 (N.D. Tex. Jan. 6, 2017) ............................. 8, 17, 42

*Smith* v. *Bayer Corp.*,
    564 U.S. 299 (2011) .............................................................. 10, 11

*Southland Sec. Corp.* v. *INSpire Ins. Sols. Inc.*,
    365 F.3d 353 (5th Cir. 2004)..................................................................... 39

*Standard Fire Ins. Co.* v. *Knowles*,
    133 S. Ct. 1345 (2013) ........................................................................ 10

*Steering Comm.* v. *Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir. 2006)................................................................ 8, 17

*Stein* v. *Regions Morgan Keegan Select High Income Fund, Inc.*,
    821 F.3d 780 (6th Cir. 2016)............................................................ 10, 11

*Stirman* v. *Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002)..................................................................... 47

*Thorn* v. *Jefferson-Pilot Life Ins. Co.*,
    445 F.3d 311 (4th Cir. 2006)..................................................................... 20

*Tsirekidze* v. *Syntax-Brillian Corp.*,
    No. CV-07-02204-PHX-FJM, 2009 WL 2151838 (D. Ariz. July 17, 2009) ........................... 21

*Turnbow* v. *Life Partners, Inc.*,
    No. 3:11-cv-1030-M, 2013 WL 3479884 (N.D. Tex. July 9, 2013)......................................... 41

*Unger* v. *Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005)..................................................................... 23

*United States* v. *Fullwood*,
    342 F.3d 409 (5th Cir. 2003)..................................................................... 29

*Wal-Mart Stores, Inc.* v. *Dukes*,
  564 U.S. 338 (2011) ........................................................................................ 8, 11

*Warren* v. *Reserve Fund, Inc.*,
  728 F.2d 741 (5th Cir. 1984) .................................................................................. 42

*Waste Mgmt. Holdings, Inc.* v. *Mowbray*,
  208 F.3d 288 (1st Cir. 2000) .................................................................................. 19

*Zachery* v. *Texaco Exploration & Prod., Inc.*,
  185 F.R.D. 230 (W.D. Tex. 1999) ......................................................................... 42

**Statutes**

12 C.F.R. § 225.8 ...................................................................................................... 7

17 C.F.R. § 230.174 ................................................................................................ 25

17 C.F.R. § 242.101 ................................................................................................ 25

15 U.S.C. § 77k ........................................................................................... 13, 15, 21

15 U.S.C. § 77m ................................................................................................. 9, 19

28 U.S.C. § 2072 ..................................................................................................... 11

Fed. R. Civ. P. 23 ............................................................................................. passim

Fed. R. Evid. 301 .................................................................................................... 31

**Other Authorities**

Black's Law Dictionary (10th ed. 2014) ............................................................... 16

Charles P. Jones, Investments: Analysis and Management (11th ed. 2010) ........ 16

Merton H. Miller & Franco Modigliani, *Dividend Policy, Growth and the Valuation of Shares*,
  34 J. Bus. 411-33 (1961) ........................................................................................ 34

*Prospectus Delivery for Aftermarket Transactions*, Securities Act Release No. 6763, Exchange
  Act Release No. 25546, 53 Fed. Reg. 11841, 1988 WL 237444 (Apr. 4, 1988) ...... 25

Richard A. Brealey, et al., Principles of Corporate Finance (10th ed. 2011) ........ 34

## PRELIMINARY STATEMENT

Plaintiffs bear the burden of proving that their proposed Securities Act and Exchange Act classes satisfy the requirements of Rule 23, but their motion papers barely skim the surface of the requirements of the rule.  Plaintiffs appear to assume that a class should be certified because they are large institutional investors, their lawyers are experienced, and SCUSA's shares trade on the New York Stock Exchange.  But this casual approach to a motion for class certification is insufficient under U.S. Supreme Court and Fifth Circuit precedent, which require the district court to engage in a "rigorous analysis" of the Rule 23 requirements before certifying a class. Plaintiffs failed to meet their burden on multiple requirements for class certification.

The proposed Securities Act class cannot be certified because certification is time barred by the applicable three-year statute of repose.  No plaintiff other than Dearborn and Deka brought Securities Act claims within three years of SCUSA's IPO, and the prevailing view of the circuit courts is that a putative class action complaint cannot toll a statute of repose under the *American Pipe* doctrine.  The Securities Act claims of absent class members are thus time barred, and, accordingly, no Securities Act class can be certified.

The proposed Securities Act class cannot be certified for the additional reason that plaintiffs lack standing to bring Section 11 claims.  Plaintiffs must trace their stock acquisitions to the IPO, but non-IPO shares entered the market immediately after SCUSA's IPO through a separate registration statement and had already intermingled with shares sold in the IPO when ███████████████████████.  Under Fifth Circuit law, it is impossible to satisfy Section 11's tracing requirement where, as here, ███████████████ after non-IPO shares came into the market.  *Krim* v. *pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005).  For the same reason, aftermarket purchasers cannot trace their shares to the IPO and cannot be included in a Securities Act class.  *Id.* at 496-98.

Putting aside plaintiffs' statute of repose and tracing problems, issues common to the proposed Securities Act class do not predominate over individual issues.  Plaintiffs allege that SCUSA should have disclosed at the time of the IPO that it could not pay a dividend due to the Fed's CCAR regulations.  Plaintiffs go so far as to say that these publicly available regulations imposed a clear restriction on SCUSA's ability to pay dividends.  But under this theory, individual investors — which include large, sophisticated institutional investors heavily invested in bank stocks — could have determined the same thing, thus requiring individualized inquiries about their knowledge of SCUSA's regulatory environment.  Plaintiffs also argue that their dividend theory, asserted for the first time more than a year after the last corrective disclosure, is not time barred by the one-year statute of limitations because of equitable tolling and the discovery rule.  But ████████████████████████, and the cases hold, resolving these tolling issues is fact-intensive and will require individualized inquiries.

As for the proposed Exchange Act class, individualized issues also predominate.  Plaintiffs seek to invoke the fraud-on-the-market presumption of reliance throughout the proposed class period without offering competent evidence to support that presumption.  Courts have consistently held that an IPO market — *i.e.*, shares bought in the offering itself — is inefficient as a matter of law, and plaintiffs' own expert concedes that he is *not* offering an opinion as to whether SCUSA's IPO market was efficient.  To the contrary, he believes that SCUSA's IPO, like other IPOs, was significantly *underpriced*.  Similarly, plaintiffs offer no reliable analysis as to whether the market for SCUSA stock was efficient during the SEC-imposed "quiet period" following the IPO, even though the SEC, as well as federal courts around the nation, have recognized unique inefficiencies during this period.  Beyond that, the analyses put forward by plaintiffs' expert are unscientific, unsupported by the case law or academic

research, and wholly unreliable.  His testimony has previously been excluded under *Daubert* in other securities litigation, and it should be excluded here as well.

In any event, even assuming an efficient market, individualized issues of reliance predominate because none of the alleged misrepresentations had an impact on SCUSA's stock price.  Under the Supreme Court's decision in *Halliburton II*, evidence of a lack of price impact rebuts the presumption of reliance on which plaintiffs premise their motion.  At the time of the IPO, the market already had all the information that could have been known relating to restrictions on SCUSA's ability to pay dividends.  The relevant CCAR regulations were a matter of public record, and the market knew the key facts:  that SCUSA was a non-bank subsidiary of SHUSA, that SHUSA was a bank holding company, and that SHUSA was subject to the CCAR stress test.  Yet SCUSA's stock traded at or above the $24 per share IPO price for two months after the IPO, well beyond the quiet period.

Nevertheless, plaintiffs point to four so-called "corrective disclosures" beginning nearly four months after the IPO.  The first of these, on May 15, 2014, disproves price impact.  On that day, SCUSA reconfirmed that SHUSA had failed the CCAR stress test on March 26 (two months after the IPO) and that the Fed could prohibit SCUSA from issuing dividends — the exact risk that plaintiffs claim should have been disclosed in the offering documents.  Yet in response to these disclosures, SCUSA's stock declined just 32 cents, a decline that plaintiffs' own expert admits was not statistically significant.  As detailed in the report of defendants' expert, Lucy Allen, the price declines following the other alleged "corrective disclosures" were caused by news of regulatory and other developments that occurred *after* SCUSA's IPO and thus could not have been disclosed at the time of the IPO.  Indeed, the largest stock drop, on June 11, followed release of a revised earnings outlook in which management lowered its earnings growth

expectation due to concerns about competition and the evolving regulatory environment.  That disclosure made no mention of dividends.

In addition, neither class can be certified because individualized issues of damages predominate.  In the face of U.S. Supreme Court and Fifth Circuit precedent requiring plaintiffs to come forward with evidence that damages are capable of class-wide resolution, plaintiffs have come forward with nothing.  They offer no expert model or other evidence so much as addressing the issue of damages.  This complete absence of proof warrants denial of certification because it leaves the Court unable to engage in the "rigorous analysis" of plaintiffs' damages methodology mandated by the Supreme Court in *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1433 (2013), or the Fifth Circuit in *Ludlow* v. *BP, P.L.C.* ("*BP*"), 800 F.3d 674, 683 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1824 (2016) (carefully scrutinizing plaintiffs' expert's proposed class damages model).  In the words of the D.C. Circuit, under *Comcast* "[n]o damages model, no predominance, no class certification."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

Finally, neither class can be certified because plaintiffs are not adequate representatives and their claims are atypical.  One plaintiff, Dearborn, says it was misled concerning SCUSA's ability to pay dividends, yet its third-party investment manager admits that whether SCUSA paid such a dividend was "completely irrelevant" to its decision to purchase SCUSA stock. ███

████████████████████████████████████████████████████████

████████████████████████████████████  The other plaintiff, Deka, is equally untenable:  it is organized as a Kapitalverwaltungsgesellschaft ("KVG") under German law and purports to have standing to bring claims on behalf of 33 separate investment funds, ████████████████████  pursuant to some unspecified provisions of German

law.  In addition, Deka has provided no evidence that a German court would recognize a judgment of this Court, raising serious res judicata concerns if a class is certified.

Both plaintiffs, moreover, are subject to arguments on the statute of limitations defense under Section 13 of the Securities Act that are unique to them.  Plaintiffs chose to change their theory of the case and assert their CCAR dividend theory more than a year after the last alleged corrective disclosure and after representing to two federal courts that this case was about subprime lending standards, a theory they have now abandoned.  In opposing dismissal, plaintiffs successfully argued that the statute of limitations defense raised factual questions of investor knowledge. ███████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████ Plaintiffs are thus subject to statute of limitations defenses that make their Section 11 claims atypical and bar certification.

For these reasons, and the reasons discussed below, this action should not be certified as a class action, as neither proposed class satisfies the requirements of Rule 23.

## STATEMENT OF THE CASE

Defendant Santander Consumer USA Holdings Inc. is a consumer finance company headquartered in Dallas, Texas that focuses on vehicle finance and unsecured consumer lending products.  *See* Am. Compl. ¶ 31.  SCUSA is a non-bank, majority-owned subsidiary of Santander Holdings USA, Inc. ("SHUSA"), a bank holding company.  *See id.* ¶ 34.  As a bank holding company, SHUSA takes part in the Federal Reserve's annual Comprehensive Capital Analysis and Review ("CCAR"), which is intended to assess whether the largest bank holding companies operating in the United States have sufficient capital to continue operations through periods of financial stress.  Under CCAR, SHUSA was required for the first time in 2014 to submit a capital plan to the Fed for annual review.  *Id.* ¶¶ 75-76; Dkt. No. 107 at App. 446, 448, 652.

On January 23, 2014, SCUSA conducted an initial public offering in which it issued approximately 85 million shares of common stock at a price of $24 per share.  Am. Compl. ¶ 32. In connection with the IPO, SCUSA filed a Form S-1 registration statement and prospectus.  *Id.*; Ex. 3-A at App. 25-259.

Plaintiff Richard Steck filed the original complaint in this action in the Southern District of New York on August 26, 2014.  Plaintiff premised his claim on a July 2014 *New York Times* article on subprime auto lending and the disclosure of a regulatory subpoena that followed that article.  Dkt. No. 1 ¶ 5.  The complaint alleged that SCUSA's IPO offering documents were misleading due to SCUSA's alleged failure to disclose that it had engaged in improper underwriting practices.  *Id.* ¶ 49.  The complaint pointed to an alleged "corrective disclosure" on August 8, 2014, the day after SCUSA disclosed receipt of the regulatory subpoena.  *Id.* ¶ 57.

On October 27, 2014, Deka and Dearborn appeared in the case and each moved to be appointed lead plaintiff.  Dkt. Nos. 17-22.  At the time, they also described the case as arising from SCUSA's underwriting standards and the August 8 stock decline.  Dkt. Nos. 18, 21.  They said nothing about supposed misrepresentations regarding dividends, CCAR, or compliance systems.  Dkt. No. 18 at 2-5; Dkt. No. 21 at 2-3.

On June 24, 2015, the district court in New York transferred the action to this Court, and shortly thereafter, Deka and Dearborn were appointed lead plaintiffs.  Although plaintiffs represented to this Court that the case was about subprime lending, *see* Dkt. No. 100, and although the notice mandated by the Private Securities Litigation Reform Act says that that is what the case is about, Dkt. No. 16-1, when Deka and Dearborn filed their Amended Complaint on October 30, 2015, they abandoned their prior claims and advanced an entirely new theory of liability based on an entirely new set of facts.

The Amended Complaint makes no reference to SCUSA's subprime underwriting standards or the August 8 alleged corrective disclosure.  Instead, the Amended Complaint focuses on SHUSA's participation in the Fed's CCAR program.  According to plaintiffs, the CCAR regulations prohibited SCUSA from paying a dividend unless and until the Fed issued a notice of non-objection to SHUSA's capital plan, and that fact should have been disclosed at the time of the IPO.  Plaintiffs pointed to a new set of alleged corrective disclosures in May and June 2014 and added claims under the Exchange Act, which alleged that the dividend restriction on SCUSA was so clear that certain defendants must have acted with scienter in not disclosing it.

On December 18, 2015, defendants moved to dismiss the Amended Complaint.  Dkt. Nos. 106, 109.  Defendants argued that plaintiffs' Securities Act claims were barred by the one-year statute of limitations because the events underlying their claims occurred more than 16 months before they filed the Amended Complaint.  SCUSA also argued that plaintiffs failed to plead any material misrepresentations because their theory hinged on a fundamental misreading of the CCAR regulations, which on their face do not apply to non-bank subsidiaries of bank holding companies like SCUSA.  The relevant provision states that "[i]f the [Fed] objects to a capital plan and until such time as the [Fed] issues a non-objection to the bank holding company's capital plan, the *bank holding company* may not make any capital distribution."  12 C.F.R. § 225.8(f)(2)(iv) (emphasis added).  On June 13, 2016, this Court denied defendants' motions to dismiss.  Dkt. No. 128.

On September 21, 2016, this Court entered a Class Certification Scheduling Order staying merits discovery until after class certification is resolved.  Dkt. No. 143.

## ARGUMENT

### I.     Plaintiffs bear the burden of proving each of the requirements for class certification.

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 348 (2011).  As the Supreme Court has recognized, Rule 23 "imposes stringent requirements for certification that in practice exclude most claims." *Am. Express Co.* v. *Italian Colors Rest.*, 133 S. Ct. 2304, 2310 (2013).

A court may certify a class only if — after a "rigorous analysis" — it finds that plaintiffs have proven by a preponderance of the evidence that each Rule 23 element is met. *Wal-Mart*, 564 U.S. at 351; *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 139 (N.D. Tex. 2014). This "rigorous analysis" frequently entails "some overlap with the merits of the plaintiff's underlying claim.  That cannot be helped." *Wal-Mart*, 564 U.S. at 351.  "Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996).

To obtain certification, plaintiffs must first establish each of the requirements of Rule 23(a).  This is "not a perfunctory task" because "it is the plaintiffs['] burden to present evidence showing that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *In re Kosmos*, 299 F.R.D. at 137 (quoting *Comcast Corp.* v. *Behrend*, 133 S. Ct. 1426, 1432 (2013)); *see Seeligson* v. *Devon Energy Prod. Co.*, 2017 WL 68013, at *4 (N.D. Tex. Jan. 6, 2017) (Kinkeade, J.).  Plaintiffs must also establish the demanding predominance and superiority requirements of Rule 23(b)(3), and the other prerequisites for class certification, such as standing, membership in the putative class, and appropriate proposed class definitions.  FED. R. CIV. P. 23; *Steering Comm.* v. *Exxon Mobil*

*Corp.*, 461 F.3d 598, 601 (5th Cir. 2006); *O'Sullivan* v. *Countrywide Home Loans, Inc.*, 319 F.3d 732, 742-43 (5th Cir. 2003).

The "rigorous approach" to class certification in the Fifth Circuit is the culmination of a decades-long move "away from a presumptively pro-plaintiff view to [a] more restrictive approach." *In re Kosmos*, 299 F.R.D. at 138-39.  Beginning with the Fifth Circuit's decision in *Castano*, courts in the Fifth Circuit must "'find'— not just presume — that enough facts support class certification." *Id.* at 138; *see, e.g.*, *Castano*, 84 F.3d at 740.  This is particularly true in securities cases, where Congress enacted the PSLRA to curb "abusive private securities fraud suits" and discourage "lawyer-driven litigation and the use of 'professional plaintiffs.'" *In re Kosmos*, 299 F.R.D. at 139.

## II.     The proposed Securities Act class cannot be certified.

Plaintiffs seek to certify a "Securities Act Class" consisting of "persons who purchased or otherwise acquired SCUSA common stock in or traceable to SCUSA's January 23, 2014 IPO, and were damaged thereby" to pursue claims under Sections 11, 12(a)(2), and 15 of the Securities Act.  *See* Pls.' Br. at 1, 7; Am. Compl. ¶¶ 227-63.  Plaintiffs have not carried their burden of proving this class can be certified, as the class claims are time barred by the three-year statute of repose under the Securities Act, plaintiffs lack standing to proceed, and questions common to the class members do not predominate over individualized questions.

### A.     The statute of repose bars the claims of all unnamed putative class members.

No Securities Act class can be certified because the claims of unnamed putative class members are barred by the three-year statute of repose in Section 13 of the Securities Act, 15 U.S.C. § 77m.  Under the statute, "[i]n no event shall any . . . action be brought to enforce a

liability created under [Section 11] more than three years after the security was bona fide offered to the public." *Id.*[1]

Only Deka and Dearborn brought a Securities Act action within three years of the IPO, and thus the claims of absent class members are barred by the statute of repose.  As the Supreme Court put it, the notion "that a nonnamed class member is a party to the class-action litigation before the class is certified" is "novel and surely erroneous."  *Smith* v. *Bayer Corp.*, 564 U.S. 299, 313-14 (2011); *accord Standard Fire Ins. Co.* v. *Knowles*, 133 S. Ct. 1345, 1349 (2013).  "[U]ntil certification there is no class action but merely the prospect of one; the only action is the suit by the named plaintiffs."  *Morlan* v. *Universal Guar. Life Ins. Co.*, 298 F.3d 609, 616 (7th Cir. 2002); *see also Genesis Healthcare Corp.* v. *Symczyk*, 133 S. Ct. 1523, 1530 (2013) (class action does not "acquire[] an independent legal status" until it is certified).  The text of Rule 23 itself makes clear that the individual "action" does not become a "class action" until certification. FED. R. CIV. P. 23(c)(1)(A) (at the class certification stage, the court must "determine by order whether to certify the action as a class action").

To be sure, under *American Pipe & Construction Co.* v. *Utah*, the filing of a putative class complaint can toll the applicable *statute of limitations* for unnamed putative class members until certification is granted or denied.  414 U.S. 538 (1974); *see Crown, Cork & Seal Co., Inc.* v. *Parker*, 462 U.S. 345, 350 (1983).  But *American Pipe* tolling does *not* apply to statutes of repose such as Section 13's three-year period, as the growing majority of federal circuits have held. *Dusek* v. *JPMorgan Chase & Co.*, 832 F.3d 1243, 1249 (11th Cir. 2016); *Stein* v. *Regions Morgan Keegan Select High Income Fund, Inc.*, 821 F.3d 780, 793 (6th Cir. 2016); *Police & Fire Ret. Sys. of City of Detroit* v. *IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013).

---

[1]    The same three-year time limit applies to plaintiffs' claims under Sections 12(a)(2) and 15 of the Securities Act.  *See id.*

This is true "regardless of whether *American Pipe* tolling is derived from courts' equity powers or from Rule 23." *Stein*, 821 F.3d at 794-95; *see IndyMac*, 721 F.3d at 109.  A statute of repose is not subject to any judicially created "equitable tolling" doctrine.  The Supreme Court itself has explained that "equitable tolling . . . is fundamentally inconsistent with" a statute of repose.  *Lampf* v. *Gilbertson*, 501 U.S. 350, 363 (1991).  The Fifth Circuit has recognized the same.  *Corwin* v. *Marney, Orton Investments*, 788 F.2d 1063, 1066 (5th Cir. 1986) (Section 13 "creates an absolute bar" for which "normal tolling rules are not applicable").  Nor is a statute of repose subject to "legal tolling" by operation of Rule 23.  It is well-established that the Rules Enabling Act, 28 U.S.C. § 2072(b), forbids courts from interpreting the Federal Rules in a manner that abridges, enlarges, or modifies any substantive right, *Wal-Mart*, 564 U.S. at 367, and that "a statute of repose creates a substantive right to be free from liability after a legislatively determined period," *Barnett* v. *DynCorp Int'l, L.L.C.*, 831 F.3d 296, 307 (5th Cir. 2016); *accord CTS Corp.* v. *Waldburger*, 134 S. Ct. 2175, 2182-83 (2014).

The lone circuit court to reach a contrary result is *Joseph* v. *Wiles*, 223 F.3d 1155 (10th Cir. 2000).  But that case has not been followed by any other circuit in 17 years; the court did not consider whether "legal tolling" would abridge a substantive right in contravention of the Rules Enabling Act; and its reasoning is inconsistent with subsequent decisions of the Supreme Court. *See Waldburger*, 134 S. Ct. at 2183; *Smith*, 564 U.S. at 313 & n.10.

Plaintiffs will no doubt argue that the claims of absent class members were "essentially filed" for purposes of the statute of repose when the case was commenced.  But that argument is inconsistent with the reasoning of the majority of the circuit court opinions cited above and was squarely rejected by the Second Circuit in *In re Lehman Bros. Sec. & Erisa Litig.*, 655 F. App'x 13, 15 (2d Cir. 2016), *cert. granted in part sub nom. California Pub. Emps.' Ret. Sys.* v. *ANZ Sec., Inc.*, No. 16-373, 2017 WL 125670 (U.S. Jan. 13, 2017) ("*CalPERS*").

As the Second Circuit held in *Lehman*, a fundamental premise of *American Pipe* tolling is that putative class members' claims are *not* automatically filed when the putative class action is filed. *Id.* *American Pipe* tolling would be completely unnecessary if every unnamed class member was deemed to have actually asserted his or her Securities Act claim at the time the putative class complaint was filed. As the Second Circuit explained:

> [I]f it were true that a putative class member's claims were essentially "filed" in the putative class complaint, there would be no need for *American Pipe* tolling at all; any putative class complaint would count as a legitimate "filing" of all putative class members' claims within the limitations period. The very principle of tolling is to permit claims not timely asserted to proceed if the requirements for suspending the limitations period are met.

*Id.* In other words, without *American Pipe* tolling, an unnamed class member's Securities Act claims are barred if the applicable time limit — whether the one-year statute of limitations or the three-year statute of repose — has passed prior to the class being certified.

On January 13, 2017, the Supreme Court granted certiorari in the *Lehman* case on the question of the application of *American Pipe* tolling to statutes of repose. *CalPERS*, 2017 WL 125670. The question for which certiorari was granted — "Does the filing of a putative class action serve, under the *American Pipe* rule, to satisfy the three-year limitation in Section 13 of the Securities Act with respect to the claims of putative class members?" — directly implicates whether absent class members' claims would be timely here. Indeed, the Supreme Court agreed to hear the case on the basis of briefing (prepared by Dearborn's counsel in this case) that explicitly argued that the logic of the Second Circuit's decision in *Lehman* and the Supreme Court's decision in *Smith* would preclude certification of a class once the three-year statute of repose had run. Ex. 3-B at App. 266 (*CalPERS* Pet. Reply at 3 n.1).

This Court should therefore apply the majority rule and hold that *American Pipe* does not toll the statute of repose for the unnamed class members in this case, and that a Securities Act

class may not be certified after the three-year statute of repose has run, as it has here.  At a minimum, the Court should await guidance from the Supreme Court.

**B.      Neither plaintiffs nor aftermarket purchasers can trace their shares to the IPO.**

**1.      Plaintiffs lack standing to assert Section 11 claims.**

Plaintiffs do not have standing to pursue Section 11 claims under the Securities Act because they cannot trace their shares to the IPO registration statement.

Because Section 11 potentially imposes liability for even innocent misstatements in a registration statement, standing to pursue Section 11 claims is limited to the "narrow class of persons" that "acquir[ed]" securities issued pursuant to a challenged registration statement.  *Krim* v. *pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005); 15 U.S.C. § 77k(a).  To take advantage of this lower burden of proof, a plaintiff must therefore prove that he or she can "*trace the security for which damages are claimed to the specific registration statement at issue*."  *Krim*, 402 F.3d at 496 (emphasis added).  The "traceability" requirement is purposefully "difficult to meet" because it represents the "condition Congress has imposed for granting access to the 'relaxed liability requirements' § 11 affords."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (internal citation omitted); *see Krim*, 402 F.3d at 496.

The realities of modern securities markets, however, make it impossible to "trace" shares back to a particular offering once "a company has issued shares in multiple offerings under more than one registration statement."  *In re Century Aluminum*, 729 F.3d at 1107; *see also Krim*, 402 F.3d at 494-97.  Like most large companies, SCUSA's publicly traded shares are held in the Depository Trust Company ("DTC"), a stock clearinghouse, into which the shares are deposited and registered in the name of the DTC's nominee, Cede & Co.  *See* Ex. 6 at App. 982 (Allen Rpt. ¶ 122); *see generally Apache Corp.* v. *Chevedden*, 696 F. Supp. 2d 723, 725-27 (S.D. Tex. 2010).

Because shares at the DTC are held in a "fungible mass," it is "virtually impossible to differentiate" between shares issued under different registration statements. *Krim*, 402 F.3d at 498-99; Ex. 6 at App. 981, 983-84 (Allen Rpt. ¶¶ 118, 127).  As a result, federal courts routinely hold that plaintiffs who acquired their shares after non-offering shares have entered the so-called "street name certificate" at the DTC lack Section 11 standing. *See, e.g.*, *Krim*, 402 F.3d at 491-92; *Johnson* v. *CBD Energy Ltd.*, 2016 WL 3654657, at *5-6 (S.D. Tex. July 6, 2016) (no "hope of curing . . . standing issues" given "aftermarket intermingling" of "three groups of shares").

Under Fifth Circuit law, this is true regardless of the statistical likelihood that plaintiffs acquired at least some IPO shares.  In *Krim*, for example, the defendant issued shares of stock through an IPO and then, as here, issued a small number of non-IPO shares to insiders through a separate registration statement.  The shares issued under both registration statements were held by the DTC in the name of Cede & Co.  *Krim*, 402 F.3d at 492.  The Fifth Circuit held that the plaintiffs could not establish standing even though IPO shares comprised 99.85% of the pool of shares held by the DTC at the time the plaintiffs acquired their shares in aftermarket trading.  *Id.* Even though the likelihood that plaintiffs held IPO shares was close to 100%, the court concluded they lacked standing because the IPO and insider shares had "intermingled" once deposited in the DTC, and therefore the plaintiffs could not "trace the security for which damages [were] claimed to the specific registration statement at issue."  *Id.* at 492, 496-98.

Plaintiffs face the same problem here.  The IPO closed on January 23, 2014.  That same day, members of SCUSA's management exercised over 1.4 million options under SCUSA's 2011 Management Equity Plan.  Ex. 2 at App. 8-9 (Walsh Decl. ¶¶ 4-5); Ex. 2-A at App. 11.  The next day, SCUSA filed a registration statement regarding shares issued under the 2011 Management Equity Plan.  Ex. 3-C at App. 277-87.  Pursuant to that registration statement, management began selling these shares into the market, selling over 340,000 shares in the first day of trading alone.

Ex. 2 at App. 8-9 (Walsh Decl. ¶¶ 4-5); Ex. 2-A at App. 12-13.  By January 28, SCUSA's IPO

shares and the Management Equity Plan shares sold in the previous days were transferred to the

DTC in the name of Cede & Co., as shown below:[2]

**Capital Activity Details - Jan 28, 2014 - Jan 28, 2014**

| EFF-DATE | PROC-DATE | DEBIT FROM | CREDIT TO | SEQ-NUM | SHARES/UNITS | RUNNING TOTAL |
|---|---|---|---|---|---|---|
| 1/28/2014 | 1/28/2014 | R0000000019\|MANAGEMENT EQUITY PLAN, | Cede & Co | 2014002 | 137,991 | 85,723,183 |
| 1/28/2014 | 1/28/2014 | U0000000019\|UNALLOCATED\C | Cede & Co | IPO CLOSIN | 85,242,042 | 85,585,192 |
| 1/28/2014 | 1/28/2014 | R0000000019\|MANAGEMENT EQUITY PLAN, | Cede & Co | 2014001 | 343,150 | 343,150 |
| 1/28/2014 | 1/28/2014 | One Sided | U0000000019\|UNALLOCATED\C | IPO | 1,100,000,000 | 0 |
| 1/28/2014 | 1/28/2014 | U0000000019\|UNALLOCATED\C | Multiple Capital Accounts | IPO | 32,582,748 | 0 |
| | | OPENING BALANCE | | | 0 | 0 |

Ex. 5 at App. 914-15; Ex. 5-A at App. 917.

Although both Deka and Dearborn purportedly purchased SCUSA stock on January 23

(the day of SCUSA's IPO) at the IPO price, Section 11 provides a cause of action only to

investors who "acquir[ed]" securities issued pursuant to the challenged registration statement.  15

U.S.C. § 77k(a).  As the Fifth Circuit has explained, "[i]n limiting those who can sue to 'any

person acquiring such security,' Congress specifically conferred standing on a subset of security

owners."  *Krim*, 402 F.3d at 497. ████████████████████████████████████████

████████

████████████████████████████████████████████████████████████████

---

[2]    As reflected in the chart, employees sold 343,150 shares into the market on January 24, and sold another 137,991 shares on January 27.  Ex. 2 at App. 8-9 (Walsh Decl. ¶¶ 4-5); Ex. 2-A at App. 12-13; Ex. 3-C at App. 277-87; Ex. 6 at App. 930 (Allen Rpt. ¶ 13).

[3]    *Compare* Dkt. No. 22-1, Schedule A (identifying 4,518 shares that Dearborn claims to have purchased on January 23) *wit* ███████████████████████████████████████
████████████████████████████████████████ *Compare* Dkt. No. 19-2, Schedule A (identifying 551,000 shares that Deka claims to have purchased on January 23) *with* ████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

██████████[4] *See Acquire*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("[t]o gain possession or control of; to get or obtain").  By that time, IPO shares had been irretrievably commingled with non-IPO shares.  Even Dearborn's investment advisor agreed that there is no way for anyone who purchased shares on January 23 to know whether they obtained IPO shares ███ ██████████████████████ Ex. 3-F at App. 339 (Sansoterra Dep. Tr. at 69:20-70:2).

Accordingly, under Fifth Circuit law, plaintiffs cannot "trace the securit[ies] for which damages are claimed to the specific registration statement at issue" and cannot establish Section 11 standing.  *Krim*, 402 F.3d at 496.

### 2.   Aftermarket purchasers lack standing to assert Securities Act claims.

In any event, any class must exclude aftermarket purchasers — *i.e.*, anyone who bought their shares in the open market, beginning on the first day of trading.  For the reasons discussed above, aftermarket purchasers cannot demonstrate that they acquired shares pursuant to the registration statement for the IPO.  *See Krim*, 402 F.3d at 496-98.  All of those shareholders acquired shares after non-IPO shares entered the market and intermingled with the IPO shares at the DTC.  *Id*.  Aftermarket purchasers must also be excluded because the proposed Securities Act class includes a claim under Section 12 of the Securities Act.  *See* Pls.' Br. at 1, 7.  But Section 12 standing is limited to plaintiffs who purchased the securities at issue "directly from the defendants," *i.e.*, directly in the IPO.  *Freidus* v. *Barclays Bank PLC*, 734 F.3d 132, 141 (2d Cir. 2013).

---

[4]    A securities transaction is not complete until the settlement date, the date on which the shares are delivered to the buyer's account in exchange for payment.  *See Charles Schwab Corp.* v. *Comm'r of Internal Revenue*, 107 T.C. 282 (1996); *Kaiser Steel Corp.* v. *Charles Schwab & Co., Inc.*, 913 F.2d 846, 849 (10th Cir. 1990) ("Settlement is 'the completion of a securities transaction.'").  On that date, "the customer becomes the legal owner of any securities bought."  Charles P. Jones, INVESTMENTS: ANALYSIS AND MANAGEMENT 110 (11th ed. 2010).

### C.    Plaintiffs have not proven that common issues predominate.

A Securities Act class should not be certified for the further reason that issues common to the class do not "predominate" over individual issues. FED. R. CIV. P. 23(b)(3). This requirement is "far more demanding" than Rule 23(a) commonality because "it tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Steering Comm.*, 461 F.3d at 601-02. The court must therefore "consider how a trial on the merits would be conducted if a class were certified," *Sandwich Chef of Tex., Inc.* v. *Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218 (5th Cir. 2003), and whether individualized issues would arise not only in plaintiffs' *prima facie* liability case, but also from defenses and any damages phase. *Gene & Gene LLC* v. *BioPay LLC*, 541 F.3d 318, 327 (5th Cir. 2008); *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 303-08 (5th Cir. 2003). This searching analysis is essential to ensure that a class-wide trial will not "degenerat[e] into a series of individual trials." *Seeligson*, 2017 WL 68013, at *9.

Plaintiffs largely ignore their burden here. In a single paragraph, devoid of citation to any evidence, plaintiffs argue that predominance is "readily met" for the proposed Securities Act Class. Pls.' Br. at 19. But this is exactly the type of superficial approach to the issue that Judge Boyle found insufficient to certify a Securities Act class in *Kosmos*. 299 F.R.D. at 143, 151-52. As discussed below, trial of the named plaintiffs' claims would not resolve the putative class members' claims on a representative basis. Rather, it would leave a series of individual trials on each class member's knowledge of CCAR at the time of the IPO, notice of the alleged misstatements for limitations purposes, and Securities Act standing and damages.

### 1.    Investor knowledge regarding CCAR is an individualized issue.

Because proof of an investor's knowledge of an alleged misstatement is a defense to every Section 11 claim, class certification should be denied if investor knowledge "must be determined on an individualized basis as to each investor." *In re Superior Offshore Int'l, Inc.*

*Sec. Litig.*, 2010 WL 2305742, at *5 (S.D. Tex. June 8, 2010).  That is clearly the case here.

According to plaintiffs, all of the information needed to deduce that SCUSA might someday be

unable to pay a dividend "easily could have been ascertained since documents reflecting [such

information] were publicly available on the Federal Reserve's website" or in SEC filings.  Am.

Compl. ¶ 274.  But if, as plaintiffs assert, "abundant evidence of the dividend restrictions

imposed by the CCAR regulations and process" was publicly available prior to the IPO, *id.* ¶ 92,

it follows that any investor could have come to the same conclusion as plaintiffs have simply by

reviewing that public information.

     The prevalence of individualized issues concerning investor knowledge is particularly

pronounced here as the proposed class includes institutional investors who potentially would

have specialized knowledge of the CCAR regulatory process. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████Indeed, one of Dearborn's financial advisors testified that it closely

monitored the CCAR process and its potential impact on the companies in which it invested.  *See*

Ex. 3-F at App. 336 (Sansoterra Dep. Tr. at 58:17-60:24).

     The individualized nature of the knowledge inquiry is even more pronounced if

aftermarket purchasers are included in the class.  In that case, the four alleged corrective

disclosure dates "create at least [four] separate opportunities during the putative class period . . .

for potential class members to have acquired varying levels of knowledge" regarding the alleged

misstatements in the offering documents, a fact that should defeat any finding of predominance.

*In re Kosmos*, 299 F.R.D. at 153.

In short, plaintiffs' "own allegations show that prospective class members who acquired [SCUSA's] stock . . . may have had varying levels of knowledge." *Id*. at 154. Accordingly, under plaintiffs' theory, individual inquiries into investor knowledge of the CCAR process and its potential impact on SCUSA are inevitable because "[r]elevant information" concerning those matters "was available to potential investors before [SCUSA's] Registration Statement became effective." *In re Superior Offshore*, 2010 WL 2305742, at *5.

Plaintiffs, however, ignore this problem. Despite speculating that SCUSA could have easily ascertained the implications of CCAR based on public information, they fail to address whether the same might be true for putative class members, including the sophisticated institutional investors heavily invested in bank stocks. Plaintiffs present "zero evidence" that investor knowledge can be determined on a class-wide basis. *In re Kosmos*, 299 F.R.D. at 154. They have therefore failed to "satisf[y] their burden to demonstrate that [common] issues predominate over the knowledge issue — an issue that must be determined on an individualized basis as to each investor." *In re Superior Offshore*, 2010 WL 2305742, at *5.

### 2. Plaintiffs' invocation of the discovery rule and equitable tolling to avoid the statute of limitations creates individualized issues.

The "necessity for individualized statute-of-limitations determinations" further "weighs against class certification." *Waste Mgmt. Holdings, Inc.* v. *Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000). Each class member's Securities Act claims must have been filed within one year after he or she discovered, or should have discovered, the alleged untrue statement or omission. 15 U.S.C. § 77m; *Herm* v. *Stafford*, 663 F.2d 669, 679 (6th Cir. 1981). In their motions to dismiss, defendants argued that *all* putative class members' claims were time barred because they were on inquiry notice of the claims no later than June 12, 2014 (the date of the last alleged corrective disclosure). Dkt. No. 106 at 10-13. Plaintiffs responded that resolution of the limitations defense was premature because: (1) equitable estoppel was warranted; and (2) it was not clear that they

could reasonably have been expected to have discovered the facts critical to their Securities Act claims prior to October 30, 2014.  Dkt. No. 117 at 47-48, 53-54.

Given these arguments, one of two things must be true:  either the claims of all class members are barred by the statute of limitations (in which case this lawsuit should be dismissed) or individual class members will have to show that the statute of limitations was tolled (in which case the Court will need to conduct mini-trials).  Equitable estoppel and the discovery rule are inherently fact-intensive inquiries.  Among other things, they hinge on what each investor knew and when, an inquiry that becomes even more daunting given the varying levels of sophistication among the investors and the wide range of information that was available in the marketplace under plaintiffs' theory of the case.  *See, e.g.*, *Thorn* v. *Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 320 (4th Cir. 2006) ("[W]hether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it.").  Because limitations will be a central issue at any trial, it alone warrants denying certification.  *See, e.g.*, *Johnson* v. *Kansas City S. Ry. Co.*, 208 F. App'x 292, 296-97 (5th Cir. 2006) (denying certification where, among other things, individualized issues of statute of limitations predominated); *Henson* v. *Fid. Nat'l Fin. Inc.*, 300 F.R.D. 413, 421 (C.D. Cal. 2014) (applications of discovery rule, equitable tolling, and equitable estoppel were "fact-intensive and highly individualized," defeating predominance); *see also Broussard* v. *Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998).

### 3.    In this case, Section 11 standing and damages require individualized determinations.

As explained above, aftermarket purchasers do not have standing to bring Securities Act claims.  *Krim*, 402 F.3d at 495.  If, however, this Court concludes that individual aftermarket purchasers theoretically might be able to trace their shares to the IPO, that would just create a

different, insurmountable problem for plaintiffs on the predominance issue.  It is well established

that common proof of tracing is impossible for class members who purchased after non-IPO

shares entered the market.  As a result, the standing question would raise individualized issues.

*See, e.g.*, *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. 65, 118-19 (S.D.N.Y. 2004); *see also*

*In re Bank of Am. Corp. Sec., Deriv., & ERISA Litig.*, 281 F.R.D. 134, 147 (S.D.N.Y. 2012)

(holding that inclusion of aftermarket purchasers would create "tracing problems that necessitate

individualized inquiries and defeat the predominance requirement of Rule 23(b)(3)"); *Tsirekidze*

v. *Syntax-Brillian Corp.*, 2009 WL 2151838, at *7 (D. Ariz. July 17, 2009) (same).

Moreover, although plaintiffs note the existence of a statutory formula for calculating

Section 11 damages, they have provided no class-wide damages model and fail to offer any

evidence of how they could apply the statutory formula to avoid individualized inquiries.  Pls.'

Br. at 18.  This absence of proof sharply conflicts with the Supreme Court's decision in *Comcast*

*Corp.* v. *Behrend* requiring that plaintiffs offer proof at class certification that damages are

"capable of measurement on a classwide basis" in a manner consistent with their theory of

liability.  133 S. Ct. at 1433.  Merely citing the statutory formula does not allow the Court to

engage in the "rigorous analysis" required by *Comcast*, particularly in light of the complex

damages issues raised in this case.  *Id.*; *BP*, 800 F.3d at 683.

For instance, Section 11 damages are not available for shares sold at a profit.  15 U.S.C. §

77k(e).  Nor can investors recover damages in excess of the $24 IPO price.  *Id.*  And since only

offering shares are eligible for Securities Act damages, any purchaser in the IPO that later bought

and sold shares in the aftermarket would have to differentiate which IPO and non-IPO shares

were sold or held at which points in time.  This would entail a highly individualized review of

each investor's trading history.  Compounding matters, this case involves four separate alleged

corrective disclosures, mandating different damages calculations depending on when each

putative class member sold its stock.  Passing reference to the statutory formula does not explain how plaintiffs would account for these limitations, which preclude any calculation of damages on a class-wide basis.

*                    *                    *

In sum, no Securities Act class may be certified because certification of this action as a class action is barred by the three-year statute of repose, plaintiffs lack standing because they cannot trace their shares to SCUSA's IPO registration statement, and the issues common to the class do not predominate over individual issues.

## III.    The proposed Exchange Act class cannot be certified.

Plaintiffs also seek to certify an "Exchange Act Class" consisting of "persons who purchased or otherwise acquired SCUSA common stock between January 23, 2014 and June 12, 2014, inclusive . . ., and were damaged thereby" to pursue fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act.  *See* Pls.' Br. at 1, 7; Am. Compl. ¶¶ 333-49.  This class cannot be certified because plaintiffs have not proven that common questions "predominate over" individual issues.  FED. R. CIV. P. 23(b)(3).

### A.    Individualized issues of reliance predominate.

To recover on their Exchange Act claims, plaintiffs must prove that they relied on the alleged misstatements or omissions.  That is an inherently individualized question that precludes certification unless plaintiffs can take advantage of the "rebuttable presumption" of class-wide reliance under the "fraud-on-the-market" theory.  *See Basic Inc.* v. *Levinson*, 485 U.S. 224, 242 (1988).  The basis of this theory is that in an efficient, well-developed market, all public information about a company is reflected in its stock price, and that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of [the market] price."  *Id.* at 244-45, 247.  To benefit from the presumption, plaintiffs must therefore prove that

SCUSA's stock traded in an efficient market throughout the proposed class period.  If they cannot meet their burden, the Exchange Act class cannot be certified.  Defendants can also rebut the presumption at the certification stage through "*any* showing" that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2414-17 (2014) ("*Halliburton II*"). "In the absence of price impact, [the] fraud-on-the-market theory and presumption of reliance collapse." *Id.* at 2414.

Here, plaintiffs have not shown class-wide reliance because they have not offered reliable evidence of market efficiency throughout the class period, and defendants' evidence demonstrates that the alleged misrepresentations had no price impact.

### 1. Plaintiffs cannot invoke the fraud-on-the-market presumption because they have not shown an efficient market.

To invoke the fraud-on-the-market presumption of reliance, plaintiffs bear the burden of presenting "adequate admissible evidence" demonstrating that SCUSA's stock traded in an efficient market throughout the proposed class period.  *Bell* v. *Ascendant Sols., Inc.*, 422 F.3d 307, 312-13, 316 (5th Cir. 2005).  Courts apply a series of well-known factors to gauge whether a security trades in an efficient market, including the number of analysts covering a stock and the cause-and-effect relationship between company news and stock price reactions, among others. *See Unger* v. *Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005); *Barrie* v. *Intervoice-Brite, Inc.*, 2009 WL 3424614, at *9-13 (N.D. Tex. Oct. 26, 2009).

Plaintiffs' only evidence supporting market efficiency is the report of their expert, Frank Torchio, who has opined that "the market for SCUSA's common stock was informationally efficient during the Class Period."  Pls.' App. at 103 (Torchio Rpt. ¶ 1).  Torchio bases his conclusions, in part, on his experience as an expert.  But one federal court has found Torchio's testimony — offered to support a fraud-on-the-market theory — to be "*both* so facially

unreliable as to be inadmissible under Fed. R. Evid. 702 and so plainly irrelevant as to be

inadmissible under Fed. R. Evid. 401." *DeMarco* v. *Lehman Bros., Inc.*, 222 F.R.D. 243, 249

(S.D.N.Y. 2004).  The court found that Torchio's opinion "[i]n no way . . . survive[d] the

'rigorous analysis' . . . required for class certification," and it described his approach as

"irrelevant on its face," "transparently unreliable," and "appear[ing] to be based on no

methodology whatsoever."  *Id.* at 248-49.  More recently, another federal court rejected

Torchio's evaluation of market efficiency as to a company's debt securities, concluding that

Torchio's analysis contained "internal inconsistencies" and that he failed to show that his

methodology was "soundly supported by academic authority" or that he used "a generally

accepted approach."  *Loritz* v. *Exide Techs.*, 2015 WL 6790247, at *20 (C.D. Cal. July 21, 2015).

     While Torchio purports to apply the factors for market efficiency in this case, his analysis

suffers the same flaws as his analyses in *DeMarco* and *Loritz*.  As discussed below and in the

report of defendants' expert, Lucy Allen, who previously served as an Economist for the Council

of Economic Advisors to Presidents Bush and Clinton, Ex. 6 at App. 927 (Allen Rpt. ¶ 10), the

analysis put forward in Torchio's expert report is unscientific, unsupported, and unreliable.

## The IPO Market

     Torchio's report creates the impression that his market efficiency opinion covers the full

period of the proposed Exchange Act class.  *See* Pls.' App. at 103 (Torchio Rpt. ¶ 1).  The report

states, without equivocation, that "the market for SCUSA's common stock was informationally

efficient during the Class Period."  Pls.' App. at 103 (Torchio Rpt. ¶ 1).  But when asked whether

"the people who bought SCUSA's stock in the IPO bought in an efficient market," Torchio said

"no."  In fact, he believes that SCUSA's IPO was "underpriced."  Ex. 3-H at App. 406 (Torchio

Dep. Tr. at 102:1-15).  That SCUSA's IPO was "underpriced" is demonstrated by the fact that

the stock initiated trading on the NYSE at $25.75, a more than 7% premium over the $24 IPO price.  Ex. 6 at App. 936 (Allen Rpt. ¶ 20).

Torchio nowhere mentions this limitation in his report, a glaring omission given that excluding direct IPO purchasers cuts the proposed Exchange Act class in half.  *See* Ex. 6 at App. 938 (Allen Rpt. ¶ 26).  Torchio's admissions aside, courts routinely hold that IPO markets are inefficient as a matter of law and exclude IPO purchasers from Section 10(b) classes as a result. *E.g.*, *In re Initial Pub. Offering Sec. Litig.* ("*In re IPO*"), 471 F.3d 24, 42 (2d Cir. 2006); *Freeman* v. *Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990).  This is because a "primary market for newly issued securities is not efficient or developed under any definition of these terms."  *In re IPO*, 471 F.3d at 42 (alterations omitted).

## The Quiet Period

Following the IPO, SCUSA entered an SEC-imposed "quiet period" from the beginning of the proposed class period through March 3, 2014.  During a quiet period, the SEC prohibits an IPO issuer and securities analysts employed at firms associated with the IPO from publicly disclosing certain information about the company.  *See* 17 C.F.R. §§ 230.174(d), 242.101(b)(1). The SEC has maintained these restrictions because of "[d]oubts . . . about whether, immediately after the completion of an initial public offering, information concerning the issuer will have been disseminated as broadly as information relating to comparable companies having a reporting history under the Exchange Act."  *Prospectus Delivery for Aftermarket Transactions*, Securities Act Release No. 6763, Exchange Act Release No. 25546, 53 Fed. Reg. 11841, 1988 WL 237444, at *3 (Apr. 4, 1988).

Courts have thus recognized that the SEC-mandated quiet period is uniquely ill-suited to a finding of market efficiency for purposes of the fraud-on-the-market theory and the presumption of reliance.  *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556, 577-

79 (S.D.N.Y. 2008); *see In re IPO*, 471 F.3d at 42-43.  In *In re SCOR Holding*, for example, the court found that the quiet period restrictions reflect "the opinion of the SEC" that "the market in a new security has likely not yet become efficient as that term is understood in the fraud-on-the-market context—*i.e.*, such a market does not yet reflect all publicly available information."  537 F. Supp. 2d at 577 (quotation marks and alterations omitted).  Faced with a proposed Exchange Act class that began the day of a stock's IPO, the district court concluded that "at least a rebuttable presumption" of market *inefficiency* was appropriate until the end of the quiet period. *Id.* at 575.  The court excluded quiet period purchasers from the proposed class after finding that, during this period, only one analyst covered the stock, the company could not file a Form S-3, and there was no evidence of market makers or market reaction to new information.  *Id.* at 578-79.

Notwithstanding the recognition that markets in the period immediately following an IPO are presumptively inefficient, Torchio never bothered to conduct a separate analysis of market efficiency for SCUSA's 40-day quiet period.  He essentially glossed over the issue by stating that he "didn't see anything that bothered" him after eyeballing SCUSA's "put-call parity," "short interests" and "bid-asks" during the quiet period, and didn't find it necessary to "do any analysis on any particular day or any particular . . . segment of the class period."  Ex. 3-H at App. 406, 408, 418 (Torchio Dep. Tr. at 103:1-16; 111:3-11; 149:18-24).

This cursory approach does not come close to rebutting the presumption of inefficiency during the quiet period.  As Allen explains, throughout Torchio's report, he improperly relies on class period-wide averages that create the appearance of an efficient market where none exists. Ex. 6 at App. 943-44 (Allen Rpt. ¶¶ 37, 39, 40).  For example, Torchio notes that an average of ten securities analysts covered SCUSA during the class period.  True enough.  But the relevant fact is that only *one* analyst covered SCUSA during the quiet period. Pls.' App. at 113 (Torchio

Rpt. ¶ 33).  Courts have routinely concluded, and Torchio agrees, that coverage by a single

analyst does not support market efficiency.  Ex. 3-H at App. 418 (Torchio Dep. Tr. at 149:7-14);

*e.g.*, *Petrie* v. *Elec. Game Card, Inc.*, 308 F.R.D. 336, 351 (C.D. Cal. 2015); *Krogman* v. *Sterritt*,

202 F.R.D. 467, 475 (N.D. Tex. 2001).

 Similarly, Torchio uses a class-period-wide average of SCUSA's weekly trading volume

that obscures the substantial divide between the quiet period and the rest of the proposed class

period.  While Torchio concludes that SCUSA's 2% average weekly trading volume over the

whole class period supported efficiency, Pls.' App. at 111 (Torchio Rpt. ¶ 27), this figure drops

to 1.4% when limited to the quiet period, Ex. 6 at App. 944 (Allen Rpt. ¶ 40).  And even this

1.4% figure is skewed by SCUSA's abnormally high trading volume in the days immediately

following its IPO.  *See* Pls.' App. at 158 (Torchio Rpt., Ex. 3); *In re SCOR Holding*, 537 F. Supp.

2d at 578.  When the first week after SCUSA's IPO is excluded, SCUSA's average weekly

trading volume falls to 0.98%, below the 1% minimum threshold required to support market

efficiency.  Ex. 6 at App. 944 (Allen Rpt. ¶ 40); Ex. 3-H at App. 408 (Torchio Dep. Tr. at 110:2-

23); *see Cammer* v. *Bloom*, 711 F. Supp. 1264, 1286 (D.N.J. 1989).  For two weeks within the

quiet period, the average weekly trading volume was 0.7% and 0.5%, respectively, well below

the 1% threshold.  Ex. 3-H at App. 408-09 (Torchio Dep. Tr. at 112:24-113:14).  Yet Torchio

again apparently was not "bothered" by the discrepancy.[5]

 Torchio's own reverse event study also confirms that SCUSA's stock did not trade in an

efficient market within the quiet period.  Torchio identified five statistically significant price

movements in that period, but conceded that he had identified no company-specific news that

---

[5] Torchio's lack of interest in confirming that the market for SCUSA's stock was efficient
*throughout* the class period is confirmed by his concession that his calculations of SCUSA's
short interest ratio and put-call parity do not include any data for large portions of the quiet
period. Ex. 3-H at App. 472-73 (Torchio Dep. Tr. at 368:1-17, 370:24-371:7).

could explain those movements for three of them.  Ex. 3-H at App. 442 (Torchio Dep. Tr. at 246:18-247:22).  Torchio admitted that finding potential news to explain 50% of statistically significant price movements would not weigh much in favor of market efficiency.  Ex. 3-H at App. 450 (Torchio Dep. Tr. at 279:18-280:10).  But his reverse event study did not even meet that threshold.

And when one takes a closer look at his analysis, Torchio could not explain the statistically significant price movements on *any* of the five days, a batting average of zero for the quiet period.  *See* Ex. 3-H at App. 446-48 (Torchio Dep. Tr. at 263:17-271:14).  The only "news" that Torchio identified to explain the January 23 price movement was a non-binding letter of intent for a financing deal between SCUSA and the U.S. branch of luxury Italian sports car manufacturer Maserati.  Ex. 6 at App. 942 (Allen Rpt. ¶ 34(a)).  On its face, it is implausible that the announcement of a non-binding letter of intent with Maserati could have caused SCUSA's 5% stock price increase above the IPO price on January 23.  But this explanation becomes absurd when one looks at SCUSA's intraday stock prices, which show that SCUSA's stock price reached its peak of $26.50 before the Maserati announcement was made at 10:00 a.m.  Ex. 6 at App. 942 (Allen Rpt. ¶ 34(a)).[6]

The lack of any company-specific news to explain any of the statistically significant results is fully consistent with Torchio's event studies of earnings announcements and the alleged

---

[6]     Torchio's further hypothesis that the appointment of former FDIC chairman Sheila Bair to the board of Banco Santander (SCUSA's ultimate parent), which is based in Spain, could possibly explain SCUSA's 2.44% price increase on January 27 similarly lacks credibility.  This news was released at 10:38 a.m., yet SCUSA's stock price did not start increasing until the afternoon.  Moreover, the news does not appear to have had any impact on Banco Santander's stock price, which *declined* 1.04% on January 27.  Ex. 6 at App. 942 (Allen Rpt. ¶ 34(b)).

corrective disclosures.  Neither test includes any dates within the quiet period.  *See* Pls.' App. at 127, 182 (Torchio Rpt. ¶ 77 & Ex. 6).[7]

In sum, here, as in *In re SCOR Holding*, during the quiet period, only one analyst covered SCUSA stock, the company could not file a Form S-3, and there is no evidence that the market reacted to new information.  Torchio's analysis has not come close to showing that the market was efficient during the quiet period, much less rebutting the presumption of *inefficiency* that applies to that period.  *See In re SCOR Holding*, 537 F. Supp. 2d at 575-79.

### The Remainder of the Class Period

Beyond the tests that affirmatively disprove market efficiency in the IPO or during the quiet period, Torchio's report contains numerous flaws and inconsistencies that render his entire market efficiency opinion unreliable, unscientific, and subject to exclusion.  *See Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *DeMarco*, 222 F.R.D. at 249.  In light of these flaws, plaintiffs have failed to meet their affirmative burden to establish that Torchio's testimony satisfies the *Daubert* standard by a preponderance of the evidence.  *United States* v. *Fullwood*, 342 F.3d 409, 412 (5th Cir. 2003).  As described more fully in Allen's report, these deficiencies include the following:

- In assessing average weekly trading volume, analyst coverage, and several other market efficiency factors identified in *Unger* and other cases, Torchio compares SCUSA to the "NYSE/Nasdaq Universe," even though SCUSA traded exclusively on the New York Stock Exchange.  When SCUSA is compared to the NYSE Universe, SCUSA's percentile ranking drops substantially for several of Torchio's tests.  Pls.'

---

[7]   Several of the remaining factors do not support efficiency during the quiet period or for any portion of the proposed class period.  SCUSA was at all relevant times *ineligible* to file SEC Form S-3.  Ex. 3-H at App. 417 (Torchio Dep. Tr. at 145:8-21); Ex. 6 at App. 945-46, 960-61 (Allen Rpt. ¶¶ 42-43, 75); *see Barrie*, 2009 WL 3424614, at *11.  The number of market makers for stocks that trade on the NYSE is irrelevant.  Pls.' App. at 116 (Torchio Rpt. ¶ 44); *see Barrie*, 2009 WL 3424614, at *10; *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 210 (E.D. Pa. 2008).  Torchio also conceded that SCUSA's public float of only 25% of shares outstanding does not support market efficiency.  Pls.' App. at 138 (Torchio Rpt. ¶ 115); *see* Ex. 6 at App. 960 (Allen Rpt. ¶ 74).

App. at 103, 111-12 (Torchio Rpt. ¶¶ 1, 28); Ex. 3-H at App. 409 (Torchio Dep. Tr. at 114:13-17); Ex. 6 at App. 950-51 (Allen Rpt. ¶ 55).

- The 16th percentile threshold Torchio used to analyze these same factors assumes that the "NYSE/Nasdaq Universe" has a normal distribution curve even though he conducted no tests to support that assumption. As shown in Allen's report, Torchio's assumption is wrong. The actual distribution of stocks in the NYSE/Nasdaq Universe is heavily skewed to one side. Pls.' App. at 111-12 (Torchio Rpt. ¶ 28); Ex. 3-H at App. 412 (Torchio Dep. Tr. at 125:17-128:4); Ex. 6 at App. 948-50 (Allen Rpt. ¶¶ 52-54).

- To conduct four out of five of his tests for the cause-and-effect market efficiency factor (which courts consider to be the most important of the market efficiency factors), Torchio created and used an industry index for his market model that excluded SCUSA's actual competitors and included only three handpicked companies — all automobile manufacturers. SCUSA is not an automobile manufacturer, it is a consumer finance company, and some of its competitors are public companies. Torchio just didn't use any competitors for his "industry index." As Torchio himself acknowledged, his handpicked index was not statistically significant. Pls.' App. at 202-03 (Torchio Rpt., App. B ¶¶ 17-18); Ex. 3-H at App. 427-28 (Torchio Dep. Tr. at 185:18-191:9); Ex. 6 at App. 956-57 (Allen Rpt. ¶ 66(e)-(f)).

- The validity of Torchio's "reverse event study," one of his tests for the cause-and-effect market efficiency factor, hinges on an article that did not even purport to draw any conclusions about market efficiency or endorse the test that Torchio conducted here. Moreover, the article's conclusions were based on stock data from the London Stock Exchange in the mid-1990s. At his deposition, Torchio could not point to any evidence that such data has any application to stocks that trade on the NYSE today. Torchio's "reverse event study" has no scientific basis and he takes the article's conclusions, which are irrelevant to market efficiency, entirely out of context. Ex. 3-H at App. 443-44 (Torchio Dep. Tr. at 251:4-254:21); Ex. 6 at App. 953-54 (Allen Rpt. ¶¶ 61-62).

- In each of the court decisions that Torchio cites in support of his reverse event study, the reverse event study was merely a supplement to a news vs. non-news test.[8] Although he has done so in other cases, Torchio did not perform a news vs. non-news test in this case. Ex. 6 at App. 954 (Allen Rpt. ¶ 63). At least one court has found a reverse event study unreliable and excludable under *Daubert* where not used to supplement a reliable news vs. non-news test. *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *12 (N.D. Cal. Apr. 21, 2016).

---

[8]    A news vs. non-news test compares the proportion of statistically significant stock price reactions on "news days" to the proportion on "non-news days." If the proportion is higher on "news days," that would provide evidence of a cause-and-effect relationship between company-specific news and stock price reactions. Ex. 6 at App. 958 (Allen Rpt. ¶ 69). If Torchio had performed a news vs. non-news test in this case, SCUSA's stock would have failed the test. Ex. 6 at App. 958-60 (Allen Rpt. ¶¶ 70-72).

- He concluded that his earnings release event study supported market efficiency during the class period even though the only two events within the class period lacked any statistically significant price movement.  Torchio claimed that this provided meaningful information about the class period, even though, in a prior report, Torchio stated unequivocally that events lacking statistical significance provide no meaningful economic evidence.  *See* Pls.' App. at 123 (Torchio Rpt. ¶ 63); Ex. 3-H at App. 437-39 (Torchio Dep. Tr. at 228:5-20, 231:14-235:20); Ex. 6 at App. 952 (Allen Rpt. ¶ 59).

When these defects, among others discussed in Allen's report, are considered in combination, Torchio's market efficiency opinion is unreliable and should be excluded in its entirety, and in any event, does not support a finding of market efficiency.  *See Daubert*, 509 U.S. at 589; *DeMarco*, 222 F.R.D. at 249 (excluding Torchio's opinion as unreliable and denying class certification).  Plaintiffs have not come forward with "adequate admissible evidence" to support market efficiency during the class period.  *Bell*, 422 F.3d at 3136.

> **2.      Plaintiffs cannot invoke the fraud-on-the-market presumption because the alleged misrepresentations did not impact SCUSA's stock price.**

Even where there is an efficient market, the fraud-on-the-market presumption can be rebutted at class certification with "appropriate evidence" that "the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock."  *Halliburton II*, 134 S. Ct. at 2414-17.  "*Any* showing that severs the link between the alleged misrepresentation" and the price paid by the plaintiff is sufficient.  *Id.* at 2415-16 (quoting *Basic*, 485 U.S. at 248) (emphasis added).  Defendants need not prove conclusively that there was no price impact to defeat class certification; rather, the fraud-on-the-market presumption operates under Federal Rule of Evidence 301, which controls presumptions "[i]n a civil case, unless a federal statute or the[] rules provide otherwise."  FED. R. EVID. 301; *IBEW Local 98 Pension Fund* v. *Best Buy Co., Inc.*, 818 F.3d 775, 782-83 (8th Cir. 2016) (applying Rule 301 and denying certification of securities class action after defendants rebutted the fraud-on-the-market presumption).  Under Rule 301, defendants may rebut the presumption by producing evidence sufficient to create a question of

fact at summary judgment or withstand a motion for judgment as a matter of law.  *City of Arlington* v. *F.C.C.*, 668 F.3d 229, 256 (5th Cir. 2012).[9]

The Exchange Act class cannot be certified here because none of the alleged dividend or compliance misrepresentations had an impact on SCUSA's stock price.  *See* Ex. 6 at App. 926, 961-80 (Allen Rpt. ¶¶ 5-7; 76-116).  Plaintiffs' core contention is that SCUSA's stock traded at an artificially inflated price during the class period because SCUSA failed to disclose that it would not be able to issue dividends unless and until SHUSA passed the CCAR stress test.  *E.g.*, Am. Compl. ¶¶ 96, 104.

But any argument that there was price impact from the alleged fraud is fundamentally inconsistent with plaintiffs' theory of fraud.  Plaintiffs claimed that "abundant evidence of the dividend restrictions imposed by the CCAR regulations and process" was "publicly available" and that the "plain meaning" of the CCAR regulations "clear[ly]" prohibited SCUSA from paying a dividend unless the Fed issued a notice of non-objection to SHUSA's capital plan.  *See* Am. Compl. ¶¶ 92, 219; Dkt. No. 117 at 2.  But in an efficient market, all of this publicly available information would have been reflected in SCUSA's stock price after the start of public trading.  Torchio himself agreed, explaining that if the CCAR regulations clearly prohibited SCUSA from paying a dividend, as plaintiffs contend, then that information "would have been" reflected in the market.  Ex. 3-H at App. 457-58 (Torchio Dep. Tr. at 308:11-309:12).  Yet SCUSA's stock traded at or above the $24 IPO price for two full months, including for two weeks after the quiet period ended.  The entire premise of plaintiffs' fraud case is thus inconsistent with the fraud-on-the-market theory.  *See Best Buy*, 818 F.3d at 782 ("common

---

[9]   On remand from *Halliburton II*, the district court, in dicta, declined to apply Rule 301 out of an apparent concern that a plaintiff would not have an opportunity to produce a rebuttal expert on price impact.  *See Erica P. John Fund, Inc.* v. *Halliburton Co.*, 309 F.R.D. 251, 258-60 (N.D. Tex. 2015).  That concern is not relevant here.

sense" that "statements add[ing] nothing to what was already public" had no price impact); *see also Greenberg* v. *Crossroads Sys., Inc.*, 364 F.3d 657, 663-66 (5th Cir. 2004) ("information already known to the market," "will not cause a change in stock price" and "cannot be the basis for a fraud-on-the-market claim").

Nonetheless, plaintiffs contend that the "truth" regarding SCUSA's dividend and compliance systems was revealed when SCUSA made four allegedly "corrective" disclosures in May and June 2014, months after the IPO. But those disclosures only confirm that the alleged misstatements had no impact on SCUSA's stock price.

### May 15, 2014

On May 15, in its Form 10-Q, SCUSA reiterated that SHUSA had failed the CCAR test and further disclosed that the Fed had "the authority to prohibit or limit the payment of dividends [by SCUSA]." Ex. 3-I at App. 508, 547 (May 15, 2014 10-Q at 31, 70).[10] SCUSA also disclosed that (1) SHUSA had "to receive a notice of non-objection to [its capital plan] from the Federal Reserve before taking capital actions, such as paying dividends," and (2) this "could have a negative impact on SCUSA." *Id.* This is the precise risk that plaintiffs allege should have been disclosed at the time of the IPO. Plaintiffs even point to the fact that the offering documents "contained no such disclosure about stress tests, the Federal Reserve's power to prohibit or limit dividend payments or the need to receive a notice of non-objection to the capital plan before paying dividends, even though those requirements existed at the time of the IPO." Am. Compl. ¶¶ 117-19.

But in response to the May 15 "corrective disclosure," SCUSA's stock declined just 32 cents. Plaintiffs' expert concedes that this decline was not statistically significant. *See* Pls.' App.

---

[10]   On March 26, 2014, both the Fed and SHUSA disclosed that SHUSA had failed the stress test. Am. Compl. ¶ 13; Ex. 3-Z at App. 866-69. That day, SCUSA's stock price declined two cents. *See* Pls.' App. at 223.

at 129 (Torchio Rpt. ¶ 82).  And defendants' expert agrees.  Ex. 6 at App. 963-65 (Allen Rpt. ¶¶ 79-84).  This conclusion should be fatal to plaintiffs' case.  On May 15, SCUSA disclosed all of the information concerning potential CCAR-related dividend restrictions that could have been included in the offering documents.  And it further disclosed that SHUSA had failed the stress test, which plaintiffs contend made it "*crystal clear* that SCUSA could not pay dividends."  Am. Compl. ¶ 13 (emphasis added).  Yet there was no impact on the price of SCUSA's shares.[11]

The lack of any meaningful reaction is fully consistent with economic theory, which posits that dividends do not matter to valuation.  *See, e.g.*, Merton H. Miller & Franco Modigliani, *Dividend Policy, Growth and the Valuation of Shares*, 34 J. BUS. 411-33 (1961); Richard A. Brealey, et al., PRINCIPLES OF CORPORATE FINANCE, 395-99 (10th ed. 2011).  That is because a company's value — reflected in its stock price in an efficient market — is based on the present value of future cash flows, which do not include dividend payments, as plaintiffs' expert conceded.  *See* Ex. 3-H at App. 397 (Torchio Dep. Tr. at 65:2-8); Ex. 6 at App. 964-65 (Allen Rpt. ¶¶ 83-84).[12]

---

[11]   Plaintiffs cannot avoid the import of the May 15 disclosure by characterizing their claim in terms of a "current restriction" on dividends at the time of the IPO.  Under plaintiffs' interpretation of the CCAR regulations, SCUSA was prohibited from issuing dividends unless and until the Fed issued a non-objection to SHUSA's capital plan.  *E.g.*, Am. Compl. ¶¶ 96, 98, 203.  This is just a different way of saying that SCUSA would not be able to issue its planned dividend if SHUSA failed the stress test.  SCUSA's disclosure on May 15 that SHUSA *had* failed the stress test and that the Fed *could* prohibit it from paying dividends was a disclosure of the exact risk that plaintiffs contend should have been included in the offering documents.

[12]   Free cash flow is calculated by taking profit after tax, adding depreciation, and then subtracting investment in fixed assets and working capital.  PRINCIPLES OF CORPORATE FINANCE, at 477-78; *see* Ex. 3-H at App. 397 (Torchio Dep. Tr. at 65:19-68:9).  Dividends are not part of that calculus, as Torchio admitted.  Although a company's decision whether to pay dividends may implicate future cash flows to the extent the decision *signals* the company's expectations of future sales and future costs, in an efficient market the *level* of a dividend should be irrelevant to investors.  PRINCIPLES OF CORPORATE FINANCE, at 395-99; *see* Ex. 3-H at App. 398-99 (Torchio Dep. Tr. at 71:11-73:23).

**May 29, 2014**

Although the risk of non-payment of dividends was disclosed on May 15, plaintiffs contend that SCUSA's further disclosures on May 29 were also "corrective."  On that day, SCUSA disclosed that the Fed had taken the further step of restricting its ability to pay dividends and that, as a result, it "d[id] not expect to pay dividends during the remainder of 2014," and would not resume paying dividends until "permitted to do so by the Federal Reserve."  Ex. 3-J at App. 676 (May 29, 2014 8-K).  SCUSA also disclosed that it "expects to incur higher costs than originally anticipated in connection with compliance with, and assisting SHUSA in, the CCAR process."  *Id.*  Quite clearly, these events happened months after the IPO and thus were not in any way "corrective" of the IPO offering documents.  Ex. 6 at App. 965-67 (Allen Rpt. ¶¶ 85-90).

Moreover, as the analyst community recognized, the 96-cent stock price decline on May 29 was caused not by investor concern about receiving dividends, but by the implication that SCUSA was coming under increasing regulation by the Fed, which could hurt SCUSA's growth prospects.  Ex. 6 at App. 965-75 (Allen Rpt. ¶¶ 85-91, 95-106).  Bank of America noted that the stock "was off about 5%" because news of the Fed's regulatory actions created uncertainty surrounding "the possible impact to [the Company's] operations, growth and financial results."  Ex. 3-K at App. 679.  Goldman Sachs likewise reported that "most investors perceived SC as a non-bank that was somewhat insulated from Fed regulatory risk," but that the dividend announcement "has changed that perception and . . . the Fed could potentially impose limitations on its growth moving forward."  Ex. 3-L at App. 688-89.  Indeed, as Torchio himself conceded, the dividend suspension was just a "signal" that "SCUSA is going to be treated as a bank subsidiary as opposed to a non-bank subsidiary," which "could be a harbinger for other restrictions on SCUSA's business activity."  Ex. 3-H at App. 459 (Torchio Dep. Tr. 315:4-316:17); *see also* Ex. 3-H at App. 399-400, 461-62 (Torchio Dep. Tr. at 76:10-77:4, 324:25-

325:24).  In other words, "the dividend cut . . . gave the market the indication about lower growth

expectation."  Ex. 3-H at App. 464 (Torchio Dep. Tr. at 333:16-20).

As for additional CCAR compliance costs, there was nothing corrective about those

disclosures either.  The IPO offering documents did not say anything about CCAR compliance

costs or provide any assurance that compliance costs generally would never go up.  To the

contrary, SCUSA cautioned investors that it was subject to potential oversight by the Fed, and

that "costs of compliance" could increase "with increased regulation."  Ex. 3-A at App. 42

(Prospectus at 13); *see* Ex. 6 at App. 969-73 (Allen Rpt. ¶¶ 95-100).  In any event, the

incremental compliance costs were not meaningful.  UBS, for example, estimated that these costs

would potentially reduce annual earnings by *only three cents a share*.  Ex. 3-M at App. 691.  And

even that estimate was too high, as SCUSA's later disclosures suggested that expected

incremental compliance costs would have an earnings impact of less than two cents per share —

less than 1% of its annual earnings per share.  Ex. 3-N at App. 699 (June 12, 2014 8-K); Ex. 3-X

at App. 845 (Q4 2014 Earnings Release); Ex. 6 at App. 978 (Allen Rpt. ¶ 111).

In less than two weeks, SCUSA's stock price more than recovered from the 96 cent

decline, closing at $21.05 on June 10, up from $19.76 on May 29, further rebutting any inference

of price impact.  Ex. 6 at App. 975 (Allen Rpt. ¶ 106).  Torchio ignores this rebound and seeks to

analyze the two alleged corrective disclosures that bookend this period (May 29 and June 11) in

isolation.  *See* Pls.' App. at 129-33 (Torchio Rpt. ¶¶ 84-96).  That approach is inconsistent with

his testimony, his report in this case, and his prior reports in other cases.  Ex. 6 at App. 979-80

(Allen Rpt. ¶¶ 113-16).  According to Torchio, new information from analysts concerning the

Fed action was entering the market from May 29 to June 11.  Pls.' App. at 130 (Torchio Rpt. ¶

85).  Torchio claims that "where there are numerous follow-up stories, the difficult-to-analyze

situations that are very important to a company . . . can take a number of days to impound into

the stock price." Ex. 3-H at App. 395 (Torchio Dep. Tr. at 60:20-25).  To account for this,

Torchio has in prior cases tested the statistical significance of the cumulative stock decline during

the entire period in which allegedly corrective news is entering the market.  Ex. 6 at App. 979-80

(Allen Rpt. ¶ 116).  Had he done so here, he would have found that the cumulative decline

between May 29 and June 12 was not statistically significant.  *Id.*

### June 11, 2014

After the May 15 and May 29 disclosures, SCUSA had already told investors that:  (1) the

Fed could restrict its dividend payment, (2) SHUSA had failed the CCAR stress test, (3) the Fed

had determined that SCUSA could no longer pay a dividend, and (4) SCUSA would incur

materially higher compliance costs in connection with the CCAR process.  Plaintiffs nonetheless

seek to recover for stock declines following two additional alleged corrective disclosures, one on

June 11 and the other on June 12.  As detailed in Allen's report, neither had anything to do with

dividends, both included new adverse information not available at the time of the IPO, and

Torchio concedes the June 12 disclosure was not even statistically significant.  Ex. 6 at App. 976-

78 (Allen Rpt. ¶¶ 107-12); Pls.' App. at 133 (Torchio Rpt. ¶ 96).

At an investor conference on June 11, SCUSA's CEO, Tom Dundon, discussed SCUSA's

business climate generally and provided his perspective on SCUSA's growth prospects and the

changing regulatory environment.  He disclosed that SCUSA was facing a more difficult and

competitive environment and a decrease in loan originations.  Ex. 3-N at App. 703.  In addition,

he explained that "what we have learned in the CCAR process is as a subsidiary we are going to

be treated like a bank," which would impact SCUSA's business by, among other things, "shifting

some of the mix from net interest margin to fee income, limiting the size of the balance sheet in

exchange for more fee income and less risk on the balance sheet."  *Id*. at App. 705.  And he

elaborated that "given the regulatory environment we can't expand."  *Id*. at App. 706.  The next

day, SCUSA quantified the revised business outlook, lowering projected earnings growth from 10% to 2%-3%, and also quantified the expected costs of the additional compliance personnel previously disclosed on May 29.  *Id.* at App. 699.  According to Torchio, the market anticipated this additional quantification, which was reflected in the June 11 stock decline.  Ex. 3-H at App. 470-71 (Torchio Dep. Tr. at 359:24-361:4).

On June 11, SCUSA's stock declined $1.80.  That drop was a direct response to management's more pessimistic outlook for the business and its earnings potential.  Ex. 6 at App. 976-78 (Allen Rpt. ¶¶ 107-11).  Analysts at the time recognized that the outlook for earnings growth was less optimistic.  *Id.*; Pls.' App. at 352.  JPMorgan, for example, reported that "a combination of regulatory uncertainty and competitive pressures may reduce earnings growth rates."  Ex. 3-Y at App. 860.  And Dearborn's own investment advisor attributed the price decline to the regulatory repercussions of SHUSA's stress test failure, which "made the ability to hit earnings riskier than it was originally thought."  Ex. 3-F at App. 350 (Sansoterra Dep. Tr. at 113:18-114:11).  As Torchio explained, SCUSA disclosed changes to its business that confirmed that it would be treated more like a bank, which required it to negatively revise its growth expectations.  Ex. 3-H at App. 466 (Torchio Dep. Tr. at 343:7-344:16).  That is "unquestionably" the type of information that could "affect, and potentially significantly affect the stock price."  Ex. 3-H at App. 463 (Torchio Dep. Tr. at 332:7-15).

Neither the May 29 or June 11 disclosures, moreover, corrected any misstatement about SCUSA's compliance framework at the time of the IPO.  According to plaintiffs, the offering documents represented that SCUSA's compliance systems were "extensive" and "comprehensive."  Am. Compl. ¶¶ 93, 103.  But the offering documents made no representations about CCAR compliance.  To the contrary, the IPO disclosures about compliance that plaintiffs

rely upon related to state and federal consumer lending laws. *E.g.*, Ex. 3-A at App. 121, 126-27 (Prospectus at 92, 97-98).

In any event, SCUSA's "generalized, positive statements" statements about its compliance program in the offering documents could not have been relied on by a reasonable investor and are therefore not actionable as a matter of law. *Southland Sec. Corp.* v. *INSpire Ins. Sols. Inc.*, 365 F.3d 353, 372 (5th Cir. 2004).[13] This principle has been repeatedly applied to companies' general statements about compliance or risk management processes, which are not "sufficiently specific for an investor to reasonably rely on" as a matter of law. *E.g.*, *Ind. Pub. Ret. Sys.* v. *SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016); *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 185-86 (2d Cir. 2014). Because the alleged compliance misstatements are not the "type of fraud on which an efficient market may be presumed to rely," they cannot support class certification under the fraud-on-the-market theory. *Regents of Univ. of Cal.* v. *Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 385-86 (5th Cir. 2007).[14]

> **B. Plaintiffs have not established that damages can be proven on a class-wide basis.**

Even if class-wide reliance may be presumed, plaintiffs have still failed to establish that common issues predominate as they have not advanced, and cannot advance, any proof that damages may be determined on a class-wide basis. This failure to come forward with evidence on class-wide damages is dispositive, and bars certification of this action as a class action.

---

[13] *See also Hopson* v. *MetroPCS Commc'ns, Inc.*, 2011 WL 1119727, at *19 (N.D. Tex. Mar. 25, 2011); *Congregation of Ezra Sholom* v. *Blockbuster, Inc.*, 504 F. Supp. 2d 151, 162 (N.D. Tex. 2007).

[14] SCUSA previously argued that the challenged statements about SCUSA's compliance program were neither false nor material. Dkt. No. 106 at 19, 21-22. While this Court denied defendants' motions to dismiss, the Court now can consider factual information during the certification phase. When reviewing *what* impact these statements had on SCUSA's price, it is entirely appropriate for this Court to consider *why* they did (or did not) have an impact. *See generally Halliburton Co.* v. *Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2414 (2014).

In *Comcast Corp.* v. *Behrend*, the U.S. Supreme Court held that to certify a class, the plaintiff would have to offer proof that damages were "capable of measurement on a classwide basis," and that the damages methodology proposed by plaintiff would "measure only those damages attributable" to their theory of liability.  133 S. Ct. 1426, 1433 (2013).  Although plaintiffs in *Comcast* presented an expert's model that purported to measure class-wide damages, the Supreme Court found that the model failed the test because it did not isolate damages attributable to the lone theory of antitrust impact susceptible to class-wide determination.  *Id.* at 1434-35.  As a result, the Supreme Court held that the class had been "improperly certified under Rule 23(b)(3)" because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class."  *Id.* at 1433.

In a recent decision applying *Comcast*, the Fifth Circuit affirmed the district court's decision granting certification of a proposed Section 10(b) class and denying certification of another Section 10(b) class.  *Ludlow* v. *BP, P.L.C.*, 800 F.3d 674, 691 (5th Cir. 2015), *cert. denied*, 136 S. Ct. 1824 (2016).  *BP* involved two distinct sets of alleged misrepresentations involving the BP oil spill:  one involving BP's pre-spill safety procedures and the other involving the spill itself.  In reviewing the district court's decision, the Fifth Circuit began by citing *Comcast* and observing that, "in order to certify a class, the damages methodology must be sound and must produce commonality of damages."  *Id.* at 683 (quotation marks and alterations omitted).  The Fifth Circuit then engaged in a careful analysis of plaintiffs' proposed damages model, and ultimately agreed with the district court that the model worked for the post-spill claims but not for the pre-spill claims.  *Id.* at 683-91.  The court found that the pre-spill claims involved a so-called "materialization of the risk" theory that was not capable of class-wide determination because it hinged on an individualized "determination that each plaintiff would not have bought BP stock *at all* were it not for the alleged misrepresentations."  *Id.* at 689-90

(emphasis in original).  Although the plaintiffs contended that the fraud-on-the-market presumption of reliance rendered such individualized inquiries unnecessary, the court held that the presumption was irrelevant to the issues of causation and damages.  *Id.* at 691.

Under *Comcast* and *BP*, plaintiffs' proposed Exchange Act class cannot be certified because plaintiffs have offered no proof whatsoever that damages can be determined on a class-wide basis.  This Court is unable to engage in the "rigorous analysis" performed by the Fifth Circuit in *BP* because plaintiffs have failed to offer *any* proposed model on damages, let alone one that would establish that damages are "capable of measurement on a classwide basis." *Comcast*, 133 S. Ct. at 1433.  Because *Comcast* and *BP* leave no room for plaintiffs to abdicate their affirmative burden to explain how damages factor into their proposed class action, plaintiffs' failure of proof warrants denial of certification.  *See Comcast*, 133 S. Ct. at 1432-33; *BP*, 800 F.3d at 683; *see also Turnbow* v. *Life Partners, Inc.*, 2013 WL 3479884, at *15-18 (N.D. Tex. July 9, 2013).[15]  In the words of the D.C. Circuit, "[n]o damages model, no predominance, no class certification."  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013).

Plaintiffs' failure to address damages is particularly egregious given that they assert a materialization-of-the-risk theory on all fours with *BP*.  As discussed above, the crux of plaintiffs' theory is that SCUSA's stock traded at an artificially inflated price during the class period because SCUSA failed to disclose the potential impact of the CCAR process on SCUSA's

---

[15]   While *Comcast* does not go so far as to say that individualized damages issues *automatically* defeat class certification, the Fifth Circuit has repeatedly acknowledged that individualized damages issues may defeat predominance.  *Ibe* v. *Jones*, 836 F.3d 516, 529 (5th Cir. 2016); *Bell Atl.*, 339 F.3d at 307; *O'Sullivan*, 319 F.3d at 744.  Although the Fifth Circuit has held that *Comcast* does not apply where the district court only certifies a settlement class for liability purposes, here, as in *BP*, plaintiffs seek certification of a liability-damages class.  *BP*, 800 F.3d at 683 n.36 (rejecting argument that *Comcast* was inapplicable based on the decision in *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014)).

ability to pay a dividend.  *See, e.g.*, Am. Compl. ¶ 9; Pls.' Br. at 4-5.  Plaintiffs claim to have

suffered losses when that risk materialized — *i.e.*, when, after the IPO, SHUSA failed the stress

test and the Fed prohibited SCUSA from paying dividends.  *See* Am. Compl. ¶¶ 125-26, 289.  As

a result, any class-wide damages model that plaintiffs could present would suffer from the same

defects as the model in *BP*.  Plaintiffs cannot create a class-wide damages model that accounts

for different investors' risk tolerances regarding dividends and the different prices those investors

would have paid for SCUSA stock had they known of the risk.

*          *          *

The proposed Exchange Act class cannot be certified because individualized issues of

reliance and damages bar a finding of predominance of common questions.

**IV.**     **Neither class can be certified because plaintiffs have not proven they are adequate
class representatives whose claims are typical.**

    **A.**     **Plaintiffs are not typical class representatives.**

The typicality requirement protects absent class members from representation by a

plaintiff who may become preoccupied or distracted with a defense applicable only to himself.

*Warren* v. *Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984).  "Where unique defenses

against a named plaintiff exist, the Court must consider the potential danger that the attention to

this individual defense might harm the class."  *Zachery* v. *Texaco Exploration & Prod., Inc.*, 185

F.R.D. 230, 240 (W.D. Tex. 1999).  Courts in this circuit have concluded that certification should

be denied where, as here "a class representative is subject to unique defenses that threaten to

become the focus of the litigation."  *Lehocky* v. *Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D.

Tex. 2004); *accord Seeligson*, 2017 WL 68013, at *8; *City of San Antonio* v. *Hotels.com*, 2008

WL 2486043, at *6 (W.D. Tex. May 27, 2008).

### 1.     Deka is subject to unique defenses.

Deka's legal and factual position is markedly differently from that of other class members.  It is subject to several unique defenses, each of which make it an atypical plaintiff.

*First*, Deka has not demonstrated that it has standing to represent the funds it manages.  Deka purports to bring suit on behalf of 33 different funds, and the investors in those funds, based solely on unspecified provisions of German law.  Deka has represented in its court filings that it is organized as a Kapitalverwaltungsgesellschaft ("KVG") under German law and that unspecified provisions of the "Kapitalanlagegesetzbuch," or German investment law, grant it the right to "bring legal claims, in its own name" on behalf of the funds it manages.  *See, e.g.*, Dkt. No. 19-2 ¶ 2 (Deka PSLRA Cert.).  These assertions — which are unsupported by any expert opinion on German law, or even a citation to any particular provision of German law — "raise[] complex and novel issues" concerning Deka's standing to bring suit, "which would require extensive factual and foreign legal analysis" to resolve.  *Baydale* v. *Am. Exp. Co.*, 2009 WL 2603140, at *3 (S.D.N.Y. Aug. 14, 2009) (declining to appoint Swedish fund manager as lead plaintiff because it was subject to unique standing defense).

As Dearborn argued over two years ago in opposing Deka's motion to be appointed lead plaintiff in this case, "the true scope of Deka's authority is an issue unique to Deka."  Dkt. No. 28 at 4-5.  Litigating this unique defense will create a "needless . . . sideshow," *Baydale*, 2009 WL 2603140, at *3, that would "prejudice the class," *Pipefitters Local No. 636 Defined Ben. Plan* v. *Bank of Am. Corp.*, 275 F.R.D. 187, 191 (S.D.N.Y. 2011) (declining to appoint foreign fund manager as lead plaintiff because it was subject to unique standing defense).

*Second*, Deka is also subject to a unique challenge on res judicata grounds.  Deka has provided no evidence that a German court would recognize this Court's judgment.  Deka should therefore be excluded from the class, along with other foreign purchasers.  *See Ansari* v. *N.Y.*

*Univ.*, 179 F.R.D. 112, 117 (S.D.N.Y. 1998) (denying certification where foreign plaintiff presented no evidence of preclusive effect of class action judgment in home country).  As with the standing defense, Dearborn was alert to this issue years ago, arguing that res judicata issues unique to Deka precluded its appointment as lead plaintiff in this case.  *See* Dkt. No. 28 at 6.  In fact, Deka has previously been denied lead plaintiff status for this very reason.  *See Borochoff* v. *Glaxosmithkline PLC*, 246 F.R.D. 201, 203 (S.D.N.Y. 2007).  Faced with identical res judicata concerns, this Court has concluded that foreign plaintiffs like Deka are not typical or adequate representatives of the class where they "might be plagued with res judicata issues" that would "jeopardize[ ] the interests of the entire class."  *Buettgen* v. *Harless*, 263 F.R.D. 378, 383 (N.D. Tex. 2009) (Kinkeade, J.) (rejecting a Swiss entity as a proposed securities fraud class representative on res judicata grounds).[16]

    *Third*, Deka's claims are not typical because it seeks to recover on behalf of 33 different funds ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████ Dkt. No. 19-2 at Sched. A.  If a class is certified, it is therefore inevitable that substantial time and energy will be devoted to ████ ████████████████████████████████████████████ Moreover, each of the funds may themselves be subject to individualized defenses.  For example, more than half of Deka's funds sold shares at a profit within the first two days of trading, three-quarters of Deka's funds sold prior to the first alleged corrective disclosure, ██████████████████ ████████████████████████████████████████████ only one fund sold after the May 29 disclosure regarding dividends, and at least two funds continued to

---

[16]   Notably, the foreign entities in *Borochoff* and *Buettgen* were found to be atypical at the lead plaintiff stage, where the typicality inquiry "is not as searching as would follow a motion for class certification."  *Buettgen*, 263 F.R.D. at 381.

purchase SCUSA stock after the last alleged corrective disclosure.  In short, Deka is effectively

bringing 33 individual claims that would require 33 individual trials to resolve.  The unique and

varied facts applicable to each fund will "threaten to become the focus of the litigation" and

cause Deka to be "preoccupied" with issues relevant only to itself.  *Lehocky*, 220 F.R.D. at 500.

 *Finally*, Deka is subject to a unique statute of limitations defense. 

 And Deka was represented

by securities counsel more than a year before it filed the Amended Complaint, which changed the

theory of liability from subprime lending to dividends. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See,*

*e.g.*, *Franze* v. *Equitable Assurance*, 296 F.3d 1250, 1254 (11th Cir. 2002) ("a class

representative whose claim is time-barred cannot assert the claim on behalf of the class"); *In re*

*U.S. Healthcare, Inc. Sec. Litig.*, 1988 WL 102671, at *3-4 (E.D. Pa. Sept. 29, 1988) (plaintiffs

atypical where "[d]eposition testimony . . . suggest[ed] a basis for a viable statute of limitations

defense").[17]

### 2. Dearborn is subject to unique defenses.

 Dearborn is also subject to multiple unique defenses, each of which, standing alone,

makes it an atypical plaintiff.

 *First*, Dearborn is subject to a unique defense because ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ According to plaintiffs, "[t]his case is about

fundamental expectations every investor in a public company has – dividend payments and

compliance."  Am. Compl. ¶ 4.  But Dearborn ▮▮▮▮▮▮▮▮▮▮▮ instructed

its investment advisors to pursue a growth strategy. ▮▮▮▮▮▮▮▮▮▮

---

[17] *See also Leroy* v. *Paytel III Mgmt. Assocs., Inc.*, 1992 WL 367090, at *2-3 (S.D.N.Y. Nov. 24, 1992); *Auto Ventures, Inc.* v. *Moran*, 1997 WL 306895, at *5 (S.D. Fla. Apr. 3, 1997).

██████████ Ex. 3-F at App. 328-29, 332 (Sansoterra Dep. Tr. at 26:16-27:12, 31:16-32:10, 44:10-21).  Indeed, Dearborn's investment advisors testified that when investing in SCUSA — both for Dearborn and for other putative class members — dividends were "completely irrelevant."  Ex. 3-F at App. 332, 344, 355 (Sansoterra Dep. Tr. at 44:10-21, 90:8-10, 133:1-12, 135:24-136:11); ████████████████████████████

████████████████████

That admission should be completely disqualifying.  ████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████ These admissions subject Dearborn to a unique defense, rebut any presumption of reliance, and render Dearborn atypical of the proposed classes.  *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455-56 (S.D. Tex. 2002); *Degulis* v. *LXR Biotechnology, Inc.*, 176 F.R.D. 123, 126 (S.D.N.Y. 1997); *Koenig* v. *Benson*, 117 F.R.D. 330, 335-36 (E.D.N.Y. 1987).

*Second*, for the same reasons discussed above as to Deka, Dearborn is subject to a unique statute of limitations defense.  ████████████████████

████████████████████████████

████████████████████ signed a PSLRA certification on October 17, and appeared in the case in October 27.  Ex. 3-S at App. 825-27; ████████████

████ Dkt. No. 22-1; Dkt. No. 20.  ████████████████████

████████████████████████

████████████████████████████

████████████████████████████████████████████████

███████████████████████████

### B.    Plaintiffs have not proven that they are controlling this litigation and monitoring their counsel.

Plaintiffs must prove that they will "fairly and adequately protect the interests of the class," FED. R. CIV. P. 23(a)(4), by showing a "willingness and ability . . . to take an active role in and control the litigation," *Berger* v. *Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001). "Adequacy is for the plaintiffs to demonstrate; it is not up to the defendants to disprove the presumption of adequacy." *Id.* at 481; *see Stirman* v. *Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002). The Fifth Circuit has made clear that the PSLRA "raises the standard adequacy threshold" and constitutes an "emphatic command that competent plaintiffs, rather than lawyers," direct securities class actions. *Berger*, 257 F.3d at 483-84. Plaintiffs must therefore "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation" and their "understanding should not be limited to derivative knowledge acquired solely from counsel." *Id.* at 482-83 & n.18.

Among the factors that courts have emphasized in finding proposed class representatives inadequate are:

- Relying solely on a declaration from the proposed class representative to attempt to prove adequacy. *In re Kosmos*, 299 F.R.D.at 146-47; *Karnes* v. *Fleming*, 2008 WL 4528223, at *3 (S.D. Tex. July 31, 2008).

- No meaningful review of or contribution to the complaint. *In re Enron*, 529 F. Supp. 2d at 733; *Krim*, 210 F.R.D. at 588.

- Failure to oversee the work of counsel or participate in key strategic decisions. *E.g.*, *In re Enron*, 529 F. Supp. 2d at 733; *Ogden* v. *AmeriCredit Corp.*, 225 F.R.D. 529, 535 (N.D. Tex. 2005).

- Knowledge of the case derived almost exclusively from counsel. *In re Kosmos*, 299 F.R.D. at 146; *Karnes*, 2008 WL 4528223, at *3; *In re Enron*, 529 F. Supp. 2d at 732.

- Having a close affiliation with the plaintiffs' firm bringing the class action, indicating that the suit is lawyer-driven. *In re Kosmos*, 299 F.R.D. at 148-49.

Here, the proposed class representatives are inadequate based on the above criteria.

Plaintiffs' only evidence in support of their alleged adequacy are boilerplate declarations that do not meaningfully differ from the declaration that Judge Boyle found flatly insufficient in *Kosmos*. *Compare* Pls.' App. at 363-68 (plaintiffs' declarations in support of certification) *with In re Kosmos*, 299 F.R.D. at 142 n.64, 150 (providing text of declaration and finding that plaintiff's "minimal evidence of its adequacy — consisting entirely of a written sworn statement replete with boiler-plate assertions . . . — does not accomplish the task").

The evidentiary record also refutes plaintiffs' conclusory claims of adequacy. ███



which is fundamentally inconsistent with Rule 23(a)(4) and "Congress's emphatic command that competent plaintiffs, rather than lawyers," direct class actions, *Berger*, 257 F.3d at 484.

### V.     Plaintiffs' proposed class definitions are unsupportable.

For the reasons set forth above, no class should be certified.  But if the Court disagrees, it should not accept plaintiffs' proposed class definitions, which are grossly overbroad.  First, as discussed above, under Fifth Circuit law, aftermarket purchasers cannot be included in any Securities Act class because of tracing issues.  Second, any Exchange Act class cannot start until March 4 at the earliest because, as discussed above, the absence of an efficient market during the quiet period means that individual reliance issues predominate.  Third, no class should include

persons who sold their shares prior to May 29, 2014, the first statistically significant alleged corrective disclosure.  As numerous courts have recognized, "in-and-out traders" who sell before the first alleged corrective disclosure must be excluded from any Exchange Act class.  *E.g.*, *In re Comverse Tech., Inc. Sec. Litig.*, 2007 WL 680779, at *7 (E.D.N.Y. Mar. 2, 2007); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 719-20 (S.D. Tex. 2006).  The same is true for any Securities Act class because losses on shares sold prior to May 29 do "not constitute a loss actionable under the 1933 Act because [they] could not have been caused by misstatements which had not yet been revealed."  *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 254 (S.D.N.Y. 2003).

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs' Motion for Class Certification should be denied.

Dated:  February 17, 2017                     Respectfully Submitted,


                                              *s/ R. Thaddeus Behrens*
                                              R. Thaddeus Behrens
                                              Texas Bar No. 24029440
                                              thad.behrens@haynesboone.com
                                              Daniel H. Gold
                                              Texas Bar No. 24053230
                                              daniel.gold@haynesboone.com
                                              Matthew A. McGee
                                              Texas Bar No. 24062527
                                              matt.mcgee@haynesboone.com
                                              HAYNES AND BOONE, LLP
                                              2323 Victory Avenue, Suite 700
                                              Dallas, TX  75219
                                              214-651-5000 (telephone)
                                              214-200-0886 (facsimile)

                                              Stephen R. DiPrima (*pro hac vice*)
                                              SRDiPrima@wlrk.com
                                              David B. Anders (*pro hac vice*)
                                              DBAnders@wlrk.com
                                              Caitlin A. Donovan (*pro hac vice*)
                                              CADonovan@wlrk.com
                                              Nathaniel D. Cullerton (*pro hac vice*)
                                              NDCullerton@wlrk.com
                                              Corey Jared Banks (*pro hac vice*)
                                              CJBanks@wlrk.com
                                              WACHTELL, LIPTON, ROSEN & KATZ
                                              51 West 52nd Street
                                              New York, NY  10019
                                              212-403-1000 (telephone)
                                              212-403-2000 (facsimile)

                                              *Attorneys for Defendants Santander Consumer
                                              USA Holdings Inc., Thomas G. Dundon, Jason
                                              A. Kulas, Gonzalo de Las Heras, Alberto
                                              Sánchez, Matthew Kabaker, Tagar C. Olson,
                                              Daniel Zilberman, Javier San Felix, Roman
                                              Blanco, Stephen A. Ferriss, Juan Carlos
                                              Alvarez, and Juan Andres Yanes*

                                        s/  Noelle M. Reed
*Of Counsel*                            Noelle M. Reed
Jay B. Kasner                           Texas Bar No. 24044211
*(Admitted Pro Hac Vice)*               noelle.reed@skadden.com
jay.kasner@skadden.com                  Skadden, Arps, Slate,
Susan L. Saltzstein                         Meagher & Flom LLP
*(Admitted Pro Hac Vice)*               1000 Louisiana, Suite 6800
susan.saltzstein@skadden.com            Houston, Texas 77002
Skadden, Arps, Slate,                   Telephone: (713) 655-5122
    Meagher & Flom LLP                  Facsimile: (713) 483-9122
Four Times Square
New York, New York 10036-6518           Michelle L. Davis
Telephone: (212) 735-3000               Texas Bar No. 24038854
Facsimile: (212) 735-2000               michelle.davis@skadden.com
                                        Skadden, Arps, Slate,
                                           Meagher & Flom LLP
                                        2521 Springer Road
                                        Midlothian, Texas 76065
                                        Telephone: (972) 723-6370
                                        Facsimile: (713) 483-9197

                                         *Attorneys for the Underwriter Defendants*
                                         *Citigroup Global Markets Inc., J.P. Morgan*
                                         *Securities LLC, Merrill Lynch, Pierce, Fenner &*
                                         *Smith Incorporated, Deutsche Bank Securities*
                                         *Inc., Santander Investment Securities Inc.,*
                                         *Barclays Capital Inc., Goldman, Sachs & Co.,*
                                         *Morgan Stanley & Co. LLC, RBC Capital*
                                         *Markets, LLC, BMO Capital Markets Corp.,*
                                         *Credit Suisse Securities (USA) LLC, UBS*
                                         *Securities LLC, Wells Fargo Securities, LLC, KKR*
                                         *Capital Markets LLC, Sandler O'Neill & Partners,*
                                         *L.P., Stephens Inc., and LOYAL3 Securities, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served upon its filing via this Court's CM/ECF system on this 17th day of February, 2017 on the individuals listed below:

**KENDALL LAW GROUP LLP**

Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jamie J. McKey
Texas Bar No. 24045262
jmckey@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Tel.: (214) 744-3000

**BALON B. BRADLEY LAW FIRM**

Balon B. Bradley
balon@bbradleylaw.com,
anneh@bbradleylaw.com,
balonbb@aol.com,
iasanchez@bbradleylaw.com
5473 Blair Rd. Suite 100
Dallas, TX 75231
Tel.: (972) 991-1582

*Local Counsel for the Lead Plaintiffs*

**GRANT & EISENHOFER P.A.**

James J. Sabella (*pro hac vice*)
Charles T. Caliendo (*pro hac vice*)
Caitlin M. Moyna (*pro hac vice*)
Jeremy Cole (*pro hac vice*)
485 Lexington Ave., 29th Floor
New York, NY 10017
Tel.: (646) 722-8500

**ROBBINS GELLER RUDMAN & DOWD LLP**

Willow E. Radcliffe (*pro hac vice*)
Nadim G. Hegazi (*pro hac vice*)
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Tel.: (415) 288-4545

Matthew I. Alpert (*pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel.: (619) 231-1058

*Co-Lead Counsel for the Lead Plaintiffs*

 s/ R. Thaddeus Behrens
R. Thaddeus Behrens